UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA,

        - against -                    11 Cr. 623 (JG)

AGRON HASBAJRAMI,

                 Defendant.
--------------------------------------------------X
--------------------------------------------------X
AGRON HASBAJRAMI,

                 Petitioner,

        - against -                    13 Cv. 6852 (JG)

UNITED STATES OF AMERICA,

                 Respondent.
--------------------------------------------------X

# DEFENDANT/PETITIONER AGRON HASBAJRAMI'S MOTION FOR DISCOVERY AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF

STEVE ZISSOU, ESQ.          MICHAEL K. BACHRACH, ESQ.
42-40 Bell Blvd., Suite 302     276 Fifth Avenue, Suite 501
Bayside, New York 11361      New York, New York 10001
(718) 279-4500             (212) 929-0592

*Attorneys for Defendant/Petitioner Agron Hasbajrami*

## **Table of Contents**

Table of Authorities ....................................................................... iv

Introduction ....................................................................................... 1

Motion ................................................................................................ 8

       MOTION FOR DISCOVERY OF MATERIAL AND
INFORMATION NECESSARY TO DETERMINE
WHETHER THE GOVERNMENT'S SUPPRESSION OF
EVIDENCE TAINTED THE KNOWING AND
VOLUNTARY NATURE OF HASBAJRAMI'S GUILTY
PLEA ................................................................................................ 8

Argument ......................................................................................... 10

I.     Because the Government violated  a mandatory notice
obligation  to the Court  and to the defense, the starting point
for this Court's  discovery order should be disclosure of the
circumstances behind the violation of the requirement of
pretrial notice under 50 U.S.C. § 1806(c). ........................................ 10

     A.    The mandatory language of 50 U.S.C. § 1806(c) required
the Government to provide notice of the use of material
derived from FAA surveillance *prior to* entry of a guilty
plea. ..................................................................................... 11

     B.    Representations to the Supreme Court that led to the late
notice establish that the Government's suppression of
discoverable information here was knowing and
intentional............................................................................. 15

     C.    The circumstances behind the Government's violation of
the notice statute are relevant to forthcoming defense
motions regarding remedy: the vacating of Hasbajrami's
guilty plea, suppression, and dismissal of any new trial.......... 21

     D.    Discovery is needed to determine an appropriate remedy
for the violation of the notice requirement in this case............ 23

II.     In order to determine whether Hasbajrami's guilty pleas was
        knowingly and voluntarily entered into, this Court will need to
        determine the extent to which the products of unlawful activity
        influenced Hasbajrami's decision to plead guilty. ............................ 27

        A.     Disclosure of the factual bases for the notice violation in
               this case is necessary to deter future unlawful conduct. .......... 28

        B.     The details of the FAA electronic surveillance should be
               produced because motions based on the FAA's
               unconstitutionality and the scope of authorized
               surveillance require full factual development. ......................... 30

        C.     This Court should order the production of all material
               relating to the Government's seizure and accessing of
               internet and telephone metadata in this case. ........................... 36

        D.     This Court should order the Government to produce
               material relevant to the application of secret surveillance
               programs to this case. ............................................................... 40

III.    This Court's discovery order should direct disclosure to
        security-cleared counsel and full defense participation in
        adversary proceedings regarding the lawfulness of the
        Government's surveillance activities because the balance of
        interests has tilted sharply toward transparency and inclusion of
        both parties in all litigation. ................................................................ 42

        A.     The complexity and the need for accurate factual
               determinations strongly support full defense access to
               surveillance material and advocacy regarding its
               significance. .............................................................................. 42

        B.     The balance of the factors this court considers in
               determining defense participation requires full defense
               access and advocacy. ................................................................ 46

               1.     The need for secrecy has been reduced by the
                      Edward Snowden disclosures. ....................................... 46

2.     The benefits of adversarial proceedings are recognized by the President's Review Group............... 47

3.     The complexity of the legal issues warrants defense participation. .................................................... 50

4.     The presumably voluminous factual materials favor defense participation. ........................................... 53

5.     Congress anticipated that evidence of misrepresentation would favor disclosure and defense participation. .................................................... 56

IV.   This Court should grant the broadest discovery because litigation regarding the lawfulness of governmental surveillance activity accomplishes important societal purposes of transparency and deterrence. .............................................. 65

V.    The "arm of the prosecution" for purposes of discovery extends beyond the specific Eastern District of New York prosecutors assigned to this case........................................................... 66

VI.   The waivers contained in Hasbajrami's plea agreement are unenforceable given the institutional complicity in the FAA notice omission, and the impact such omission has on Hasbajrami's Constitutional protections. ........................................... 69

Conclusion ............................................................................... 72

## Table of Authorities

CASES

[Case Name Redacted],
No. [docket number redacted],
2011 WL 10945618 (FISC Oct. 3, 2011) ..................................... 58, 61

[Case Name Redacted],
PR/TT No. [docket redacted] (FISC [date redacted])
(available at <http:// www.dni.gov/files/documents/1118/
CLEANEDPRTT%202.pdf>) ........................................................... 35

ACLU v. Clapper,
Docket No. 13 Civ. 3994,
2013 WL 6819708 (SDNY Dec. 27, 2013)....................................... 51

ACLU Foundation of S.Cal. v. Barr,
952 F.2d 457 (D.C.Cir. 1991) ........................................................ 42

Alabama v. Bozeman,
533 U.S. 146 (2001) ....................................................................... 12

Alderman v. United States,
394 U.S.165 (1969) .............................................................. 22, 45, 55

Anderson v. Yungkau,
329 U.S. 482 (1947) ....................................................................... 12

In re All Matters Submitted to the Foreign Intelligence
Surveillance Court,
218 F.Supp.2d 611 (FISC 2002) ..................................................... 62

In re Application of the FBI for an Order Requiring the
Production of Tangible Things from [redacted], No.,
B.R. 09-06 (FISC June 22, 2009) (available at
<http://www.clearinghouse.net/chDocs/public/NS-DC-0013-
0001.pdf>) ......................................................................................... 35

In re Application of the FBI for an Order Requiring the
Production of Tangible Things from [redacted],
Docket No. B.R. 09-13,
2009 WL 9150896 (FISC Sept. 25, 2009) .................................. 36, 61

Brady v. Maryland,
373 U.S. 83 (1963) ..................................................................... *passim*

Clapper v. Amnesty International USA,
133 S.Ct. 1138 (2013) .................................................. 4, 17, 44, 50, 51

Franks v. Delaware,
438 U.S. 154 (1978) ..................................................................... 52, 63

Frederick v. Warden, Lewisburg Correctional Facility,
308 F.3d 192 (2d Cir. 2002) ............................................................... 70

Goldberg v. Kelly,
397 U.S. 254 (1970) .......................................................................... 21

Islamic Shura Council of S.Cal. v. FBI,
779 F.Supp.2d 1114 (C.D.Cal. 2011).................................................. 29

Jencks v. United States,
353 U.S. 657 (1957) .......................................................................... 22

Klayman v. Obama,
Docket No. 13-0851,
2013 WL 6571596 (D.D.C. Dec. 16, 2013) ........................... 37, 38, 51

Kyles v. Whitley,
514 U.S. 419 (1995) .......................................................................... 29

Mathews v. Eldridge,
424 U.S. 319 (1976) .......................................................................... 21

Miller v. Angliker,
848 F.2d 1312 (2d Cir. 1988) ............................................................ 23

Murray v. United States,
487 U.S. 533 (1988) ..................................................................... 14, 52

Nardone v. United States,
308 U.S. 338 (1939) ..................................................................... 14, 53

Panah v. United States,
Docket No. 02 Cr. 147S,
2006 WL 2056728 (WDNY July 21, 2006) ....................................... 70

In re Production of Tangible Things from [redacted],
Docket No. B.R. 08-13,
2009 WL 9150913 (FISC Mar. 2, 2009) ...................................... 35, 61

In re Production of Tangible Things from [redacted],
Docket No. BR 08-13,
2009 WL 9157881 (FISC Jan. 28, 2009) ........................................... 61

Riley v. California,
Docket Nos. 13-132, 13-212,
--- S.Ct. ---, 2014 WL 2864483 (June 25, 2014)............................... 37

Roviaro v. United States,
353 U.S. 53 (1957) ..................................................................... 22, 45

Silverthorne v. United States,
251 U.S. 385 (1920) ........................................................................ 52

Strickler v. Green,
527 U.S. 263 (1999) ........................................................................ 23

Tate v. Wood,
963 F.2d 20 (2d Cir. 1992) ........................................................ 23, 24

United States v. Abu-Jihaad,
630 F.3d 102 (2d Cir. 2010) ........................................ 7, 26, 45, 46, 53

United States v. Aref,
533 F.3d 72 (2d Cir. 2008) ......................................................... 7, 46

United States v. Arevalo,
628 F.3d 93 (2d Cir. 2010) .............................................................. 69

United States v. Avellino,
136 F.3d 249 (2d Cir. 1998) ............................................................ 24

United States v. Awadallah,
349 F.3d 42 (2d Cir. 2003) .............................................................. 63

United States v. Belfield,
692 F.2d 141 (D.C.Cir. 1982) ..................................................... 44, 60

United States v. Coplon,
185 F.2d 629 (2d Cir. 1950) ............................................................ 22

United States v. Coppa,
267 F.3d 132 (2d Cir. 2001) ............................................................ 23

United States v. Djelevic,
161 F.3d 104 (2d Cir. 1998) ............................................................ 70

United States v. El-Mezain,
664 F.3d 467 (5th Cir. 2011) ............................................................. 62

United States v. Ferguson,
758 F.2d 843 (2d Cir. 1985) ............................................................... 57

United States v. Finnerty,
411 F.Supp.2d 428 (SDNY 2006) ...................................................... 67

United States v. Garcia,
166 F.3d 519 (2d Cir. 1999) ............................................................... 69

United States v. Ghailani,
687 F.Supp.2d 365 (SDNY 2010) ...................................................... 67

United States v. Gomez-Perez,
215 F.3d 315 (2d Cir. 2000) ............................................................... 69

United States v. Gupta,
848 F.Supp.2d 491 (SDNY 2012) ................................................. 67, 68

United States v. Hernandez,
242 F.3d 110 (2d Cir. 2001) ............................................................... 70

United States v. Hernandez-Meza,
720 F.3d 760 (9th Cir. 2013) ............................................................. 23

United States v. Jacobson,
15 F.3d 19 (2d Cir. 1994) ................................................................... 70

United States v. Jones,
132 S.Ct. 945 (2012) .......................................................................... 37

United States v. Mahaffy,
693 F.3d 113 (2d Cir. 2012) .................................................. 23, 28, 29

United States v. Mejia,
448 F.3d 436 (D.C.Cir. 2006) ........................................................... 46

United States v. Mohamud,
10 Cr. 475 (KI) (D.Oregon)........................................................... 19, 20

United States v. Muhtorov,
12 Cr. 33 (JLK) (D.Colo.) ............................................................ 19, 20

United States v. Nixon,
418 U.S. 683 (1974) ......................................................................... 50

United States v. Olsen,
737 F.3d 625 (9th Cir. 2013) ....................................................... 28, 29

United States v. Ott,
827 F.2d 473 (9th Cir. 1987) ............................................................ 44

United States v. Pappas,
94 F.3d 795 (2d Cir. 1996) ................................................................. 6

United States v. Persico,
164 F.3d 796 (2d Cir. 1999) .............................................................. 24

United States v. Rajaratnam,
719 F.3d 139 (2d Cir. 2013) ........................................................ 56, 63

United States v. Ready,
82 F.3d 551 (2d Cir. 1996) ............................................................... 70

United States v. Reynolds,
345 U.S. 1 (1953) ............................................................................ 27

United States v. Rivas,
377 F.3d 195 (2d Cir. 2004) .............................................................. 23

United States v. Rosa,
123 F.3d 94 (2d Cir. 1997) ................................................................. 69

United States v. Shakur,
543 F.Supp. 1059 (SDNY 1982) ........................................................ 68

United States v. Stewart,
590 F.3d 93 (2d Cir. 2009) ...................................................... 7, 26, 45

United States v. Upton,
856 F.Supp. 727 (EDNY 1994) ......................................................... 68

United States v. Villa,
Docket No. 12 Cr. 40 (JBA),
2014 WL 280400 (D.Conn. Jan. 24, 2014) ........................................ 67

United States v. Wilson,
571 F.Supp. 1422 (SDNY 1983) .......................................................... 6

United States v. Yemitan,
70 F.3d 746 (2d Cir. 1995) ................................................................. 69

Wong Sun v. United States,
371 U.S. 471 (1963) .................................................................... 14, 53

Youngblood v. West Virginia,
547 U.S. 867 (2006) ........................................................................... 24

STATUTES AND OTHER AUTHORITIES

18 U.S.C. App. 3 .................................................................. 6, 7, 26, 46

28 U.S.C. § 2255 .............................................................. 5, 8, 28, 70

50 U.S.C. § 1801 ........................................................ 11, 12, 17, 32

50 U.S.C. § 1806 ........................................................ *passim*

50 U.S.C. §§ 1801-1812 ............................................ 12, 13

50 U.S.C. §§ 1821-1829 .................................................. 13

50 U.S.C. § 1825 ............................................................ 13

50 U.S.C. § 1842 ...................................................... 38, 39

50 U.S.C. § 1861 .................................................. 38, 39, 40

50 U.S.C. § 1881a.................................................... *passim*

50 U.S.C. §§ 1881a-1881g ............................................. 12

50 U.S.C. § 1881e....................................... 1, 12, 13, 17

Fed.R.Crim.P. 16 ...................................... 8, 21, 28, 67, 68

Fed.R.Crim.P. 33 .......................................... 5, 8, 28, 71

Rule 6, Rules Governing § 2255 Proceedings....................................... 8

Rule 12, Rules Governing § 2255 Proceedings.................................... 8

Fourth Amend., U.S. Const. ........................................ *passim*

Fifth Amend., U.S. Const. .............................. 3, 4, 21, 38, 71

Sixth Amend., U.S. Const. ................................................ 3

158 Cong. Rec. S8393 (daily ed. Dec. 27, 2012).............................. 18

S.Rep.No. 95-701 (1978)............................................. 44, 56

S. Kris & J. Douglas Wilson, <u>National Security Investigations</u> <u>& Prosecutions</u> (2012 ed.) .................................................................. 54

*The President's Review Group on Intelligence and Communications Technologies, Liberty and Security in a Changing World*, (Dec. 12, 2013) (available at < http://www.whitehouse.gov /sites/default/files/docs/2013-12-12_rg_final_report.pdf>) ............................................................ 48, 52

Press Release, *DNI Declassifies Intelligence Community Documents Regarding Collection Under Section 702 of the Foreign Intelligence Surveillance Act (FISA)* (Aug. 21, 2013) (available at <http://www.dni.gov/index.php/newsroom/press-releases/191-press-releases-2013/915-dni-declassifies-intelligence-community-documents-regarding-collection-under-section-702-of-the-foreign-intelligence-surveillance-act-fisa>). ....... 32

Letter from the Office of the DNI to Senator Ron Wyden, dated, July 20, 2012, available at <http://www.wired.com/images_blogs/dangerroom/2012/07/2012-07-20-OLA-Ltr-to-Senator-Wyden-ref-Declassification-Request.pdf> .......................................................... 33

James Ball, *NSA stores metadata of millions of web users for up to a year, secret files show*, The Guardian, Sept. 30, 2013 ................ 38

Kimberly Dozier, *Clapper Apologizes For "Erroneous" Answer On NSA*, Associated Press, July 2, 2013 ............................... 58

Jennifer Granick, *FISA Amendments Act Is Way Worse for Privacy Than Title III*, Center for Internet and Society of Stanford Law School, Nov. 13, 2012 (available at <http://cyberlaw.stanford.edu/blog/2012/11/fisa-amendments-act-way-worse-privacy-title-iii>) ..................................................................... 53

Glenn Greenwald, *NSA collecting phone records of millions of Verizon customers daily*, The Guardian, June 5, 2013 ...................... 36

Glenn Greenwald & Ewen MacAskill, *NSA Prism program taps in to user data of Apple, Google and others*, The Guardian, June 6, 2013 ....................................................................... 36

Glenn Greenwald & James Ball, *The top secret rules that allow NSA to use US data without a warrant*, The Guardian, June 20, 2013 ................................................................. 32, 34

Glenn Greenwald, et al., *Top-Secret Document Reveals NSA Spied On Porn Habits As Part Of Plan To Discredit 'Radicalizers,'* Huffington Post, Dec. 2, 2013 ................................... 41

Sari Horwitz, *Justice is Reviewing Criminal Cases that Used Surveillance Evidence Gathered under FISA*, Wash. Post, Nov. 15, 2013 ..................................................................... 19

Adam Liptak, *A Secret Surveillance Program Proves Challengeable in Theory Only*, N.Y. Times, July 15, 2013 ............... 18

Ryan Lizza, *State of Deception*, The New Yorker, Dec. 16, 2013 .................................................. 57, 58

Ewen MacAskill, et al., *GCHQ taps fibre-optic cables for secret access to world's communications*, The Guardian, June 21, 2013 ..................................................................... 39

Mark Mazzetti & Justin Elliott, *Spies Infiltrate a Fantasy Realm of Online Games*, N.Y. Times, Dec. 9, 2013 .......................... 41

Mollie Reilly, *James Clapper: I Gave 'Least Untruthful' Answer Possible On NSA Surveillance*, Huffington Post, June 11, 2013 ..................................................................... 57

James Risen & Laura Poitras, *N.S.A. Gathers Data on Social Connections of U.S. Citizens*, N.Y. Times, Sept. 28, 2013 ............... 37

Charlie Savage, *N.S.A. Said to Search Content of Messages To and From U.S.*, N.Y. Times, Aug. 8, 2013 ........................................ 33

Charlie Savage, *Door May Open for Challenge to Secret Wiretaps*, N.Y. Times, Oct. 16, 2013 .................................................. 18

Charlie Savage, *Warrantless Surveillance Continues to Cause Fallout*, N.Y. Times, Nov. 20, 2013.................................................. 19

John Shiffman & Kristina Cooke, *U.S. directs agents to cover up program used to investigate Americans*, Reuters, Aug. 5, 2013 ........................................................................ 64

Craig Timberg & Ellen Nakashima, *FBI's search for 'Mo,' suspect in bomb threats, highlights use of malware for surveillance*, Wash. Post, Dec. 6, 2013 ............................................... 41

Jennifer Valentino-DeVries & Danny Yadron, *FBI Taps Hacker Tactics to Spy on Suspects*, Wall St. J., Aug 3, 2013 ............ 41

## **Introduction**

On February 24, 2014, the Government provided the defendant/petitioner, Agron Hasbajrami, with notice, post-sentencing and for the very first time, that "pursuant to 50 U.S.C. §§ 1806(c) and 1881e(a), the government intended to offer into evidence or otherwise use or disclose in proceedings [related to the defendant's prosecution] information derived from acquisition of foreign intelligence information conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 ["FISA"], as amended, 50 U.S.C. § 1881a" (*ecf* #65 at 1, filed under 11 Cr. 623 [S-1] [JG]) (emphasis added). More specifically, the Government's post-sentencing notice alerted the defendant for the very first time "that certain evidence and information, obtained or derived from Title I or III FISA collection, that the government intended to offer into evidence or otherwise use or disclose in proceedings in this case was derived from acquisition of foreign intelligence information conducted pursuant to [the FISA Amendments Act ("FAA")]," i.e., warrantless FISA surveillance targeting the communications of non-U.S. persons located outside of the United States.

Although the Government's notice purported to be pursuant to 50 U.S.C.§ 1806(c), that statute specifically requires that notice be provided "prior to trial, hearing, or other proceeding or at a reasonable time prior to an

effort to so disclose or so use that information or submit it in evidence" (emphasis added), which unquestionably did not occur here.  Even though the Government originally provided notice in 2011 that Titles I and III of FISA had been relied upon (see Gov't FISA Notice, dated, September 13, 2011 [*ecf* #9]), said notice made absolutely no reference to the FAA (e.g., 50 U.S.C. § 1881a), and as such the Government did not in fact provide timely notice to the defense or – presumably – to this Court of the information presently in question, notwithstanding the fact that the information was favorable to the defense and could have foreseeably impacted Hasbajrami's decision to plead guilty rather than exercise his Constitutional right to trial.

As a result, the Government's February 24, 2014, notice raises a wide range of serious issues regarding suppression of unlawfully or unconstitutionally obtained evidence, dismissal or other sanctions based on the Government's intentional violation of governing rules, and, at an absolute minimum, the vacation of Hasbajrami's conviction and sentence based upon the affect the Government's omission had on the knowing and voluntary nature of his guilty plea.

On April 25, 2014, pursuant to a briefing schedule negotiated between the parties and approved by this Court, the defense filed a written discovery demand seeking discovery necessary to effectively advance a claim that

Hasbajrami's guilty plea was not knowingly and voluntarily entered into in light of the information referenced in the Government's untimely February 24, 2014 notice.

On May 22, 2014, again pursuant to the briefing schedule negotiated between the parties and approved by this Court, the Government responded by refusing to comply with the demand, asserting the misplaced conclusion that Hasbajrami's ability to challenge the validity of his guilty plea was waived for all purposes – a conclusion that is legally flawed and  would be against public policy and against the Fourth, Fifth, and Sixth Amendments to enforce.

As will be explained below, the Government's pre-plea omission violated the notice provisions of the FAA.  Further, as a result of the Government's belated notice that "that certain evidence and information" disclosed to the defense prior to the entry of his guilty plea – and relied upon in the defendant's decision to enter said plea – "was derived from acquisition of foreign intelligence information conducted pursuant to [the FAA]" (i.e., warrantless FISA surveillance), at least three areas of legal challenge arise:

> (1)  **Whether the FAA is unconstitutional on its face and as applied.**  Before the notice was provided, Hasbajrami did not know he was an "aggrieved party" with standing to challenge the constitutionality of the FAA, because he did not know that

this statute was used to gather information about him. See Clapper v. Amnesty Int'l USA, 133 S.Ct. 1138, 1154-55 (2013) (plaintiff did not have standing to challenge the FAA's constitutionality, but a person charged in a criminal case who received notice could do so).   Now that Hasbajrami has been notified that he was in fact an "aggrieved party", he wishes to exercise his Fourth and Fifth Amendment rights to raise Constitutional challenges to the statute.  Discovery on precisely how the statute has been applied is therefore required in advance of that pleading in order to allow the arguments to be based on facts rather than speculation.

(2) **Whether the Government complied with statutory requirements of the FAA.** Even if Constitutional, surveillance under the FAA may have been unlawful – and the fruits subject to suppression – if the Government failed to follow the strict procedural requirements of the statute.  Discovery is required concerning the specific procedures (e.g., "targeting" and "minimization") in place at the time of the surveillance of Hasbajrami, the Government's compliance with those procedures, and other factual issues, including access to and analysis of the information captured under the FAA. Any assurances of local prosecutors that "all procedures were followed" should not be considered sufficient in this case, given the recent disclosures of National Security Agency ("NSA") wrong-doing, including recently declassified Foreign Intelligence Surveillance Court ("FISC") opinions and statements from the Executive Branch that some of the procedures in effect during the time of surveillance on Hasbajrami were either not followed or were unconstitutional.

(3) **Whether the withheld surveillance evidence tainted Hasbajrami's decision to plead guilty, and what consequences should flow from the intentional withholding of such evidence.**   The new notice that the Government engaged in surveillance of Hasbajrami under the FAA requires reconsideration of the knowing and voluntary nature of Hasbajrami's guilty plea.   The defense relied upon the Government's prior representation that only Title I and Title III of FISA was implicated in this case, and the reasonable

4

conclusion that the lack of FAA notice meant that the FAA was not relied upon during the investigation or prosecution of this case. Now that public disclosures of government surveillance programs, along with the notice in this case, conclusively establish that the Government possessed more information than it produced or gave notice of, the knowing and voluntary nature of Hasbajrami's decision to plead guilty, and the effect of the withheld material on that decision, must be revisited. Discovery is necessary first, however, to establish what information the Government possessed at the time, how the information was obtained, and how that information was accessed and used.

As set out in detail below, broad discovery on these topics in advance of Hasbajrami's motions to vacate his conviction and sentence pursuant to Rule 33 and/or Section 2255, is essential and necessary so that Hasbajrami, as an "aggrieved party", can be placed in a position to provide this Court with the full factual context in which these legal issues arise. However, discovery is also necessary so that counsel can effectively advise Hasbajrami whether or not it is in his interest to vacate his conviction and sentence in the first place.

At present, the information disclosed to the defense is confined to the Government's February 24, 2014 letter. Said information is scant at best: "certain evidence and information, obtained or derived from Title I or III FISA collection, that the government intended to offer into evidence or otherwise use or disclose in proceedings in this case was derived from acquisition of foreign intelligence information conducted pursuant to the

FAA" (Gov't February 24, 2014, letter at 1 [*ecf* #65]) (emphasis added). Without further explanation or discovery defense counsel cannot adequately determine what evidence, if any, would remain *even after* suppression of the derivative fruits of the Government's misconduct had been ordered.   As a result, discovery is also necessary to ensure that counsel does not advise Hasbajrami to pursue a course of conduct that could ultimately leave him worse off than he is at present (i.e., convicted after trial of more counts than agreed to in his plea agreement, and thus subject to a higher potential sentence than presently imposed).

We note that we do not dispute that FISA provides for in camera, ex parte consideration of materials relevant to these motions if certain national security conditions exist.   See 50 U.S.C. § 1806(f).   The statute also provides, however, that the Court may disclose to the defense the requested discovery under appropriate procedures and protective orders, if the issues are complex or other factors exist.   Id.; cf. United States v. Pappas, 94 F.3d 795, 799-801 (2d Cir. 1996) (discussing how the Classified Information Procedures Act of 1980 ["CIPA"], 18 U.S.C. App. 3, establishes "procedures to harmonize a defendant's right to obtain and present exculpatory material" with "the government's right to protect classified material in the national interest"), quoting, United States v. Wilson, 571

F.Supp. 1422, 1426 (SDNY 1983).

Given that, upon information and belief, both of the undersigned defense counsel have the requisite security clearances, and the balance of other factors now strongly favors defense involvement in assessing and analyzing these complex issues, we respectfully submit that this Court should not resort to ex parte proceedings to review and assess the discovery in question.  Instead, disclosure to the undersigned subject to appropriate protective orders should be directed.  See, e.g., United States v. Abu-Jihaad, 630 F.3d 102, 140 (2d Cir. 2010) ("CIPA does not confer on the government a privilege to refrain from disclosing classified information; it merely presupposes one" based upon the common law privilege against disclosure of state secrets, and this privilege, "in some circumstances … 'give[s] way … to a criminal defendant's right to present a meaningful defense' "), citing, United States v. Stewart, 590 F.3d 93, 130 (2d Cir. 2009), United States v. Aref, 533 F.3d 72, 78 (2d Cir. 2008), and quoting, Stewart, 590 F.3d at 131.

## Motion

**MOTION FOR DISCOVERY OF MATERIAL AND INFORMATION NECESSARY TO DETERMINE WHETHER THE GOVERNMENT'S SUPPRESSION OF EVIDENCE TAINTED THE KNOWING AND VOLUNTARY NATURE OF HASBAJRAMI'S GUILTY PLEA**

So that the defense may effectively establish that Hasbajrami has a basis to withdraw his guilty plea either pursuant to Rule 33 of the Federal Rules of Criminal Procedure and/or 28 U.S.C. § 2255, and in light of the Government's post-sentencing FAA notice and the reasons discussed herein, the defense requests the following pursuant to Rule 16 of the Federal Rule of Criminal Procedure, Rules 6 and 12 of the Rules Governing § 2255 Proceedings, Brady v. Maryland, 373 U.S. 83 (1963), and its progeny:

1. Disclose the "foreign intelligence information" referenced in the Government's February 24, 2014 letter.

2. To the extent the "foreign intelligence information" referenced in the Government's February 24, 2014 letter includes recordings of or relating to the defendant's prosecution, and to the extent available, provide transcripts – both in the native language and translated into English – of any and all such recordings.

3. Identify what "evidence and information" was derived from the warrantless surveillance (i.e., the FAA).

4. Identify what "evidence and information" was derived from the warrantless surveillance (i.e., the FAA) that was also thereafter relied upon in support of subsequent Title I and Title III FISA warrant application relevant to the defendant herein.

8

5. Disclose whether the FAA surveillance relied upon against Hasbajrami intentionally targeted the defendant (see 50 U.S.C. §§ 1881a[b][1], 1881a[b][2]).

6. Disclose whether the FAA surveillance relied upon against Hasbajrami intentionally targeted "a United States person reasonably believed to be located outside of the United States" (50 U.S.C. § 1881a[b][3]).

7. Disclose whether the FAA surveillance relied upon against Hasbajrami "intentionally acquire[d] any communication as to which the sender and all intended recipients [were] known at the time of the acquisition to be located in the United States" (50 U.S.C. § 1881a[b][4]).

8. Disclose whether the Government has any reason to believe that the FAA surveillance relied upon against Hasbajrami were not "conducted in a manner consistent with the fourth amendment to the Constitution of the United States" (50 U.S.C. § 1881a[b][5]).

9. Provide copies of all FISA warrants and FISA warrant applications not previously disclosed to the defense in this case.

10. And provide material documenting the Government's failure to provide pretrial notice of surveillance pursuant to 50 U.S.C. § 1881a (i.e., the FAA), including, but not limited to, all relevant communications manifesting any policy of non-disclosure and all relevant communications underlying the decision to provide no notice and the decision to provide the supplemental notice.  This material should at least answer the following questions:

   a. Who had knowledge that FAA surveillance was implicated in this case and when was such knowledge gained?

   b. Who was involved in any decision  not to provide pretrial notice of FAA surveillance and when was such a decision made?

   c. What, if any, notice was this Court given about FAA

surveillance relative to Hasbajrami (or other persons relevant to this case) <u>prior to</u> the entry of Hasbajrami's guilty plea?

d. What minimization and targeting procedures and interpretive instructions were in effect at the time any such evidence or information was gathered, and how were those procedures implemented (<u>i.e.</u>, who was being targeted, what was the basis for that targeting, and what minimization procedures were used during that targeting)?

e. And what, if anything, was the Foreign Intelligence Surveillance Court ("FISC") told about FAA surveillance relative to Hasbajrami (or other persons relevant to this case) in approving any FISA warrants in this case?

## <u>Argument</u>

**I. Because the Government violated a mandatory notice obligation to the Court and to the defense, the starting point for this Court's discovery order should be disclosure of the circumstances behind the violation of the requirement of pretrial notice under 50 U.S.C. § 1806(c).**

At the outset we note that the Government violated the statutory requirement that pretrial notice be provided of FAA surveillance to both the Court and to the defense. We respectfully submit that this Court should conclude that the Government's failure to comply with the FAA notice requirement resulted from knowing and intentional conduct by Government actors. The deliberate violation of the notice statute, which also implicates <u>Brady</u> and Due Process, requires discovery for litigation regarding the remedy for the statutory violation, the grounds for suppression of derivative, and potentially other, uses of FAA surveillance, and the disclosure of

10

potential evidence of governmental over-reaching that may be introduced at a trial held after vacating Hasbajrami's conviction and sentence.

> **A.    The mandatory language of 50 U.S.C. § 1806(c) required the Government to provide notice of the use of material derived from FAA surveillance *prior to* entry of a guilty plea.**

The notice statute is mandatory in requiring that notice be provided to "the aggrieved person and the court" <u>prior to any proceeding</u> where evidence derived from FAA surveillance is used in any way:

> Whenever the Government intends to enter into evidence or otherwise use or disclose in any trial, hearing, <u>or other proceeding</u> in or before any court, department, officer, agency, regulatory body, or other authority of the United States, against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person pursuant to the authority of this subchapter, <u>the Government shall, prior to the trial, hearing, or other proceeding or at a reasonable time prior to an effort to so disclose or so use that information or submit it in evidence</u>, notify the aggrieved person and the court or other authority in which the information is to be disclosed or used that the Government intends to so disclose or so use such information.

50 U.S.C. § 1806(c) (emphasis added).

Hasbajrami is an "aggrieved person" within the plain meaning of the statute.  <u>See</u> 50 U.S.C. § 1801(k) (" 'Aggrieved person' means a person who is the target of an electronic surveillance or any other person whose

11

communications or activities were subject to electronic surveillance."). The "electronic surveillance" under "this subchapter" refers to subchapter I of the FISA, which is entitled "Electronic Surveillance" and codified at 50 U.S.C. §§ 1801-1812. The statute broadly defines electronic surveillance in 50 U.S.C. § 1801(f).

The FAA explicitly incorporates the 50 U.S.C. § 1806(c) mandatory notice requirement to cover surveillance activity under Title VII, which is codified at 50 U.S.C. §§ 1881a-1881g. The cross-reference on notice is explicit and mandatory: "Information acquired from an acquisition conducted under section 1881a of this title shall be deemed to be information acquired from an electronic surveillance pursuant to subchapter I of this chapter for purposes of section 1806 of this title." 50 U.S.C. § 1881e(a). Congress's use of "shall" leaves no room for the Government to fail to give notice: "The word 'shall' is ordinarily 'the language of command.'" Alabama v. Bozeman, 533 U.S. 146, 153 (2001), quoting, Anderson v. Yungkau, 329 U.S. 482, 485 (1947).

Despite the mandatory notice statute, the initial notice in this case provided no reference to FAA surveillance (i.e., surveillance conducted pursuant to, inter alia, 50 U.S.C. § 1881a):

> The United States, through its Attorney, Loretta E. Lynch, United States Attorney for the Eastern

> District of New York, hereby provides notice to
> defendant AGRON HASBAJRAMI and to the
> Court that, pursuant to Title 50, United States
> Code, Sections 1806(c) and 1825(d), the United
> States intends to offer into evidence, or otherwise
> use or disclose in any proceedings in the above-
> captioned matter, information obtained or derived
> from electronic surveillance and physical searches
> conducted pursuant to the Foreign Intelligence
> Surveillance Act of 1978 ("FISA"), as amended,
> 50 U.S.C. §§ 1801-1812 and 1821-1829.

Gov't FISA Notice, dated, September 13, 2011 (*ecf* #9), at 1-2.

On the other hand, the new notice explicitly concedes that the products of FAA surveillance – 50 U.S.C. § 1881a – were relied upon against Hasbajrami during its investigation and prosecution and would have been relied upon at trial:

> We write to supplement the original notice by
> informing you that, pursuant to 50 U.S.C. §§
> 1806(c) and 1881e(a), the government intended to
> offer into evidence or otherwise use or disclose in
> proceedings in the above-captioned matter
> information derived from acquisition of foreign
> intelligence information conducted pursuant to the
> Foreign Intelligence Surveillance Act of 1978, as
> amended, 50 U.S.C. § 1881a. This supplemental
> notification is based on a recent determination by
> the government that certain evidence or
> information obtained or derived from Title I and
> Title III FISA collection in this case was itself also
> derived from other collection pursuant to Title VII
> of FISA as to which you were aggrieved….
> Accordingly, we write to inform you that certain
> evidence and information, obtained or derived
> from Title I or III FISA collection, that the

13

> government intended to offer into evidence or
> otherwise use or disclose in proceedings in this
> case was derived from acquisition of foreign
> intelligence information conducted pursuant to the
> FAA.

Gov't Sup. Notice, dated, February 24, 2014 (*ecf* #65), at 1.

Where evidence is "derived" from surveillance that was "not lawfully authorized or conducted," the court must suppress the evidence. 50 U.S.C. § 1806(g). Derivative evidence includes statements and tangible evidence that are the "fruit of the poisonous tree." Murray v. United States, 487 U.S. 533, 536-37 (1988) ("the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint'") (quoting Nardone v. United States, 308 U.S. 338, 341 [1939], and citing Wong Sun v. United States, 371 U.S. 471, 484-85 [1963]).

The Supreme Court found in Murray that law enforcement decisions are derived from – or fruits of – the primary illegality, where "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry," Murray, 487 U.S. at 542, or, here, for example, if the later application for a FISA warrant was based upon information derived from

14

illegal, warrantless, surveillance.

**B.     Representations to the Supreme Court that led to the late notice establish that the Government's suppression of discoverable information here was knowing and intentional.**

Based on public information that preceded the supplemental notice in this case, it is apparent that Government actors made a conscious decision to conceal the fact that evidence collected in this and other cases was derived from warrantless FAA surveillance.  The Solicitor General, in response to finding out that he had misrepresented to the Supreme Court the Government's notice practice, put into motion the events leading to the revelation that national security lawyers and other Government operatives routinely and deliberately failed to provide notice of FAA surveillance to criminal defendants.  This revelation appears to have led directly to the post-conviction (indeed, post-sentencing) notice in this case.

On the day the FAA was enacted in 2008, the American Civil Liberties Union ("ACLU") filed suit on behalf of individuals who believed they were subjected to FAA surveillance.   The ACLU challenged the statute's broadening of electronic surveillance authority under the FAA to eliminate much of the specificity and other protections traditionally required by the Fourth Amendment.  For example:

- excision of the requirement that the government describe to the

15

Foreign Intelligence Surveillance Court ("FISC") each specific target and identify each facility at which its surveillance would be directed, thus permitting surveillance on a programmatic, rather than individualized, basis (<u>see</u> 50 U.S.C. § 1881a[g]);

- removal of the requirement that a target be a "foreign power or an agent of a foreign power" (<u>id.</u>); and

- diminution of the FISA court's authority to insist upon, and elimination of its authority to supervise, instance-specific privacy-intrusion minimization procedures (though the Government must still use court-approved general minimization procedures) (<u>see</u> 50 U.S.C. § 1881a[e]).

Before reaching these Constitutional questions, the initial FAA litigation focused on the question of standing: Could the plaintiffs establish that they were subjected to secret surveillance when the Government refused to disclose whether they were being watched?  After the Second Circuit found the plaintiffs had standing, the Supreme Court granted certiorari.

In the Supreme Court briefing, Solicitor General Donald Verrilli argued that, contrary to the ACLU's argument that no one could prove standing because the surveillance was secret, criminal defendants received notice of FAA surveillance and would therefore have standing to challenge the surveillance program:

If the government intends to use or disclose any information obtained or derived from its acquisition of a person's communications under Section 1881a in judicial or administrative proceedings against that person, it must provide advance notice of its intent to the tribunal and the

person, whether or not the person was targeted for surveillance under Section 1881a.    50 U.S.C. 1881e(a); <u>see</u> 50 U.S.C. 1801(k), 1806(c). That person may then challenge the use of that information in district court by challenging the lawfulness of the Section 1881a acquisition.  50 U.S.C. 1806(e) and (f), 1881e(a).

Brief for Petitioners at 8, <u>Clapper v. Amnesty Int'l USA</u>, <u>supra</u>, 133 S.Ct. 1138 (2013).    During the oral argument in <u>Clapper</u>, the Government continued to represent that it provided notice to criminal defendants as required by statute.  <u>See</u> Transcript of Oral Argument at 4-5, <u>Clapper</u>, <u>supra</u>.

On February 26, 2013, the Supreme Court reversed the Second Circuit's finding of standing by a 5:4 vote.  Writing for the majority, Justice Alito relied upon the provision that notice is given when "the Government intends to use or disclose information obtained or derived from a § 1881a acquisition in judicial or administrative proceedings."  <u>Clapper</u>, 133 S.Ct. at 1154.  The Court rejected the argument that the FAA would be insulated from Constitutional challenge because, if an individual who had been subject to FAA surveillance were prosecuted, "the Government would be required to make a disclosure." <u>Id.</u>  However, after the Supreme Court ruled, it became apparent that the Solicitor General's representations to the Court were wrong – to the contrary prosecutors routinely and deliberately failed to provide notice in cases where the derivatives of FAA surveillance were intended to

be used at trial or other proceedings.

The exposure of the Government's secret policy that kept the defense and the courts in the dark apparently stemmed from the statement by Senator Dianne Feinstein, the Chair of the Senate's intelligence oversight committee, on December 27, 2012, that the FAA had been used to thwart terrorist attacks in Chicago and Ft. Lauderdale.  See 158 Cong. Rec. S8393 (daily ed. Dec. 27, 2012).  However, subsequent inquiry determined that the lawyers in the cases referenced by Senator Feinstein had received no notice regarding FAA-derived evidence, establishing that either Senator Feinstein was mistaken or the Solicitor General had misinformed the Supreme Court.  See Adam Liptak, *A Secret Surveillance Program Proves Challengeable in Theory Only*, N.Y. Times, July 15, 2013.[1]

On October 25, 2013, the Government for the first time disclosed the intention to use evidence derived from FAA electronic surveillance in a

---

[1]    Senator Feinstein later asserted her statements were not intended to convey FAA involvement in those cases, however Solicitor General Verrilli reportedly made his representations about notice because national security lawyers had reviewed and approved the Solicitor General's brief prior to filing.  See Charlie Savage, *Door May Open for Challenge to Secret Wiretaps*, N.Y. Times, Oct. 16, 2013. The Solicitor General later discovered that, with no legal basis, the notice requirement had been construed in such a restrictive manner that no notice was ever provided: "The move [to begin disclosing FAA surveillance] comes after an internal Justice Department debate in which Solicitor General Donald B. Verrilli Jr. argued that there was no legal basis for a previous practice of not disclosing links to such surveillance, several Obama administration officials familiar with the deliberations said." Id.  The Solicitor General apparently determined there was not "any persuasive legal basis for failing to clearly notify defendants that they faced evidence linked to the 2008 warrantless surveillance law." Id.

criminal case. See United States v. Muhtorov, 12 Cr. 33 (JLK) (D.Colo.) (*ecf* #457). Shortly thereafter, Attorney General Eric Holder stated that the Department of Justice was reviewing cases to determine whether they should be "providing defendants with information that they should have" in order for them to decide what steps to take. See Sari Horwitz, *Justice is Reviewing Criminal Cases that Used Surveillance Evidence Gathered under FISA*, Wash. Post, Nov. 15, 2013.

On November 19, 2013, the Government filed a similar notice in United States v. Mohamud, 10 Cr. 475 (KI) (D.Oregon) (*ecf* # 486), which according to reports resulted from a review of deliberate decisions by national security prosecutors to withhold the information:

> But it has since emerged that it was not the practice of National Security Division prosecutors to tell defendants when warrantless wiretapping had led to evidence in a case, something Mr. Verrilli had not known at the time of the Supreme Court case, even though his briefs and arguments assuring the justices otherwise had been vetted by the division. After the discrepancy came to light, Mr. Verrilli fought an internal battle to bring department policy in line with what he had told the court, ultimately prevailing.

Charlie Savage, *Warrantless Surveillance Continues to Cause Fallout*, N.Y. Times, Nov. 20, 2013.

Thereafter, on February 24, 2014, the Government provided the

19

supplemental notice that gives rise to the present discovery dispute. Notably, it appears that the Government chose Muhtorov, Mohamud, and Hasbajrami, as its "test cases" related to the Constitutionality of the FAA and the access to remedies by "aggrieved parties". We make this assumption because each notice arises in a distinctly different procedural context: in Muhtorov the notice comes pretrial; in Mohamud the notice comes post-trial but pre-sentencing; and in Hasbajrami the notice comes both post-plea and post-sentencing; thereby allowing the issue to be examined in the three most common procedural contexts upon which the issue could hypothetically ever arise (pretrial, post-trial, and post-guilty plea).[2]

Regardless, the public record strongly demonstrates that the failure to provide the statutorily required pretrial notice in the present case – as well as in Muhtorov and Mohamud – resulted from a secret and deliberate policy that led to the routine practice of violating the notice requirements contained in the statute.

---

[2] To counsel's knowledge a fourth potential context, post-appeal, has yet to tested.

**C.**     **The circumstances behind the Government's violation of the notice statute are relevant to forthcoming defense motions regarding remedy: the vacating of Hasbajrami's guilty plea, suppression, and dismissal of any new trial.**

The contrast between the initial FISA notice and the post-sentencing FAA notice, in the context of the reporting on the Government's change in notice practices, demonstrates that an intentional violation of the notice statute occurred in this case.  This Court should order discovery regarding the circumstances surrounding the withholding of the FAA notice because such information is necessary to determine the remedy for the statutory violation, to provide the bases for vacating Hasbajrami's guilty plea and suppression of evidence, and to disclose any Brady material that should be available for a trial (assuming the possibility for one survives a suppression motion) or in relation to the plea and suppression motions.  While the statutory violation provides this Court with remedial authority, the Government's deliberate suppression of notice also violated Due Process because the notice requirement codified by 50 U.S.C. § 1806(c) embodies the Constitutional requirement of notice, given the Government's Brady obligations, Rule 16, and the balance of procedural Due Process interests at stake.  See Mathews v. Eldridge, 424 U.S. 319, 333 (1976); Goldberg v. Kelly, 397 U.S. 254, 267-68 (1970).

Although press reports provide the background, motions to vacate a guilty plea, suppress evidence, and/or move to dismiss, generally require more. Instead, the defense – and this Court – should be provided with primary source information regarding the policies and practices that led to the violation of the notice requirement in this case. We respectfully submit that this Court should hold that if the notice violation was intentional then the ultimate remedy for Hasbajrami should be the vacation of his guilty plea and dismissal of his indictment. Such measure may seem extreme, but Congress enacted the notice statute in the context of Supreme Court decisions that required the Government to choose, in national security cases, between disclosure and dismissal. See Alderman v. United States, 394 U.S.165, 184 (1969) (dismiss or disclose surveillance reports); Jencks v. United States, 353 U.S.657, 672 (1957) (dismiss or disclose witness statements); Roviaro v. United States, 353 U.S. 53, 61 & 65 n.15 (1957) (dismiss or disclose informant); see also United States v. Coplon, 185 F.2d 629, 638 (2d Cir. 1950) (Hand, J.) ("the prosecution must decide whether the public prejudice of allowing the crime to go unpunished was greater than the disclosure of such 'state secrets' as might be relevant to the defense.").

**D.     Discovery is needed to determine an appropriate remedy for the violation of the notice requirement in this case.**

Where there is a right to pretrial notice, there must be a remedy for the violation of that right.  For the defense to effectively advocate for a certain remedy, and for this Court to make an informed exercise of its authority, the facts should be fully developed. See United States v. Hernandez-Meza, 720 F.3d 760, 768-69 (9th Cir. 2013).  The Second Circuit has specifically held that the Government's obligation to disclose Brady material applies to guilty pleas.  See Tate v. Wood, 963 F.2d 20, 24 (2d Cir. 1992); Miller v. Angliker, 848 F.2d 1312, 1320-23 (2d Cir. 1988); see also United States v. Coppa, 267 F.3d 132, 145 n.9 (2d Cir. 2001) ("Brady disclosures must be made in sufficient time for their effective use.").

As is well known, "Brady requires that the government disclose material evidence favorable to a criminal defendant."  United States v. Mahaffy, 693 F.3d 113, 127 (2d Cir. 2012), citing, United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004).  "Evidence is favorable if it is either exculpatory or impeaching, and it is material if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' "  Mahaffy, 693 F.3d at 127, citing, Strickler v. Green, 527 U.S. 263, 281-82 (1999), and quoting,

23

Youngblood v. West Virginia, 547 U.S. 867, 870 (2006).

"[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but rather, a conviction must be reversed "upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Youngblood, 546 U.S. at 870 (citation and quotation marks omitted).

In the context of a guilty plea, undisclosed exculpatory information is material when "there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial." Tate, 963 F.2d at 24. This test is "objective," United States v. Persico, 164 F.3d 796, 805 (2d Cir. 1999), and does not look to "what a particular defendant would do," but rather "the likely persuasiveness of the withheld information," United States v. Avellino, 136 F.3d 249, 256 (2d Cir. 1998).

We respectfully submit that the Second Circuit's objective test is easily satisfied in this case. Here, the Government withheld notice that an – at least arguably – unconstitutional statute had been used against him to derive evidence necessary to his prosecution. Were this an ordinary case there is no question that

such information would be sufficient to undermine confidence in the outcome of the proceedings; it should be no different when the case involves a statute that has come under such well-known public criticism.

That said, we respectfully submit that more information must still be disclosed before a full and accurate determination can be made regarding the knowing and voluntary nature of Hasbajrami's guilty plea.  We now know that the Government failed to comply with its notice requirements, and that this significant omission may have Constitutional significance, but we still do not know exactly what evidence and information was suppressed. Allowing the defense to pierce the Government's veil of secrecy, even if within the confines of a protective order permitting the disclosure of the evidence solely to the undersigned cleared defense counsel, will allow defense counsel to be in a position to effectively advise Hasbajrami regarding his rights, and advise this Court what remedies the defense believes appropriate.

To that end, in developing facts this Court should order complete and unrestricted access to the materials that reflect the formulation and implementation of the policies and practices that led to the statutory and Constitutional violation. The questions of who knew what when, as well as the level of knowledge and intention, should be fully explored by this Court

with the assistance of the defense.  This Court should not accept selective or summary accounts of the underlying facts: the primary sources and the inferences to be drawn from them should be subject to full adversary proceedings, whether or not the proceedings are sealed.

To the extent the Government would seek to claim such information is privileged, this Court should reject such contentions.  As previously discussed, in the analogous context of the Classified Information Procedures Act ("CIPA") the Second Circuit has specifically held that "CIPA does not confer on the government a privilege to refrain from disclosing classified information; it merely presupposes one" based upon "the common law privilege against disclosure of state secrets."  United States v. Abu-Jihaad, supra, 630 F.3d 102, 140 (2d Cir. 2010) (citations omitted).  Further, "the state-secrets privilege must – under some circumstances – 'give way … to a criminal defendant's right to present a meaningful defense.' " Abu-Jihaad, 630 F.3d at 141, quoting, United States v. Stewart, supra, 590 F.3d 93, 131 (2d Cir. 2009).  In the FISA context, we respectfully submit that this Court's considerations should be no different.

First, the public interest is very much served by disclosure of executive efforts to thwart congressional requirements of notice. Second, the material can hardly be treated as confidential when, according to the media,

26

"several Obama administration officials familiar with the deliberations" have already made selective disclosures to the press on the subject of the institutional failure to comply with notice requirements. Third, the policies of privilege generally do apply to prevent exposure of law violations. Lastly, because once the decision is made to prosecute the Government "has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense." United States v. Reynolds, 345 U.S. 1, 12 (1953).

**II. In order to determine whether Hasbajrami's guilty pleas was knowingly and voluntarily entered into, this Court will need to determine the extent to which the products of unlawful activity influenced Hasbajrami's decision to plead guilty.**

Discovery regarding materials reflecting the hiding of surveillance and its eventual exposure will help to determine the extent to which the derivatives of unlawful activity influenced Hasbajrami's decision to enter a guilty plea.

We note that the Government, by giving notice only after sentencing, has admitted that derivative evidence was not validly noticed to Hasbajrami prior his guilty plea, as required by 50 U.S.C. § 1806(c). As a result, evidence regarding the notice violation alone provides information relevant to the exercise of this Court's supervisory power as well as to whether

27

discovery violations occurred that should be addressed under Rule 16(d)(2), Rule 33, or 28 U.S.C. § 2255.

Second, the lawfulness of the underlying surveillance activity may be informed by information regarding efforts to keep it clandestine. Given the massive tools available in national security cases, the Government's efforts to keep this surveillance secret from this Court as well as the defense may reflect on the legality of the derivative evidence that was disclosed.

**A.** **Disclosure of the factual bases for the notice violation in this case is necessary to deter future unlawful conduct.**

The Chief Judge of the Ninth Circuit recently observed that the Government's withholding of evidence – as here, notice of FAA surveillance – virtually never has meaningful consequences: "In the rare event that the suppressed evidence does surface, the consequences usually leave the prosecution no worse than had it complied with <u>Brady</u> from the outset." <u>United States v. Olsen</u>, 737 F.3d 625, 630 (9th Cir. 2013) (Kozinski, C.J., dissenting from denial of rehearing en banc). As a result, "[t]here is an epidemic of <u>Brady</u> violations abroad in the land. Only judges can put a stop to it." <u>Id.</u> at 626. As the Second Circuit similarly explained in <u>Mahaffy</u>:

> <u>Brady</u> violations obscure a trial's truth-seeking function and, in doing so, place criminal defendants at an unfair disadvantage. When the government impermissibly withholds <u>Brady</u>

28

> material, "its case is much stronger, and the
> defense case much weaker, than the full facts
> would ... suggest." <u>Kyles [v. Whitley]</u>, 514 U.S.
> [419,] 429 (1995).

<u>United States v. Mahaffy</u>, <u>supra</u>, 693 F.3d 113, 134 (2d Cir. 2012).

We respectfully submit that this Court should not accept assurances from the Government without first obtaining the complete factual underpinnings of the notice violation. This is especially important, where the Government may have provided materially incomplete or incorrect information to this Court.  <u>See</u> <u>Islamic Shura Council of S.Cal. v. FBI</u>, 779 F.Supp.2d 1114, 1117 (C.D.Cal. 2011) (the Government "provided false and misleading information" to the court regarding the existence of documents, then asserted the "untenable" position that misleading the court was permissible "to avoid compromising national security").

This Court's exercise of supervisory power includes a strong interest in deterring the withholding of information that should have been disclosed. In order to determine how to exercise its authority, this Court should order complete discovery not only to protect the interests of the accused, but to preserve "the public's trust in our justice system" and prevent erosion of "the foundational premises of the rule of law." <u>Olsen</u>, 737 F.3d at 632.

**B.** **The details of the FAA electronic surveillance should be produced because motions based on the FAA's unconstitutionality and the scope of authorized <u>surveillance require full factual development.</u>**

The Government's notice that it intended to use the products of 50 U.S.C. § 1881a surveillance in proceedings in this case is only the starting point for consideration of the appropriate remedy that can only be determined after it is fully understood how extensive the Government's surveillance was and its timing. There is no question that the defense will challenge the constitutionality of the FAA as part of the substantive motions following completion of discovery: this Court should ultimately find that the statute's lack of judicial warrants, specificity of individuals and locations, and judicial supervision render it constitutionally invalid.

The present case involves the surveillance of an individual "located in the United States" – Hasbajrami – notwithstanding the limitation against surveilling such an individual under 50 U.S.C. § 1881a(b):

> An acquisition authorized under subsection (a) –
>
> (1)   may not intentionally target any person known at the time of acquisition to be located in the United States;
>
> (2)   may not intentionally target a person reasonably believed to be located outside the united States if the purpose of such acquisition is to target a particular, known person reasonably believed to be in the

30

United States;

*        *        *

(4)     may not intentionally acquire any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States; and

(5)     shall be conducted in a manner consistent with the fourth amendment to the Constitution of the United States.

While the Government has yet to disclose to the defense just what was intercepted pursuant to its FAA surveillance, at a minimum the Government's notice indicates that the FBI possessed information on Hasbajrami prior to obtaining a FISA warrant specifically directed at him. What specifically the Government had at the time and how it was initially obtained must be disclosed in order for any meaningful analysis to now occur.

Discovery regarding the targeting, scope, manner, authorizations, limitations, and mitigation of the intrusions (or lack thereof) are needed to effectively formulate the arguments regarding the legality and derivative use of the surveillance under the statute. The defense should have full access to the relevant facts to inform the legal arguments regarding the FAA's constitutionality, and the effect suppression of such evidence had on the

31

knowing and voluntary nature of Hasbajrami's guilty plea.

The discovery order should also include all targeting and minimization procedures, including interpretive instructions, that were in effect at all times the Government conducted surveillance of Hasbajrami. The Edward Snowden disclosures include purported FAA targeting and minimization procedures under FISA and the FAA See 50 U.S.C. §§ 1801(h)(1), 1881a(d), 1881a(e); see also Glenn Greenwald & James Ball, *The top secret rules that allow NSA to use US data without a warrant*, The Guardian, June 20, 2013. Since these initial revelations, some of the disclosed rules have been declassified, others remain classified, and still others are likely classified but not publicly disclosed. See Press Release, *DNI Declassifies Intelligence Community Documents Regarding Collection Under Section 702 of the Foreign Intelligence Surveillance Act (FISA)* (Aug. 21, 2013) (available at <http://www.dni.gov/index.php/newsroom/press-releases/191-press-releases-2013/915-dni-declassifies-intelligence-community-documents-regarding-collection-under-section-702-of-the-foreign-intelligence-surveillance-act-fisa>) (last accessed, June 30, 2014).[3]

As such, this Court's order should require specification of which procedures were in effect on all dates that Hasbajrami was subject to

---

[3]    Section 702 was codified as 50 U.S.C. § 1881a, the statute referenced in the Government's February 24, 2014 supplemental notice.

surveillance because the Director of National Intelligence ("DNI") has acknowledged that rules during that rough time frame violated the Fourth Amendment. In a letter from the Director's office to Senator Wyden, the DNI included the admissions that

- "on at least one occasion the Foreign Intelligence Surveillance Court held that some collection carried out pursuant to the Section 702 minimization procedures used by the government was unreasonable under the Fourth Amendment," and

- the agency believed "the government's implementation of Section 702 of FISA has sometimes circumvented the spirit of the law, and on at least one occasion the FISA Court has reached this same conclusion."

Letter from the Office of the DNI to Senator Ron Wyden, dated, July 20, 2012, available at <http://www.wired.com/images_blogs/dangerroom/2012/07/2012-07-20-OLA-Ltr-to-Senator-Wyden-ref-Declassification-Request.pdf> (last accessed, June 26, 2014); see also Charlie Savage, *N.S.A. Said to Search Content of Messages To and From U.S.*, N.Y. Times, Aug. 8, 2013.

This Court's order should include not only the complete targeting and minimization procedures in effect at the relevant times, but also any interpretive directives, memoranda, letters, transcripts of instructions, and other writings that guided the implementation of the procedures. For example, the initial Snowden disclosure included a "transcript of a 2008

briefing on FAA from the NSA's general counsel" that "sets out how much discretion NSA analysts possess when it comes to the specifics of targeting, and making decisions on who they believe is a non-US person."  Glenn Greenwald & James Ball, *The top secret rules that allow NSA to use US data without a warrant*, The Guardian, June 20, 2013.  Further, because recent declassified FISC decisions have found that historical government conduct from the outset of the FAA was unlawful, this Court should order that the defense have access to all decisions, classified or not, that find problems with the conduct of surveillance under the procedures in effect from 2010-2011, or earlier if it turns out that the FAA surveillance referenced in the Government's February 24, 2014 notice (*ecf* #65) was surveillance that occurred *prior to* the offense conduct alleged in Hasbajrami's Indictment.

Aside from facial and as-applied challenges to the statute, factual development and access to the relevant protocols will enable the defense to present arguments regarding the second half inquiry: whether the Government acted within the scope of the authorizations and orders.  Even assuming the FAA is facially valid, vacating Hasbajrami's conviction may still be warranted if the "surveillance was not made in conformity with an order of authorization or approval."  50 U.S.C. §§ 1806(e)(2), 1806(g).

Recently declassified FISC opinions reveal that the relevant agencies have a long and persistent history of violating the limitations in court orders. For example:

- The "NSA exceeded the scope of authorized acquisition continuously during the more than [redacted] years of acquisition." [Case Name Redacted], PR/TT No. [docket redacted], at 3, (FISC [date redacted]) (declassified Nov. 18, 2013) (available at <http://www.dni.gov/files/documents/1118/CLEANEDPRTT%202.pdf>) (last accessed, June 29, 2014);

- "[T]he NSA has on a daily basis, accessed the BR [business records] metadata for purposes of comparing thousands of non-RAS [reasonable articulable suspicion] approved telephone identifiers on its alert list against the BR metadata in order to identify any matches," which was a violation of the earlier court order that was compounded by the Government's repeated inaccurate descriptions to the FISC.  In re Production of Tangible Things from [redacted], No. BR 08-13, 2009 WL 9150913, at *2-8 (FISC Mar. 2, 2009) (declassified Sept. 10, 2013);

- "NSA's placement of unminimized metadata [redacted] into databases accessible by outside agencies, which, as the government has acknowledged, violates not only the Court's orders, but also NSA's minimization and dissemination procedures set forth in [United States Signal Intelligence Directive] 18." In re Application of the FBI for an Order Requiring the Production of Tangible Things from [redacted], No. BR 09-06, at 6-7 (FISC June 22, 2009) (order requiring Government to report and explain instances of unauthorized sharing of metadata) (declassified Sep. 10, 2013) (available at <http://www.clearinghouse.net/chDocs/public/NS-DC-0013-0001.pdf>) (last accessed, June 29, 2014);

- The court was "deeply troubled" by previous compliance incidents that occurred shortly after the completion of  NSA's "end to end review" of the processes for handling BR metadata "and its submission of a report intended to assure the court that NSA had addressed and corrected the issues giving rise to the history of

serious and widespread compliance problems."  In re Application of the FBI for an Order Requiring the Production of Tangible Things from [redacted], No. BR 09-13, 2009 WL 9150896, at *2 (FISC Sept. 25, 2009) (declassified on Sep. 10, 2013).

Without discovery regarding all the surrounding factual and legal circumstances of the surveillance, the defense here cannot present to this Court complete arguments based on lack of compliance with the required authorizations.

**C.  This Court should order the production of all material relating to the Government's seizure and accessing of internet and telephone metadata in this case.**

A year ago the world learned the NSA was collecting massive amounts of Americans' telephone information and Internet activity from former NSA contract employee Edward Snowden.  See Glenn Greenwald, *NSA collecting phone records of millions of Verizon customers daily*, The Guardian, June 5, 2013; Glenn Greenwald & Ewen MacAskill, *NSA Prism program taps in to user data of Apple, Google and others*, The Guardian, June 6, 2013.  Since that time, the Government has acknowledged the program, and the legal debate regarding its lawfulness has begun.

Part of the debate rests on the reality that, just as Global Positioning Systems ("GPS") can provide intimate details of an individual's life, the same can occur with phone and Internet metadata. Compare United States v.

Jones, 132 S. Ct. 945, 955 (2012) (Sotomayor, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.") with Klayman v. Obama, Docket No. 13-0851, 2013 WL 6571596 (D.D.C. Dec. 16, 2013) (in the context of telephone metadata, "[r]ecords that once would have revealed a few scattered tiles of information about a person now reveal an entire mosaic – a vibrant and constantly updating picture of the person's life.") and Riley v. California, Docket Nos. 13-132, 13-212, --- S.Ct. ---, 2014 WL 2864483, at *20 (June 25, 2014) (holding that cell phone metadata is protected by the Fourth Amendment, concluding, "Modern cell phones are not just another technological convenience.  With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.' … Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.") (citation omitted).  Indeed, based on the mass collection of metadata, the Government even maps the social connections of American citizens. See James Risen & Laura Poitras, *N.S.A. Gathers Data on Social Connections of U.S. Citizens*, N.Y. Times, Sept. 28, 2013.

The scope and complexity of the Government's metadata surveillance

programs require discovery to unravel the role they played in the investigation and prosecution of Hasbajrami, the way these programs operate in practice, and their purported statutory bases.  For instance, for at least seven years, the NSA has collected the phone records of virtually every call made or received within the United States, relying on authority purportedly conferred in 50 U.S.C. § 1861.  See Klayman v. Obama, supra, Docket No. 13-0851, 2013 WL 6571596, *3-*4 (D.D.C. Dec. 16, 2013).  The Government's collection of Internet metadata appears to be even more intrusive than traditional telephone metadata. See James Ball, *NSA stores metadata of millions of web users for up to a year, secret files show*, The Guardian, Sept. 30, 2013 ("Metadata provides a record of almost anything a user does online, from browsing history – such as map searches and websites visited – to account details, email activity, and even some account passwords.").  These widespread intrusions on digital privacy have been conducted, at least in part, under the anemic procedural provisions for pen registers and trap-and-trace devices in 50 U.S.C. § 1842.

The metadata programs directly affect this case in at least three ways that require notice and discovery as a matter of procedural Due Process and under Brady.  First, the surveillance almost certainly involved the seizure of Hasbajrami's telephone information and Internet activity during the relevant

time.  Hasbajrami had accounts with the relevant service providers and, in any event, the NSA was collecting and searching data as it traveled across cables linking service providers and/or their data storage centers.  See Ewen MacAskill, et al., *GCHQ taps fibre-optic cables for secret access to world's communications*, The Guardian, June 21, 2013.

Second, if telephone records were collected as "tangible things" under 50 U.S.C. § 1861(a), or if Internet metadata was collected pursuant to 50 U.S.C. § 1842, discovery is needed to establish whether the taking of material regarding Hasbajrami violated the statutory targeting protocols or Constitutional protections.

At the time of the seizure, the Government would have had to show "that there are reasonable grounds to believe that the tangible things sought are relevant to an authorized investigation." 50 U.S.C. § 1861(b)(2)(A).  To the extent metadata was accessed outside of 50 U.S.C. § 1861, the targeting procedures or the lack thereof should be subject to disclosure.  Discovery is needed to determine whether the telephone and Internet information was lawfully authorized and whether the surveillance lawfully conducted. Only with discovery to the defense can violation of the targeting provisions be effectively brought to this Court's attention.

Third, given some of the numbers called and Internet sites visited, the

Government may well have accessed the metadata as it pertains to the defendant's social connections. The FAA includes significant restrictions on the surveillance of individuals located in the United States, as well as extensive minimization procedures. See 50 U.S.C. § 1881a(b), 50 U.S.C. § 1861(g). Because Hasbajrami was "located in the United States" at the time of the surveillance, the discovery must include the minimization and dissemination procedures adopted pursuant to 50 U.S.C. § 1861(g) as well as whether and how those procedures applied to the collection and use of Hasbajrami's telephone and Internet metadata. The discovery in this area is especially important given the recent declassification of opinions in which the FISC criticized the intelligence agencies' failure to follow statutory requirements and to adhere to limitations in court authorizations. This Court should order disclosure of all the material related to any accessing and use of Hasbajrami's telephone and Internet metadata and content.

**D.      This Court should order the Government to produce material relevant to the application of secret surveillance programs to this case.**

The Edward Snowden disclosures have established that the types, times, and intrusiveness of the surveillance are much greater than would otherwise have been known. As the new disclosures mount a number of them correlate closely to situations in this case. The Court's discovery order

should include all material pertaining to secret surveillance programs to the extent they applied to Hasbajrami so that this Court may determine whether such programs were pre se unconstitutional or unconstitutional as applied

For example, it is now known that the Government can apparently install malware software that remotely activates the camera on a person's laptop computer "without triggering the light that lets users know [their camera] is recording." Craig Timberg & Ellen Nakashima, *FBI's search for 'Mo,' suspect in bomb threats, highlights use of malware for surveillance*, Wash. Post, Dec. 6, 2013; see also Jennifer Valentino-DeVries & Danny Yadron, *FBI Taps Hacker Tactics to Spy on Suspects*, Wall St. J., Aug 3, 2013. The Snowden disclosures have also exposed the practice of sending agents to record conversations within video games played by Americans and others online. See Mark Mazzetti & Justin Elliott, *Spies Infiltrate a Fantasy Realm of Online Games*, N.Y. Times, Dec. 9, 2013. Further, the Snowden disclosures have even revealed that the Government surveilled the accessing of online pornography sites to compromise certain persons of interest. See Glenn Greenwald, et al., *Top-Secret Document Reveals NSA Spied On Porn Habits As Part Of Plan To Discredit 'Radicalizers,'* Huffington Post, Dec. 2, 2013.

The Government should be required to disclose whether Hasbajrami's

41

computer use was surveilled in any manner that could potentially violate the Fourth Amendment.   Such information would assist in determining the extent to which the Government's delayed notice potentially impacted the knowing and voluntary nature of his plea.

**III.   This Court's discovery order should direct disclosure to security-cleared counsel and full defense participation in adversary proceedings regarding the lawfulness of the Government's surveillance activities because the balance of interests has tilted sharply toward transparency and inclusion of both parties in all litigation.**

**A.   The complexity and the need for accurate factual determinations strongly support full defense access to surveillance material and advocacy regarding its significance.**

The scope of appropriate disclosure to the defense corresponds to the depth and complexity of the potential motion to vacate Hasbajrami's conviction and sentence and any additional or related motions that could follow.   For example, the statute provides for an aggrieved person to file a motion for suppression where the information was either unlawfully acquired or acquisition was conducted outside the scope of an order of authorization or approval.   See 50 U.S.C. § 1806(f).   Here, the motion would first be to vacate Hasbajrami's conviction and sentence, but the basis for the motion is the same: information is unlawfully acquired if the statute was unlawfully applied or if the statute itself is unconstitutional.   See ACLU

Found. of S.Cal. v. Barr, 952 F.2d 457, 465 (D.C.Cir. 1991) ("Section 1806(f) requires the court to decide whether the surveillance was 'lawfully authorized and conducted.' The Constitution is law.").

The Government's failure to adhere to the limitations on the scope of surveillance also supports defense motions to vacate Hasbajrami's conviction and sentence and thereafter to suppress both direct and derivative evidence:

> If the United States district court pursuant to subsection (f) of this section determines that the surveillance was not lawfully authorized or conducted, it shall, in accordance with the requirements of law, suppress the evidence which was unlawfully obtained or derived from electronic surveillance of the aggrieved person or otherwise grant the motion of the aggrieved person.

50 U.S.C. § 1806(g).  Even if the motion is denied, this Court must review the information to determine whether material considered on the motion, assuming it was reviewed ex parte, requires production as Brady material: "If the court determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure." Id.

The statute confers authority on this Court to order disclosure to defense counsel "where such disclosure is necessary to make an accurate determination of the legality of the surveillance."  50 U.S.C. § 1806(f).  In

this provision, Congress intended to strike "a reasonable balance between an entirely in camera proceeding which might adversely affect the defendant's ability to defend himself, and mandatory disclosure, which might occasionally result in the wholesale revelation of sensitive foreign intelligence information."    S.Rep.No. 95-701 at 64 (1978).    The developments since the Snowden disclosures and the institutionalized suppression of notice revealed after Clapper establish that this case – even in the unlikely event this is the only case – fits exactly what Congress thought should trigger full defense participation: disclosure may be "necessary" when there are "indications of possible misrepresentation of fact" and other problems indicating the need for adversarial review.  Id.

Courts have explained that disclosure to the defense is warranted if the legal and factual issues involved in reviewing the surveillance are "complex," and where "the question of legality may be complicated by factors such as 'indications of possible misrepresentation of fact, vague identification of the persons to be surveilled, or surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order.' " United States v. Belfield, 692 F.2d 141, 147 (D.C.Cir. 1982) (quoting S.Rep.No. 95-701 at 64 [1978]); accord United States v. Ott, 827

F.2d 473, 476 (9th Cir. 1987).  These factors must be assessed in light of the Supreme Court's recognition that valuable defense input is lost when review of the legality of electronic surveillance is conducted ex parte.  See Alderman v. United States, supra, 394 U.S. 165, 184  (1969); see also United States v. Abu-Jihaad, supra, 630 F.3d 102, 141 (2d Cir. 2010) ("Although applicable in criminal cases, the state-secrets privilege must – under some circumstances – 'give way … to a criminal defendant's right to present a meaningful defense.' "), quoting, United States v. Stewart, supra, 590 F.3d 93, 131 (2d Cir. 2009).

We note that if the Government asserts the "state-secrets" privilege as a basis for its continued refusal to disclose the material under dispute, the Second Circuit has held that the test announced in Roviaro v. United States, supra, 353 U.S. 53 (1957), should be applied.  See Abu-Jihaad, 630 F.3d at 141.  As the Second Circuit explained, the first question is "whether the material in dispute is discoverable, and if so, whether the state-secrets privilege applies," and the second question is, if the privilege applies, "whether the information is helpful or material to the defense, i.e., useful to counter the government's case or to bolster a defense."  Id., quoting Stewart, 590 F.3d at 131 (citing Roviaro).

The Second Circuit also observed, however, "Information that is

45

helpful or material to the defense 'need not rise to the level that would trigger the Government's obligation under <u>Brady v. Maryland</u> … to disclose exculpatory information.' " "   <u>Abu-Jihaad</u>, 630 F.3d at 141 n.33, <u>quoting</u>, <u>United States v. Aref</u>, <u>supra</u>, 533 F.3d 72, 80 (2d Cir. 2008), <u>and citing</u>, <u>United States v. Mejia</u>, 448 F.3d 436, 457 (D.C.Cir. 2006) (observing that, for purposes of CIPA, "information can be helpful without being 'favorable' in the <u>Brady</u> sense").

### B.   The balance of the factors this court considers in determining defense participation requires full defense access and advocacy.

Under the present circumstances, the balance strongly favors disclosure: the need for government secrecy has been radically reduced by the public disclosures of previously secret programs; the need for adversary proceedings has been recognized by a presidential study group; the legal and factual complexity of the issues in this case favor full defense participation; and there are reasonable grounds to question the candor and completeness of the security apparatus's representations.

### 1.   The need for secrecy has been reduced by the Edward Snowden disclosures.

The Government has either publicly acknowledged or failed to deny the broad range of electronic surveillance now attributed to it.   Prior Hasbajrami's guilty plea, the mass collection of telephone and Internet

content and metadata was speculative; now it is fact.  As a result of the Snowden disclosures and other revelations, there are no longer compelling reasons for secrecy, or to the extent they remain, cleared defense counsel should be allowed to look under the veil.  The gathering up of all of Hasbajrami's telephone call and Internet metadata (along with everyone else's metadata) was not previously known, but now the secret is out. The Government likely has records of every one of Hasbajrami's calls and Internet communications prior to any FISA warrant.

The only questions remaining are whether and under what circumstances the Government obtained and accessed surveillance, the lawfulness of the authority or conduct of the surveillance, and how the patterns of communication can be helpful to the defense. The Government need for ex parte proceedings has collapsed now that the secrets this Court was balancing against disclosure are part of general public discourse.

### 2.    The benefits of adversarial proceedings are recognized by the President's Review Group.

The public debate surrounding the Snowden disclosures has exposed the serious flaws that ex parte proceedings import into the structure of our country's legal system.   President Obama's national security review recognized that our adversary system is compromised, and the benefits of defense advocacy are lost, in a system that does not include an advocate for

individual privacy. <u>See</u> Recommendation 28, *The President's Review Group on Intelligence and Communications Technologies, Liberty and Security in a Changing World*, (Dec. 12, 2013) (available at < http://www.whitehouse.gov /sites/default/files/docs/2013-12-12_rg_final_report.pdf>)   (last   accessed, June 30, 2014):

<u>Recommendation 28</u>

We recommend that:

(1) Congress should create the position of Public Interest Advocate to represent privacy and civil liberties interests before the Foreign Intelligence Surveillance Court;

(2) the Foreign Intelligence Surveillance Court should have greater technological expertise available to the judges;

(3) the transparency of the Foreign Intelligence Surveillance Court's decisions should be increased, including by instituting declassification reviews that comply with existing standards; and

(4) Congress should change the process by which judges are appointed to the Foreign Intelligence Surveillance Court, with the appointment power divided among the Supreme Court Justices.

The rationale for an advocate before the Foreign Intelligence Surveillance Court applies equally to the need for security-cleared counsel in this case to provide technological and legal perspectives to balance against the Government's one-sided presentations in proceedings before the District

Court.

As the Supreme Court held 40 years ago:

> Our legal tradition is committed to the adversary
> system.   When the government initiates a
> proceeding against a person, that person is usually
> entitled to representation by an advocate who is
> committed to protecting her interests.   If it is
> functioning well, the adversary system is an engine
> of truth.   It is built on the assumption that judges
> are in a better position to find the right answer on
> questions of law and fact when they hear
> competing views. When the FISC was created, it
> was assumed that it would resolve routine and
> individualized questions of fact, akin to those
> involved when the government seeks a search
> warrant. It was not anticipated that the FISC would
> address the kinds of questions that benefit from, or
> require, an adversary presentation. When the
> government applies for a warrant, it must establish
> "probable cause," but an adversary proceeding is
> not involved. As both technology and the law have
> evolved over time, however, the FISC is
> sometimes presented with novel and complex
> issues of law. The resolution of such issues would
> benefit from an adversary proceeding.

> In our system of justice, defense counsel standing
> for the rights of the accused traditionally provides
> competing arguments needed by a neutral
> decision-maker.

> We have elected to employ an adversary system of
> criminal justice in which the parties contest all
> issues before a court of law. The need to develop
> all relevant facts in the adversary system is both
> fundamental and comprehensive.   The ends of
> criminal justice would be defeated if judgments
> were to be founded on a partial or speculative

presentation of the facts.

United States v. Nixon, 418 U.S. 683, 709 (1974) (citation omitted).

While recognizing that secrecy is sometimes permissible, this Court acts in the best traditions of our justice system by recognizing the benefits of full adversary participation where, as here, the circumstances call for careful scrutiny of complex legal issues based on voluminous material.

### 3. The complexity of the legal issues warrants defense participation.

Substantial issues exist regarding the constitutionality of the FAA as well as the application of the FAA and other surveillance programs to Hasbajrami. These concerns were readily evident from the colloquies with several of the Justices during the Clapper oral argument. Justice Kagan noted that the FAA "greatly expands the government's surveillance power. Nobody denies that." Transcript of Oral Argument at 17, Clapper, 133 S.Ct. 1138 (2013).  Similarly, Justice Ginsburg noted that certain checks required for traditional FISA surveillance do not exist in the FAA:

> JUSTICE GINSBURG: Mr. Jaffer, could you be clear on the expanded authority under the FAA? As I understood it, it's not like in [FISA], where a target was identified and . . . the court decided whether there was probable cause.  Under this new statute, the government doesn't say who the particular person or the particular location.  So, there isn't that check.  There isn't that check.

MR. JAFFER: That's absolutely right, Justice Ginsburg … the whole point of the statute was to remove those tests, to remove the probable cause requirement, and to remove … the requirement that the government identify to the court the facilities to be monitored.  So those are gone.

That's why we use the phrase "dragnet surveillance." I know the government doesn't accept that label, but it concedes that the statute allows what it calls categorical surveillance, which … is essentially the surveillance the plaintiffs here are concerned about.

Id. at 32-33.   Justice Breyer stated that the program is not limited to wiretapping alleged terrorists or foreign agents, noting that any conversation touching on "foreign intelligence" information could be implicated: "the definition of foreign intelligence information … defines it to include information with respect to a foreign power or foreign territory that relates to the conduct of foreign affairs. It's very general." Id. at 43.

The competing privacy and national security interests are the subject of current judicial debate upon which the defense perspective is essential to a fair disposition.  Compare Klayman v. Obama, Docket No. 13-0851, 2013 WL 6571596 (D.D.C. Dec. 16, 2013) (the metadata collection program likely unconstitutional) with ACLU v. Clapper, Docket No. 13 Civ. 3994, 2013 WL 6819708 (SDNY Dec. 27, 2013) (upholding the metadata collection program).   The President's Review Group used collection of

51

telephone metadata under section 215 of FISA as a "good example" of the "serious and difficult questions of statutory and constitutional interpretation about which reasonable lawyers and judges could certainly differ," finding that better decisions result from adversary presentations:

> On such a question, an adversary presentation of the competing arguments is likely to result in a better decision.  Hearing only the government's side of the question leaves the judge without a researched and informed presentation of an opposing view.

Review Group Report at 203-04 (available at < http://www.whitehouse.gov/ sites/default/files/docs/2013-12-12_rg_final_report.pdf>)   (last   accessed, June 30, 2014).

The complexity of the legal questions increase with the case – factual analysis of retention, accessing, and use of information. In addition to debating the scope and lawfulness of surveillance, a defense advocate is necessary to present the legal arguments on the inclusion of false statements or material omissions within the meaning of Franks v. Delaware, 438 U.S. 154 (1978); on the use of evidence derived from earlier unlawful surveillance to make decisions under Murray v. United States, supra, 487 U.S. 533, 542-43 (1988); and determining whether the use of any such derivative evidence in subsequent FISA applications requires suppression as the "fruit of the poisonous tree" under Silverthorne v. United States, 251

U.S. 385, 392 (1920), <u>Nardone v. United States</u>, 308 U.S. 338, 342 (1939), and/or <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963).

Further, compliance with complicated statutes upon which there is little precedent militates in favor of defense participation. The simple determination of probable cause in the standard FISA case is often "relatively straightforward and not complex." <u>United States v. Abu-Jihaad</u>, <u>supra</u>, 630 F.3d 102, 129 (2d Cir. 2010).  Although the FISA issues in the present case have their own share of novelty and complexity, the complicated legal issues under the FAA receive little guidance from the courts of appeals or other districts about how to evaluate the constitutionality of orders granting applications for FAA surveillance or actual execution of the surveillance.  Indeed, this is the first case in this Circuit to address this issue, and the first – and thus far only – case in this country to address the issue in the context of a post-sentencing motion.  As such, defense advocacy is reasonable and necessary given the serious and difficult questions this case presents, as well as the importance and effect any precedent will create.

### 4. The presumably voluminous factual materials favor defense participation.

The electronic surveillance generated in the national security context is far more extensive than that produced under the minimization procedures in cases investigated with Article III wiretaps.  <u>See</u> Jennifer Granick, *FISA*

*Amendments Act Is Way Worse for Privacy Than Title III*, Center for Internet and Society of Stanford Law School, Nov. 13, 2012 (available at <http://cyberlaw.stanford.edu/blog/2012/11/fisa-amendments-act-way-worse -privacy-title-iii>) (last accessed, June 30, 2014).

In contrast to Article III wiretaps, a greater volume of telephone conversations and Internet communications in national security cases are generally recorded and preserved. <u>See</u> David S. Kris & J. Douglas Wilson, <u>National Security Investigations & Prosecutions</u>, 276-77 (2012 ed.). Minimization in national security cases generally occurs when there is a retrospective examination of bulk data and a decision is made to index and log conversations, not by contemporaneous decisions not to record conversations in compliance with Article III minimization.  <u>Id.</u>  National security communications that are not indexed and logged are not routinely destroyed, as with Article III material, but may still be available for defense review.  <u>Id.</u> at 277.  The decision of agents to treat communications as not pertinent to the foreign intelligence investigation is irrelevant to the defense assessment of whether the communication is favorable to the defense or discoverable under Rule 16 as the defendant's statement, evidence material to the defense, or otherwise subject to production.  <u>Id.</u> at 278.

In this case, there is likely a voluminous amount of communications

recorded and metadata gathered that this Court is not in a reasonable position to review. The defense is perfectly suited to review material with the full adversarial perspective, identifying potential <u>Brady</u> material, both for purposes of post-sentencing motions, suppression, and as trial material should a trial ultimately result.

In a case involving the analogous post-trial disclosure of wiretapping, the Supreme Court noted the unique perspective of the defense in assessing the potential value of the products of Government surveillance:

> An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances.  Unavoidably, this is a matter of judgment, but in our view the task is too complex, and the margin for error too great, to rely wholly on the in camera judgment of the trial court to identify those records which might have contributed to the Government's case.

<u>Alderman v. United States</u>, <u>supra</u>, 394 U.S. 165, 182  (1969). The need to parse out from extensive data the information that the Court should hear is a core function of the defense that should fully apply in this case.

### 5.    Congress    anticipated    that    evidence    of misrepresentation  would  favor  disclosure  and defense participation.

The legislative history of FISA specifically stated that "indications of possible misrepresentation of fact" could establish the necessity for defense participation in discovery and suppression proceedings. S.Rep.No. 95-701 at 64 (1978). Congress set an intentionally low bar for favoring defense participation: "indications" and "possible". Under this standard, which requires no finding of *actual* misrepresentation, there are a number of factors this Court should consider as favoring defense participation.

First, this Court knows whether or not the Government provided previous notice in chambers of which the defense is unaware.  But it appears that, assuming this Court did not know that the derivatives of FAA surveillance were intended to be used in Hasbajrami's proceedings, the failure to advise this Court before Hasbajrami's guilty plea constituted a serious  omission,  especially  where  the  defendant  relied  upon  the completeness of the Government's publicly filed FISA notice, which made no mention of FAA surveillance, in deciding to plead guilty without filing pretrial motions.  The omission of material facts, under Second Circuit law, constitutes the functional equivalent of a material misrepresentations.  See United States v. Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013) ("omissions

'are governed by the same rules' as misstatements"), <u>quoting</u>, <u>United States v. Ferguson</u>, 758 F.2d 843, 848 (2d Cir. 1985). As such, the violation of the notice statute alone should trigger full defense participation.

Second, the circumstances of the disclosure involve lack of candor high in the national security establishment. The apparent reluctance of national security lawyers to permit Solicitor General Verrilli to correct the misrepresentation to the Supreme Court reflects the kind of questionable dealings that Congress saw as favoring disclosure. Similarly, the Director of National Intelligence ("DNI") admitted that he provided testimony that constituted the "least untruthful" answer regarding surveillance practices before a congressional hearing. <u>See</u> Mollie Reilly, *James Clapper: I Gave 'Least Untruthful' Answer Possible On NSA Surveillance*, Huffington Post, June 11, 2013.

On March 12, 2013, Senator Ron Wyden posed the following question to NDI Clapper during a hearing of the Senate Intelligence Committee: "Does the N.S.A. collect any type of data at all on millions or hundreds of millions of Americans?" Ryan Lizza, *State of Deception*, The New Yorker, Dec. 16, 2013. Director Clapper replied, "No, sir," explaining that no such activity could occur given the restrictions on CIA and NSA surveillance of on United States soil. After the Snowden revelations, Director Clapper

submitted to the Committee a formal retraction admitting that his response was "clearly erroneous." Id.  As Senator Wyden later stated, "There is not a shred of evidence that the statement ever would've been corrected absent the Snowden disclosures." Id. The erroneous testimony to Congress apparently was not an isolated incident. Kimberly Dozier, *Clapper Apologizes For "Erroneous"  Answer On NSA*, Associated Press, July 2, 2013 ("Sen. Wyden is deeply troubled by a number of misleading statements senior officials have made about domestic surveillance in the past several years.").

But this type of high level deception only scratched the surface of the systematic lack of candor revealed by previously classified court decisions that the Administration released in response to the Snowden disclosures.  On August 21, 2013, the Government declassified the opinion of District Judge John Bates holding that aspects of the surveillance authorized by 50 U.S.C. § 1881a – the statute of which the Government provided notice in this case – was unconstitutional.   See [Case Name Redacted], No. [docket number redacted], 2011 WL 10945618 (FISC Oct. 3, 2011).   While ultimately continuing surveillance authorizations, Judge Bates made a record of serious concerns regarding the legal authority and agency actions in carrying out that authority.

The opinion detailed the Government's May 2011 disclosure to the

FISC that, contrary to previous statements, the NSA was relying on the FAA to collect Internet communications that are "wholly unrelated to the tasked selector, including the full content of discrete communications that are not to, from, or about the facility tasked for collection," and that the NSA "might lack confidence in the effectiveness" of procedures for ensuring that persons targeted with FAA surveillance of their Internet transactions are actually located overseas. Id. at *2. In other words, the Government "advised the Court that the volume and nature of the information it has been collecting is fundamentally different from what the Court had been led to believe." Id. at *9. These disclosures "fundamentally alter[ed] the Court's understanding of the scope of the collection conducted pursuant to Section 702," which had previously been based on erroneous representations that "acquisition of Internet communications under Section 702 would be limited to discrete 'to/from' communications between or among individual account users and to 'about' communications falling within [redacted] specific categories that had been first described to the Court in prior proceedings." Id. at *5.[4]

The Government's applications for authorization to conduct FAA surveillance thus contained all of the problems that justify disclosure:

---

[4]       See n.3, supra.

"misrepresentation of fact, vague identification of the persons to be surveilled, [and collection of] surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards" contained in past orders.  United States v. Belfield, supra, 692 F.2d 141, 147 (D.C.Cir. 1982). These problems appear to coincide temporally with the period of FAA surveillance in this case, which likely occurred between 2008 and 2010, or under earlier precursor programs.

In another opinion, Judge Bates expressed concern that, for a third time, the Government acknowledged "a substantial misrepresentation" regarding surveillance:

> The Court is troubled that the government's revelations regarding NSA's acquisition of Internet transactions mark the third instance in less than three years in which the government has disclosed a substantial misrepresentation regarding the scope of a major collection program.
>
> In March, 2009, the Court concluded that its authorization of NSA's bulk acquisition of telephone call detail records from [redacted] in the so-called "big business records" matter "ha[d] been premised on a flawed depiction of how the NSA uses [the acquired] metadata," and that "[t]his misperception by the FISC existed from the inception of its authorized collection in May 2006, buttressed by repeated inaccurate statements made in the government's submissions, and despite a government-devised       and       Court-mandated

60

oversight regime." Docket [redacted].  Contrary to
the government's repeated assurances, NSA had
been routinely running queries of the metadata
using querying terms that did not meet the required
standard for querying. The Court concluded that
this requirement had been "so frequently and
systemically violated that it can fairly be said that
this critical element of the overall … regime has
never functioned effectively." Id.

[Case Name Redacted], No. [docket number redacted], 2011 WL 10945618,

at *5 n.14 (FISC Oct. 3, 2011) (declassified on Aug. 21, 2013) (alterations in

original).

Other FISC judges, some in recently declassified opinions, expressed

similar concerns. See In re Application of the FBI for an Order Requiring

the Production of Tangible Things from [redacted], No. BR 09-13, 2009 WL

9150896, at *2 (FISC Sept. 25, 2009) (declassified Sept. 10, 2013) (the court

was "deeply troubled" whether the NSA had addressed and corrected the

issues giving rise to the history of serious and widespread compliance

problems and had taken the necessary steps to ensure compliance going

forward.); In re Production of Tangible Things from [redacted], No. BR 08-

13, 2009 WL 9150913, at *2 (FISC Mar. 2, 2009) (declassified Sept. 10,

2013) (detailing "misrepresentations to the Court" and "violations of its

Orders"); In re Production of Tangible Things from [redacted],  No. BR 08-

13, 2009 WL 9157881, at *2 (FISC Jan. 28, 2009) (declassified Sept. 10,

2013) ("The Court is exceptionally concerned about what appears to be a flagrant violation of its Order in this matter."); In re All Matters Submitted to the Foreign Intelligence Surveillance Court, 218 F. Supp. 2d 611, 620–21 (FISC 2002) (explaining Government's "errors related to misstatements and omissions of material facts" in FISA applications), abrogated on other grounds by, In re Sealed Case, 310 F.3d 717 (FISC Rev. 2002).

The errors in the Government's applications to the FISC, including its applications for FAA surveillance authorization, are not merely "typographical or clerical in nature." United States v. El-Mezain, 664 F.3d 467, 566 (5th Cir. 2011) (internal quotation marks omitted). Rather, "the errors [are] . . . pervasive enough to confuse the court as to the quantity or quality of the evidence described in the applications," such that "disclosing the applications and related materials to defense counsel would assist the court in making an accurate determination of the legality of the surveillance." Id. at 567 (internal quotation marks omitted).

Moreover, because numerous FISC opinions – including opinions authorizing FAA surveillance – remain classified, the defense has no way to know the extent of the Government's misrepresentations to the FISC and noncompliance with its orders.  As such, disclosure under 50 U.S.C. § 1806(f) is necessary to permit the robust adversarial testing that accurate

review of these issues requires.

These misrepresentations also provide the grounds for a hearing similar to one held pursuant to Franks v. Delaware, supra, 438 U.S. 154 (1978). Under Franks, a hearing on the veracity of the affidavit supporting a warrant is warranted if the defendant makes a preliminary showing that the affidavit contains intentional or reckless false statements or material omissions.  See United States v. Rajaratnam, supra, 719 F.3d 139, 146 (2d Cir. 2013); see also United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003) (noting that "[i]n order to invoke the Franks doctrine, [a defendant] must show that there were intentional and material misrepresentations or omissions in [the] warrant affidavit").  While the threshold question here will be the knowing and voluntary nature of Hasbajrami's guilty plea, whether or not the originally-noticed FISA warrants survive scrutiny now that the previously unnoticed FAA surveillance has been made known is a question that will likely need to be dealt with as well.

If the prosecution failed to disclose to the Court the then-classified FISC opinions expressing concerns regarding the reliability of the Government representations, in the pretrial setting such failure alone would be a Franks violation because the Government omitted material information reasonably necessary for the Court's evaluation of the Government's

submissions.  While Hasbajrami is presently post-sentencing rather than pre-trial, the examination should be no different since it appears that the Government intentionally suppressed information – the warrantless surveillance of the defendant – that undermines confidence in the knowing and voluntary nature of Hasbajrami's guilty plea.

Notably, in a separate disclosure, it has been revealed that Government agents have been laundering intelligence from NSA electronic intercepts to disguise their origins: "[L]aw enforcement agents have been directed to conceal how such investigations truly begin – not only from defense lawyers but also sometimes from prosecutors and judges."  John Shiffman & Kristina Cooke, *U.S. directs agents to cover up program used to investigate Americans*, Reuters, Aug. 5, 2013.   The governmental units that distributed information include the FBI, the CIA, and the NSA, all of which were likely involved in the present case. Although the Reuters documents are undated, they "show that federal agents are trained to 'recreate' the investigative trail to effectively cover up where information originated."  Id. Interviews with law enforcement personnel showed the practice is widespread to protect sources, but "employing the practice as a means of disguising how an investigation began may violate pretrial discovery rules by burying evidence that could prove useful to criminal defendants." Id.

Given the record of affirmative misrepresentations and omissions made by the Government in its applications for 50 U.S.C. § 1881a authorizations (as well as its misrepresentations and omissions in applications for orders authorizing other forms of FISA surveillance), discovery is warranted so that the defense and this Court may effectively assess whether the fruits of those authorizations effected the knowing and voluntary nature of Hasbajrami's guilty plea.

**IV.  This Court should grant the broadest discovery because litigation regarding the lawfulness of governmental surveillance activity accomplishes important societal purposes of transparency and deterrence.**

Meaningful review regarding the Government's violation of the statutory notice requirement and potential grounds for vacating Hasbajrami's guilty plea accomplishes essential societal functions beyond protection of the defendant's individual rights. Constitutions and statutes are merely a collection of toothless platitudes in some countries.  In the United States, transparency and deterrence of governmental misconduct are essential to the rule of law that sets us apart by giving the promise of justice meaning in the real world.  Preservation of a plea agreement do not outweigh the strong societal interests in assuring fairness for the individual accused and assuring that the rules regarding pretrial notice and judicial review of surveillance on individuals located in the United States at the time of the surveillance, and at

all times relevant to this case, are protected.

50 U.S.C. § 1881a specifically protects not merely United States citizens, but anyone located within the United States at the time of the surveillance. As such, the public interest strongly favors discovery and defense participation in all proceedings.

## V. The "arm of the prosecution" for purposes of discovery extends beyond the specific Eastern District of New York prosecutors assigned to this case.

The Government's February 24, 2014 notice (*ecf* #65) tactfully states, "This supplemental notification is based on <u>a recent determination by the government</u> that certain evidence or information obtained or derived from Title I and Title III FISA collection in this case was itself also derived from other collection pursuant to Title VII of FISA as to which you were aggrieved" (<u>i.e.</u>, the provisions of the FAA) (emphasis added). It appears that the reference to "a recent determination by the government" is most likely a reference either to the specific prosecutors assigned to this case or possibly, somewhat more broadly, the United States Attorney's Office for the Eastern District of New York. Such comment is somewhat disingenuous, however, since cases involving classified information, FISA, and the FAA, always involve additional governmental agencies such as the CIA or the NSA – agencies that are not ordinarily part of a criminal

66

prosecution but become part of a joint investigation due to the very nature of the surveillance and security measures involved.

Indeed, it may be that the local prosecutors assigned to this case, or even the Eastern District office in its entirety, were insulated from full knowledge of surveillance and tactics used in the present case, however such insulation does not shield the Government of its Rule 16 and Brady obligations. See United States v. Ghailani, 687 F.Supp.2d 365 (SDNY 2010) (Kaplan, J.) (holding that Department of Justice officials were properly considered "the government" within the meaning of Rule 16); United States v. Villa, Docket No. 12 Cr. 40 (JBA), 2014 WL 280400 (D.Conn. Jan. 24, 2014) ("Courts in this Circuit have generally held that where the U.S. Attorney's Office is engaged in a joint investigation with another federal or state, agency, materials in the possession of that other agency must be disclosed pursuant to Rule 16 and Brady"), citing, United States v. Gupta, 848 F.Supp.2d 491, 493 (SDNY 2012) (Rakoff, J.) ("Where the USAO conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for Brady evidence."), United States v. Finnerty, 411 F.Supp.2d 428, 432 (SDNY 2006) (collecting cases) ("Courts have typically required the prosecution to

disclose under Rule 16 documents material to the defense that (1) it has actually reviewed, or (2) are in the possession, custody, or control of a government agency so closely aligned with the prosecution so as to be considered part of the prosecution team.").

"In the words of Judge Weinfeld, any argument that the Government's duty does not extend so far merely because another agency, not the USAO, is in actual possession of the documents created or obtained as part of the joint investigation is both 'hypertechnical and unrealistic.' " Gupta, 848 F.Supp.2d at 493 (Rakoff, J.), quoting, United States v. Shakur, 543 F.Supp. 1059, 1060 (SDNY 1982) (Weinfeld, J.); see also United States v. Upton, 856 F.Supp. 727 (EDNY 1994) (Glasser, J.) (summarizing case law).

Here, other governmental agencies were unquestionably involved in the investigation and prosecution of Hasbajrami – this circumstance simply cannot be disputed.  As such, the "arm of the prosecution" for discovery purposes must extend beyond the line prosecutors assigned to this case, and, for that matter, beyond the United States Attorney's Office for the Eastern District of New York.

**VI.     The waivers contained in Hasbajrami's plea agreement are unenforceable given the institutional complicity in the FAA notice omission, and the impact such omission has on Hasbajrami's Constitutional protections.**

Finally, we note that the Government's preliminary belief that Hasbajrami has waived his right to challenge his conviction and sentence is greatly misplaced.

While waivers, such as the right to appeal or collaterally attack a conviction are "presumptively enforceable," United States v. Arevalo, 628 F.3d 93, 98 (2d Cir. 2010), citing, United States v. Gomez-Perez, 215 F.3d 315, 319 (2d Cir. 2000), waivers are unenforceable "when the waiver was not made knowingly, voluntarily, and competently, when the sentence was imposed based on constitutionally impermissible factors, [or] when the government breached the plea agreement," Id. (emphasis added); see also, United States v. Rosa, 123 F.3d 94, 98 (2d Cir. 1997) (holding that waivers are unenforceable if they are not knowing and voluntary or if the Government breaches the plea agreement); United States v. Garcia, 166 F.3d 519, 521 (2d Cir. 1999) (same).

Moreover, "Plea agreements are subject to the public policy constraints that bear upon the enforcement of other kinds of contracts," United States v. Yemitan, 70 F.3d 746, 748 (2d Cir. 1995), and "a waiver of the right not to be sentenced on the basis of a constitutionally impermissible

factor may be invalid," United States v. Jacobson, 15 F.3d 19, 23 (2d Cir. 1994).

Furthermore, the waivers provisions of a plea agreement are unenforceable when there is reason to "call into question the constitutionality of the process by which the defendant waived his appeal [or collateral challenge] rights in the first place." Panah v. United States, Docket No. 02 Cr. 147S, 2006 WL 2056728 (WDNY July 21, 2006), citing, United States v. Hernandez, 242 F.3d 110, 113-14 (2d Cir. 2001); United States v. Djelevic, 161 F.3d 104, 107 (2d Cir.1998) (per curium); United States v. Ready, 82 F.3d 551, 555 (2d Cir. 1996).

As the Second Circuit explained specifically in the context of the waiver of the right to collaterally attack a conviction pursuant to 28 U.S.C. § 2255, "[A] waiver of appellate or collateral attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured, here, the plea agreement." Frederick v. Warden, Lewisburg Corr. Facility, 308 F.3d 192, 195-96 (2d Cir. 2002), citing, inter alia, Hernandez, 242 F.3d at 113-14 (declining to enforce waiver of appellate rights where defendant sought to challenge on appeal the constitutionality of the process by which appeal rights were waived).

Moreover, we respectfully submit that when a defendant's plea is the product of the Government's illegal or unconstitutional activity, as is the case here, appeal and collateral attack waivers <u>can never be enforceable</u> – to rule otherwise would remove the check on governmental misconduct that the Fourth and Fifth Amendments were intended to provide.

It is also worth noting that Hasbajrami's plea agreement did not contain any provision waiving his right to challenge his conviction and sentence pursuant to Rule 33 of the Federal Rules of Criminal Procedure. <u>See</u> Fed.R.Crim.P. 33(a) ("Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."). And the time permitted for Hasbajrami to file a Rule 33 motion has not yet lapsed. <u>See</u> Fed.R.Crim.P. 33(b)(1) ("Any motion for a new trial grounded on newly discovered evidence must be filed <u>within 3 years after</u> the verdict or <u>finding of guilty</u>.") (emphasis added).

Here, Hasbajrami's "finding of guilty" (<u>i.e.</u>, guilty plea) took place on April 12, <u>2012</u>. As such, Hasbajrami has until April 12, <u>2015</u> to file any Rule 33 motion based upon newly discovered evidence, which is the ground sought to be raised here. Thus, with respect to a Rule 33 motion, there is no waiver that the Government may even seek to enforce.

## Conclusion

For the foregoing reasons, this Court should order, with disclosure to cleared defense counsel and full participation in any hearings, that the following information and material should be produced:

- Disclose the "foreign intelligence information" referenced in the Government's February 24, 2014 letter.

- To the extent the "foreign intelligence information" referenced in the Government's February 24, 2014 letter includes recordings of or relating to the defendant's prosecution, and to the extent available, provide transcripts – both in the native language and translated into English – of any and all such recordings.

- Identify what "evidence and information" was derived from the warrantless surveillance (i.e., the FAA).

- Identify what "evidence and information" was derived from the warrantless surveillance (i.e., the FAA) that was also thereafter relied upon in support of subsequent Title I and Title III FISA warrant application relevant to the defendant herein.

- Disclose whether the FAA surveillance relied upon against Hasbajrami intentionally targeted the defendant (see 50 U.S.C. §§ 1881a[b][1], 1881a[b][2]).

- Disclose whether the FAA surveillance relied upon against Hasbajrami intentionally targeted "a United States person reasonably believed to be located outside of the United States" (50 U.S.C. § 1881a[b][3]).

- Disclose whether the FAA surveillance relied upon against Hasbajrami "intentionally acquire[d] any communication as to which the sender and all intended recipients [were] known at the time of the acquisition to be located in the United States" (50 U.S.C. § 1881a[b][4]).

- Disclose whether the Government has any reason to believe that the FAA surveillance relied upon against Hasbajrami were <u>not</u> "conducted in a manner consistent with the fourth amendment to the Constitution of the United States" (50 U.S.C. § 1881a[b][5]).

- Provide copies of all FISA warrants and FISA warrant applications not previously disclosed to the defense in this case.

- And provide material documenting the Government's failure to provide pretrial notice of surveillance pursuant to 50 U.S.C. § 1881a (<u>i.e.</u>, the FAA), including, but not limited to, all relevant communications manifesting any policy of non-disclosure and all relevant communications underlying the decision to provide no notice and the decision to provide the supplemental notice. This material should at least answer the following questions:

  o Who had knowledge that FAA surveillance was implicated in this case and when was such knowledge gained?

  o Who was involved in any decision  not to provide pretrial notice of FAA surveillance and when was such a decision made?

  o What, if any, notice was this Court given about FAA surveillance relative to Hasbajrami (or other persons relevant to this case) <u>prior to</u> the entry of Hasbajrami's guilty plea?

  o What minimization and targeting procedures and interpretive instructions were in effect at the time any such evidence or information was gathered, and how were those procedures implemented (<u>i.e.</u>, who was being targeted, what was the basis for that targeting, and what minimization procedures were used during that targeting)?

  o And what, if anything, was the Foreign Intelligence Surveillance Court (FISC) told about FAA surveillance relative to Hasbajrami (or other persons relevant to this case) in approving any FISA warrants in this case?

73

The instant discovery motion seeks to identify for this Court the areas on which discovery is required so legal briefing can proceed on a complete factual record.  We respectfully submit that the Government's violation of its statutory notice requirement, coupled with the pervasive Constitutional issues related to Hasbajrami's prosecution and guilty plea, raise serious legal issues on which factual development is warranted in this case.  Accordingly, for all of the foregoing reasons, we respectfully submit that the instant discovery motion should be granted and the Government should be directed to immediately disclose to cleared defense counsel all such information responsive to this Court's Order.

Dated:  New York, New York
June 30, 2014

Respectfully submitted,

Michael K. Bachrach
Steve Zissou

*Attorneys for Defendant/Petitioner*
*Agron Hasbajrami*