```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ----------------------------------------x
     UNITED STATES OF AMERICA,
 3                 Plaintiff,

                                         11 CR 623
 4

 5           versus            United States Courthouse
                               225 Cadman Plaza East
 6                             Brooklyn, N.Y.  11201
     AGRON HASBAJRAMI,
 7
                     DEFENDANT.
 8
     ----------------------------------------x
 9
                                January 23,  2015
10                              10:15 a.m.
             TRANSCRIPT OF ORAL ARGUMENT
11   Before:  HON. JOHN GLEESON,
                               DISTRICT COURT JUDGE
12
                          APPEARANCES
13
     LORETTA LYNCH
14   United States Attorney - Eastern District of New York
     271 Cadman Plaza East
15   Brooklyn, New York  11201
             SETH DuCHARME, ESQ.
16           SERITHA KOMATIREDDY, ESQ.
     Assistant United States Attorneys
17

18   ATTORNEY FOR DEFENDANT:

19   MICHAEL BACHRACH, ESQ.

20   For the Amicus Party:

21   PATRICK C. TOOMEY, ESQ.
     ALEX ABDO, ESQ.
22   JAMEL JAFFER, ESQ.

23   Reporter:  ALLAN R. SHERMAN, CSR, RPR
                225 Cadman Plaza East Rm 374
24               Brooklyn, New York  11201
                Tel: (718) 613-2529  Fax: (718) 613-2630
25   Proceedings recorded by mechanical stenography, transcription
     by CAT.
```

Oral Argument

1          THE CLERK:  Criminal cause for motion hearing,

2    United States of America versus Agron Hasbajrami, docket

3    number 11 CR 623.

4          Counsel, please state your appearances for the

5    record.

6          (Official Albanian (Tosk) Interpreter present, Uk

7    Lushi.)

8          THE COURT:  State and spell your name for the

9    record.

10          MR. DuCHARME:  For the United States Seth DuCharme,

11    Matthew Amatruda and Saritha Komatireddy.

12          And this morning we're joined at counsel table by

13    Joe Palmer and Danya Tia from the National Security Division

14    of the Department of Justice.

15          MR. BACHRACH:  Your Honor, for the defendant Agron

16    Hasbajrami, Michael Bachrach.

17          Mr. Zissou and Mr. Dratel were unable to be here

18    today.  I apologize.  Seated with me, I'll let them introduce

19    themselves.

20          MR. TOOMEY:  Good morning, your Honor.

21          Patrick Toomey from the ACLU.  I'm here with my

22    colleagues Alex Abdo and Jamel Jaffer.

23          THE COURT:  Good morning, everyone.

24          Do you want to be heard in support of your motion?

25          MR. BACHRACH:  Your Honor, at its core, the

Oral Argument

1    suppression motion really comes down to the question of

2    whether or not the U.S. can spy on U.S. persons within the

3    United States without a warrant.

4              We believe the Fourth Amendment says no.  We believe

5    the FAA says no.  And the parties have collectively devoted

6    over 350 pages to this question so I don't pretend to believe

7    it's an uncomplicated one.

8              Before I really get to the heart of the motion

9    though, I feel I need to point something out, and that is that

10   from the defense perspective, these motions or at least the

11   second motion which is the as applied challenge to the

12   statute, the defense position is that that motion is not fully

13   briefed and cannot be fully briefed until defense counsel

14   receives copies, even if it's within the confines of the

15   Classified Information Procedures Act, but copies of the

16   government's legal arguments with respect to their response to

17   the second motion.

18             We understand there may be reasons for national

19   security purposes that we can't see the actual FISA material,

20   although we debate that, but we think at the very least, due

21   process requires us to see those legal arguments so that we

22   can effectively research and respond to them because right

23   now, it's a complete vacuum and we have no idea what the

24   government has said.

25             With respect to the motions themselves, your Honor,

Oral Argument

1    I think -- quite frankly, I think I briefed it as thoroughly

2    as I think we can possibly can and I really would rather know

3    if there is a particular area your Honor would like us to go

4    into, otherwise, I'm actually quite comfortable resting on the

5    briefs or turning to counsel for the amici if they have

6    something to say or with respect to the suppression motion.  I

7    am going to assume for a moment that you want me to wait

8    before discussing all the other motions.

9              If I'm wrong --

10             THE COURT:  That's fine with me.  If I have

11   questions, I won't be bashful.

12             MR. BACHRACH:  Thank you.

13             THE COURT:  Gentlemen, do you want to be heard?

14             MR. TOOMEY:  Yes, your Honor.

15             My name is Patrick Toomey from the ACLU.

16             Thank you, your Honor, for allowing us to

17   participate in this morning's hearing.

18             As you know, we filed a brief addressing the

19   constitutionality of the FISA Amendments Act, and with your

20   permission, I'd like to address a few issues raised in the

21   government's papers and, of course, entertain any questions

22   that the Court may have.

23             The three issues that I would like to address are

24   the feasibility of a warrant requirement, the applicable of

25   the International Overhear Rule and the availability of a

Oral Argument

1   foreign intelligence exception.

2          The first issue, the feasibility of the warrant

3   requirement.  The government's position is that a warrant

4   requirement would be unworkable.

5          It claims that to require a warrant for surveillance

6   under the FAA would be to require a warrant any time the

7   government engages in foreign surveillance targeted at a

8   foreigner abroad.  That is not true.

9          THE COURT:  You know what, come on up here to this

10  shelf.

11          MR. TOOMEY:  Thank you, your Honor.

12          The government claims that to require a warrant for

13  foreign surveillance targeted at individuals abroad would be

14  to require a warrant any time on the off chance that the

15  government's surveillance might sweep up the communications of

16  an American.

17          The Fourth Amendment doesn't require that however.

18  What the Fourth Amendment requires is at a minimum, the

19  government do one of two things; take reasonable precautions

20  to avoid intercepting the communications of Americans without

21  a warrant or to obtain a warrant when it seeks to look at an

22  American's communications that it has collected the course of

23  that foreign intelligence surveillance.

24          That requirement is entirely workable and would not

25  comprise the government's legitimate interests in gathering

Oral Argument

1    foreign intelligence.  The warrant requirement is the Fourth

2    Amendment's default rule, and in a sense, it's always

3    burdensome for the government to obtain a warrant to collect

4    information or to engage in a search.

5            The mere fact that it has to go through the judicial

6    process to do so is not the type of burden that the Fourth

7    Amendment excuses.  And the Supreme Court recognizes as much

8    in Keith when it addressed intelligence gathering in the

9    domestic context.  The proposal to incorporate a warrant

10   requirement is not novel either.  There have been proposals

11   put forth by then Senator Obama in 2008 when the FISA

12   Amendment Act was first adopted.  There have been more recent

13   proposals that would incorporate a warrant requirement from

14   both the President's Review Group and in a bill passed by the

15   House this past year.

16           These proposals show that there are various ways

17   incorporating this requirement and that there are more

18   reasonable alternatives available to the government in terms

19   of protecting Americans' communications in the course of this

20   surveillance.

21           On the second point, on the application of the

22   Incidental Overhear Rule, that rule has never operated as an

23   independent or a separate exception to the warrant

24   requirement.  In fact, the cases show that precisely the

25   opposite is true.

Oral Argument

1    In the cases that the government points to, the

2  government had obtained a warrant to collect the

3  communications at issue and that warrant served to protect not

4  just the privacy interests of the person who was the subject

5  of the warrant, but also the privacy interests of other

6  parties who might be overheard.  And cases like Donovan

7  Yannotti stand for that proposition.

8    Just as fundamentally, the practical consequence of

9  the government's application and location of the Incidental

10 Overhear Rule in this case would be to eliminate Americans'

11 pricey interests in their international communications.

12    It would mean that the government could target any

13 foreigner or every foreigner for surveillance and on that

14 basis collect every American's communications with those

15 foreigners without obtaining a warrant.

16    Similarly, the purpose of the surveillance that is

17 at stake under the FISA Amendment Act, the programatic purpose

18 is to obtain the international communications of Americans.

19 And the scope of the surveillance that is being undertaken

20 pursuant to this statute bears that out.  The government is

21 monitoring at least 89,000 targets under the statute according

22 to it's own transparency reports and according to both the

23 Privacy and Civil Liberties Oversight Board and other reports,

24 the amount of Americans' international communications being

25 collected is considerable.

Oral Argument

1          Under the third point, the applicability of the

2     foreign intelligence exception, as we lay out in our briefs,

3     we don't believe the government can satisfy that exception

4     because the warrant requirement is not impracticable in this

5     context and it has -- it can use a warrant to obtain the

6     information that it needs, but even more fundamentally, if

7     there is a foreign intelligence exception and that's something

8     with which we strongly disagree, it is not broad enough to

9     encompass the surveillance that the government is undertaking

10    here.

11         The cases that the government points to stand for

12    the proposition that there is a foreign intelligence exception

13    where the government -- it's an individualized finding that

14    the target is an agent of a foreign power and that finding

15    then personally certified by the president for the Attorney

16    General.

17         Even the Privacy and Civil Liberties Oversight Board

18    in its report, Section 702, found that it was not clear that

19    the exception that the government would carve out with respect

20    to this statute met the standard put forth in any of the

21    preceding cases.

22         Finally, I would just like to emphasize that what

23    this statute does is to allow the government, to give the

24    government nearly unfettered access to the international

25    communications of Americans, and the practical consequence of

Oral Argument

1    the government's arguments would be to eliminate Americans'

2    privacy interests in their international communications at a

3    time when global communications are becoming ever more common.

4                  Thank you, your Honor.

5                  If you have any questions.

6                  THE COURT:  Thank you Mr. Toomey.

7                  MR. DuCHARME:  May I approach as well, your Honor?

8                  THE COURT:  Yes.

9                  MR. DuCHARME:  Your Honor, it is quite correct that

10   the briefing was extensive in this case.  That is not to say

11   however that the issues are extraordinarily complicated.

12                  I think that there is general agreement, for

13   example, that what is at issue here is a subset of information

14   that is incidentally obtained under Section 702 and I think it

15   bears focusing on the title of the Statute 702, which is

16   Procedures for Targeting Certain Persons Outside the United

17   States other than the United States persons.

18                  We feel confident, your Honor, that the statute and

19   the way that the government has effected executing that

20   statute is lawful and is reasonable under the Fourth

21   Amendment.

22                  THE COURT:  Excuse me.

23                  If you turn off the mic, we won't be listening to

24   you confer.

25                  MR. TOOMEY:  Sorry.

1           MR. DuCHARME:  Your Honor, I don't think anyone

2    disputes that it's okay and reasonable, I don't think anyway,

3    for the U.S. government to target specific foreign persons in

4    foreign countries for a foreign intelligence purpose.

5           What I understand defense counsel and amici counsel

6    to be saying is they are concerned with the handling of the

7    incidental collection of U.S. persons that sometimes occurs

8    when 702 is executed against foreign targets.

9           More broadly in this case, what is at issue I think

10   here is the integrity really of the process by which the

11   government conducts its national security surveillance

12   programs.  It's of importance obviously to the United States

13   national security interests.  In this particular case, it's of

14   course of great importance to the defendant.

15          We extensively briefed the issue and provided

16   your Honor with a number of exhibits, supplemental filings

17   which are intended to make clear how that process actually

18   takes place in the real world.

19          THE COURT:  Just don't talk.

20          MR. BACHRACH:  Your Honor, if I may.

21          THE COURT:  Is this the interpreter?

22          MR. BACHRACH:  Yes.

23          THE COURT:  I was led to believe by communications

24   from you that there wasn't going to be interpretation.

25          MR. BACHRACH:  Only if Mr. Hasbajrami was having

Oral Argument

1   trouble understanding.

2              THE COURT:  Okay.

3              Swear the interpreter.

4              (Albanian (Tosk) interpreter sworn, Uk Lushi.)

5              MR. DuCHARME:  Sorry, your Honor.

6              To be clear, we want the defendant with respect to

7   this case but we also want the Court and the American people

8   to have confidence in the integrity of this process.  We take

9   very seriously, of course, our constitutional obligations with

10  respect to the surveillance of U.S. persons.

11             What I think bears emphasizing is Section 702 does

12  not permit the targeting or reverse targeting of U.S. persons.

13  What happens occasionally is that when a foreign person is

14  targeted, a U.S. person is a party to a communication with

15  that person and that U.S. person's information is obtained in

16  the course of the 702 collection.  It's not the intent of the

17  statute.  There are mandated minimization in targeting

18  procedures to limit the risk of inadvertently targeting a U.S.

19  person.  The Court knows what those procedures are.  The law

20  requires them.  The government requires them.  The government

21  follows them.  The FISC reviews them.  Congress does oversight

22  over them on a routine basis.  So there are oversights in

23  place.

24             In terms of the worry that every foreign person

25  could be targeted under every facility that they might use,

1   really I think distorts what the statute says and what

2   hopefully the Court's understanding is of how the program

3   works.

4           In this particular case, judge, I think it also

5   bears focusing on the fact that this case is really important

6   because it implicates an interplay between a number of

7   different authorities.

8           The Title VII FISA authority where Section 702 is

9   which is really what is front and center here but also

10  traditional Title I and Title III FISAs which have been more

11  frequently litigated, and the other investigative tools that

12  are available to the United States government and law

13  enforcement agencies when they learn, for example, that a

14  person in the United States, in New York City for example, is

15  communicating with someone overseas about matters related to

16  terrorism.  What did the United States government do in this

17  case?  What does the United States do as a general matter?

18  And I hope that what we'll emerge from this litigation is a

19  better understanding and a greater confidence in how those

20  tools are used and not frankly abused.

21          We share in the concerns of the ACLU frankly and the

22  defendant in this case that there must and should be proper

23  limitations on government surveillance of U.S. persons.  We

24  want the Court and the defendant and the American people to

25  have confidence that there are checks more broadly and that

Oral Argument

1  there were checks in this case and that the steps that we took

2  were reasonable.

3           In fact, we think that this case stands really as a

4  very good example of how these various legal authorities and

5  tools should be used.

6           Respectfully, judge, I think when I read the statute

7  and when I look at the cases that give us guidance on

8  balancing our national security efforts against foreign

9  persons with our need to protect the American people here at

10  home, I really think this case stands as an example largely

11  and clearly with respect to the notice issue, I am not saying

12  we have done everything perfectly but when we are talking

13  about reasonableness and good-faith and appropriateness and an

14  understanding of what the law requires of us and where the

15  boundaries should be and our obligations, I think this case

16  frankly stands as an example of what we are supposed to do.

17           THE COURT:  When you say notice issue, you mean the

18  notice to Mr. Hasbajrami that he was subjected to 702

19  surveillance?

20           MR. DuCHARME:  That's correct, judge.  That was an

21  unfortunate mistake but when we realized we should have told

22  him, we told him.  And reasonable minds perhaps could differ

23  as to what the appropriate remedy was for that late notice.

24  Yours was you put him back in the position that he would have

25  been had we given him the proper notice in the first place and

1   that's where he now stands and given where we ended up, we

2   welcome the challenges by the defendant and by amicus and we

3   welcome the Court's scrutiny.

4          These are issues that frankly have not been

5   addressed previously very often by the Court and we welcome

6   the chance to allay some of the concerns raised by the

7   defendant and we welcome the Court's scrutiny.  We want people

8   to have confidence in the integrity of our programs, the

9   reasonableness of our programs and the constitutionality of

10  our programs.  These are obviously very sensitive and

11  important issues.

12          I think --

13          THE COURT:  Does it make a difference whether the

14  communications at issue are specifically targeted

15  communications or on the other hand, what are called -- this

16  terminology is actually new to me, but upstream

17  communications?

18          Do you understand my question?

19          MR. DuCHARME:  I think so.

20          THE COURT:  From a Fourth Amendment perspective,

21  does it matter whether the incident or interception of a U.S.

22  person pursuant to 702 surveillance was obtained in connection

23  with a targeted, a targeted interception, specific

24  communication devices, interception to/from as opposed to

25  upstream?

1          Do you understand my question?

2          MR. DuCHARME:  I think I do, judge.  And with your

3  indulgence, I would like to give my colleague to also engage

4  with the Court.

5          Ms. Komatireddy is fully prepared and eager to

6  address some of the Court's questions, and if that is okay

7  with you, I would like to give her a chance to engage.

8          MS. KOMATIREDDY:  With respect to the two types of

9  collection that you are referencing, both are actually under

10  the statute what you would consider to involve targeting

11  because the statute requires that surveillance only be

12  conducted with the intention of targeting a non-U.S. person

13  located abroad to obtain foreign intelligence information.

14  And then the targeting procedures that are approved by the

15  Court promulgated by the Attorney General submitted to the

16  Court and approved by the FISC further delineate exactly how

17  the intelligence community identifies those targets.  So with

18  respect to the two types of collection that you are

19  referencing, whether there is collection that is coming

20  directly from a service provider or from the

21  telecommunications backbone, the upstream collection, the

22  actual seizure of communications results from targeting of a

23  non-U.S. person.

24          THE COURT:  I understand that.  So it sounds like

25  the answer to my question you say is no, it doesn't matter.

Oral Argument

1              MS. KOMATIREDDY:  Between the programs?

2              THE COURT:  Is the likelihood of incidental

3    interception of a U.S. person different in those two contexts?

4              MS. KOMATIREDDY:  I can't speak to the precise

5    likelihood.  What I can say with respect to both of the

6    programs, we have in addition to the targeting procedures,

7    minimization procedures that are also submitted to the FISC

8    with respect to both programs, and as the Court is aware from

9    Judge Bates' opinion, those procedures have at times been

10   approved, at times have not been approved and have been

11   modified.

12              So with respect to both, there are safeguards in

13   place to insure that any incidental collection of U.S.

14   persons' communications is minimized as much as possible.

15              THE COURT:  What is your response to your

16   adversary's claim that unless he sees all of your legal

17   argument, he can't adequately argue in support of this motion?

18              MS. KOMATIREDDY:  Your Honor, it's certainly in

19   everyone's interest for defense to see as much of the legal

20   argument as possible.  To the extent we redacted our brief,

21   it's because the law requires it.  In this context, Congress

22   has set forth a very specific procedure for how to handle

23   classified information.  And Section 1806 F sets out that

24   procedure and specifically contemplates ex parte briefing in

25   the context of a suppression motion.

1           And as Judge Posner recently affirmed in his opinion

2   in Dowd in the Seventh Circuit, that procedure specifically

3   states that when the Attorney General declares the disclosure

4   of certain information to pose harm to national security, then

5   the next step is for the Court to review ex parte and in

6   camera that information and make a determination as to the

7   legality of the acquisition.  Only if it's not capable of

8   making that determination on it own is disclosure deemed

9   necessary under the statute and is disclosure permitted.

10          We would respectfully submit that given all the

11  information that has been submitted in the classified form and

12  unclassified form, and the Court knows the content, without

13  commenting on exactly what was redacted, we would submit that

14  the material that was redacted was redacted for a legitimate

15  purpose and is covered by the declaration that was submitted

16  as to why disclosure of the material would pose harm and that

17  material taken as a whole gives the Court enough information,

18  full information to determine the legality of the acquisition

19  without disclosure.

20          THE COURT:  Anything further from the government?

21          MR. DuCHARME:  No, your Honor.

22          MS. KOMATIREDDY:  No, your Honor.

23          THE COURT:  Do you want to be heard with regard to

24  this aspect of your motions and then I'll hear you on the

25  other motions?

Oral Argument

1          MR. BACHRACH:  Yes, your Honor.

2          May I approach?

3          THE COURT:  Yes.

4          MR. BACHRACH:  I'm going to work backward a little

5   bit, your Honor.

6          With respect to the last point that your Honor

7   raised with respect to whether or not we should be entitled to

8   this information, let me make one thing clear.  We two

9   competing statutes here.  We have FISA but we also have CIPA.

10  And FISA came first and was originally contemplated to not

11  allow defense counsel to be part of the equation unless the

12  Court absolutely thought it was necessary.  But then just a

13  few years later, Congress created a new statute, CIPA, for the

14  very purpose of getting defense counsel who have the necessary

15  security clearance involved in the process.

16         Now, the two statutes have never really been

17  rectified.  They have been at odds, however, here there is no

18  question that the relevant national security agencies made the

19  determination at the very beginning of this case that both

20  myself and Mr. Zissou, the two attorneys of record on this

21  case, were not a security risk and because we were not a

22  security risk, they gave us the relevant clearance, the

23  relevant national security clearance to be able to see

24  material related to this case, at the very least, to be able

25  to see the arguments related to this case so that due process

Oral Argument

1    can be supported.

2              In fact, under CIPA, your Honor, when the government

3    refuses to turn over material that is classified and refuses

4    to turn it over even to cleared counsel, this Court has the

5    authority to give the government a choice; turn over the

6    material or dismiss the entire case.  That's within

7    your Honor's power under CIPA.

8              Now, I acknowledge that that is an extreme sanction

9    and I'm not asking for it here.  I'm simply asking to be able

10   to see the material.  But the point being, your Honor, the NSA

11   has made one determination, that we are cleared, we are not a

12   security risk, and the government has written in their brief

13   and appears to be arguing still to this day that now for

14   prosecutorial purposes, they take a different position.  And

15   respectfully, your Honor, we really believe that that can't

16   stand.

17             With respect to the government's argument with

18   respect to whether or not the material, whether or not the

19   intercepts of these communications were incident, there are a

20   few problems with the government's argument.

21             First of all, every case discussing the incidental

22   overhear doctrine discusses it in the specter or in the

23   auspices of a warrant.  So what we are dealing with in all of

24   those cases is there has been a warrant approved by a judge

25   upon probable cause and during the execution of that probable

1    cause warrant, accidentally a little bit of material, a little

2    bit of intercepts were intercepted, not wide-scale programatic

3    intercepts that we have in this case.

4         In this case, we have surveillance programs that

5    have been authorized by Congress but are not subject to a

6    judge first approving a specific warrant.  It doesn't include

7    a determination of probable cause for the specific target or

8    for Mr. Hasbajrami.  It does not include any particularity

9    regarding the place, time, person or thing that can be

10   searched.  And again, of course, all of it is issued by a

11   judge.

12        The only thing that the FISA Court does in relation

13   to the surveillance is approve whether or not the procedures

14   at use are compliant with the statute, not whether or not the

15   targets are appropriately being surveilled or intercepted

16   incidentally, which again, we don't believe can be incidental

17   when the government is fully aware that the way it is

18   conducting its surveillance program, it is intended to capture

19   not simply the recordings of a target abroad who is a foreign

20   national, but an individual on U.S. soil or actually many

21   individuals on U.S. soil who are either U.S citizens or

22   permanent lawful residents, U.S. persons as they are both

23   collectively defined under the statute and under the case law.

24   It is completely different, your Honor.

25        The particular case that the government relies upon

1  in its briefs to say that that particular targeting period --

2  that these procedures were appropriate, that they have these

3  protections and these mechanisms, the case they refer to is In

4  Re Directives.

5     In Re Directives covered the same time period or at

6  least part of the same time period as the intercepts in this

7  case and in In Re Directives, the Court concluded the FAA

8  itself wasn't even being followed properly and then the Court

9  had to say no, you have to do it differently.

10     I'm not privy to whether or not the material they

11  are using against Mr. Hasbajrami was collected before or after

12  the procedures were corrected.  All I know is that during that

13  time period, the FISA Court of review determined that the FAA

14  and its programs were not even following even the FAA's own

15  statute, let alone whether or not it's constitutional.

16     And again, the Constitution is clear, you need a

17  warrant; you need probable cause; you need a judge with a

18  specific case in controversy examining whether or not it's

19  appropriate to issue a warrant in this case, not just some

20  broad, very broad shot in the dark.

21     If I may beg your indulgence, your Honor, for a

22  second, an analogy.  There is a movie and a book right now

23  that is very popular.  It's called American Sniper.  And I

24  think a sniper is a good analogy to the FAA program.

25     A sniper targets a very specific target who is

1    supposed to be a foreigner or an enemy of the state.  The FAA

2    ostensibly targets, if it's working properly, a noncitizen

3    abroad.  But the way the FAA does it is instead of using a

4    sniper's rifle, it uses a machine gun.  Instead of using a

5    scope, it puts on a blindfold.  And instead of targeting

6    foreign persons abroad, it turns around with the machine gun

7    and just sprays across at anything it can hit on U.S. soil.

8            That is not constitutional, your Honor.  That is not

9    consistent with the Fourth Amendment.  And it's certainly not

10   consistent with when the defendant individually specifically

11   in this case is a U.S. person who at all times relevant to

12   this case is on U.S. soil.

13           Lastly, your Honor, United States versus Verdugo,

14   which the government also cites, shouldn't be lost on

15   your Honor.

16           The Verdugo case talks about the fact that when a

17   foreigner is targeted abroad, it is constitutional to

18   surveillance them.  But in Verdugo, the entire surveillance

19   was occurring abroad and that was what made it constitutional,

20   the fact that it was a noncitizen and it was occurring abroad.

21           Here, your Honor, we have surveillance and just

22   about I think all of both upstream and to/from surveillance,

23   the actual intercepts are occurring on U.S. soil and then

24   specifically in this case of a U.S. person.

25           So even under Verdugo, the Fourth Amendment says

Oral Argument

1    this cannot stand.

2              I'll defer now to amicus counsel.

3              THE COURT:  All right.

4              Thank you.

5              MR. TOOMEY:  Thank you.

6              The government tried to convey the impression that

7    the incidental collection of Americans' communications under

8    the statute is a de minimus consequence of any type of

9    surveillance but that is not the case.  The collection at

10   issue under 702 as much as the government attempts to describe

11   it as targeted at foreigners located abroad might equally be

12   labeled as targeted at Americans' international communication.

13             One of the programatic purposes of the law was to

14   collect those communications and the government does so in

15   great quantity under the statute.

16             The Fourth Amendment does not contain the word

17   target but what matters under the Fourth Amendment is whether

18   the surveillance or the search invades an American's

19   reasonable expectation of privacy and the government at least

20   nominally in this case does not disagree with that

21   proposition, that Americans have a recognized privacy interest

22   in their international communications.

23             The scope of the incidental collection in this case

24   and the invasion of privacy goes directly to the

25   reasonableness question that is before the Court.  And the

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court   Eastern District of New York

1   reasonableness of these procedures and the statute as a whole

2   is not borne out by the facts as to the surveillance that the

3   government points to.  The statute permits collection without

4   prior judicial review without a finding of probable cause and

5   without any type of particularity.  It leaves an immense

6   amount of discretion in the hands of lower level executive

7   branch officials and that is proven even more by the targeting

8   and minimization procedures.

9        One might think that if the surveillance was

10  targeted simply at foreigners located abroad, that the

11  government would undertake reasonable efforts to exclude the

12  communications of Americans when it collects them in the

13  course of a surveillance.

14       There is nothing like that in the targeting

15  procedures for the statute.  Equally, one might think that if

16  the government were seeking to protect the privacy of

17  Americans' communications, the minimization procedures would

18  require the government to go through the communications and

19  sift out or segregate Americans' international communications.

20  That is not the case.

21       What in fact the minimization procedures allow is

22  the government in most cases to retain Americans'

23  communications for up to five years and in the course of a

24  dozen exceptions to keep those communications indefinitely.

25  The procedures also allow the government to dip into this pool

1   of incidentally collected communications and search using the

2   names or identifiers associated with U.S. persons for

3   information about those Americans in the course of ordinary

4   criminal investigations.

5           The Privacy and Civil Liberties Oversight Board

6   reported that the FBI does so routinely even at the assessment

7   stage of national security investigations and that it also

8   does so in the course of some ordinary criminal

9   investigations.

10          What that does is convert a pool of data that the

11  government says was acquired to target foreigners abroad for

12  foreign intelligence purposes into an every day law

13  enforcement tool for the FBI.  And our position is that the

14  procedures that currently exist don't satisfy the

15  reasonableness requirement and instead, a warrant should be

16  required when the government wants to access that information

17  at the back end or in order to acquire Americans'

18  communications at the front end.

19          Finally, just on your question about the upstream

20  surveillance, your Honor, upstream surveillance raising a host

21  of different legal problems separate from the prison program

22  that is described in the papers.  And you can see some of

23  those other problems in both Judge Bates' opinion from 2011

24  which I believe is the opinion that defense counsel was

25  referring to, In Re Directives, and you can also -- those

1    problems with upstream in the course of which the government

2    seizes entire streams of internet traffic as it flows across

3    networks not just the targets but many, many individuals who

4    have no relationship to the government's target and may be

5    communicating internationally or may be communicating

6    domestically.

7              The set of additional legal problems associated with

8    that program is spelled out even more clearly in the Jewel

9    brief that is referenced in footnote 22 of the amicus filing.

10             If the Court has no other questions, thank you.

11             THE COURT:  Thank you, Mr. Toomey.

12             Do you have other motions you want to address

13   orally?

14             MR. BACHRACH:  Briefly.  If I may stand up?

15             THE COURT:  Yes.

16             MR. BACHRACH:  Very briefly touching on our motion

17   to suppress based upon outrageous government conduct.  Just to

18   be very clear, our position on that case, if it wasn't already

19   clear, is that the government's violation of its notice

20   provisions simply returning both us and the government to

21   where it would be had they not violated the statute is

22   insufficient here because although it does allow us to be --

23   the defendant to be able to challenge the constitutionality of

24   the searches, it's really not a sanction in any way to the

25   government because this was something they should have done to

Oral Argument

1    begin with.  And since this Court has already ruled that this

2    was an intentional DOJ-wide policy, we believe a stronger

3    statement than simply giving them a second chance is

4    appropriate in this case.

5              THE COURT:  That I should dismiss the indictment?

6              MR. BACHRACH:  No, not that you should dismiss the

7    indictment, that you should suppress the results of the FAA

8    surveillance.

9              We recognize that --

10             THE COURT:  Even if it's consistent with the Fourth

11   Amendment?

12             MR. BACHRACH:  Yes, your Honor.  Yes, your Honor.

13   To prevent the government from in the future failing to give

14   the defendant notice so that they can properly litigation this

15   section.  There are two motions here.  We have a per se

16   challenge under the Fourth Amendment but there is also an as

17   applied challenge.  So that assumes that the statute is

18   generally speaking constitutional but then whether or not it

19   is here, and that's where a sanction of suppression, even if

20   it's constitutional, would have an appropriate effect.

21             On the other motions, obviously, your Honor, a lot

22   of these are fruit of the poisonous tree.  They sort of

23   trickle out of the others.  The post-arrest statements would

24   only come into effect, and we acknowledge this, if we win one

25   of the first three motions.

1        The discovery, I don't mean to relitigate.  We have

2   already spent a whole hearing on it previously and I discussed

3   briefly why we think here it's additionally appropriate at

4   least with respect to their brief and their arguments with

5   respect to this brief.

6        The one of the final ones that I did want to address

7   though is a request that the government provide early

8   disclosure of its expert notice and of its Brady, Giglio

9   evidence, really Giglio evidence since obviously the

10  government has an obligation to turn over Brady as soon as

11  they recognize it.

12       This is a particularly complicated case and

13  particularly sensitive.

14       How do I put this?  Based upon -- I'm being careful

15  because of CIPA.  Depending who the government chooses to use

16  in their case I know will impact whether or not the defense

17  needs to file additional CIPA motions.  And it's for that

18  reason that we ask that whatever the witnesses are going to be

19  in this case, be them lay witnesses or expert witnesses, we

20  learn that well in advance of the trial date so that if as I

21  expect these issues, classified issues to arise, we can

22  effectively litigate it in a proper manner so that it doesn't

23  delay the trial in any way.

24       All of our motions with respect to early discovery

25  of notice, even if it's under 404(b), it's all about we don't

1  want to delay the trial, we want to shake sure we can proceed

2  as quickly as possible assuming there is a trial, and we

3  believe particularly here, it's going to be complicated and

4  it's going to involve classified information, the earlier we

5  get it, the better chance we have of avoiding unnecessary

6  delays.

7          Thank you.

8          MR. DuCHARME:  Very briefly.

9          I guess on the last matter first.  It is certainly

10 our intent for things to proceed smoothly towards trial.  I

11 will speak to Mr. Bachrach after today's proceeding and try to

12 figure out what his CIPA concern is.

13         If we determine that there is some CIPA issue

14 coming, we will get it in front of the Court right away so it

15 shouldn't be a last minute problem.  I think that we can

16 probably sort that out between ourselves.  If not, we'll take

17 the Court's assistance as always but I think that maybe we

18 can.  We don't have any secret witnesses in this case, so I

19 think that we can sort that out.

20         In terms of the characterization of the Court's

21 finding on this notice issue and specter of outrageous

22 government conduct, it's not my understanding that the Court

23 found that there was intentional misconduct by the Department

24 of Justice with respect to the notice issue.

25         I think the record is clear, I hope it is, that we

1    gave the notice we thought we were supposed to give at the

2    time and when we realized we should have given different

3    notice, we didn't, and I hope that cuts against the notion of

4    outrageous government misconduct with respect to the notice

5    issue or even intentional withholding of the notice.

6            So I just wanted to say that.  I think that is

7    really the only thing I need to say in response.

8            THE COURT:  Remind me where we are on the CIPA

9    track?  We have, our CIPA Section 4 motion was due and filed

10   January 9, I believe so that is pending before your Honor.

11   There was previously some classified information that we had

12   turned over to defense counsel prior to the plea.  Some of

13   those issues are implicated by the CIPA motion in that regard.

14   There are some other issues as well and we are essentially

15   waiting for the decision on that motion.

16           MR. BACHRACH:  Just to supplement that.

17           Much more recently, actually during the pendency of

18   this litigation while we were drafting the briefs,

19   considerable more classified information has been disclosed to

20   the defense.

21           We have not fully been able to look through it all

22   yet but we have received it recently.  So there is more there

23   and I don't know yet if it's going to be litigated.

24           I know the original pretrial disclosure is something

25   that we would want to make public.

Oral Argument

1          THE COURT:  The motion for relief based on

2   outrageous governmental misconduct is denied.

3          The rest of these motions, I'll take under

4   advisement.

5          Thank you.

6          MR. DuCHARME:  Thank you, your Honor.

7          (Matter concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25