```
 1                                    Tuesday, 23rd January 2007
 2    (2.00 pm)
 3   MR JUSTICE MACKAY:  Yes, Mr Hilliard.
 4   MR HILLIARD:  My Lord, I do not know if as before it might
 5        just help if I was to introduce the material to your
 6        Lordship briefly before calling Mr Kohlmann?
 7   MR ROBERTSON:  Perhaps he could do the introducing of the
 8        material.  I do not want to delay him.
 9   MR JUSTICE MACKAY:  Well, before anyone introduces any
10        material, can I just understand what the exercise is we
11        are engaged on?  This is an exceptional procedure to
12        establish on a voir dire the expertise of this witness.
13        I have received from you an edited version of his report
14        which indicates the areas you would want him to ask
15        about if he was to qualify in my judgment as an expert
16        witness with relevant evidence to give.
17   MR HILLIARD:  Yes.  It may be that the evidence is -- really
18        all I wanted to say is that the emphasis may be on the
19        latter, the relevant evidence to give, because as your
20        Lordship will see I think from the material I have
21        highlighted, I think almost without exception it does
22        not in fact involve expressing an opinion at all.
23   MR JUSTICE MACKAY:  Well --
24   MR HILLIARD:  It is a question of dealing with the
25        material --
```

```
 1   MR JUSTICE MACKAY:  The material that is in circulation in
 2       other places.  I understand that entirely.  I also
 3       understood Mr Robertson, before we got to that, to
 4       say: this man is not an expert of any sort in the sense
 5       that we look at expert witnesses.  Is that still being
 6       contended, Mr Robertson?
 7   MR ROBERTSON:  Oh yes, it is.
 8   MR JUSTICE MACKAY:  Yes.  Well then that is the first
 9       business for today; is it not?
10   MR ROBERTSON:  Yes.
11   MR JUSTICE MACKAY:  Then I need to consider, if I can find
12       my note, what investigation I am embarking on; what am
13       I looking for.
14   MR HILLIARD:  Yes.
15   MR JUSTICE MACKAY:  This is in section 10 of --
16   MR HILLIARD:  Well it is 10-64.
17   MR JUSTICE MACKAY:  There is that long quotation from
18       a south Australian case; is there not?
19   MR HILLIARD:  My Lord, that is absolutely right.
20   MR JUSTICE MACKAY:  Mr Robertson, do you accept that is the
21       ambit of this inquiry this afternoon?
22   MR ROBERTSON:  Oh yes.  Yes, yes.
23   MR JUSTICE MACKAY:  It is not controversial, any of that?
24   MR ROBERTSON:  No, I think Cross and Archbold set out the
25       general principles and indeed we have set them out even
```

2

1     more shortly in our skeleton.

2  MR JUSTICE MACKAY:  All right.  So we look at that and then

3     we say, if I am satisfied -- if I am not satisfied he

4     qualifies as an expert that is the end of it.  If he

5     does, is the material that is proposed to go through

6     with him relevant to issues in the case?

7  MR ROBERTSON:  Yes.

8  MR JUSTICE MACKAY:  Thank you.  Sorry to be pedantic.  Can

9     I just get another piece of paper off my desk and give

10     it to you without calling for comment.

11        These are the jury questions that were asked of the

12     other case currently going on in this court.  I asked

13     for them out of interest.  You may have seen them

14     already, I do not know if you have.

15  MR ROBERTSON:  No.

16  MR JUSTICE MACKAY:  There are four copies, two for each

17     side.  Obviously they need adapting, but if you care to

18     think about them overnight and let me have your views.

19  MR ROBERTSON:  Thank you very much.

20  MR JUSTICE MACKAY:  All right.  Yes, sorry.  On you go.

21  MR HILLIARD:  Yes.  Mr Kohlmann, please.

22                    MR KOHLMANN (affirmed)

23           Examination-in-chief by MR HILLIARD

24  MR HILLIARD:  Can you give us your full name, please?

25  A.  My full name is Evan F Kohlmann.

                              3

```
 1   Q.   And your occupation now, as at this time?
 2   A.   I currently serve as an international terrorism
 3        consultant providing expert services to media, law
 4        enforcement and prosecutors in the United States,
 5        United Kingdom and Australia.
 6   Q.   Can you help us please just a bit about your background.
 7        I am really interested, as it were, in your educational
 8        qualifications, and I do not mean at school, obviously,
 9        but since then, and your academic background.  Can you
10        help us about that?
11   A.   Sure.  I am a graduate of the Edmund A Walsh School of
12        Foreign Service at Georgetown University in
13        Washington DC.  While at Georgetown University, I was
14        focussing on the Arab-Afghans.  I minored in Islam at
15        the Centre of Muslim-Christian Understanding at
16        Georgetown University.
17   MR JUSTICE MACKAY:  Sorry.  That was a bit fast for me.  So
18        you went to Georgetown University.  Your degree, this is
19        a first degree?
20   A.   That is correct, my Lord.  The degree was in
21        International Security Studies, International Politics.
22        And I did a minor programme in Islam and
23        Muslim-Christian Understanding from the Centre for
24        Muslim-Christian Understanding at Georgetown University.
25   MR JUSTICE MACKAY:  You will have to help me on a minor.
```

```
1       What is a minor?  Is that part of your first degree or
2       is it subsequent?
3    A. It was almost like an addendum degree to that.  It is
4       actually, at Georgetown University, it is referred to as
5       a certificate programme.  While at Georgetown I also
6       served as a research assistant to Dr Mamoun Fandy, at
7       the Centre for Contemporary Arab Studies.  Afterwards,
8       I gained a law degree at the University of Pennsylvania
9       Law School in Philadelphia, Pennsylvania, where
10      I focused on national security, cybercrime law and
11      I also took separate classes at the grad school in such
12      subjects as Afghanistan and Islamic trends in
13      Afghanistan.
14          Since then I have contributed scholarly pieces,
15      scholarly articles, to a number of recognised
16      publications including Foreign Affairs.  I have also
17      written a book, which was published by an university
18      publisher here in the United Kingdom, the title of that
19      book is Al Qaeda's Jihad in Europe.  That book is used
20      in a textbook in university classes in Canada, the
21      United States and Australia.  It has also been cited by
22      the US Congressional 9/11 Commission in their final
23      report as a source of information.
24          My recent papers include the North African Mujahadin
25      Network of the Western Balkans, published as a part of
```

5

```
 1        Bosnian Security after Dayton, which came out last
 2        month -- excuse me, three months ago.  I have also
 3        recently published the Role of International -- excuse
 4        me, the Role of Islamic Charities in International
 5        Terrorist Fundraising and Recruitment on behalf of the
 6        Danish Institute for International Studies.
 7   MR ROBERTSON:  I trust we will be supplied with these
 8        papers.  We have asked for them and not thus been
 9        supplied.
10   MR JUSTICE MACKAY:  You will get your turn to --
11   MR ROBERTSON:  Yes.
12   MR HILLIARD:  I have forgotten where you were.
13   MR JUSTICE MACKAY:  We were on the role of Islamic studies
14        in international terrorist fundraising.  Where was that
15        published?
16   A.   That was published as part of a conference organised by
17        the Danish Institute for International Studies in
18        Copenhagen.  Another paper of mine that was recently
19        published is the Afghan-Bosnian Mujahidin Network in
20        Western Europe, which was published by the Swedish
21        National Defence College and presented at a symposium in
22        Stockholm, Sweden, organised by the European Emergency
23        Management Agency and the Swedish National Defence
24        College.
25   MR JUSTICE MACKAY:  Mm hmm.
```

```
1    MR HILLIARD:  Can you just help us with this, before we look
2        at one or two other areas: have you given evidence in
3        court as an expert before?
4    A.  Yes, I have.
5    Q.  In this country or abroad or both?
6    A.  In both.
7    Q.  In this country, can you just help us with what that was
8        about?
9    A.  Sure.  Last year I testified in R v Palvinder Singh and
10       Mohammed Ajmal Khan.  During that case I provided expert
11       testimony on the Arab Afghans, on Lashkar-e-Taiba, which
12       is also known as Army of the Pure, which is an Afghan
13       linked group active in both Afghanistan and Kashmir.
14   Q.  That was a case I think in front of Mr Justice Fulford;
15       is that right?
16   A.  I believe that is correct.
17   Q.  Abroad, can you help us about cases where you have given
18       evidence as an expert abroad?
19   A.  Yes, I have testified five times in the US federal court
20       as an expert witness in cases including United States v
21       Sabri Ben Khala, United States v --
22   MR JUSTICE MACKAY:  I do not need the names, I do not think.
23   MR HILLIARD:  We have the names on a sheet.  Can you just
24       help us, what the issues were, the area was that those
25       cases concerned.  Does your Lordship have this document
```

7

```
 1      that has the names of the cases?
 2   MR JUSTICE MACKAY:  Did I have that with his original
 3      report?
 4   MR HILLIARD:  Not with the original one.  We have a copy.
 5      It just saves your Lordship writing it all down.
 6   MR JUSTICE MACKAY:  Thank you.
 7   MR ROBERTSON:  What document is this?
 8   MR JUSTICE MACKAY:  Have you had this?
 9   MR ROBERTSON:  Yes, we have.
10   MR JUSTICE MACKAY:  Expert background.  Thank you very much.
11      All right, yes.
12   MR HILLIARD:  So those cases, we have them in a list, and
13      I may not be pronouncing them right but I am sure you
14      will know the case I mean.  Sabri Ben Khala.  Can you
15      help us, what was the area about which you gave expert
16      evidence  in that case?
17   A.  In that case I testified in a number of diverse areas
18      relating to Mujahadin organisations active in
19      Afghanistan, Europe and also on the internet.  My
20      testimony included tracing internet IP addresses.  It
21      included playing Jihadist videos for the court,
22      explaining their sources and their origins; it also
23      included explaining the background and histories of
24      various of the Mujahadin organisations that had surfaced
25      during the case, including the Taliban, Al Qaeda,
```

1      Lashkar-e-Taiba and others.

2  Q.  And the Ali Timini case?

3  A.  The Ali Timini case also was the same areas of

4      testimony.  Also in the Eastern District of Virginia.

5  Q.  And in Uzair Paracha?

6  A.  In United States v Uzair Paracha, I testified on the

7      history and development of Al Qaeda in Afghanistan, of

8      the Arab Afghan movement generally, of tactics, and

9      I suppose methods used by Mujahadin organisations such

10     as those active in Afghanistan.  I testified on the

11     location and nature of terrorist training camps in

12     Afghanistan and also the nature of the network that

13     Al Qaeda employs.

14  Q.  And Ali Asad Chandia?

15  A.  Ali Asad Chandia, United States v Ali Asad Chandia,

16     I testified again, the same subjects as United States v

17     Sabri Ben Khala and United States v Ali Timini.

18  Q.  And United States v Yassin Aref?

19  A.  In United States v Yassin Aref I testified on several

20     issues including the Islamic Movement of Kurdistan,

21     Ansar al-Islam, various individuals in Iraq,

22     Saudi Arabia, North Africa and elsewhere who are active

23     in international terrorist organisations such as the

24     Saudi cleric Abu Sulaiman Al-Makki.  I also testified as

25     to the general background of the Bangladeshi militant

```
 1      group Jamaat-i-Isalmi.

 2          Excuse me, I forgot, I also testified as to the

 3      identity of Libyan nationals who were recorded as having

 4      met with the defendant, including leaders of the Libyan

 5      Islamic Fighting Group.

 6   Q. Since about 1997, have you been engaged on a particular

 7      project?

 8   A. Yes.  Since approximately 1997, I have been engaged in

 9      a far-reaching project to gather information about

10      international Mujahidin, or holy warrior organisations

11      with links, shared common linkages, through the Jihad in

12      Afghanistan, both --

13   Q. Pause for a moment.

14   MR JUSTICE MACKAY:  Well, if you are taking him through EK5,

15      for my purposes you can take this as read, and if need

16      be, ask questions on it, because I am reading it now as

17      I go through it.  You are on the first paragraph of this

18      at the moment.

19   MR HILLIARD:  My Lord, I am.  I just want to get the sense

20      of it.  So to gather information you said about

21      international Mujahidin, I think you said with reference

22      to Afghanistan.  Can you just help me about that?

23   A. Yes.  During, when I was doing the research for my

24      thesis at Georgetown University, the focus of my

25      research was on the Arab Afghan Brotherhood.
```

```
 1      Individuals who had gone to Afghanistan from various
 2      countries in the Middle East and elsewhere in the Muslim
 3      world with the hopes of saving the Afghan people from
 4      catastrophe.  In the end they had formed their own
 5      Jihadist organisations in the hopes of inspiring Islamic
 6      revolutions in their own home countries.
 7          But what I discovered upon researching these
 8      organisations is that while they did maintain separate
 9      organisations, they had shared common linkages.  They
10      shared the same spiritual leaders; they shared the same
11      sources of money; they shared weapons; they shared
12      training camps, and in fact what would often happen is
13      if one organisation needed the resources of another
14      organisation, including personnel, that essentially work
15      could be contracted out between and among these
16      organisations.
17          So while the organisations in the beginning, were
18      not explicit allies, they formed a brotherhood, an
19      Afghan brotherhood, which grew closer over the years.
20  Q.  In the course of gathering that information, have you
21      gathered information about something called the
22      Libyan Islamic Fighting Group?
23  A.  Yes, I have.
24  Q.  Were members of that group in Afghanistan?
25  A.  Yes, the Libyan Islamic Fighting Group first emerged in
```

11

```
 1        the early 1990s an as a result almost directly of the
 2        involvement of Libyan Islamists inside of Afghanistan.
 3        One of the seminal events for LIFG was the travel of
 4        senior members of the group, that would found the group,
 5        to Afghanistan in the late 1980s.  As a result a number
 6        of the individuals who went on to found the Libyan
 7        Islamic Fighting Group became influential figures not
 8        just within that organisation but within other
 9        organisations as well, affiliated with the Afghan Jihad,
10        including Makhtab --
11   MR JUSTICE MACKAY:  Do not let us have a history of the LIFG
12        at this stage.  I have the picture.  We may want to know
13        more about this later.
14   MR HILLIARD:  You have prepared two reports that we have.
15        In particular the main one runs to 19 pages and deals
16        with the Libyan Islamic Fighting Group, has a large
17        number of footnotes, 113 or so.  You know the report
18        I mean?
19   A.   Yes.
20   Q.   The material that you deal with in that report, is that
21        material that you are very familiar with?
22   A.   Much of the material in the report was drawn from
23        original sources taken from the Libyan Islamic Fighting
24        Group.  Perhaps one of the most important sources was
25        the actual website run by the Libyan Islamic Fighting
```

```
 1        Group.  That website began as Almuqatila.com, first
 2        surfaced in August 2000.  It later went offline, was
 3        kicked offline, in approximately late July 2002.  Then
 4        within two months a new website surfaced, a new
 5        incarnation, you could say, of Almuqatila, except that
 6        this new incarnation was hosted at Almuqatila.cc,
 7        instead of .com.
 8            These websites contain copies of virtually all
 9        communiques, official communiques issued by the Libyan
10        Islamic Fighting Group from the very date that the
11        organisation was officially founded in October 1995.  It
12        also contained what are known as fatwas, which are
13        religious edicts, issued either on behalf of Libyan
14        Islamic Fighting Group clerics, or clerics whom the
15        Libyan Islamic Fighting Group deemed allegiance to,
16        offered allegiance to, along with numerous other
17        documents including links to speeches by individuals
18        such as Sheik Abdullah Azzam, and Sheik Osama Bin Laden.
19   MR HILLIARD:  The material on the website, I just want to be
20        clear, is that material that you have only accessed and
21        researched for the purposes of this case or has that
22        been part of the work you have told us you have been
23        doing since 1997?
24   A.   When the Almuqatila.com website first surfaced in August
25        of 2000, I was working in a thinktank in Washington DC
```

13

```
 1        that specialised in gathering open source information on

 2        terrorist groups.  One of the responsibilities that

 3        I had at that organisation was tracking North African

 4        militant groups, and a secondary task that I had at that

 5        organisation was to track websites of militant groups.

 6        So the Almuqatila site actually hit at a juncture

 7        between two areas of which I was primarily responsible

 8        for.  I began monitoring Almuqatila.com virtually at its

 9        inception.  I have saved multiple archived versions of

10        that website over time.  I was a regular visitor to that

11        website.  When it went offline I quickly -- I guess you

12        say tracked on to the new website, Almuqatila.cc, of

13        which I also saved archive copies --

14   MR ROBERTSON:  I am sorry to interrupt.  We are not getting

15        our LiveNote.  I gather the prosecution is and the

16        defence is not.

17   MR JUSTICE MACKAY:  Let us do as well as we can.  You will,

18        I am sure, get this eventually.

19   MR ROBERTSON:  We did not get it yesterday either and I was

20        told it had been fixed today, but it has not.

21   MR JUSTICE MACKAY:  It becomes more important, when real

22        evidence is being given but it is not easy for you.

23   MR HILLIARD:  You were just telling us that when

24        Almuqatila.com went offline, you quickly found a couple

25        of months or so later, Almuqatila.cc.
```

14

```
 1   A.   .cc, that is correct, which was on-line from
 2        approximately October 2002 until July 2003.  I also have
 3        multiple archived versions of that website, including
 4        versions that were saved with commercial website
 5        archiving software, which create detailed logs
 6        explaining which files were saved, what times they were
 7        saved at, how they were saved and where they were saved
 8        from.  Those files include again communiques from the
 9        Libyan Islamic Fighting Group; they include fatwas, or
10        religious edicts urging Muslims to fight in Jihad in
11        Libya, in Iraq and elsewhere, in Afghanistan and various
12        other documents.
13            I should add, I also maintain copies of all of that
14        material, and I can present it if necessary.
15   Q.   All the material you have had long since and not simply
16        for the purposes of this case?
17   A.   No, I have been tracking both of these websites from
18        their inception and I have researched them over the
19        space of at least four years, if not more.
20   Q.   Thank you very much.
21   A.   Thank you very much.
22   MR JUSTICE MACKAY:  Mr Robertson.
23                   Cross-examination by MR ROBERTSON
24   MR ROBERTSON:  Yes.  Mr Kohlmann, how old are you?
25   A.   I am 28.
```

```
 1   Q.  You are 28.  So that means that in 1997, when you

 2       embarked on this exercise, you were 19?

 3   A.  That is correct, or 18, but yes.

 4   Q.  18, probably.  Now tell us about your education.  You

 5       went to the Edmund A Walsh School of Foreign Service at

 6       Georgetown.  When did you begin that degree?

 7   A.  The same year I began my work on the Afghan-linked

 8       extremist groups, that was in 1997.

 9   Q.  So when you were 18?

10   A.  That is correct.

11   Q.  Was that a three-year course or a four-year course?

12   A.  No, that was four years.

13   Q.  A liberal arts course, it is described, on its website?

14   A.  It is not a standard university education as per what is

15       offered in the United States.  It is a cross between

16       a graduate and an undergraduate programme in which

17       individuals with --

18   Q.  It is an undergraduate programme; is it not?

19   A.  It is -- I received a bachelor in --

20   Q.  Sure.  There was a masters programme you could have gone

21       on to but you chose not to?

22   A.  I chose to go to law school instead.

23   Q.  Right.  Just going back to the Georgetown University

24       liberal arts course for four years in which you majored

25       in International Politics.  Unusually, one of the points
```

```
 1      about the course you did is that it is usually
 2      a postgraduate course; is it not?
 3   A. Yes, although the course of study that I did was --
 4      International Politics was the general rubric, but
 5      underneath that I actually did a more specific study on
 6      international security studies and within that
 7      particular field I even specialised further and I did
 8      a focus purely on the Islamic world.  My thesis --
 9   Q. Your minor was in Islamic Studies and a minor in
10      American terminology is a small element of the
11      university course; correct?
12   A. Well, that is why it is not called the minor by
13      Georgetown.  They call it a certificate.
14   Q. But you called it a minor in your evidence and you call
15      it a minor in your CV.
16   A. That is because typically when I come to court people do
17      not know what a certificate programme means and the
18      closest equivalent to it is a minor.
19   Q. A minor has a very clear meaning.  All American
20      universities have majors and minors and a minor is
21      a small study that is a small element of the main
22      course.
23   A. But that was not the extent of my studies of Islam
24      though, because aside from my minor certificate,
25      whatever you want to call it, in Islam, on top of that
```

17

```
 1        I also wrote an honours thesis.
 2   Q.   How many words?
 3   A.   I cannot give you a word count.
 4   Q.   There would have been a word count requirement,
 5        presumably, for a thesis?
 6   A.   It has been several years.  It was over a hundred pages
 7        long.
 8   Q.   Yes.  It depends on the type, I suppose, as to how many
 9        words, but it was not a masters thesis or a doctorate?
10   A.   No.
11   Q.   That is quite a different dimension in which you do not
12        have a say?
13   A.   I do not have a doctorate, no.
14   Q.   Here you were doing an international politics course for
15        four years from 18, 19, 20, 21, then you do a JD, which
16        is an undergraduate law course?
17   A.   No.  A JD is a graduate law degree.
18   Q.   I am sorry, JD is what we would call a first law degree.
19   A.   I am not sure how it is referred to in the
20        United Kingdom but in the United States, in order to
21        practice as an attorney, you achieve a JD.  If you want
22        to teach as a law professor, then you would go on and
23        get a LOM or a SJD, but those degrees are only for
24        individuals generally looking to teach in law school.
25   Q.   So a JD, I am correct in saying, is a first law degree.
```

```
 1        How many years?  Three years?

 2   A.   Three years, yes.

 3   Q.   You begin your first year with torts and contracts and

 4        so forth?

 5   A.   That is correct, yes.

 6   Q.   Your second year and third year, more electives.  Did

 7        you elect to do the rules of evidence?

 8   A.   Well, that was included on a course in trial advocacy,

 9        yes.

10   Q.   That is a course in your third year.  So three years

11        doing a first law degree.  Then you are aged, what, 25?

12   A.   When I graduated from law school I was 25, yes.

13   Q.   You are now 28.  So you have had a couple of years in

14        which you have been a researcher.

15   A.   Well, that is actually not true, because I have also --

16        when I was an undergraduate and when I was at law school

17        I was also working as a researcher, as a senior

18        researcher, actually, at the investigative project,

19        which is a counterterrorism thinktank and research group

20        in Washington DC.  I started working there

21        in February 1998 and I continued working through there

22        until my law school was finished, at which point

23        I branched out and I began doing my research on

24        a freelance basis instead of with the investigative

25        team.
```

```
 1   Q.  While you were at law school and doing an undergraduate
 2       you moonlighted as a researcher for some other
 3       institution, about which I do not think you have
 4       supplied any details?
 5   A.  It should be in my resume, at the bottom of my resume
 6       you should see a paragraph about it.  But it was not
 7       really moonlighting.  My exact title at the
 8       investigative project was senior terrorism consultant,
 9       or senior terrorism analyst.
10   Q.  Let us be clear, Mr Kohlmann, you are an 18, 19-year old
11       undergraduate who is helping with the research for
12       a thinktank, correct?
13   A.  No, I was basically the deputy head of the organisation.
14       I was speaking on television, on nationally televised
15       shows about terrorism on behalf of the investigative
16       project.  At that point I was testifying --
17   Q.  Who is on the board of the investigative project?  Who
18       is the CEO?
19   A.  The executive director of the investigative project is
20       Mr Steven Emerson.
21   Q.  Steve Emerson, who has written a number of books on
22       politics?
23   A.  More on terrorism, but yeah.
24   Q.  So you are a researcher on project, and you are doing
25       that at the same time as you are doing your law exams
```

```
 1       and your politics exams?
 2    A.  Essentially what I was attempting to do is fuse all of
 3       this together into one common stream.  So essentially
 4       the work that I did for my thesis, I researched my
 5       thesis while at work.  I used research that I had done
 6       at work in my thesis.  When I was at law school I took
 7       courses I believed that would help me do forensic work
 8       and do analysis work in terms of terrorism, such as
 9       taking cybercrime seminars taught by investigators, by
10       federal investigators at the University of Pennsylvania.
11    Q.  You have never been, for any lengthy period of time,
12       under anyone's discipline; you have never been tutored,
13       you have never been controlled or subject to peer
14       review.  Correct?
15    A.  No, I have been subject to peer review.
16    Q.  Your book is a book described as published by Berg
17       Publishers?
18    A.  It is Oxford University Press, I believe.
19    Q.  That is a false statement, Mr Kohlmann; is it not?
20       Oxford University Press?  It was published by Berg?
21    A.  Which is an imprint of Oxford University Press.
22    Q.  No, it is an imprint of Oxford International Publishers,
23       which is not Oxford University Press?
24    A.  Excuse me.  The book itself was peer reviewed.  In order
25       to have it published by Berg I had to have it peer
```

```
 1        reviewed first of all by individuals of my choosing,
 2        then subsequently it was peer reviewed by individuals of
 3        their choosing with whom I did not have any contact, nor
 4        do I even today know who they were.  But every paper
 5        that I write is extensively peer reviewed by academics
 6        and by others around the world.  I maintain regular
 7        discussions with individuals at universities in the
 8        United States, the United Kingdom, South Asia,
 9        Australia.  Everything --
10   Q.   Yes, you said it was set as a textbook --
11   A.   That is correct.
12   Q.   -- in Australian universities.  Tell us one Australian
13        university where it is set as a textbook?
14   A.   It is -- I forget the name of it.  It is in Sydney.
15        I can give you --
16   Q.   There are five universities in Sydney.  You said it with
17        such confidence that -- you told us in evidence with
18        great confidence that this book, published in 2005, was
19        set as a textbook in courses in Canada and Australia?
20   A.   Yes.
21   Q.   Now I am asking you what universities in Australia is it
22        set as a textbook?
23   A.   Offhand, I do not know the university in Australia, but
24        I do know it is used as a textbook at Harvard University
25        in Boston by Richard Clarke, who was the former national
```

```
 1      security council adviser on counterterrorism during
 2      the Clinton --
 3  Q.  Your evidence in this court was that this book was set
 4      as a textbook in Australian universities.  In which
 5      Australian universities was it set as a textbook,
 6      Mr Kohlmann?
 7  A.  Off the top of my head, I cannot tell you, but I can
 8      tell you that it is -- I have been contacted by
 9      individuals who have studied from it, who have read from
10      it, and also individuals who have taught with it in
11      Australia.
12  Q.  What are their names?
13  A.  Offhand I cannot tell you.
14  Q.  You have been contacted, you say.  Does that mean that
15      it has been set as a textbook in Australian universes,
16      Mr Kohlmann, which you swore under oath?
17  A.  Yes, I swear it is.
18  Q.  You cannot tell us the name of the Australian
19      universities, the name of the academic who has contacted
20      you or any academics who have contacted you or the name
21      of their course?
22  A.  Not offhand, no.
23  Q.  You see --
24  A.  If you like I can provide that information subsequently.
25      It should not be difficult to find.
```

```
 1   Q.  Have you been apprised of the expert witness protocol,

 2       of the duties that expert witnesses have to the courts

 3       in this country?

 4   A.  Not specifically, I do not believe.  Excuse me, I have

 5       been sent a copy of it, yes.

 6   Q.  Of what?

 7   A.  Of the expert witness protocol, but I am not sure if it

 8       was in the context of this case.

 9   Q.  How did you come to testify?  Were you contacted by

10       police, and is there some sort of letter of contract?

11   A.  I was contacted by individuals from the

12       Metropolitan Police, and I was asked to prepare a report

13       on certain subjects, namely the Libyan Islamic Fighting

14       Group.  Also subsequently I was asked to produce

15       a report on the Abu Yahya al-Liby training camp in

16       Afghanistan and I was also asked to prepare a report

17       detailing several definitions of key terms such as

18       shahid and Mujahadin.

19   Q.  Your first report, contract, you were asked to prepare

20       it, what, in a letter which included the protocol, or

21       a letter that had contractual terms in it?  What was the

22       basis of your contract for this case?

23   A.  Maybe I am not understanding your question.  What do you

24       mean, the basis of my contract?

25   Q.  Yes.  Why are you here?  You were flown here --
```

```
 1   A.  Yes.

 2   Q.  Business class, I assume?

 3   A.  That is correct, yes.

 4   Q.  You are being paid?

 5   A.  Eventually, hopefully, yes.

 6   Q.  Well, what is your rate?  What rate have you agreed?

 7   A.  The general rate which I charge is $275 a hour.

 8   Q.  $275 an hour?

 9   A.  US dollars an hour.

10   Q.  Which would include travel, of course?

11   A.  That does not include -- travel is an extra expense on

12       to that.

13   Q.  That is an extra expense.  But the time that you are

14       travelling and preparing, it is all $275 dollars

15       an hour.  Is that written down somewhere in the

16       contract?

17   A.  I do not know that I ever wrote that down in a written

18       contract, no.

19   Q.  But you say that you have been shown the expert

20       protocol, but you cannot remember in relation to this

21       case?

22   A.  Honestly, I cannot remember if it was sent to me in

23       relation to this case.

24   Q.  Where is your letter of instructions in relation to this

25       case?  Were you sent a letter of instructions?
```

25

```
 1   A.  Through the mail?

 2   Q.  Or e-mail?

 3   A.  I do not recall.

 4   Q.  You see -- you do not recall receiving a letter of

 5       instructions?

 6   A.  I sent -- there were numerous correspondence sent

 7       between me and the Metropolitan Police with regards to

 8       my report.  There have been so many, I honestly cannot

 9       recall off the top of my head exactly whether there was

10       a letter of instruction or whether it was simply an

11       e-mail, but the instructions were to -- yes, to write

12       a report about the Libyan Islamic Fighting Group.

13   Q.  You have that letter, presumably?

14   A.  I have a copy of all the correspondence that I have had.

15   Q.  Right.  Did you bring it with you?

16   A.  No.

17   Q.  We will have to obtain it from the prosecution.  But in

18       any event you were paid $275 dollars an hour for

19       producing this 19 page report on the Libyan Islamic

20       Fighting Group?

21   A.  I have not been paid anything yet.

22   Q.  Have you sent your bill in?

23   A.  No.  But with these cases, generally speaking, I do not

24       get paid until well after the case is over.

25   Q.  You have testified in a number of cases in the
```

                                  26

```
 1        United States, always for the prosecution?
 2    A.  I have been requested to testify by the defence in only
 3        one case.  I would be more than happy to testify on
 4        behalf of defendants.  The only reason why I did not
 5        testify on behalf of the defendant in that case was
 6        because it was a war crimes case involving a Croatian
 7        military individual and I did not want my research to be
 8        used in the defence of an individual who was accused of
 9        committing gross crimes against Muslims in Bosnia.
10    Q.  Even though he might be innocent you were not prepared
11        to allow your research to be used in the service of
12        justice?
13    A.  No, I was willing.  I sat down with the attorney
14        involved and I discussed with him how he wanted to use
15        my research, but in the end I felt that the way in which
16        he intended to use my research did not appropriately
17        reflect my conclusions, the research, and I felt that
18        also by doing so, that I would antagonise Muslims who
19        are a key part of my research so I did not wish to do
20        that.
21    Q.  So you withheld your assistance on that occasion even
22        though in the witness box you would be able to represent
23        your report properly?
24    A.  I am sorry, what is that?
25    Q.  You withheld your services from the defence on that
```

```
 1     occasion?
 2  A. After discussions with the attorney.  But generally
 3     speaking, I mean, I would be happy to testify on behalf
 4     of defendants.  I mean, my research is my research.  My
 5     conclusions are my own.  If a defendant sees that part
 6     of my research or part of my conclusions would be
 7     helpful, I would be more than happy to testify in their
 8     regard, as long as my research is not being twisted in
 9     ways that it does not represent what I have found.
10  Q. Well, let us take a look at your research.  The first
11     document that is presented to us is the 19-page document
12     on the Libyan Islamic Fighting Group.  Do you have that
13     there?
14  A. I do not have a copy in front of me, no.
15  Q. Perhaps you could be shown it.   (Handed).
16  MR JUSTICE MACKAY:  This is EK1, is it?
17  A. Yes.  This is the 19-page document which, today for the
18     first time at lunchtime, we were given a copy of with
19     parts of it --
20  MR HILLIARD:  That was to help.  I am sorry, I did not
21     realise --
22  MR JUSTICE MACKAY:  Do not let us bicker.
23  MR HILLIARD:  I am sorry.  I did it to try and help.
24  MR ROBERTSON:  This is the document that was withheld from
25     us, but let us pass on.  This document shows the quality
```

```
 1        of your research and we find that everything that is
 2        said about the Libyan Islamic Fighting Group on page 1,
 3        this will be a feature of this document, is sourced to
 4        Norman Benotman, correct?
 5   A.   I am sorry, I cannot hear what you are saying.  Can you
 6        repeat that?
 7   Q.   Everything in page 1 -- every statement you make in
 8        page 1 that is not common knowledge -- is sourced to an
 9        interview with Norman Benotman; is that correct?
10   A.   No, that is not correct.
11   Q.   Well, the second one -- let us go through it.  The first
12        paragraph begins with:
13            "A group of ambitious military officers, led by
14        Gaddafi, staged a coup d'etat."
15            That is common knowledge.
16   A.   That is common knowledge.
17   Q.   "Though he claimed his revolution was aimed at achieving
18        direct popular democracy, his regime nonetheless began
19        to generate resentment among dissidents who questioned
20        his true commitment."
21            That is correct up to a point; is it not?  Common
22        knowledge?
23   A.   Well, I do not know if it is common knowledge, but,
24        I mean, it is common knowledge for me.
25   Q.   It is very common knowledge that Colonel Gaddafi killed
```

```
 1       and tortured dozens, hundreds of people, is it not, you
 2       do not mention that?
 3    A. That was not directly relevant to the Libyan Islamic --
 4    Q. Not directly relevant to the reason why Libyans opposed
 5       Gaddafi?
 6    A. That is why I said it began to generate resentment among
 7       dissidents and I also said that the Libyan security
 8       forces had rounded up members of Islamist cells and
 9       sentenced them to death.
10    Q. No mention of Gaddafi's human rights record here, is
11       there?
12    A. I was not asked to write a report about that.
13    Q. No, I appreciate that.  But you see when you come to
14       talk about the Libyan -- offer any opinion about the
15       Libyan Islamic Fighting Group, in the second paragraph,
16       you say that:
17          "Although the Libyan Islamic Fighting Group did not
18       officially announce its formation until 1995, the roots
19       of the movement are closely linked to the first group of
20       Libyans who fought and declared their Jihad against
21       Gaddafi's regime."
22          You source there some April 11th website.
23    A. That website is probably the second most important
24       terrorist website on the internet.  It is run by a group
25       known as Jaish al-Islami in Iraq, the Islamic Army in
```

```
 1          Iraq, which is an organisation that works with Al Qaeda.
 2          This material, the material posted on this website, is
 3          considered to be entirely credible because it is posted
 4          in Arabic by individuals who work in these
 5          organisations.  This website is a password protected
 6          website.
 7     Q.   I am sure it is all of those things.  The only I want to
 8          make, I want you to accept, is that the truth of that
 9          statement depends on a statement on an Al Qaeda website?
10     A.   Made by individuals with close intimate knowledge of the
11          situation.
12     Q.   It depends on a statement that appears on an Al Qaeda
13          website; is that right?
14     A.   That is correct, sure.
15     Q.   "During their early years of existence, distracted by
16          disagreements and rivalries ..."
17              Your source for that is Norman Benotman; is that
18          correct?
19     A.   That is correct.
20     Q.   You do not know it of your own knowledge, you draw
21          entirely on Mr Benotman?
22     A.   This -- when I cited sources here, they were meant to be
23          the primary sources.  However, most of what is in this
24          is something that has been fused together from multiple
25          sources.  Part of writing a document like this is taking
```

```
 1          various sources and matching them up next to each other
 2          and corroborating the information.  When someone's name
 3          or a fact continually appears over and over again in
 4          multiple sources, such as for instance the names of the
 5          Allied chief commanders or in this case Awatha
 6          al-Zuwawi, when you start seeing names pop up over and
 7          over again, that tends to lend significant credence to
 8          these sources.
 9   Q.     That depends on a statement by Benotman; does it not:
10              "They were distracted by disagreements and rivalries
11          during the early years of their existence."
12   A.     That was the primary source but not the only source that
13          was used in that.
14   Q.     Then, when we go down to the next paragraph:
15              "Despite these disheartening failures, the Libyan
16          Mujahadin volunteers remained committed to their Jihad
17          against the apostate Gaddafi, fighters began to band
18          together under Commander al-Zuwawi, a student of Islamic
19          law in Tripoli, who formed an underground Jihadist
20          organisation in Libya in 1985."
21              That statement again depends on an interview with
22          Norman Benotman; does it not?
23   A.     That is actually also corroborated by the statement
24          issued on al-Boraq.
25   Q.     I see, so it depends on a statement made on an Al Qaeda
```

```
 1      website and corroborated by Mr Benotman?

 2  A.  A former Shura Council member.

 3  Q.  Corroborated by an interview with Mr Benotman?

 4  A.  As an Shura Council --

 5  MR JUSTICE MACKAY:  Just a yes or no will do.  Do not answer

 6      your case yet, Mr Kohlmann.

 7  A.  I am sorry, yes.

 8  MR ROBERTSON:  Of course, that in turn depends on whether

 9      Mr Benotman was quoted correctly.

10  A.  That is true, but I am -- some of my colleagues at the

11      Jamestown Foundation, so I have reason to believe that

12      this interview was done in a professional and correct

13      manner.

14  Q.  Have you interviewed Mr Benotman?

15  A.  Not me personally.

16  Q.  Look at your sixth footnote:

17      "Most of the founding leaders and cadres of the

18      Fighting Group were members of Zuwawi's clandestine

19      organisation."

20      Again that statement depends on Mr Benotman?

21  A.  That is correct.

22  Q.  And on the accuracy of his interview in some journal of

23      the Jamestown Foundation?

24  A.  That is correct.

25  Q.  You have never been to Libya yourself, have you?
```

33

```
 1   A.   No, I have not.
 2   MR JUSTICE MACKAY:  Are you an Arab speaker?
 3   A.   Not fluently.  I speak English and French fluently and
 4        I speak some Arabic.
 5   MR ROBERTSON:  Some Arabic, you have never done a proper
 6        lengthy course in Arabic to qualify yourself as a fluent
 7        Arabic speaker or translator.
 8   A.   No, hardly.
 9   Q.   Do you read Arabic?
10   A.   No, but I understand it aurally, from watching many,
11        many hours of video tapes and audio tapes and listening
12        to original lectures and also as a result of studying
13        Arabic --
14   Q.   These texts are in Arabic; are they not?
15   A.   Yes, that is correct.
16   Q.   Not this one, but a lot of the texts you rely upon are
17        in Arabic and you do not put yourself forward as an
18        expert translator.  You have had to rely on other
19        people's translations?
20   A.   I have translators who work for me.  Basically, when it
21        comes to material such as this, because of the fact that
22        many of the original materials put out by terrorist
23        organisations have involved colloquialisms and involves
24        material where really only native speakers would be able
25        to interpret it or be able to properly translate it,
```

34

```
 1       I have native speakers do that for me.
 2   Q.  Benotman is your primary source, I suggest, about LIFG.
 3       We find him at footnote 7.  This interview, footnote 8,
 4       and throughout this text, at the bottom, four lines from
 5       the bottom:
 6           "Former LIFG, Shura Council member, Norman Benotman
 7       notes that ..."
 8           And again, you quote him from an interview that he
 9       has given.  I will not take you to all the cases but
10       I suggest if we look through this 19-page document, his
11       name appears again and again.  If we look at page 3, at
12       the footnotes, he is the source of footnote 13 and
13       footnote 14.  He is the source of -- over at page 5, he
14       is the source of footnote 23, 26, of 27.  Correct?
15   A.  He is not my primary source.  My primary source was the
16       Almuqatila websites, but he is an important secondary
17       source.  That is correct.
18   Q.  Let us go on, page 8, he is at footnote 48.  Page 9,
19       what do you mean he is not the primary source?  He is
20       the source of almost every statement on page 9.
21       Footnote 49, footnote 50, 51, 52?
22   A.  The major source of my knowledge about the Libyan
23       Islamic Fighting Group is not the interview with Norman
24       Benotman, but I cite him as a source here because I felt
25       that the words of a former LIFG Shura Council member
```

35

```
 1          were certainly valuable and definitely accented the
 2          other information which I was presenting.
 3             Let me put it this way: when I started writing this
 4          report, the first sources I went to when writing this
 5          report were the actual communiques put out by the LIFG.
 6    Q.    So he is an important source?
 7    A.    That is correct.
 8    Q.    As someone who was actually in the group, in
 9          a leadership position, you would expect him to be the
10          best able to provide good evidence, if not the best
11          evidence, of what the group was really about?
12    A.    I think he can provide valuable personal insight,
13          I think.
14    Q.    You are reporting second or third-hand hearsay evidence.
15          He is the real thing.  If the prosecution wanted him,
16          wanted to give the jury a true insight into this group,
17          they would call him; would they not?
18    A.    Well, he only can tell part of the story, and that is
19          the problem.  This is a story that really does not take
20          place in Libya.  The LIFG's primary base for their
21          activities is outside of Libya.  It is in Afghanistan
22          and in Europe.  In order to closely track everything
23          that they have done over the years, you cannot simply
24          stop at 1995, 1996, 1997.  Norman Benotman's knowledge
25          is very good for certain years, just as the communiques
```

```
 1        that LIFG puts out are excellent at demonstrating their
 2        activities for a certain number of years.  But part of
 3        what I do as an expert, is that I take various sources,
 4        I take primary sources such as the communiques,
 5        secondary sources such as the interview with Norman
 6        Benotman and I juxtapose these together.  What I do is
 7        I evaluate what is credible and not credible and from
 8        there as an expert I create a fusion, which is
 9        ultimately my testimony and my expert report.
10   Q.   You are not an expert in Libya, are you?
11   A.   In Libya itself, no.
12   Q.   You are not an expert in Arabic?
13   A.   In the Arabic language?
14   Q.   Yes?
15   A.   No.
16   Q.   You are not an expert in Libyans, their character, their
17        experience?
18   A.   I would say I am an expert in Libyan Islamists.
19   Q.   The real problem with Norman Benotman, who is available
20        in London for the prosecution to use first-hand rather
21        than to go to you third-hand, is that Mr Benotman has
22        made it totally clear that you are totally wrong and
23        that the LIFG was never sympathetic to Al Qaeda; there
24        was no ideological affinity with them and it has always
25        been focused entirely on Libya?
```

37

```
 1   A.  He -- Mr Benotman left the group.
 2   Q.  That is what he says in the Jamestown interview and that
 3       is what you do not footnote.
 4   A.  Mr Benotman left the group.  Mr Benotman --
 5   Q.  Mr Benotman gives the lie to your thesis, which is why
 6       and you do not quote that part of his Jamestown
 7       interview, which is why the prosecution is not calling
 8       him.
 9   A.  Again, as an expert what I do is I take interviews such
10       as this one and I evaluate it for information that is
11       factual, of a factual nature, versus what is of a nature
12       which contradicts what we know about the Libyan Islamic
13       Fighting Group, from the Group itself.
14           I did not think Mr Benotman had any motivation to
15       lie about the roots of his own organisation in the 1980s
16       in Libya because those are establishable facts and they
17       are facts which, I do not really see what the point of
18       disputing them is.  However the point about whether or
19       not the LIFG is connected to Al Qaeda, that is a very
20       sensitive issue, legally or otherwise.
21   Q.  Mr Benotman's statement in the interview in which you
22       quote him was that the LIFG has never been sympathetic
23       to Al Qaeda, that there has never been a single case of
24       it being implicated in international terrorism; it has
25       always been focused entirely on Libya and its objective
```

38

```
 1         is the creation of an Islamic state in Libya.  That is
 2         Mr Benotman's conclusion which you do not quote.
 3    A.   Well he stated that but that directly contradicts --
 4    Q.   That --
 5    MR JUSTICE MACKAY:  You are interrupting his answers.
 6    MR ROBERTSON:  Sorry.
 7    A.   That may be what he states but that directly
 8         contradicts -- this interview is a secondary source
 9         whereas the communiques from the LIFG are a primary
10         source.  Now if I have information in a primary source
11         that contradicts that of a secondary source, especially
12         on an issue of controversy such as this, especially when
13         there would be a motivation for the secondary source to
14         fib about this or to manipulate the facts, I have to go
15         to the primary source as the correct document.  If we
16         have official signed communiques from the LIFG stating
17         very specific facts that directly contradict the facts
18         in a secondary source, I have no choice but to adopt the
19         view in the primary source.  What is more is that the
20         research that I have done, both in Bosnia-Herzegovina,
21         Afghanistan and elsewhere, directly contradicts what
22         Mr Benotman says in that particular portion.  Large
23         parts of what he said were confirmed through other parts
24         of research I did, but that particular conclusion, those
25         particular statements were directly contradicted by
```

```
 1        members of the Libyan Islamic group, by members of other
 2        Mujahadin organisations, by Awatha al-Zuwawi, by
 3        Al Qaeda itself.  There were so many different sources
 4        that contradicted --
 5    Q.  Have you spoken to any of these people?
 6    A.  No.
 7    Q.  Mr Benotman is a primary source if he is put in the
 8        witness box because he is a member of the LIFG governing
 9        council.  Correct?
10    A.  If he testified as a primary witness, yes.
11    Q.  Let us have a look at what you say is a primary source,
12        and I ask you to think carefully because I suggest to
13        you that no expert would ever say that an English
14        translation of an Arabic website was -- particularly
15        issued by some group that cannot be exactly specified is
16        a primary source.  You rely upon these websites that you
17        have told us about.  The first website which claimed to
18        be a LIFG website emanated from America; did it not?
19    A.  Almuqatila.com?
20    Q.  Yes.
21    A.  I do not know where it was hosted initially but in the
22        latter stages it was hosted in Pakistan.
23    Q.  Right.  So you do not know, this website you claim as
24        a primary source, you do not know where it was hosted?
25    A.  Again, initially when it was first set up, I do not have
```

40

```
 1        records of where it was hosted.  Later on it was hosted

 2        in Pakistan.

 3   Q.  Do you know the names of the people who were putting

 4        material on this website?

 5   A.  The individuals that put material on this website

 6        included Abu Abdullah al-Sadeq.

 7   Q.  What did he put on the website?

 8   A.  He put on their calls to the fighters of the Libyan

 9        Islamic Fighting Group urging them to continue their

10        Jihad, there were other --

11   Q.  How do you know that he put --

12   MR JUSTICE MACKAY:  If these answers are important, they

13        must be finished, Mr Robertson.  You asked him for

14        example: do you know the people on the website.  He is

15        in the middle of explaining it if it is important for

16        this exercise, which I doubt, then you took him on to

17        another point.

18   MR ROBERTSON:  I am sorry, I was trying to speed things up.

19        I was simply going to ask you whether you knew that that

20        person posted it or whether someone posted it in his

21        name.

22   A.  I do not know whether it was posted in his name or he

23        posted it personally but with these websites what tends

24        to happen is that if this is not a legitimate statement,

25        the organisation, in this case the Libyan Islamic
```

41

```
 1          Fighting Group, would have come out with their own
 2          statement saying this is not a legitimate website.  This
 3          website carries the logo of the Libyan Islamic Fighting
 4          Group.  It professes itself to be the official website
 5          of the Libyan Islamic Fighting Group, including photos
 6          and videos of LIFG activities and LIFG members that
 7          no body else has.  Given those facts and given the fact
 8          that no one from the LIFG ever condemned this website,
 9          said it was illegitimate, suggested that anything on the
10          website was anything other than the explicit truth, it
11          stands to reason to take that this website is indeed the
12          official website for the Libyan Islamic Fighting Group.
13     Q.   That is your reason for stating that it is the official
14          website.  In relation to the statement it makes, on what
15          grounds do you say those statements must be believed
16          given the tradition of all political websites to spin
17          and to exaggerate and to lie?
18     A.   I am not taking what they are saying as per the truth.
19          What I am taking is this is their opinion.  If they make
20          a statement: we believe this, and this is coming from
21          the official Jamaah Islamiya Islamia Almuqatila, this is
22          coming from the Libyan Islamic Fighting Group, this is
23          a statement of their policy.  Whether their policy is
24          right or wrong or whether the underlying facts they
25          state are correct or incorrect, that is irrelevant to
```

```
 1       me.  I am only interested in what they are saying and
 2       accurately portraying their views as represented on this
 3       website.
 4   Q.  I want to look at very briefly at your other sources.
 5       Some of your sources are trial transcripts; correct?
 6   A.  That is correct, yes.  Sorry.
 7   Q.  You do not examine and have been in no position to
 8       examine the individuals speaking as to their motives,
 9       whether they have been tortured, whether they have an
10       inducement to make those statements?
11   A.  Well, this is sworn testimony in federal court so
12       these --
13   Q.  Sworn testimony is often untrue.
14   A.  These individuals were sworn in federal court and the
15       defence attorneys had an opportunity to cross-examine
16       them and they did not find anything specific or major
17       holes in their testimony.  The defendants in this case
18       were ultimately convicted on the weight of this
19       testimony.  This testimony that I cite was among the
20       most important pieces of evidence that were actually
21       submitted in this trial.
22          Again, as part of my job as an expert it is up to me
23       to evaluate the credibility of certain evidence.  Had
24       this person been someone that had been random, I did not
25       know his background, it is possible.  But on page, for
```

```
 1        instance, 3 to 4, I cite testimony from a Moroccan
 2        Al Qaeda operative called Lihoussaine Kherchtou.
 3           The reason I feel confident in citing Mr Kherchtou's
 4        testimony is I am familiar with his background and I am
 5        familiar with the places in Europe at which he
 6        congregated with other Mujahadin representatives and
 7        others, such as the Islamic Cultural Institute in Milan,
 8        Italy, which served for a headquarters for, among other
 9        groups --
10    MR JUSTICE MACKAY:  There is an example of the kind of at
11        the moment.  We will now give the unfortunate
12        transcriber a break.  She has had an afternoon and
13        a half, I should think.  Ten minutes, please.
14    (3.09 pm)
15                        (A short break)
16    (3.22 pm)
17    MR JUSTICE MACKAY:  Yes.
18    MR ROBERTSON:  To clarify, have you ever met anyone from the
19        LIFG?
20    A.  I have not met any members of the LIFG, no.
21    Q.  You have not met any members of the LIFG.  The case of
22        R v Singh, which you testified in before
23        Mr Justice Fulford, your qualifications as an expert in
24        that case were not gone into, were not raised?
25    A.  I am sorry, my expert qualifications were --
```

44

```
 1  Q.  The question of your expert qualification was not raised
 2      by the defence, which used you or got from you some
 3      assistance?
 4  A.  I testified on behalf of the Crown in that case.
 5  Q.  Yes, but the defence did not raise any issue as to your
 6      expertise.  They obtained information from you and the
 7      men were acquitted?
 8  A.  I do not know whether they challenged my qualifications
 9      or not.  I really do not know.
10  Q.  Okay.  We have dealt with two of your main sources.  Can
11      we just look briefly at your other sources for this
12      19-page report.  One source that you quote is the Libyan
13      government.  You really think that the Libyan government
14      is a credible source?
15  A.  I actually did not quote them.  I only quoted I believe
16      in one instance.  I did not quote them for the substance
17      of the charges.  What I quoted was one of the elements
18      of what they had accused an individual of associating
19      with, in fact that he had gone out to a particular camp
20      in Afghanistan.  I couched that very specifically by
21      instead of stating it as a fact, I said: the Libyan
22      government has said in an indictment that they have
23      issued.  The reason why that is basically the only time
24      that I used anything from the Libyan government is
25      because generally speaking in a case like this the
```

45

```
 1       Libyan government is not generally a trustworthy source.
 2   Q.  Right, but that is why you use it at page 15.  You say
 3       it cites, "... instances of wanted LIFG fugitives who
 4       have received weapons training."
 5   MR JUSTICE MACKAY:  Sorry, where are we?
 6   MR ROBERTSON:  Page 15 at the bottom of the first full
 7       paragraph.  You cite it as a credible source there.  No
 8       question about its credibility.
 9   A.  Again, that is why I couched it with "according to the
10       Libyan government".  I believe that the Libyan
11       government generally speaking when it comes to the LIFG
12       is not a completely trustworthy source.  However as per
13       a specific allegation that an individual went to
14       Afghanistan and met with another member of the Libyan
15       Islamic Fighting Group there, I thought it was worthy of
16       mentioning as long as it was couched in, "this is
17       according to the Libyan government".  That was the only
18       time I cited anything from the Libyan government with
19       regard to the Libyan Islamic Fighting Group and it is
20       really a very minor issue.
21   Q.  You do not cast any question over the credibility of the
22       Libyan government there or elsewhere.
23   A.  Again that was not the subject of my report but again,
24       with the exception of this one fact, which I deemed to
25       be relevant despite the source, I did not cite the
```

```
 1       Libyan government.
 2   Q.  Another source that you cite several times is
 3       John Negraponte.  Tell us who he is.
 4   A.  He was the director of national intelligence but
 5       I believe I only cited him, again, once.
 6   Q.  Well he is cited at page 18 for the proposition that
 7       LIFG has called on Muslims everywhere to fight the US in
 8       Iraq.  That is a statement by an American official,
 9       which you have not investigated.
10   A.  I have investigated that.  Actually the reason that
11       I included that statement was because it was directly
12       backed up by primary evidence that I myself had
13       collected with regard to Libyan Islamists who had gone
14       to Iraq to become suicide bombers, who had become
15       members of the organisation run by Abu Musab al-Zarqawi.
16       As a matter of fact there was a statement that was
17       published on Almuqatila.cc, which directly encouraged
18       Muslims around the world, both in Libya and elsewhere,
19       to support the Jihad in Iraq, including supporting the
20       brothers in the Ansar al-Islam, which was a partner with
21       Zarqawi.  So the reason that I included that statement
22       was because I felt that that was a conclusion that was
23       very thoroughly backed up by weighty evidence.
24           By the way, I should add: evidence gathered directly
25       from Zarqawi's affiliates in Iraq.
```

47

```
 1   Q.   But not by you?

 2   A.   By me.

 3   Q.   With whom?  Whom have you spoken to?

 4   A.   This information was disseminated via propaganda videos

 5        directly from Iraq, from these organisations, of which

 6        I have a complete archive.

 7   Q.   You make a series of allegations against the defendant

 8        on page 18; do you not?

 9   A.   Are you referring to the reference to the Rabat Criminal

10        Court of Appeals?

11   Q.   Yes:

12            "He has a history of GICM related activity," you

13        claim, "and has served as a key liaison between LIFG and

14        GICM."

15            These defamatory statements which you make about

16        him, your authority for that --

17   A.   Again, I am not making these --

18   MR JUSTICE MACKAY:  Now you are interrupting now.  If you

19        interrupt the questions and he interrupts the answers,

20        this is going to be a most terrible trial, so do not do

21        it please, either of you.

22   A.   Excuse me.  The --

23   MR JUSTICE MACKAY:  No, he had not finished the question.

24        That is why I intervened.  Start again, Mr Robertson.

25   MR ROBERTSON:  You have seen the passage that I read.
```

```
 1   A.  Yes.

 2   Q.  And the serious allegations that you make there.  Your

 3       source for that is, again, the United States government,

 4       is it?

 5   A.  The source of that is a designation by the United States

 6       Treasury Department of individuals under the 1996 --

 7   MR JUSTICE MACKAY:  The answer is yes, then?

 8   A.  Yes.  Excuse me, my Lord.

 9   MR ROBERTSON:  And not your own opinion, it is the opinion

10       that you are producing to the court of the United States

11       government?

12   A.  To the court of the United States government?

13   Q.  To this court, you are producing the opinion of the

14       United States government?

15   A.  Again I believe that the facts that are in that

16       statement from the United States Treasury Department

17       generally reflect correct statements and thus when they

18       made these statements I felt that it was worthy of

19       mentioning in this report.  I consider the US Treasury

20       Department to be a relatively reliable source.

21   Q.  But you yourself have no evidence that the defendant has

22       a history of GICM related activity, do you?

23   A.  No, that is why I put that in quotes.

24   Q.  You yourself have no evidence for what you did not put

25       in quotes, namely that he served as a key liaison
```

```
 1        between the LIFG and GICM?
 2    A.  That was a direct summary of what was in the Treasury
 3        Department release but I mean I cited it right there.
 4        That was the source for that.
 5    Q.  You have no basis for expressing that opinion or belief
 6        yourself, from your own research?
 7    A.  Well, other than my confidence in the United States
 8        Treasury Department.
 9    Q.  I am sure it is 100 per cent.
10        Then over the page you show your confidence again in
11        the last paragraph:
12        "In February 2006 the US Treasury Department took
13        significant action aimed at the LIFG's operation base in
14        the United Kingdom, designating five individuals, three
15        companies and one charity, as terrorists."
16    A.  Well that is just a statement of fact.  I did not
17        actually make an opinion whether or not the Treasury
18        Department was correct or incorrect.  I said exactly
19        what they had ruled, why, and I quoted them
20        extensionally.
21        Again, I believe the US Treasury Department to be a
22        reliable source of information when it comes to
23        terrorist financing and terrorists supporting charities.
24        I consider this to be a fact.  It is a de facto issue.
25        Whether you agree with the Treasury Department or not,
```

```
 1      this is what they have printed.  It is a relevant

 2      factual --

 3   Q. You consider it as a fact?

 4   A. I consider it as a relatively reliable fact.

 5   Q. As a reliable fact that the defendant is a senior leader

 6      of the LIFG?

 7   A. As per stated by the United States Treasury Department.

 8      But again, here, this paragraph is a statement of fact.

 9      I did not see any reason to doubt that the United States

10      Treasury Department made that statement.

11   Q. That is your primary report, and I think the prosecution

12      want to introduce a two-page report, which I think your

13      Lordship has.  Do you have it, Mr Kohlmann?  Dossier for

14      Shahid Abu Liby training camp.

15   A. Actually I do not have a copy.

16   Q. Perhaps you could be shown it.  (Handed).

17   A. Yes, I have it in front of me.

18   Q. Your basic evidence here, or you rely upon, a record of

19      interrogation conducted in Morocco by the Moroccan

20      Judicial Police Service?

21   A. That is correct.

22   Q. You were not present at that interrogation?

23   A. No.

24   Q. You do not know what interrogative tools were used by

25      the Moroccan Police Service?
```

51

```
 1   A.   No, I do not.

 2   Q.   So that is the primary source.  Over the page -- and you

 3        also rely on an article in the Wall Street Journal.

 4   A.   It was actually -- the article is listed as a source,

 5        however I had a direct interview with the author of the

 6        article, Jay Soloman.  He is a colleague of mine.

 7   Q.   Not with Khalid Sheik Mohammed?

 8   A.   As much as I would like to interview Khalid Sheik

 9        Mohammed, I do not think I am going to get that

10        opportunity.

11   Q.   I am sure you are not the only one.  You have been

12        provided, you say, with an Arabic language document

13        along with the corresponding English translation by

14        Detective Constable Glen Grummit, now was he the

15        gentleman who commissioned you for this case?

16   A.   No, I do not believe so.

17   Q.   Did he give it to you in person?

18   A.   No, this was sent to me I believe electronically by

19        e-mail.

20   Q.   And you were given -- you were not asked to translate

21        it, but you were presented with an English translation?

22   A.   I was presented both with the original document and the

23        English translation.

24   Q.   The form that you have attached to this, over the page:

25             "Top secret, in the name of God the merciful, the
```

```
 1      compassionate."
 2          Is that a form that you have provided from the
 3      Padilla case?
 4   A. Yes, that is correct --
 5   Q. Which is your form, that was not provided to you?
 6   A. The form from the Padilla case?
 7   Q. Yes.
 8   A. That was actually made public in January 2006 by the
 9      United States Justice Department, it was released
10      I believe via their internet site, and I included it as
11      an appendix to this report.
12   Q. We have asked for the other publications that you cited,
13      but have not been provided with them.  We have provided
14      ourselves with two.  One is your article in foreign
15      affairs, which is a journalistic publication, albeit
16      sometimes having scholars write 2,000 or 3,000 words,
17      but basically a journalistic publication available at
18      news agents and so on, and you wrote an article called
19      "The Real On-line Terrorism Threat"?
20   A. I mean, it is considered to be a pretty respectable
21      publication.
22   Q. Yes, I am not disputing whether it is respectable.  What
23      I want to have you simply confirm is that that said
24      nothing about Libya or about the Libyan Islamic Fighting
25      Group?
```

53

```
 1  A.  Oh, no.  That was about --
 2  Q.  It was entirely about the US's capacity to intercept and
 3      to deal with the internet as it was being used by
 4      Jihadists?
 5  A.  Well, that is part of the article, but a large part of
 6      the article is about how -- is actually about how
 7      Jihadists, Mujahadin organisations are using the
 8      internet and specific case studies.  There is less --
 9  Q.  Yes.  There was no reference to Libya or to the Libyan
10      international fighting group in that article?
11  A.  Not in the final draft, no.
12  Q.  Sorry?
13  A.  Not in the final draft, no.  I believe in one of the
14      initial drafts there might have been a reference to --
15  Q.  Well, the answer is yes, there is no reference to --
16  A.  In the final draft, no, there is not.
17  Q.  I have, if I can find it, finally to ask you about your
18      book.  Do you have a copy of "Al Qaeda's Jihad in
19      Europe"?
20  A.  In front of me?
21  Q.  Yes.
22  A.  No, I am sorry.
23  Q.  Do you have it in a bag, or does the prosecution have
24      it, since you testified about it in a statement that was
25      handed up on your behalf.  Do you have it?
```

```
 1   A.   I am sorry, I did not bring a copy with me.

 2   Q.   In the statement that was handed up to the learned

 3        judge, you said that you -- in this book, you recount

 4        the stories of Muslim foreign fighters who joined the

 5        Jihad in Bosnia, including a number of Libyan Islamists.

 6        One of the key figures was a Libyan dissident formerly

 7        living in exile in Vienna who became a senior figure

 8        among foreign fighters.

 9   A.   That is correct, Dr Abul-Harith Al-Liby.

10   Q.   Let us be clear, this book contains no reference to

11        Libya?  Libya is not in the index.

12   A.   No.  No.

13   Q.   And it contains no reference to the Libyan Islamic

14        Fighting Group.  That is not in the index.

15   A.   No. I indexed the names of Libyan fighters under their

16        kunya, or combat names.

17   Q.   You list two Libyan fighters, one the gentleman that you

18        mention who was a doctor, right?

19   A.   He was a little bit more than that.  He was the deputy

20        commander and then subsequently the commander of the

21        el-Mujahedin unit in Bosnia-Herzegovina.

22   Q.   I want to put to you, he is listed on about six pages,

23        but you deal with him entirely -- you say, "In his late

24        30s, he worked as a doctor in Austria for many years

25        prior to the Bosnia war", then you describe him in his
```

```
 1      role in the Bosnia war?
 2   A. I have also reviewed original documents on behalf of the
 3      International War Crimes Tribunal at the Hague, original
 4      letters from Dr Abul-Harith Al-Liby, original
 5      correspondence from Dr Abul-Harith Al-Liby.  My book,
 6      I had to consolidate it down to what would be readable
 7      for an average browser, but there is a tremendous amount
 8      of research that was involved to --
 9   Q. No doubt.  But in your book, and you agree with this
10      proposition, that you deal with Dr Abul-Harith Al-Liby
11      entirely in the context of his life and death in Bosnia?
12   A. That is correct.
13   Q. And make no reference at all to his Libya background?
14   A. That is correct.  That is correct.
15   Q. And the other gentleman that you have mentioned who is
16      from Libya is Abu Abdullah, whom you mention at
17      page 128.  The only Libyan aspect that you mention in
18      relation to him is that he had previously been a tank
19      driver in the Libyan army?
20   A. That is right, he had left Libya after serving in the
21      military and become a dissident.
22   Q. And this book is footnoted in the same way as we have
23      seen with -- published by reference to other published
24      accounts and court papers?
25   A. Again, it is a collection of primary, secondary and
```

56

```
 1          tertiary sources.  Most of them are material on
 2          Abul-Harith Al-Liby and Abu Abdullah Al-Liby(?), who was
 3          also known as the Black Lion, were derived almost
 4          exclusively from Mujahadin sources.  Audio recordings,
 5          video recordings, put out by the el-Mujahedin brigade in
 6          Bosnia-Herzegovina.
 7   MR JUSTICE MACKAY:  Let us just call it Bosnia.
 8   A.   Okay, Bosnia.  The sources of that information were
 9          almost exclusively again from Mujahadin organisations,
10          including Mujahadin veterans here in the United Kingdom.
11   MR ROBERTSON:  You know, do you not, that there are a number
12          of distinguished experts on terrorism and on Libya in
13          Britain, professors and the like.
14   A.   I do not know of any academic, offhand, anyway, that is
15          an expert on the Libyan Islamic Fighting Group.
16   Q.   Do you not know of Professor Wilkinson from Aberdeen?
17   A.   I am familiar with Professor Wilkinson but I am not
18          familiar with what his expertise is on --
19   Q.   He is a professor of terrorism, and there are other
20          professors specialising in terrorism?
21   A.   Again, I am familiar with Professor Wilkinson, but I am
22          not familiar with his expertise on the Libyan Islamic
23          Fighting Group.
24   Q.   Are you familiar with Reuben Paz(?)?
25   A.   He is actually a colleague of mine.
```

```
 1  Q.  Of course, and you know the work that his group, Prism,
 2      does?
 3  A.  Again, Reuben is a colleague of mine.  I am supposed to
 4      speak with him at a conference in a week.
 5  Q.  In short -- and you know that there are a number of
 6      distinguished professors, particularly at English
 7      universities, experienced in Libyan history and politics
 8      and government?
 9  A.  If I can just go back for a second, I know Reuben pretty
10      well.  I have never seen anything from Reuben on the
11      Libyan Islamic Fighting Group.  As far as experts or
12      academics here in the United Kingdom are familiar with
13      Libya, I do not know, but there is a difference between
14      being familiar with Libya and being familiar with the
15      Libyan Islamic Fighting Group.  The organisation LIFG is
16      predominantly made up by exiles.  Only during a very
17      brief period was it actually active inside Libya.  Most
18      of the activity associated with the LIFG has been
19      outside of Libya in places like Afghanistan and Western
20      Europe.  Most of that activity has taken place in the
21      last decade and a half.  Most of that activity has taken
22      place rather furtively and has been only documented by
23      Mujahadin sources, and again, the occasional report from
24      a government or an interrogation.  As a result there are
25      very few academics, no matter how well that they know
```

```
 1         Libya, that know much about what the LIFG has done or
 2         have had access to their communiques or have had access
 3         to other material.  It is just not that common.
 4    Q.   Or had access to what purports to be LIFG material and
 5         what purports to be LIFG websites?
 6    A.   However you want to describe it.
 7    Q.   One final question: you describe yourself in your own CV
 8         as being currently employed by NBC News.
 9    A.   That is correct.
10    Q.   Are you currently an employee of NBC News?
11    A.   I am an on-air analyst, so I am a contractor.  I am paid
12         by NBC News to provide expert advice and assistance when
13         it comes to on-air discussions regarding terrorism.
14         I also provide them original access to material from
15         terrorist organisations around the world through my
16         travels, through the internet, through other mechanisms.
17    Q.   Sure, and you comment on court cases and developments in
18         the area?
19    A.   Well, that is a bit difficult.  Because of the fact that
20         I am involved in some of the court cases, I only comment
21         on cases that I am not involved in.
22    Q.   And like other people contracted those various ways by
23         NBC and by other news services -- you have a contract
24         with others, no doubt.  You are really, to sum you up
25         with one word, a journalist.
```

```
 1   A.   No.  I wish that that would be -- there was a one word
 2        way to describe what I do.  But the best way to describe
 3        what I do is that I am a micro-historian; that I have
 4        taken a very tiny piece of modern history and I have
 5        dissected it using sources that are usually unavailable
 6        to academics, and I have attempted to create a narrative
 7        and an in-depth explanation of these activities, again,
 8        generally from the perspective of the Mujahadin
 9        themselves.
10            A journalist would be writing books, would be
11        looking to make money, you know, making mass-produced
12        books.  I have not made a cent off the book that
13        I produced.  It was purely for academic reasons.  Most
14        of my research work and what-not is done with academics,
15        not journalists, and in fact that is why NBC employs me:
16        because I have access to material that is outside the
17        bounds of what a traditional journalist would have
18        access to.
19   Q.   That is quite wrong, in relation to journalists like
20        Robert Fisk, who you cite quite a lot?
21   A.   What about that is incorrect?
22   Q.   Journalists in their portentous moments say that they
23        write the first draft of history.  Your answer at the
24        beginning suggests that you think you are doing very
25        much the same thing.  You are putting together scraps of
```

60

```
 1      information from other sources in the hope that you can
 2      find or produce any links.
 3  A.  But I do not produce newspaper articles.  I produce
 4      academic studies --
 5  MR JUSTICE MACKAY:  There we are, we could debate the
 6      definition of a journalist for a long time.
 7  MR ROBERTSON:  Yes, that is quite enough.
 8  MR JUSTICE MACKAY:  Very interesting.  Yes.
 9                  Re-examination by MR HILLIARD
10  MR HILLIARD:  Just three matters.  First of all,
11      Mr Kohlmann, you said you had never been to Libya
12      yourself.
13  A.  That is correct.
14  Q.  Can you help us, does that affect your ability to speak
15      about LIFG, and if not, why not?
16  A.  I do not believe it significantly affects it because of
17      the fact that, again, as I have stated, the LIFG is an
18      organisation that predominantly has its activities
19      inside of Afghanistan and Western Europe.  Except for
20      a very brief period in 1995 and 1996, more or less the
21      LIFG has not had a presence in Libya.  Its presence was
22      wiped out by the intelligence and law enforcement of
23      Gaddafi.
24          As a result, the organisation can best be studied
25      not in Libya, but by studying events in Afghanistan and
```

61

```
 1        by studying their organisational activities in countries
 2        like the United Kingdom.  It is in these countries and
 3        these regions where you see -- you get an actual look
 4        inside what the LIFG is really up to.  Because, again,
 5        there really are no significant LIFG members left inside
 6        Libya.  They have not been there for many, many years.
 7        In fact many of the people that are senior --
 8   MR JUSTICE MACKAY:  Right, that is an answer to that
 9        question.
10   A.   Sorry.
11   MR HILLIARD:  You were being asked about other people and
12        LIFG, and you said that there were very few academics,
13        you thought, who knew very much about LIFG and what it
14        had done.  Do you consider yourself to be an expert so
15        far as LIFG is concerned, and if so, why?  What is the
16        study?  Just summarise it for us, please, that you have
17        done.
18   A.   Sure.  I do consider myself to be an expert in LIFG.
19        Number 1, I have studied the organisation's activities
20        at length in Europe, in the United Kingdom, in
21        Bosnia-Herzegovina, in Italy and elsewhere.  I have very
22        closely studied the interactions between the LIFG and
23        other Mujahadin groups such as the Egyptian Al-Ga
24        maat --
25   MR JUSTICE MACKAY:  Let us just call them the Egyptian Group
```

```
 1      for the moment.
 2  A.  That is correct, the Egyptian Group.  On top of that,
 3      because of the fact that the LIFG really was one of the
 4      first Mujahadin organisations on earth to jump on the
 5      internet to establish an official internet website, we
 6      know more -- or I should say I know more about the LIFG
 7      than many other organisations like it that have fought
 8      in Afghanistan, because this was an organisation that
 9      was remarkably open in the material that it was
10      presenting.  Remarkably quick about posting communiques,
11      about providing information, even past information.
12          For instance, when Almuqatila.com was put on-line in
13      2000, it did not merely include the communiques from
14      2000 on; they also included the communiques going all
15      the way back to the group's formation in October 1995,
16      thus offering an unparalleled look into what the LIFG
17      was actually doing in those years.
18  MR ROBERTSON:  Just two last matters.  When the new website
19      came as it were onstream two months or so after the
20      first one had shut down, was all the previous material
21      as it were posted again?
22  A.  Most of the original material was posted again.  There
23      were a few items that were missing and there were a few
24      new items that were added.  However, the bions(?), the
25      communiques that were issued by the LIFG were still on
```

63

```
 1        that website, as were many of the fatwas, including a
 2        fatwa by Sheikh Hussan Qa'id(?) endorsing a Jihad
 3        against America in Afghanistan.
 4   Q.   We have that one.  Lastly, this: have you ever seen
 5        material in the name of LIFG repudiating or seeking to
 6        repudiate anything that had appeared on either of those
 7        sites?
 8   A.   Not once, not a thing, not from the LIFG or from any
 9        other Jihaddist organisation in North Africa, in
10        Afghanistan, or otherwise.  In fact, other websites,
11        other Islamic websites, including extremist websites
12        directly linked to Almuqatila.com and Almuqatila.CC,
13        with the indication that this was the official website
14        of the Libyan Islamic Fighting Group.  So it was not
15        only endorsed apparently by other Jihaddists, but there
16        was no reason to believe it was not legitimate.
17   MR HILLIARD:  Yes, unless your Lordship has any questions?
18   MR JUSTICE MACKAY:  No thank you.  Thank you very much.  You
19        can retire.
20   A.   Thank you, my Lord.
21                    (The witness withdrew)
22                         DISCUSSION
23   MR JUSTICE MACKAY:  Mr Hilliard, that is that.  What is left
24        to do?
25   MR HILLIARD:  My Lord, I think there is probably a little
```

64

```
 1        bit of argument to be had about what we have heard, and
 2        I think that is it.
 3   MR JUSTICE MACKAY:  You think that is it.
 4   MR HILLIARD:  That is it.
 5   MR JUSTICE MACKAY:  The little bit of argument I think we
 6        can complete this afternoon.
 7   MR ROBERTSON:  Subject to this: I do not want to seem to be
 8        a perpetual whinger, but we got, as your Lordship knows,
 9        the two page report from Mr Kohlmann in October.  It was
10        not until December that we got the 19 page report,
11        without any apology.  It should have been sent to us
12        originally.  Then, we still do not have any of these
13        publications that Mr Kohlmann has relied upon.
14   MR JUSTICE MACKAY:  Yes, that is something I should have
15        asked him about.
16   MR ROBERTSON:  I take the view that we cannot -- the
17        prosecution, which has failed in this respect, should
18        not be in a position to rely upon it other than the
19        publications which we have managed to get, which is the
20        book, the only book which is written, of which I have
21        a copy and I can hand it up.
22   MR JUSTICE MACKAY:  You mean should not be able to rely upon
23        it for the purposes of this --
24   MR ROBERTSON:  Of accrediting him.
25   MR JUSTICE MACKAY:  I agree with that.
```

65

 1    MR ROBERTSON:  And this includes the American cases.  I have

 2       the transcript of his appearance in Singh, where I can

 3       show your Lordship there was no challenge at all to him;

 4       in fact he was helpful to the defence and they did not

 5       make any challenge.

 6    MR JUSTICE MACKAY:  I am sorry, I thought you were talking

 7       about the papers that he had written and the --

 8    MR ROBERTSON:  The papers that he mentioned and the US

 9       cases.

10    MR JUSTICE MACKAY:  What do you want, the entire transcript

11       of the US cases?

12    MR ROBERTSON:  Well, we need to see what he was testifying

13       about.

14    MR JUSTICE MACKAY:  Does he have those?  Do witnesses leave

15       a case with a transcript of their --

16    MR ROBERTSON:  We cannot get the transcripts because they

17       are first instance cases; they are not reported cases.

18    MR JUSTICE MACKAY:  But he will not have them.  I would not

19       have thought so.

20    MR ROBERTSON:  No, I would not have thought so.  The

21       prosecution has the duty to establish him as a witness.

22       If it is going to rely on his having testified in the US

23       before, we have to see it, because he could well have

24       testified as a witness of fact.  It may well be that as

25       a witness of fact he can produce this or that

                              66

```
 1        communique, but the question of whether he is an expert
 2        who can venture an opinion is a very different matter.
 3        On that basis, unless my learned friend can produce this
 4        material for me overnight, I would seek to address your
 5        Lordship on the basis that that material upon which --
 6        which he has mentioned which cannot be produced cannot
 7        be relied upon.
 8   MR JUSTICE MACKAY:  Right.  Thank you.  Mr Hilliard, what do
 9        you say about that?
10   MR HILLIARD:  My Lord, I will do my best to see what we can
11        get overnight.  But can I just say this: if your
12        Lordship looks carefully at the copy of the report, I am
13        not suggesting your Lordship would not, but if your
14        Lordship has time to look carefully at it, your Lordship
15        will see, I do not think there is an opinion in it that
16        I am seeking to elicit.
17   MR JUSTICE MACKAY:  I have gone through it again, just
18        looking at your red sections.
19   MR HILLIARD:  As my learned friend has indicated, no
20        dispute, no difficulty about him as a witness of fact
21        producing the communiques; he has just said that.  And
22        that is in fact, if one looks at it, what I am seeking
23        to do.
24   MR JUSTICE MACKAY:  The problem with that is, and I can
25        understand as a good advocate why you are seeking to do
```

67

```
 1        that, expert witnesses -- and I suspect this gentleman
 2        will be no exception to this general rule -- find it
 3        very difficult not to express opinions, even if they are
 4        merely being called to, as it were, act as an index to
 5        material which is in circulation, if I can put it that
 6        way.
 7   MR HILLIARD:  My Lord, perhaps they do.  With great respect,
 8        they should not really do.  It is not very difficult if
 9        it is made plain to somebody that what they are simply
10        doing is going through a series of -- it is a pretty
11        small number of --
12   MR JUSTICE MACKAY:  Yes, but for example, we had a little
13        taste of it this afternoon, Mr Robertson is entitled to
14        say before the jury: well, you have said X; you have
15        given us a source for X, Y; Y is a tainted source for
16        this or that reason; to which the witness may well
17        respond: well, in my opinion it is not because it is
18        accepted as a good source, or it is corroborated by
19        other material I have seen in other ... that is the
20        thing.  One would expect him to say that.
21   MR HILLIARD:  Yes, but --
22   MR JUSTICE MACKAY:  You are calling this man as an expert
23        witness, not just as a sort of card index system.
24   MR HILLIARD:  My Lord, that is why I was seeking to
25        introduce the material at the beginning, and I think
```

```
 1     Mr Robertson politely objected to my doing that, simply
 2     because what I wanted to say was that it is our
 3     submission that he is an expert, but in my submission,
 4     actually what I want from him is not in fact expert
 5     evidence at all.  What I simply want to deal with
 6     through him are the contents of the communiques.  As
 7     your Lordship appreciates, they are published on the
 8     group's website throughout the document in count 2,
 9     written in the defendant's own hand.  There are
10     references that he has written about the need to consult
11     the group's website.  It is directly relevant to --
12 MR JUSTICE MACKAY:  Then why can you not just get together
13     the group's website, the communiques, what have you, and
14     either get Mr Robertson to agree that that is what they
15     are, or if he does not, get this witness to say,
16     "I produce the following documents which emanate from
17     LIFG: 1, 2, 3, 4, 5, "and leave them to be read by the
18     jury.  If you want them to be interpreted, then it is
19     another matter.
20 MR HILLIARD:  No, I do not want to do that.  If I can just
21     finish the point, because I have not had much of a go on
22     this.
23 MR JUSTICE MACKAY:  No, do not worry --
24 MR HILLIARD:  No, I do want to make the point, rather than
25     have it all taken up by cross-examination and then I do
```

69

1       not get a chance.

2           There are many references in the count 2 document to

3       the need to consult the website, and then the defendant

4       has in his possession -- it is in the proposed jury

5       bundle -- he has himself got a copy of communique 1.

6           So in the Crown's submission, aside from the more

7       general question of relevance and whether it is relevant

8       to see whether LIFG is solely concerned with Libya or

9       whether it is interested and involved in things beyond

10      Libya -- that is perhaps a different question that we

11      were talking about yesterday.  In my submission, for the

12      same reasons as yesterday, dealing with possession, so

13      far as count 1 is concerned, why has he got this

14      material on both counts if it is in possession.  In my

15      submission, this material -- and I do not know whether

16      your Lordship is going to let me do it now, but it may

17      be helpful -- your Lordship has --

18  MR JUSTICE MACKAY:  I will let you do anything -- look.  Do

19      not feel in a hurry.  The trial that follows this trial

20      is looking increasingly doomed, as far as I can see, and

21      you and I ought to relax about that, and should

22      Mr Robertson and everyone else, and we try this case at

23      the speed at which it needs to be tried.  So you take

24      whatever time you need.

25  MR HILLIARD:  Right.  If your Lordship goes to our bundle,

```
1       and at the very back of it, the bundle that we prepared
2       for this argument.
3   MR JUSTICE MACKAY:  Yes.  It has some communiques in.
4   MR HILLIARD:  My Lord, it has some communiques in it, the
5       first of which the defendant has I think on two tapes in
6       his house, but it is page 94 at the bottom.  Your
7       Lordship will see, fourth paragraph, not in bold:
8           "Confronting the evil dictators [that is dictators
9       plural] of this era like Gaddafi has become one of the
10      most important obligations."
11          Last paragraph, first two lines, the reference to:
12          " ... the brotherly, friendly and loving word of
13      peace to all the Jihadi groups."
14          Over the page, including the date, five lines up
15      from the bottom:
16          " ... mode of operation but taking a supportive
17      stand with respect to all Jihadi groups, wherever they
18      may be."
19          Over at page 96, the third paragraph down,
20      indicating --
21  MR JUSTICE MACKAY:  This comes from the website?
22  MR HILLIARD:  Yes, it does.  All of these do.
23  MR JUSTICE MACKAY:  All the rest do?
24  MR HILLIARD:  Yes.  Third paragraph down:
25          "The Libyan Islamic Fighting Group's support for the
```

71

```
 1        armed Islamic group in Algeria was based ..."
 2           Because, my Lord, what happens, this document makes
 3        it plain that it is putting an end to the support and
 4        assistance that it has given.  So this is not confined
 5        to Libya.
 6           If your Lordship goes over the page, sort of halfway
 7        down, without troubling your Lordship with why it is,
 8        but:
 9           "Based on the above and the other things that we
10        cannot elaborate on at this time for certain
11        reasons ..."
12  MR JUSTICE MACKAY:  Sorry, I am --
13  MR HILLIARD:  Just below the middle of the page, third
14        paragraph down, "Based on the above".
15  MR JUSTICE MACKAY:  Yes.
16  MR HILLIARD:  " ... the other things that we cannot
17        elaborate on at this time for certain reasons ... "
18           Does your Lordship have that, page 97?
19  MR JUSTICE MACKAY:  Yes.
20  MR HILLIARD:  " ... the Islamic Fighting Group declares it
21        is putting an end to its support and assistance to the
22        armed Islamic group in Algeria."
23           It explains, 2:
24           " ... still against the groups who have deviated,
25        call for democracy, fight in its name or believe that
```

72

```
 1        Tamkin for glorious Allah's religion can be done without

 2        Jihad."

 3            So against groups that call for democracy.

 4   MR JUSTICE MACKAY:  Yes.

 5   MR HILLIARD:  And then third:

 6            "We support the Jihad against the apostates in

 7        Algeria and any of our countries as long as it is in

 8        accordance with ..."

 9            And so on it goes.

10   MR JUSTICE MACKAY:  Yes.

11   MR HILLIARD:  14, page 99, fourth paragraph down:

12            "Islamic Fighting Group strongly ... so after

13        American action in Sudan and Afghanistan ... Islamic

14        group condemns it ... announces its support and

15        assistance of Muslims in Sudan and Afghanistan, want to

16        prove that America is not only the enemy of Osama Bin

17        Laden and the Islamic movements but rather the enemy of

18        the Islamic nation ... "

19            Over the page, four lines down:

20            "The Islamic fighting group calls upon Muslims to

21        stand up against the American aggression."

22            And it goes over just to 101, communique 18, to do

23        with the second intifada, but over the page, second

24        paragraph:

25            "Palestine's liberation and the expulsion of the
```

```
 1        Jews from it is the duty of the entire Islamic nation.
 2        It will undoubtedly require hefty sacrifices and the
 3        spilling of tolerants, of pure blood."
 4            Then we have one of the fatwas.  This was issued
 5        in September of 2001 by the group's religious adviser.
 6        It begins at your Lordship's page 103, explaining in the
 7        text, six lines down, all that is happening after the
 8        cities of New York and Washington were suddenly and
 9        fiercely attacked.
10            Then if your Lordship just goes over to 104, just to
11        get the flavour of it:
12            "2.  All Muslim scholars have agreed ...
13            "4.  That any Muslim country being attacked
14        ...(Reading to the words)... must fight the enemy and
15        protect their homeland.  That duty is upon each and
16        every individual in that country, and later it becomes
17        a duty upon that whole Islamic Nation".
18            So not only that particular nation, but as it were,
19        the whole Islamic Nation, capital "N".
20            "Every individual in the Islamic Nation must
21        contribute in defeating that enemy with any means
22        possible.
23            "3.  The United States of America by declaring war
24        against the Muslims and occupying their countries has
25        made all its interests across the world become
```

```
 1        a legitimate target for the Mujahadin.  They shall bomb
 2        and demolish it with any means possible.  These
 3        militaries include ...(Reading to the words)... touristy
 4        or individuals in any place upon earth."
 5             Then the reference to children and the elderly; that
 6        it depends, as it were, on who they were around at the
 7        time that they are killed.
 8             Lord, I have not, in putting that bundle together,
 9        as it were, dealt with -- I think it is probably most of
10        it, but it is virtually I think one or two other
11        passages -- there is much mileage in my -- I mean, I
12        could identify them, but in the report that I have
13        highlighted, as it were, that solely deals, apart from
14        the first page, which I think we were told it was agreed
15        was common knowledge, of the report, about Gaddafi
16        coming to power in 1969 or whenever it was.  The rest of
17        what I have highlighted is simply concerned with the
18        production of the communiques and the fatwas.
19   MR JUSTICE MACKAY:  Well, you may be none the worse for it,
20        but it surely goes beyond that, because he threads these
21        documents together and gives us a history of the
22        travails and travels of the group: how it starts in
23        Libya, is driven out, goes to Afghanistan, tries to come
24        back, makes a mess of it, thrown out to somewhere else.
25        There is --
```

1    MR HILLIARD:  My Lord, all of that is set out.  That appears

2        I think in one of the communiques, I think, the history

3        of the group, certainly the one that the defendant has

4        in his possession.  The attacks against --

5    MR JUSTICE MACKAY:  You are not going to be asking this

6        witness to give a commentary on this?

7    MR HILLIARD:  No.

8    MR JUSTICE MACKAY:  Are you really saying that so far as

9        your use of this expert witness, if he is such, is

10       concerned, it will be confined to him telling the jury

11       what he is and what he does, and then producing these

12       documents that you have referred to?

13   MR HILLIARD:  That is all I want to do through him.

14   MR JUSTICE MACKAY:  So if that is right, I am sorry --

15   MR HILLIARD:  That is what I want to do.

16   MR JUSTICE MACKAY:  That being so, I should say, it is still

17       expert evidence in this sense: that he is -- well, what

18       is the analysis?  He is not giving direct evidence of

19       the facts.  What he is saying is, I have looked into

20       various places, particularly the website, which I can

21       answer questions about if anyone wants me to say what it

22       is, or what it appears to be, and I produced these

23       extracts of what I found on it, or what was on it.  That

24       is an activity which I suppose is beyond the experience

25       of the man on the street.

76

```
 1    MR HILLIARD:  It is certainly giving the jury information
 2        they would otherwise not have.  He has obtained it and
 3        we have one part of it, as I say, namely the very first
 4        communique which the group has issued, which as I say
 5        sets out a large amount of its history and says now is
 6        the time that they have decided to go public.  They
 7        obviously have a website because the defendant --
 8        perhaps I can just show your Lordship -- because the
 9        defendant keeps writing out that people should look at
10        it.  So if it is not this, we do not know what the
11        website of the Libyan Islamic Fighting Group is.
12    MR JUSTICE MACKAY:  Well it is either a genuine website or
13        it has misled this defendant.
14    MR HILLIARD:  Absolutely.  He must have been sitting there
15        thinking: I agree with what it says but it is not from
16        us so I do not know how this has happened.
17            In my submission there is a real connection, both
18        because he has one of these communiques at his house and
19        because he accepts what is written out.  But in the
20        larger jury bundle, it begins at page 6, top right.
21    MR JUSTICE MACKAY:  You mean the --
22    MR HILLIARD:  The graphic, where we have this exhibit set
23        out.
24    MR JUSTICE MACKAY:  What are we going to call this larger
25        jury bundle?
```

77

```
 1   MR HILLIARD:  Exhibit 1 might be a good start.
 2   MR JUSTICE MACKAY:  That is a reasonable start.  What page
 3       am I looking at?
 4   MR HILLIARD:  Page 6 at the top right.  Then in the middle
 5       of it, the middle page, so it has 2 at the top, if your
 6       Lordship counts nine lines down, there is a reference
 7       there to "some advice through the site".
 8   MR ROBERTSON:  Is this page 6?
 9   MR JUSTICE MACKAY:  Page 6, Mr Robertson, central section,
10       if that is the right word --
11   MR ROBERTSON:  My page 6 is in Arabic, but page 7 has the
12       page 6 of the document.
13   MR JUSTICE MACKAY:  Are you looking at this (indicates)?
14   MR ROBERTSON:  Yes.
15   MR JUSTICE MACKAY:  Page 6 on the top right is an English
16       text in mine.
17   MR ROBERTSON:  Page 6 in our top right is in Arabic text.
18   MR JUSTICE MACKAY:  Right.  Well all of this will have to be
19       gone into.  But do you have the FBF5A English
20       translation of BRM3.
21   MR ROBERTSON:  Yes, we do.
22   MR HILLIARD:  It is the second typed translated page might
23       be the best way to refer to it.  It begins "now then".
24   MR JUSTICE MACKAY:  "Now then in view of the tens of
25       letters"; do you have that?
```

```
 1   MR ROBERTSON:  Perhaps if you could let us have one copy.

 2   MR HILLIARD:  We will give you some other copies later.  It

 3       is the paragraph that begins "now then"and it is ten

 4       lines down.  (Handed).

 5   MR ROBERTSON:  Thank you.

 6   MR HILLIARD:  Anyway, your Lordship sees there the

 7       reference --

 8   MR JUSTICE MACKAY:  This is advice to the would-be

 9       participant.

10   MR HILLIARD:  Yes.  If your Lordship goes --

11   MR JUSTICE MACKAY:  "Some of them ask us to write to him and

12       the likes of him.  Some advice through the site so that

13       it becomes available to you."

14           Yes.  Well that is a reference to the site, yes.

15   MR HILLIARD:  Yes.  If you look over the page, your

16       Lordship, at page 8 at the top and page 4, Mr Robertson,

17       it is the page again that begins with the word

18       "committee", four lines down, talking about the

19       organisation, so the group:

20           "One can increase his knowledge about that committee

21       through what is published on the site about the

22       committee and their activities."

23           Then if your Lordship goes to page 16, and it is the

24       last typed page of the translation.  It is the last

25       three lines of that first paragraph:
```

```
 1            "Must take precautions of any announcement issued by
 2        the group and that is published on the website on the
 3        internet of the group, as the site ..."
 4            This is what he is writing out in his hand:
 5            " ... as the site is the only place speaking on
 6        behalf of the group."
 7  MR JUSTICE MACKAY:  Yes.  So that ties it in, yes.
 8  MR HILLIARD:  My Lord, in my submission, it is certainly, as
 9        it were, sufficient for allowing the issue to the jury.
10        For that threshold, it would be open for your Lordship
11        to say, well, looking at the references to the website
12        that he himself has written out, looking at the evidence
13        of what is on the website under the group's name, and
14        bearing in mind that, as it were, the very first time
15        the defendant has it, he has it in his own possession.
16  MR JUSTICE MACKAY:  Yes, Mr Robertson can make his points on
17        it, and that gets it off the ground as some sort of
18        apparent organ which gives the views of the
19        organisation.
20            But coming back to what you have said this
21        afternoon, you said, "I only intend to use the witness
22        for the production of the pages from the website which
23        you have taken me through."
24  MR HILLIARD:  There may be one or two, as it were, by virtue
25        of the passages I have highlighted in the report,
```

80

```
 1      because I think there may be one or two more in the
 2      report that are not actually been copied at the
 3      moment --
 4  MR JUSTICE MACKAY:  You will not be asking him to comment on
 5      them or express an opinion --
 6  MR HILLIARD:  No.
 7  MR JUSTICE MACKAY:  Either as to the truth of their
 8      contents, is that right?
 9  MR HILLIARD:  No, simply that that is what the organisation
10      was putting out.
11  MR JUSTICE MACKAY:  Or as to the authenticity of the source,
12      that is to say if it is a non-website source -- well,
13      I do not know what other ones you do intend to --
14  MR HILLIARD:  My Lord, they are all from the website.
15  MR JUSTICE MACKAY:  They are all from the website.
16  MR HILLIARD:  Yes.  There are about two, as it were, that
17      are referred to in the report.
18  MR JUSTICE MACKAY:  So you only intend to get him to produce
19      material which emanates from the LIFG website.
20  MR HILLIARD:  Yes.
21  MR JUSTICE MACKAY:  Then you will, as it were, sit down.
22  MR HILLIARD:  Yes.
23  MR JUSTICE MACKAY:  Yes.  Do you want to say anything more
24      to me at this stage?
25  MR HILLIARD:  My Lord, not at this stage, but at some point,
```

```
 1          and I am sure it is plain, I know your Lordship will
 2          have it well in mind, I have already submitted I suppose
 3          as your Lordship will recall yesterday, the defendant
 4          saying he knows nothing of the CD that is -- on which,
 5          as it were, count 1 is, nothing about any part of the
 6          CD, already submitted that other material on the CD
 7          connects with other material at his address and has the
 8          same themes.  That material -- so all the material on
 9          the CD which we say he is in possession of all of, and
10          the other material in his house, we submit the jury
11          would be -- it would be open to the jury to say that
12          that demonstrates this person is not solely concerned
13          with the conflict.
14  MR JUSTICE MACKAY:  Yes.  These are matters we talked about
15          yesterday.
16  MR HILLIARD:  Absolutely.
17  MR JUSTICE MACKAY:  I have that point firmly in mind.  I am
18          beginning to write my decision on that point.
19  MR HILLIARD:  Yes, my Lord, I am sure, and I am probably not
20          helping.
21  MR JUSTICE MACKAY:  No, no.
22  MR HILLIARD:  It is only a small part, and it is not a large
23          amount of material.  It is a relatively small number of
24          the communiques.  But in our submission, in assessing
25          that, is that right, that he, as he claimed, is solely
```

```
 1        concerned with Libya, well, the material in his house
 2        suggests not.  If you actually look at what is issued by
 3        the group of which he is a member, in our submission
 4        that suggests not either.  There are similar themes in
 5        that material, attacking America, which is both on the
 6        CD and in other material at his house, and in the
 7        communiques, shedding blood in Palestine.  Again, there
 8        are themes through it.  All we are saying is that there
 9        is really no reason why the jury should not have that
10        part of the picture in deciding the very important
11        issues in this case.
12   MR JUSTICE MACKAY:  Yes.  Coming back to this afternoon's
13        agenda, does it need this gentleman really, forgive me
14        for saying so, $275 an hour and a business class
15        transatlantic fare -- jolly good for him -- to come over
16        and produce six communiques from a website?
17   MR HILLIARD:  My Lord, it may not do --
18   MR JUSTICE MACKAY:  Having read his first report I have to
19        say, and I suspect Mr Robertson felt this, there was
20        a more ambitious agenda for him.
21   MR HILLIARD:  My Lord, certainly that was the report he
22        produced.  I rightly or wrongly have to take a decision
23        as to what I think I need.
24   MR JUSTICE MACKAY:  Of course.
25   MR HILLIARD:  And, as it were, what is safely admissible.
```

83

```
 1      I have taken a view --
 2  MR JUSTICE MACKAY:  Yes, that is your job.  This is how you
 3      are doing it, and I understand it, yes.
 4  MR HILLIARD:  My Lord, it may not.  It certainly needed him
 5      to find them, I have to say.  I was aware that the
 6      defendant had one communique, the rest of us did not
 7      have archived material from the website.  He has
 8      certainly come up with that.  Your Lordship is right,
 9      and I have to say, I would be very surprised if
10      Mr Robertson will just admit it like that and somebody
11      else able to deal with it.
12  MR JUSTICE MACKAY:  Well we will find out in a moment.
13  MR HILLIARD:  But if he would, it can be dealt with in that
14      way.
15  MR JUSTICE MACKAY:  All right.  Mr Robertson, given that
16      that is the use to which -- I am sympathetic to you in
17      the sense that when I read this report for the first
18      time I thought: here we go, we are going to have
19      a debate on the geopolitics of the Middle East, which
20      would be fascinating but not perhaps productive for this
21      trial.
22          Now that Mr Hilliard has rightly done what
23      a prosecutor should and cut it down to what he wants
24      this witness to produce, why does he not have the
25      ability to produce it as a witness?
```

```
 1    MR ROBERTSON:  My Lord, I am in a state of bewilderment.

 2         I was served at lunchtime with this cut down version,

 3         which still contained at least, about ten pages of

 4         geopolitical material as being the part of the report

 5         that he wanted to rely upon.  But can I just come back

 6         and ask your Lordship to see it through my eyes for

 7         a moment.  We were served in October with a two-page

 8         opinion from Mr Kohlmann.  This is the one with

 9         operation (inaudible), and it contains an eight-page

10         document which is --

11    MR JUSTICE MACKAY:  This is the training camp?

12    MR ROBERTSON:  That is right.  So we begin with Mr Kohlmann

13         as an expert witness --

14    MR JUSTICE MACKAY:  All right, you can go through all this

15         if you want --

16    MR ROBERTSON:  No, I do not want to go through it, if it is

17         going to be abandoned, but I want to know --

18    MR JUSTICE MACKAY:  It is.  He has just said, he will not

19         call him to deal with the training camp, so you can put

20         that to one side.

21    MR ROBERTSON:  We will put to one side all the work we have

22         done on his first expert report.  That is fine.

23            We are then in December.  We get, finally, a copy of

24         this 19-page report and we ask for the footnotes.

25         A case again of our seeking information which ends up
```

```
 1      being produced as part of the prosecution case.  But we
 2      get to see several thousands of pages of footnotes,
 3      including these communiques.  It now transpires, after
 4      we challenge Mr Kohlmann's expertise in the way that we
 5      did in our skeleton, and after the cross-examination
 6      this afternoon, that Mr Kohlmann is no longer put
 7      forward as an expert.  The Crown seem to have resiled
 8      entirely from the use of him as an expert.  He is being
 9      used --
10  MR JUSTICE MACKAY:  Well, I do not know --
11  MR ROBERTSON:  -- to produce --
12  MR JUSTICE MACKAY:  He is being used as a witness to produce
13      this material.  As I said, rather inelegantly, I think
14      it does require a form of expertise if you are going to
15      be analytical, to do that.
16  MR ROBERTSON:  If it is on the website it could be produced
17      by a police officer.
18  MR JUSTICE MACKAY:  Well, if you want we can send him home
19      and you can get a police officer to give the same
20      evidence.  Are you happy with that?
21  MR ROBERTSON:  No, because I want to see a statement.
22      I want to see a statement from someone annexing those
23      communiques which my learned friend wants to introduce,
24      because this is a shifting sand.  This whole
25      prosecution, in so many ways, but in this way in
```

```
1       particular.  I cannot -- my friend and I cannot take
2       instructions and I cannot deal with something that is
3       described airily this afternoon at 4.30 pm by my learned
4       friend, having resiled from a position that has been his
5       for four months.  I just need a statement by someone,
6       whether it is Mr Kohlmann or a police officer, which
7       produces in proper form the exhibits which he wants to
8       introduce to the jury and those communiques, there are
9       no doubt hundreds of communiques from this site, but
10      those communiques that he wants to introduce.  Then --
11  MR JUSTICE MACKAY:  Are you saying these are admissible or
12      inadmissible?
13  MR ROBERTSON:  Well that is the next question.  Are they
14      admissible?  He has got communique 1 in, but I need to
15      see -- I cannot say or argue whether they are admissible
16      until I know who is going to produce them and I have
17      a statement.  That is the proper way.
18  MR JUSTICE MACKAY:  How is that going to benefit you?  You
19      know perfectly well if it is this witness he is going to
20      say: I got them from the website --
21  MR ROBERTSON:  That is what he said this afternoon for the
22      first time.
23  MR JUSTICE MACKAY:  You want that in a written statement?
24  MR ROBERTSON:  Yes.  For the first time this afternoon we
25      had the witness who does not deal with their original
```

87

```
 1      provenance in any way in any previous report said --
 2      gave a whole great deal of evidence which we do not even
 3      have down because we do not have the note, that -- for
 4      the first time.
 5  MR JUSTICE MACKAY:  Right.  Well, then, we will adjourn this
 6      issue, shall we, get a further witness statement from
 7      this witness, which can incorporate, by reference, his
 8      CV and the personal stuff he has already proposed to and
 9      say, "I now produce the following six documents which
10      have come from this source," and express no opinion
11      further than that.
12  MR ROBERTSON:  Well, it is up to my learned friend.  If he
13      is going to introduce him as an expert, that is one
14      thing.  If he is going to introduce him simply as the
15      producer of these documents, that no doubt will be
16      another.  But I must know on what basis this witness is
17      to be tendered, if he is to be tendered and I must know
18      exactly what he is going to produce.
19          My learned friend apparently has abandoned the
20      training camp document.  That is fine.  Now we know
21      where we are.  But that means out it goes and we have no
22      evidence about it.
23  MR HILLIARD:  Sorry -- well, I will wait until Mr Robertson
24      has finished.
25  MR ROBERTSON:  Do you abandon the training camp --
```

```
 1   MR JUSTICE MACKAY:  Let us not have a direct debate.  You do
 2       this outside of court if you do it at all.
 3   MR ROBERTSON:  Yes, I am sorry.  But that is the sort of
 4       thing I need to know, as a matter of fairness, whether
 5       my learned friend is abandoning Mr Kohlmann as an
 6       expert, is abandoning the training camp document, which
 7       has been part of his case from the first case summary,
 8       or whether he is going to try and do it another way --
 9   MR JUSTICE MACKAY:  Well you are entitled to know the
10       position on the training camp document, I agree.
11       I would like to know it too.  What is the position on
12       that?
13   MR HILLIARD:  The training camp document does not depend on
14       Mr Kohlmann at all.  The training camp document is
15       simply in the house.
16   MR JUSTICE MACKAY:  The one that is found in the house.
17   MR HILLIARD:  Yes, I do not need Mr Kohlmann --
18   MR JUSTICE MACKAY:  So all you need is a policeman to say:
19       I found it in such and such --
20   MR HILLIARD:  Yes, and because we know that the document the
21       defendant has written out indicates that you should go
22       to training camps.  There is a direct link.
23   MR JUSTICE MACKAY:  So anyone could produce that.
24   MR HILLIARD:  Yes.
25   MR JUSTICE MACKAY:  Is there any progress as a matter of
```

```
 1        interest in admissions of fact, as to what documents
 2        were found where and all the rest of it?
 3   MR HILLIARD:  My Lord, there is a little bit of progress.
 4        It is just so short in any event; it is actually going
 5        to be easier to follow if Mr -- it is not Mr Smith.
 6        There are two searchers.
 7   MR JUSTICE MACKAY:  I mean, all right, your judgment is it
 8        would be easier to do it through a live witness.
 9   MR HILLIARD:  It really will, because it is not long.
10   MR JUSTICE MACKAY:  All right, I will leave that point.  I
11        will not press it.  Would you be good enough to get
12        somebody to take a short statement from this gentleman,
13        dealing with what it is he intends to produce and where
14        it is he found it.
15   MR HILLIARD:  Of course.  Yes, we will certainly do that.
16   MR JUSTICE MACKAY:  He need not restate -- I do not construe
17        your action as abandoning him as an expert witness.
18   MR HILLIARD:  I did not want to interrupt.
19   MR JUSTICE MACKAY:  I am not terribly interested in who has
20        won or lost that but for what it is worth I think it
21        does or may require a level of expertise beyond the
22        competence of an average juror to go looking for this
23        and know where to look for it.
24   MR ROBERTSON:  Yes, but the expertise of an internet
25        researcher not the expertise of a geopolitician.
```

```
 1   MR JUSTICE MACKAY:  Whatever you want to call him, internet
 2       researcher, give him any name you want.
 3   MR ROBERTSON:  I am going to want to have my computer expert
 4       look at what he says.  That is the marker I put down,
 5       otherwise it is ambush.
 6   MR JUSTICE MACKAY:  Well, we will see what he says.
 7   MR HILLIARD:  Yes.
 8   MR JUSTICE MACKAY:  All right.  I think that concludes the
 9       contentious business for the day, does it?
10   MR HILLIARD:  In court, at least.  We will see if we can get
11       on better outside.
12   MR JUSTICE MACKAY:  Yes.  Well, I hope you can.  Now,
13       tomorrow, we have a jury being assembled, and we have
14       a requirement to have -- there is a requirement for my
15       decision on the essential points yesterday, on which, as
16       I say, I have made some progress, having had this
17       morning.  My instinct, tell me either of you if you are
18       opposed to this, but it is not a very firm one, is to
19       get the jury sworn first, which make take a little time;
20       give them a little homily, the contents of which I need
21       to discuss with you, which is a sort of expanded version
22       of the one you would be give in a normal case, but about
23       contacts and non-discussion and so forth, and send them
24       away without further ado, then give my decision on the
25       things I have to give you a decision on.  The only
```

```
 1      problem I suppose with doing it that way is if one or
 2      other of you wants to appeal.
 3  MR ROBERTSON:  I think there is a problem, because once we
 4      swear a jury we are out of the preparatory hearing, so
 5      I think your Lordship, with respect --
 6  MR JUSTICE MACKAY:  The appeal has to take place within the
 7      preparatory hearing.
 8  MR ROBERTSON:  Yes.  So your Lordship should give your
 9      decision --
10  MR JUSTICE MACKAY:  I think that is right.  You will lose
11      the right of a pretrial appeal.
12  MR ROBERTSON:  Correct.  We should have the opportunity to
13      consider the -- both sides -- your Lordship's decision,
14      on all these points, and either have your Lordship's
15      leave to go up or approach the Court of Appeal.
16  MR JUSTICE MACKAY:  Then is there any -- I will not be --
17      I do not expect to be ready at 10.30 am with the ruling.
18  MR ROBERTSON:  We have a conference with our computer
19      expert, and I can see that we can -- because we have the
20      DC Lewis position, and if your new statement has to --
21      we are having him down tomorrow afternoon to chambers,
22      so that is quite an important thing for the defence.  It
23      may be that your Lordship could e-mail your decision?
24  MR JUSTICE MACKAY:  I could do that.  Are you happy with
25      that?
```

```
 1   MR HILLIARD:  Yes.
 2   MR JUSTICE MACKAY:  If I do it as a Word document and send
 3        it to both of you, and then come into court, say: for
 4        the reasons in the e-mail decision, my rulings are as
 5        follows ...
 6   MR ROBERTSON:  In that way we could come back to court on
 7        Thursday and --
 8   MR JUSTICE MACKAY:  And start the jury business then.
 9   MR ROBERTSON:  Or let your Lordship know which way we ...
10   MR JUSTICE MACKAY:  Well I think you both have to -- I mean,
11        you do not know who is going to win or lose.  You know
12        one of you is, and each of you may have, by then,
13        contingent plans on what it is you want to do.
14   MR ROBERTSON:  There may be two losers of course.
15   MR JUSTICE MACKAY:  I hope there will be only one.
16   MR ROBERTSON:  There are a number of issues.
17   MR JUSTICE MACKAY:  I see what you mean.
18   MR ROBERTSON:  Will then ask for leave to appeal, because it
19        is a novel matter, and failing that, will have to go to
20        the Court of Appeal probably on Friday.
21   MR HILLIARD:  My Lord, I do not know whether --
22   MR ROBERTSON:  I think it is done in writing.
23   MR HILLIARD:  It would not take long -- I mean, I do not
24        know whether it is just possible to at least finish
25        tomorrow Mr Kohlmann's part of things, because as your
```

```
 1          Lordship says, $275 an hour, if somebody is going to do
 2          it, it is not long, but if it would be possible just to
 3          come back to court in the morning, I can well understand
 4          about the conference -- the decision can be e-mailed,
 5          with great respect, whenever it was convenient to your
 6          Lordship -- but it just would mean we had at least
 7          hopefully nailed one more issue down.
 8  MR JUSTICE MACKAY:  Well, I see that.  You mean you are
 9          going to produce a statement tonight, overnight, rather.
10  MR HILLIARD:  Yes.
11  MR JUSTICE MACKAY:  You will serve it in the morning.
12  MR HILLIARD:  Even if my learned friend's junior -- it does
13          not require him, tentatively, if we were able to resolve
14          the issue, Mr Robertson need not be here but we have the
15          chance of putting at least one issue to bed.
16  MR ROBERTSON:  We cannot put Mr Kohlmann to bed until A we
17          get the statement and B if it is going to be computer
18          expertise, we have our computer expert look at it, which
19          he can do tomorrow afternoon.  So it does not make sense
20          to spend the money reconvening the court tomorrow.  If
21          we can do this tomorrow, we get his Lordship's judgment
22          by e-mail and we are back on Thursday with our
23          submissions on it and we can put Mr Kohlmann to bed on
24          Thursday morning.
25  MR JUSTICE MACKAY:  I think, although I understand your
```

94

```
 1        position, Mr Hilliard, I think it is safer to --
 2   MR HILLIARD:  My Lord, certainly.
 3   MR JUSTICE MACKAY:  -- go slower rather than faster on this.
 4   MR HILLIARD:  My Lord, I was not intending to.  Let us leave
 5        it until Thursday.
 6   MR JUSTICE MACKAY:  I think we will leave it until then.  It
 7        does not help you to have this case listed for
 8        a conference with your client, it is the expert --
 9   MR ROBERTSON:  No, it is the expert we need to see first,
10        and he can see us tomorrow afternoon.  Then we will have
11        the conference with the client on Thursday morning.
12   MR JUSTICE MACKAY:  Very well.  Then I think that is what we
13        will do.  To be frank, I would be grateful for the
14        further time.  I do not like taking up lots of time in
15        the case to get my ruling right.  So would you both
16        kindly leave an e-mail contact address with my clerk and
17        I will get that to you, I will say no more than this, in
18        the course of tomorrow.
19   MR ROBERTSON:  Thank you.
20   MR JUSTICE MACKAY:  The great thing about e-mails is you can
21        serve them at all hours of the day and night, as we all
22        know.  So this case need not be listed, and the jury,
23        I am sorry to say, will not be needed tomorrow but may
24        be needed, will be needed, I hope, but may be needed on
25        Thursday, but again, may not, but ought to be present.
```

95

```
1        10.30 am Thursday?
2   MR HILLIARD:  Yes, please.
3   MR JUSTICE MACKAY:  Yes, please.  All right.  Any other
4        matters?
5   MR HILLIARD:  No, thank you very much.
6   MR ROBERTSON:  Thank you.
7   MR JUSTICE MACKAY:  Thank you both very much.  I think
8        I ought to say this, and it is without commitment on my
9        part:  I have the power to give leave, have I not, on
10       a preparatory hearing appeal?  If it is on either of the
11       first two points, as it were, that is to say section 1
12       and reasonable excuse, without committing myself, and
13       I know the trial judge is not normally meant to give
14       leave, I think it may well be a case where the trial
15       judge ought to, whichever way it goes.
16  MR ROBERTSON:  Yes.
17  MR JUSTICE MACKAY:  But that depends on the losing party, as
18       it were, wanting to do so.
19  MR ROBERTSON:  Of course.
20  MR JUSTICE MACKAY:  All right.
21  MR ROBERTSON:  Thank you.
22  MR JUSTICE MACKAY:  But it may help your discussions if
23       I tell you.
24  (4.35 pm)
25       (The Court adjourned until 10.30 am on Thursday,
```

```
1                       25th January 2007)

2

3
    MR KOHLMANN (affirmed) ..........................   3
4
        Examination-in-chief by MR HILLIARD ..........   3
5
        Cross-examination by MR ROBERTSON ............  15
6
        Re-examination by MR HILLIARD ................  61
7
    DISCUSSION ......................................  64
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```