IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| United States of America, | Case No. 3:06CR719 |
| Plaintiff | |
| v. | ORDER |
| Mohammed Zaki Amawi, et al., | |
| Defendant | |

This is a criminal case in which the indictment charges the defendants with conspiring to: 1) kill and maim members of the United States military in Iraq and 2) provide material support to terrorism, thereby also causing harm to or killing U.S. nationals. Another charge is that two of the defendants unlawfully distributed a video showing how to make a suicide bomb vest.

The government represents that a substantial portion of its evidence will be presented through a cooperating witness, identified in the indictment as the "Trainer." In addition to having that witness testify as to what he saw and heard the defendants do and say, the government will be presenting audio and video recordings made by him.[1]

The government also intends to offer testimony by Evan Kohlmann, whom it has designated as an expert on terrorism. Mr. Kohlmann has an undergraduate degree and a certificate in Islamic Studies. He also has a law degree, but has not sat for a bar examination.

His principal occupation is collection of information – primarily from public sources on the internet – relating to terrorist organizations and activities, analysis of such information, and

---

[1] The defendants represent that the witness made upwards of 400 hours or more of such recordings [primarily audio].

dissemination of his views and interpretation of that information. According to him, he has the largest collection of such material in the world.

Mr. Kohlmann reads and speaks some Arabic, but is not fluent. To comprehend the materials that he collects, much of which is written or spoken in Arabic, he uses two part-time native speakers of that language.

While an undergraduate and for a period thereafter, Mr. Kohlmann worked as a terrorism consultant for, according to his resume, "an open source counterterrorism think-tank and policy group in Washington, D.C." He operates, with the assistance of the two part-time translators, Globalterrorism.com.

Mr. Kohlmann has been qualified as an expert witness in several federal terrorism-related cases, and, as well, in some similar cases in the United Kingdom. He is under contract with MSNBC as an on-air interviewee.

After designating Mr. Kohlmann as an expert, the government produced a series of reports discussing various terrorism-related topics about which it anticipated he might testify. The first two reports discussed "jihadist" materials belonging to the defendants. Those materials came either from the government's cooperating witness, the "Trainer," to whom some of the defendants had provided the materials, or had been found during post-indictment searches of the defendants' computers and residences.

The materials provided to the government by the Trainer included videos of acts of violence against members of the American armed forces in Iraq[2] and written instructions about constructing

---

[2] The various videos show sniper, mortar, rocket and improvised explosive device ("IED") attacks on United States and coalition military forces; executions by Iraqi terrorists of civilians by beheading or shooting; assembly of suicide bomb vests and other explosive devices; and materials

explosives. The materials seized from the defendants, which were much more voluminous, included video, audio, and written materials similar to those obtained from the Trainer.

Kohlman's third report discussed a document entitled "39 Ways to Serve and Participate in Jihad." His fourth report related to five photographs of defendant Amawi in a white burial shroud, lying, eyes closed, in a coffin-like box. Kohlmann's report noted the similarity between these photos and photos of suicide bombers taken before their deaths.

The final report described twenty-two training manuals, found in defendant Amawi's possession, released by Al Qaida's Saudi Arabian affiliate.

The government has created a multi-hour distillation of video materials for presentation to the jurors. These show, *inter alia*, suicide car bombings, destruction of vehicles by I.E.D.s, making and testing of suicide vests, sniper shootings of American military personnel, dead American soldiers, execution of civilians, and desecration of bodies. Also included in the government's video presentation are videos about the Crusades and exhortations to participate in jihad. A small segment of the presentation includes videos, apparently made by American servicemen, of shootings of Iraqis and other military activities.[3]

In conjunction with its presentation of this evidence, the government, according to a post-*Daubert* hearing brief, desires to have Mr. Kohlmann testify about the

> origin, nature, and utility of the actual computer evidence obtained from the defendants. Of equal importance, Mr. Kohlmann's testimony will provide important explanation for jurors, who are unlikely to have any knowledge of the phenomenon of terrorist groups' use of the internet. The actual expert opinions which the government expects Mr. Kohlmann to render are limited to the following areas: (i)

---

released by terrorist groups promoting violent "jihad" against the United States.

[3] The defendants' motion in limine seeking to exclude these materials is pending.

      the use of the internet by numerous terrorist organizations as a vehicle for recruitment and training of terrorist supporters, sympathizers, and prospective jihadists; (ii) the process by which Mr. Kohlmann himself has methodically collected and maintained a database of documents, communiqués, and multimedia files distributed by these groups; (iii) an analysis of the quantity and quality of the internet materials assembled by the defendants in this case, as well as an opinion of the relative difficulty required to obtain such a collection; (iv) specific explanation as to discrete items discussed by the defendants in consensually-recorded conversations.

[Doc. 654, at 3-4].

In addition, the government indicates that it wants Mr. Kohlmann to provide "general information regarding international terrorism." This aspect of his testimony, according to the government, will be "tied directly to statements made by the defendants in consensual recordings regarding certain terrorist leaders, groups, and events." *Id.* at 5.

The defendants have filed a motion to exclude testimony by Mr. Kohlmann. [Doc. 532]. They challenge both his qualifications and the relevance of his proposed testimony. To develop the record further, I held a *Daubert* hearing as to both issues. The parties thereafter filed supplemental briefs.

For the following reasons, I find that Mr. Kohlmann's proposed testimony, though based on his extensive and continuing research, which has given him a measure of expertise, is not relevant to the issues in this case. In any event, the limited probative value of his testimony is outweighed very substantially by its very considerable potential for unfair prejudice to the defendants.

The defendants' motion in limine shall, accordingly, be granted.

## Discussion

I discuss each of the purposes for which the government offers Mr. Kohlmann's testimony in turn.

4

Before doing so, however, I note that I am not excluding his testimony for want of an adequate basis for much, if not all, of what he would say. I accept his representation that he has an exhaustive and comprehensive collection of internet-derived materials relating to terrorism in general, and, in particular, of materials produced by terrorist organizations and their affiliates and supporters.

Mr. Kohlmann is, accordingly, qualified on the basis of his research, study, and analysis to testify about who has created and creates such materials, how they use the internet to disseminate them [and difficulties encountered in such use], the apparent purposes in creating and distributing them and how internet users may be able to locate and access such materials [and the difficulties such users may encounter in attempting to do so].

Also I note that the government has not alleged that any of the defendants had or has a connection with any specific foreign or domestic terrorist group. Even if supportive of the goals of such groups as Al-Quaeda, Al-Quaeda in Iraq, the Islamic Army in Iraq, or any similar terrorist organization, there is no indication that any of the defendants has had any contact with any of those groups. There is equally no indication that those groups have had any contact with defendants. Even if one or more of defendants may have wanted to fight with Iraqi insurgents, the evidence, so far as I am aware, will not show that they anticipated working with a particular segment of the insurgency. Whatever their ultimate purposes, goals, and objectives, they appear to have entirely been "home-grown."

### A. General Topics

#### 1. "Origin, Nature, and Utility" of Computer Evidence Obtained From the Defendants

Mr. Kohlmann has presented extensive and detailed evidence about the source of many of the materials that the government expects to show to the jury. Some he attributes to Al-Quaeda and its Middle Eastern affiliates. Other materials he attributes to separate terrorist organizations. The government wants him to be able to testify about who produced the various materials.

Similarly, the government wants Mr. Kohlmann to testify about the "nature" and "utility" of those materials: *i.e.,* what they are, why they were produced, their target audience, and the use to which those producing and disseminating them desired them to be put.

In view of the lack of contact between the defendants and any specific terrorist organization, and, most specifically, the lack of contact with any of the groups that have produced this material, the source of the materials is not relevant to any fact in issue in this case. This is particularly true in light of Mr. Kohlmann's testimony, which I discuss in greater detail below, that the various materials can be accessed on websites other than those connected with a particular terrorist group.

That these materials could have been located and accessed elsewhere on the internet makes sense, because to the extent that the producers wanted them to have an impact on their target audience, it would behoove them not to keep the materials from ready, or reasonably ready access. This is so, even if some of the materials were, or in time became, password protected.

Because, as Mr. Kohlmann's testimony made apparent, it was not necessary to access a website operated by the producers of the materials, knowing who produced the materials is neither relevant nor material.

Testimony by Mr. Kohlmann about the nature of these materials is not necessary for the jury's understanding of what they are. Bombs exploding, people being killed, and exhortations to violent jihad speak for themselves, as do the other materials in the government's presentation.

6

Likewise, to the extent that the purpose of such materials might not readily be apparent from their nature and content, testimony by Mr. Kohlmann about why they were produced and disseminated is not necessary or helpful to the juror's understanding and trial of the issues. Propaganda – and that's ultimately what these materials are – can have many purposes, most, if not all of which are self-evident. To the extent that these materials seek to entice, excite, or incite their viewers, jurors can, on seeing the materials, well understand those various objectives.

What matters in this case is whether the defendants' viewing and use of those materials helps to prove a fact in issue – *i.e.*, their intent or other elements of one or more of the offenses charged. Mr. Kohlmann's testimony about the source, nature, and utility of these materials is not necessary for the jurors to perform that task in light of all the evidence.

I find, accordingly, that Mr. Kohlmann's testimony about the source, nature, and utility of the materials is not relevant or material under Fed. R. Evid. 401 and 402.

I also find that, even if his testimony in that regard had some probative value, the risk of very unfair prejudice substantially outweighs any such probative value. Few terms have a greater inherent risk of prejudgment than terrorism, terrorist, jihad, and Al-Quaeda. To permit the jury to learn who may have produced and disseminated the materials that they will be viewing, and what their putative purpose might be – even though voir dire made clear that accessing, downloading, and viewing such materials was not unlawful – could manifestly color their ability to weigh the evidence objectively.

Emphasis via Mr. Kohlmann's testimony about the source, nature, and utility of these materials is neither necessary nor proper.

### 3. Specific Purposes

### A. Terrorist Groups, Leaders and Events

The Trainer made audio recordings of some of the defendants watching, making comments about, and discussing various videos. In those conversations, the defendants reference terrorist groups, individual terrorists and terroristic activities.

The government wants to have Mr. Kohlmann tell the jurors about those groups, persons, and events to the extent that they may not already be sufficiently notorious to be known already to the jurors. Such testimony will be offered to fill in gaps in the jurors' knowledge about who's who and what's what in international terrorism.[4]

I'm far from satisfied that filling in the blanks in the jurors' awareness of who some of the referenced groups, individuals, or events are is either relevant or material. I expect that, to a considerable extent, the jurors will in any event be able to infer, and accurately so, that the referenced organizations, individuals, or occurrences have something to do with international terrorism. What, exactly, that something may be does not appear to be sufficiently pertinent to permit Mr. Kohlmann to elucidate what those groups and persons are and what they or others may have done.

In other words, the context in which the references are made would appear to suffice to inform the jurors, to the extent that they need to be informed, about those entities, etc.

---

[4] Among the organizations, persons, and events about which the government wants Kohlmann to inform the jurors are "significant international terrorism leaders, groups, and events, as well as certain world leaders and victims of terrorism, including but not limited to the following: Usama Bin Laden; Ayman Al-Zawahiri; Abu Musab Al-Zarqawi; Gulbuddin Hekmatyar; Abu Al-Waled Al-Ghamdi; Khattab; Shamil Basayev; Al Qaeda; Ansar Al Sunnah; Muntada al-Ansar; Islamic Army of Iraq; Abu Al-Zubair Al-Najdi; Abdullah Azzam; the killing of Anwar Sadat; King Fahd wearing a cross; the battle for Fallujah, Iraq; assorted locations of military conflicts in Iraq and Afghanistan; Sheikh Ibn Tamiah; terms such as "Mujahadeen" and "Dawa"; Hezbollah; Ali Al Timimi; Al Bara'a Ibn Malek; Dale Stoffel; Ahmed Chalabi; Ayad Allawi; and Yasser Arafat." *Id.* at 7.

If that appears not to be the case, that does not mean that Mr. Kohlmann is or should be the only source for providing any additional information, to the extent such appears to be needed, relevant and material. Other witnesses, including one or more of the F.B.I. agents involved in the investigation probably could provide that information on a more limited and specific basis. Alternatively, the defendants might consider agreeing to a straightforward, objective description if necessary.

Finally, as with other aspects of Mr. Kohlmann's anticipated testimony, the modest, even miminal probative value of testimony about groups, persons, and events with which the jurors may or may not be familiar – and with which the defendants have no connection whatsoever – is outweighed by the potential for unfair prejudice. Permitting the proposed testimony would suggest that, contrary to the evidence, these defendants somehow had some connection with those groups, persons or activities. Even if that weren't so, allowing such elaboration would unavoidably create a penumbra of prejudice that could unfairly and improperly affect the outcome.

### B. Terrorists' Use of the Internet

The government proposes to have Mr. Kohlmann testify about the use of the internet by terrorists and terrorist groups "as a vehicle for recruitment and training of terrorist supporters, sympathizers, and prospective jihadists." [Doc. 654, at 5]. While it probably is appropriate for the jurors to know that the defendants obtained the materials from the internet, that fact alone suffices to convey anything that is relevant about use of the internet by terrorists and their groups.

Jurors can be expected to understand that the internet has become a means of disseminating and obtaining material and information of various kinds on a world-wide basis. They can infer that terrorists find the internet useful.

9

Mr. Kohlmann's testimony about use of the internet for recruitment and training is no more relevant in this guise than in the guise of evidence as to the general "nature" and "utility" of these materials.

The government can, in any event, argue its views just as effectively without Kohlmann's commentary to the jury, as to why terrorists produce and disseminate this material where and how they do. The jury, when it sees the materials [if it does], can make its own judgments about those inferences and any other assertions that the government may make about them.

Similarly, the potential for substantial prejudice vastly outweighs the probative value of Kohlmann's testimony as to what terrorists hope to accomplish by disseminating these materials on the world-wide web. To the extent that the jurors view them as either recruitment or training materials, they might be induced, if Kohlmann were permitted to give his views about their purposes, to perceive a link between the group[s] producing the materials and the defendants. That is a link, as already noted, that otherwise is not to be found in the evidence.

Finally, I find the government's recitation of and reliance on cases involving expert explanatory testimony about organized crime, *e.g., U.S. v. Tocco*, 200 F.3d 401, 418 (6th Cir. 2000), and drug rings, *e.g., U.S. v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996), *abrogated on other grounds Morales v. American Honda Motor Co.*, 151 F.3d 500, 515 (6th Cir.1998)), to be inapposite. In such cases, the government is attempting to show the defendant's connection with and role in the group. That's not so here, where there is no basis for connecting any of the defendants with a particular group.

Opinion evidence about how and why terrorists use the internet is, therefore, not relevant under Rules 401 and 402, and should not be allowed, in any event, under Rule 403.

### C. How Mr. Kohlmann has Collected his Database

Testimony by Mr. Kohlmann as to his methods in collecting, collating, and analyzing his materials is relevant only as a predicate for his substantive testimony. Absent that substantive testimony, it serves no useful or proper purpose for him to testify about either how he has collected his materials or their extent and comprehensiveness.

### D. Assessment of the Extent of Defendants' Materials and Difficulties in Obtaining Them

Mr. Kohlmann emphasizes the difficulties that can be encountered in accessing materials of the sort found in the defendants' possession. He also expresses the view that the collection was extensive, and, for a specific period of time, comprehensive. According to him, it is the largest collection, aside from his own, that he has encountered among the half-dozen or so with which he has become familiar. Acquisition of a collection of this sort and extent, he asserts, manifests unusual attentiveness and diligence and thus substantial dedication to the jihadist cause.

This is so, he reports, because of the nature of the internet and the methods terrorists use to disseminate their materials on the internet, on the one hand, and problems, on the other hand, likely to be encountered in finding such materials.

Terrorist groups usually don't have their own websites. Commercial internet service providers do not want or tolerate having such materials on their websites. These materials must, in effect, be smuggled onto host servers. Once lodged there secretly and successfully, they are at risk of elimination once their presence is called or otherwise comes to the host provider's attention.

In addition, bandwidth limitations, as existed until relatively recently, made distribution of videos to a single site difficult, if not impossible. This meant that terrorists had to segment their

11

Case 1:06-cr-00719-JG Document 170 Filed 03/27/08 Page 12 of 15 PageID #:894

videos onto different sites. This increased the risk of discovery and elimination, while making access more difficult than if an entire video could be placed and found at one location.

Nonetheless, according to Mr. Kohlmann, an attentive user of the internet could and still can locate and access terrorist produced and disseminated materials. Doing so may require frequent checking of various websites.

Organizations disseminating terrorist-related materials have, however, some tools available to make access somewhat easier. There is at least one on-line forum that provides, apparently clearinghouse-like, links to newly or recently posted materials. Even more conveniently, from the standpoint of someone wanting to locate this sort of material as it becomes available online, is an e-mail "service" that notifies its recipients about such materials and gives the links to them.

Mr. Kohlmann suggests that there are impediments to accessing some of the venues used to disseminate terrorism-related materials. Some are password protected. Some have come to require third-party sponsorship before a third-party can register.

Password protection appears to impose little, if any, impediment to access to the materials at any particular internet location. The practice of permitting registration only via a terrorist-related sponsor appears to be a recent development, and one which post-dates the period during which the defendants were collecting most of their materials.

Thus, at least while the defendants were hunting for what they ultimately downloaded, kept, and viewed, finding and gaining access to terrorist produced and disseminated materials was not as difficult as it may since have become.

The problems were not as much technological [finding where the materials were posted] as they were temporal. This is so, because, as noted, these materials can have a short shelf-life; once discovered on a host server, the host eliminates them.

To some extent terrorist groups seek to overcome this problem by "mirroring" the materials – *i.e.*, distributing them on multiple "hijacked" servers. Also by moving them around to new servers. But, in time, they all disappear.

According to Mr. Kohlmann, materials usually will have disappeared within two weeks of initial posting. Some may disappear even more quickly – within a matter of a few hours or days. But, he testified, someone who checked at least weekly would be able to keep current.

I conclude that very little evidence of probative value would be gained by permitting Mr. Kohlmann to testify about either the extent or comprehensiveness of the defendants' collection or the problems that might be encountered in acquiring that collection.

First, Kohlmann's testimony about the difficulties one might encounter in trying to locate these materials has very little probative value.

The purpose of that testimony appears to be to show that the defendants' persistence in seeking out and acquiring those materials over a prolonged period manifested their high level of dedication and commitment to the jihadist cause and the intensity of their desire to become trained to be able to participate in that cause. This, in turn, would prove their intent in working together and with the Trainer to learn terrorist tactics as potential participants and recruiters of others.

The problem with the proffered testimony and the inferences sought to be created is that the difficulties are overstated. While it would take some degree of effort to access newly posted materials, the extent of that effort would be ameliorated by the existence of the clearinghouse-type

forum and frequent receipt of e-mail links. Finding these materials was not, in other words, an entirely self-help or solo undertaking.

As important, the frequency with which these efforts had to be made appears to be less than Kohlmann initially suggested. Once every hour or so would be one thing; once very week or two [as he testified would be all that would be required] is something else entirely.

I am also not persuaded that the actual or relative size of the defendants' collection is, without evidence of the extent to which any of the defendants had occasion to view or use the materials, either relevant or material. It's not the size of the archive that matters: it's the use to which the defendants put the archive that would matter with regard to the charges in the indictment.

Mere inspection of computer data discloses nothing about how frequently stored materials were accessed. Even though downloaded, materials may not have been viewed prior to downloading. After downloading, they may never have been accessed. Absent testimony about the extent to which materials, once accessed on and downloaded from the internet, were viewed, the size of the archive is not relevant or material.[5] This is so because, no matter how massive, a collection that remains in storage can tell the jury nothing, or nearly nothing about the defendants' motives in acquiring the materials or the extent of their use of them.

Thus, little, if anything of probative value could come from Kohlmann's testimony about the actual or relative comprehensiveness and size of the defendants' downloaded collection.

Here, again, moreover, there is a substantial risk of unfair prejudice. For the jurors to learn that, aside from Mr. Kohlmann's collection – the product of several years of work – the defendants'

---

[5] To the extent that the Trainer can provide evidence about viewing stored materials, that is the best, and perhaps only evidence of the extent to which the defendants' archive played a role in the crimes charged to them.

was the most massive of which Mr Kohlmann is aware could have a prejudicial impact that greatly outweighs the limited probative value that might simply come from learning about the collection's size apart from evidence of its use by the defendants.

### D. Testimony About Materials Discussed by the Defendants in Consensually Recorded Conversations

The government also intends to have Kohlmann testify about materials viewed by the defendants, as audio recorded by the Trainer while such viewing was occurring.

If admissible, the jury will view all the materials. It will hear how the defendants responded to what they were seeing. The Trainer can elaborate on what was happening.

Whatever Kohlmann might have to say about the specific materials being viewed during such episodes would hardly have probative value. To permit him to opine about the meaning of those videos would, moreover, manifestly create a risk of very substantial and entirely unfair prejudice.

### Conclusion

In light of the foregoing, it is

ORDERED THAT the defendants' motion *in limine* to preclude testimony by Evan Kohlmann [Doc. 532] be, and the same hereby is granted.

So ordered.

> s/James G. Carr
> James G. Carr
> Chief Judge