680

1  THE COURT: The defendant's name was Jihaad in that
2  case?
3  MR. DRATEL: Abu-Jihaad. He was a Navy --
4  THE COURT: Okay. See you in five minutes.
5  (Recess taken.)
6  (The following occurred in the absence of jury.)
7  THE COURT: Are you all set?
8  MR. DRATEL: Your Honor, we just have one -- I
9  apologize.
10  THE COURT: That's okay.
11  MR. DRATEL: I apologize for bearing the lead on
12  this.
13  There are two expert reports from Mr. Kohlmann, one
14  that we received I think in March and one that we just
15  received about a week and a half ago. We are objecting to the
16  second one and any opinions based on it simply because of
17  timeliness. We would have had an opportunity to get our own
18  witness, particularly with respect to the coastline video and
19  his analysis of it in the context of martyrdom videos and we
20  think that we would have been able to -- with the proper
21  amount of time, have been able to get an expert to come in and
22  establish obviously the contrary.
23  That's our objection to the opinion with respect to
24  the -- the witness' analysis of the coastline video.
25  THE COURT: Okay. Not having seen either report, I

1  am not sure what the difference is.  I take it, your objection
2  is on procedural grounds because you got the second report too
3  late.  You want to preclude any testimony that is not
4  reflected in the first report.
5              MR. DRATEL:  Correct, Your Honor.
6              MR. DuCHARME:  Your Honor, our witness had a medical
7  condition.  There really wasn't much we could do about it.
8              The new piece of information essentially that's
9  contained in the later report is that the witness was asked to
10 look at the coastline video, what we have argued is a
11 martyrdom video, and to analyze it in the context of other
12 jihadist type material.  We would expect him to say if asked
13 is that that video has certain elements in common with other
14 videos that he's reviewed that were essentially last will
15 videos by people who were martyrs.
16             He is not going to conclusively say it is or isn't a
17 martyrdom video.  He will say,  for example, a reference to
18 jannah is a reference to paradise which I frequently have seen
19 in martyrdom videos.  A reference to a couple of the phrases
20 and terms are the same as terms that he's seen in martyrdom
21 videos.  I think he is going to opine that it bears
22 resemblance to martyrdom videos that suggests to him it was
23 likely modeled on one.  Although he will concede there are
24 other explanations for it.
25             THE COURT:  I am not sure I need to address the

1 merits of your procedural claim.  That's really not the sort
2 of testimony I'd permit anyway.
3             MR. DuCHARME:  Okay.  Then we won't offer.
4             MR. DRATEL:  Thank you, Your Honor.
5             THE COURT:  All right.  Would you bring the jury in,
6 please?
7             We will go 9:30 to 1:00 o'clock tomorrow.  I think
8 we are on a pretty good pace here.  We are even a little ahead
9 of schedule.
10            Does that sound right to you?
11            MR. DuCHARME:  Yes.
12            We may be able to rest tomorrow.
13            THE COURT:  Is the defense case going to last more
14 than a day or two?
15            MR. STERN:  Not more than a day; not two.
16            THE COURT:  All right.  So you will be ready to sum
17 up next week.  We are missing Monday, obviously.  But it
18 sounds like we could get to summations as early as Wednesday.
19            MR. STERN:  I think it's possible, yes.
20            THE COURT:  Okay.
21            (Jury present.)
22            THE COURT:  Sorry to keep you waiting.  We have been
23 working.
24            Have a seat, everyone, please.
25            We are ready to resume.

712

important that you base your verdict solely on the evidence in the case and not be tainted by information from outside the courtroom.

Okay.  So we'll see you tomorrow.  Have a nice evening.  Safe home.  Don't discuss the case.

All rise.

(Jury excused.)

THE COURT:  Is there some dispute that you had in mind.

MR. DRATEL:  May I come up?

THE COURT:  Yes.

MR. DRATEL:  My problem is twofold.  One is the concept -- global jihadist movement is a concept and it's really his concept.  It's not a concept that's recognized in the world.  There's no incorporation.  It's not even like an organized crime family or an association in fact or anything like that.  It's just sort of an intellectual creation.

And I'm concerned that discussion in that context or giving it labels like that will be a substitute for the jury for what's really required in this case, which is a 956(a) conspiracy, not some worldwide movement that people who have never met each other, from all different countries, that people say because they believe in the same thing that it's a movement.  That's not a substitute for a 956(a) conspiracy which the government has to prove.

1  And I'm concerned about that just from historical
2  cases and the way he's testified in other cases.  So I don't
3  want it to get into that notion that somehow that exists as a
4  coherent entity and that he's part of it and that that's going
5  to be enough for them, not that he's going to say that, but
6  that it's going to act that way by the time we're done.
7  THE COURT:  Well, your remarks incorporate a number
8  of different areas.  One is his expert testimony about a
9  subject that might -- that I think is probably beyond the ken
10 -- as the case law phrase it -- of the average juror.
11 A second one is the extent to which this defendant
12 might have been part of that.  I'll be ultrasensitive to any
13 testimony that gets close to that subject.
14 I am not sure exactly what your objection is
15 precisely.  The testimony about the global jihadist movement I
16 don't find particularly objectionable.  This might be a good
17 time for us to discuss this, because we have not yet really.
18 I think the real rub in testimony of this sort is when an
19 expert -- you don't have to agree with this and if you
20 disagree with it you'll tell me -- is when an expert strays
21 from informing the jury about a phenomenon about which he's
22 got specialized training, indisputably, specialized training
23 and knowledge and expertise, strays from testifying about that
24 thing, here, the global jihadist movement.
25 Then, on the other hand, testimony about the

714

1  evidence in the case and I am acutely sensitive to anything
2  that looks like it might be perceived by a lay jury as expert
3  testimony that the defendant is guilty.
4      So you may sensitize me to this -- I'm not concerned
5  about the testimony he's given thus far.  I don't know how far
6  you intend to go, Mr. DuCharme, with the particular evidence
7  in this case.
8      MR. DuCHARME:  I would like to front it for you.  I
9  have turned over to Mr. Dratel my direct script.  There
10 shouldn't be any surprises here.  What we intend to elicit
11 from Mr. Kohlmann is a number of statements.  The first is
12 essentially just the existence in a very, very simple
13 straightforward way that Al Qaeda exists, what the word Al
14 Qaeda means, how it operates.  The same for Al-Shabaab.  We'll
15 offer through him the Al-Shabaab designation on the SDTG list.
16 The same for the fact that there are these Chechnyan groups.
17 That's going to be limited testimony.  The general framework.
18 Jihadists from three different parts of the world, Somalia,
19 Pakistan, Afghanistan and Chechnya.
20     Then we expect to ask Mr. Kohlmann about the results
21 of what he was asked to do in this case, which was we provided
22 him with a copy of the defendant's hard drive and we asked him
23 to go through it and look for things that were significant to
24 him in the context of jihad or assimilating into a jihadist
25 group and what he did is he identified for us several videos

715

1 which he tells us are useful for assimilating into this closed
2 and specialized culture.
3     And what he'll say is, for example, some of the
4 Osama bin Laden videos are sort of classics and that a person
5 who is assimilating to a jihadist group is expected to fellow
6 them, expected to be able to quote them and discuss them
7 amongst their peers.
8     And then he's going to point to specific documents
9 that he found on the hard drive, Word documents which
10 incorporate direct quotations from some of those classic
11 videos.
12     We've got those on the board.  Judge I can flip
13 around and show you.  One of them for a Nasheed, a jihadist
14 song.  What Mr. Kohlmann found is a Word document that shows
15 the lyrics of this jihadist song in Arabic, spelled
16 phonetically, and in English.  We will later argue to the jury
17 that what he's doing is he's learning these Nasheeds.  We're
18 going to argue -- we're not going to ask Mr. Kohlmann to
19 testify to this -- we're going to argue that the reason he's
20 learning the Nasheeds because it's going help him assimilate
21 into a jihadi group or a foreign terrorist organization when
22 he gets there.
23     He's also going to show the jury another document
24 that he found, which is in evidence as Government's Exhibit
25 810, and that is a document where he's listed Osama bin Laden

1  quotes from videos that he has saved on his hard drive.  We're
2  going to put those in through him and we expect to later
3  argue, again, its probative of his state of mind.  He's not
4  only casually surfing these things.  He's reading them.  He's
5  studying them and he's adopting them and we're going to ask
6  Mr. Kohlmann are these things useful to someone who is trying
7  to assimilate into a jihadist group or a foreign terrorist
8  organization.
9            We expect that he will say, yes, that learning these
10 things and adopting these things helps a Westerner come to
11 Somalia or Afghanistan or Chechnya and essentially sit down
12 around the campfire and be accepted into group because he can
13 sing the songs and quote the movies and issue the quotations.
14           That's where we're going.
15           THE COURT:  What is it about that that requires
16 expertise though?  I would think the jury would know this
17 stuff would facilitate the assimilation of the defendant into
18 a jihadist group.
19           MR. DuCHARME:  I think it's just the context.  For
20 example, the statement of the Humma video.  There's been
21 testimony already elicited that there are thousands of videos
22 on YouTube and anybody can stumble across them.  The
23 significance here is what the defendant has done is he has
24 picked the ones that are most or some of most recognized among
25 the groups that we allege he is trying to get into.  He has

1  picked the ones that will be most recognizable to Al Qaeda.
2  Nasheed, the Osama bin Laden quotes and certain Somalia
3  material that will allow him to assimilate into Al-Shabaab and
4  we're going to argue that's probative of his intent do those
5  things.  He put into effort into that.
6         What Mr. Kohlmann will say, these some of the ones
7  that will be important.  These aren't the silly ones that are
8  made by home-grown jihadists that they just post themselves on
9  YouTube.  These are the classic examples, As Sahab, that this
10 is part --
11         THE COURT:  Excuse me one second.
12         MR. DuCHARME:  Sure.
13         (Continued on next page.)

718

1        THE COURT: Excuse me one second.
2        (Pause.)
3        Juror number 12, our pregnant juror, is very sick,
4   including vomiting, back in the jury room.
5        Has she requested that she be excused? Or this is
6   just happening back there?
7        THE CLERK: She is insinuating. She kept saying you
8   knew she was pregnant and she is not feeling well. The whole
9   day she has been in and out of the restroom whenever she
10  could.
11       THE COURT: If you could please ask her whether she
12  means she would like to be excused from jury service.
13       THE CLERK: Okay.
14       THE COURT: Okay.
15       MR. DuCHARME: Aside from that, judge, I will just
16  define certain Arabic terms.
17       THE COURT: I don't intend to go back and witness
18  for myself what Ilene described for me. I intend to excuse
19  this woman.
20       Does anybody object?
21       MR. DuCHARME: I can't imagine we do.
22       No objection from the government.
23       MR. DRATEL: No.
24       THE COURT: All right.
25       THE CLERK: She says yes, she can't sit in here

```
                                                              719
```

1  anymore.
2              THE COURT:  All right.  I will try to take that in
3  the best possible light.  Tell her her application --
4              MR. DRATEL:  It might have been the fire drill.
5              THE COURT:  Tell her her application is granted.
6  Good luck with the rest of her life, with her pregnancy, with
7  everything.  Just tell her she is excused.
8              THE CLERK:  Yes.
9              THE COURT:  All right.  Do you want to be heard?
10             MR. DRATEL:  Your Honor, what Your Honor said was
11 very much what Judge Carr said in the Amawi case.  The context
12 of what -- what kind of expertise is necessary.  Many of these
13 videos and other -- the documentary stuff speaks for
14 themselves.  They don't require the additional context of what
15 they are used for necessarily.
16             This witness has testified a lot and he has
17 testified in many different forums and I am also concerned
18 about the fact that -- I appreciate what the government has
19 done in terms of trying to keep him narrow because we have
20 talked about this.  They have adjusted some of the conclusions
21 that he wrote in his report and made them much more palatable.
22             But at the same time he's gone a lot further in a
23 lot of cases.  So he needs a short leash in that regard and I
24 know the government is trying but that's also something that
25 we are very concerned about in terms of when he goes beyond

720

1  that.
2           Just to get back to the global jihadist movement, my
3  problem is there is no definition of that other than the one
4  that he has that's out there.  There is no -- you can't find a
5  definition that is agreed upon in the world.  I am just
6  concerned that when the jury hears global jihadist movement
7  and if he uses it as a synonym for people who join terrorist
8  organizations or is it people who sympathize with jihad or is
9  it people who believe in that or people who investigate it
10 or -- I don't mean investigate it, counterterrorism, but
11 investigate it on their own for the question of whether they
12 want to do something about it.
13          It's too amorphous a -- it's too amorphous a term I
14 think to include every one and anyone who might be
15 in -- wherever the penumbra is on that.  I am just concerned
16 that's going to include Mr. Kaziu in the jury's eyes when in
17 fact that's not what this case is about.
18          THE COURT:  We will play it as it goes.  I will
19 think about it some more tonight.  There is one thought that I
20 have that I will share with you.  That is, I do think -- this
21 issue about these are generally accessible materials is
22 already part of the case.  I don't think -- to the extent that
23 there is expert testimony that these are the main ones for
24 these organizations, I think that's fair ground for the
25 government.

                    GR        OCR        CM        CRR        CSR

721

1         The thought I want to share with you, Mr. DuCharme,
2 is I want that separated as much as possible from the discrete
3 facts of this case and by that I mean this is just so that the
4 order of presentation -- I don't want to create the impression
5 before the jury -- because juries get confused by experts -- I
6 don't want to create the impression that is risked when an
7 expert takes the laptop that's taken from the defendant and
8 flips through it before the jury and says, oh, here is a main
9 text for Al Shabaab or here is the main ones that someone
10 assimilating himself into Al Qaeda really needs to know.  The
11 way that gets presented matters, in my judgment.
12         So what I would like you to do is structure his
13 testimony as best you can to have him testify about those main
14 texts, whatever they are, in a manner that is distant from the
15 defendant as best as possible.  I am not articulating this
16 very well.  I believe you understand my point.
17         MR. DuCHARME:  I do understand.
18         THE COURT:  To finish the thought, later on if you
19 want to argue that here is what's on his computer, you have
20 heard that although there is lots of generally available
21 stuff, this is the main stuff.  You make that argument.
22         But to the extent it comes from him in the manner in
23 which the testimony is presented, I think it matters.  I want
24 you to avoid that.
25         MR. DuCHARME:  Okay.  Here is the challenge for us,

GR          OCR          CM          CRR          CSR

722

1  Your Honor.  The materials that we are going to show through
2  Evan Kohlmann -- he's the one who found them on the hard
3  drive.  So up to this point, there has been no testimony that
4  these were the items found on the defendant's laptop.  I
5  suppose -- that sounds like the sensitivity, that sounds like
6  what you want to us avoid.
7           I suppose what we can do is, as long as there is not
8  going to be any objection from the defense, is that after he
9  testifies, through the case agent, our next witness, we can
10 just put them in front of her and say where did these come
11 from.  She will say those came from the defendant's laptop.
12          THE COURT:  There won't be a problem with that.
13          MR. DRATEL:  Yes.
14          THE COURT:  Someone might argue that this elevates
15 form over substance but I don't think so, not the way jurors
16 tend to hang on experts.  I would like you to do it that way.
17          MR. DuCHARME:  Okay.
18          THE COURT:  I will think about it some more.  If I
19 have further thoughts, other than I am sensitive to your
20 concerns and I will rule on objections as we go, I will share
21 them with you before we start tomorrow.
22          MR. DRATEL:  Thank you, Your Honor.
23          MR. DuCHARME:  I understand, Your Honor.
24          THE COURT:  All right?
25          MR. DRATEL:  Great.