UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                                      :

UNITED STATES OF AMERICA,        :
                                        :

                                        :

            – against –        :     11 Cr. 623 (JG)
                                        :     (Filed Electronically)

AGRON HASBAJRAMI,           :
                                        :

            Defendant.      :

                                        :
-----------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## AGRON HASBAJRAMI'S MOTION TO PRECLUDE EXPERT TESTIMONY

JOSHUA L. DRATEL
Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, New York 10006

MICHAEL BACHRACH
276 Fifth Avenue
Suite 501
New York, NY 10001

STEVE ZISSOU
Steve Zissou & Associates
42-40 Bell Blvd., Suite 302
Bayside, NY 11361

*Attorneys for Defendant Agron Hasbajrami*

TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT

POINT I

MR. KOHLMANN AND/OR HIS TESTIMONY
SHOULD BE PRECLUDED BECAUSE THEY
DO NOT SATISFY THE STANDARDS OF THE
APPLICABLE RULES OF EVIDENCE, AND
VIOLATE THE FIFTH AND SIXTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.      *The Pertinent Law Regarding Expert Qualifications.* . . . . . . . . . . . . . . . . . . . . . . . 6

      1.      *The Standards Set Forth In Rule 702, Fed.R.Evid.*. . . . . . . . . . . . . . . . . . . . 6

      2.      *The Standards Set Forth In Rule 703, Fed.R.Evid.*. . . . . . . . . . . . . . . . . . . . 9

      3.      *The Limiting Principles Applied Through Rule 403, Fed.R.Evid.*. . . . . . . . . . . . 10

B.      *Under the Standards Prescribed By Rules 702, 703, 403, Fed.R.Evid., and* Daubert,
      *Mr. Kohlmann Does Not Qualify As An Expert, and His Testimony Is Inadmissible.* . . . . 11

      1.      *Mr. Kohlmann's Report and/or Proposed Testimony*
            *Are Not Proper Forms or Means of Expert Testimony.* . . . . . . . . . . . . . . . . . . 12

      2.      *Testimony by Mr. Kohlmann Based on Hearsay in the*
            *Form of Testimonial Statements That Would Violate*
            *Mr. Hasbajrami's Sixth Amendment Rights Under*
            Crawford v. Washington *Must Also Be Excluded By The Court.* . . . . . . . . . . . . 17

      3.      *Mr. Kohlmann's Projected Testimony Does Not Possess*
            *the "Specialized Knowledge Required of Expert Testimony.* . . . . . . . . . . . . . . . 21

4. *Even If Admissible Under Rules 702 and 703, Portions of Mr. Kohlmann's Projected Testimony Should Be Precluded Pursuant to Rule 403, Fed.R.Evid.*............................. 27

5. *Mr. Kohlmann's Report and Projected Testimony Are Not Reliable Because He Lacks Any Discernible and/or Acceptable Methodology*.......... 31

6. *Mr. Kohlmann Lacks the Specialized Knowledge, Skill, Experience, Training and/or Education to Qualify As An Expert Witness In This Case*....................................... 34

7. *Mr. Kohlmann Has a Habit of Selective Reporting, and Distorting and Even Altering Text and Translations.*................... 42

8. *Mr. Kohlmann Has Exaggerated and Even Misstated Certain Aspects of His Professional Career.*........................... 50

9. *Mr. Kohlmann's Formative Professional Experience With a Now-Ostracized Broadcast Journalist's Firm.*..................... 54

Conclusion.................................................................. 59

TABLE OF AUTHORITIES

CASES

*Andrews v. Metro-North Commuter R.R. Co.*, 882 F.2d 705 (2d Cir. 1989). . . . . . . . . . . . . . . . 10

*Brown v. Mississippi*, 297 U.S. 278 (1936). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Chambers v. Florida*, 309 U.S. 227 (1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Crawford v. Washington*, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 17, 20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 526 U.S. 579 (1993). . . . . . .   1-3, 6-8, 11, 15, 36

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
     43 F.3d 1311 (9th Cir. 1995), *on remand.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). . . . . . . . . . . . . . . . . . . . . . . . . 6-8, 58

*Law v. NCAA*, 185 F.R.D. 324 (D.Kan. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp.2d 558 (S.D.N.Y. 2007). . . . . . . . . . . . . . .   34

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

*Plourde v. Gladstone*, 190 F.Supp.2d 708 (D. Vt. 2002)
     *aff'd mem.*, 69 Fed.Appx. 485 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Pan Am. World Airways v. Port Auth. of NY.*, 995 F.2d 5 (2d Cir. 1993). . . . . . . . . . . . . . . . . 36

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp.2d 414 (E.D.N.Y. 2013). . . . . . . . . . . . . . 14, 48-49

*Turner v. Burlington Northern Santa Fe Railroad Co.*, 338 F.3d 1058 (9th Cir. 2003). . . . . . 9-10

*United States v. Abu Ali*, 05 Cr. 53 (GBL) (E.D.Va.). . . . . . . . . . . . . . . . . 5, 13-15, 34-35, 37-38

*United States v. Abu Jihaad*, 07 Cr. 57 (MRK) (D. Conn.). . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Ahmad*, 06 Cr. 194 (JCH) (D. Conn.). . . . . . . . . . . . . . . . 31-32, 36, 40-47, 52-53

*United States v. al-Moayad,* 545 F.3d 139 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 9, 28-29

iii

*United States v. Amawi*, 06 Cr. 719 (JGC) (N.D. Ohio, Western Div.). . . . . . . . .  20, 29-31, 45-46

*United States v. Battle*, 02 Cr. 399 (REJ) (D. Ore.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. bin Laden*, 98 Cr. 1023 (LBS) (S.D.N.Y.). . . . . . . . . . . . . . . . . . . . . . . . . . 43-44

*United States v. Buonsignore*, 131 Fed. Appx. 252 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . 17

*United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

*United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . 10, 20, 22-23

*United States v. Ghailani*, 743 F. Supp.2d 261 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Gutierrez*, 995 F.2d 169 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Kabir*, 12 Cr. 92 (VAP) (C.D. Cal.).. . . . . . . . . . . . . . . . . . . . . . . 33-34, 36-37

*United States v. Kaziu*, 09 Cr. 660 (JG) (E.D.N.Y.). . . . . . . . . . . . . . . . . . . . . . . . . 3, 24, 26, 30

*United States v. Locasio*, 6 F.3d 924 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

*United States v. Lombardozzi*, 491 F.3d 61 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Long*, 917 F.2d 691 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Mejia,* 545 F.3d 179 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 14, 20, 22-24

*United States v. Mohamud*, 10 Cr. 475 (GMK) (D. Ore.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Paracha*, 2006 WL 12768 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . 22, 48-49

*United States v. Romano*, 859 F. Supp.2d 445 (E.D.N.Y. 2012).. . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Scavo*, 593 F.2d 837 (8th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Uzair Paracha*, 2006 WL 12768 (S.D.N.Y. January 3, 2006). . . . . . . . . . . . . 30

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*,
    313 F. Supp.2d 213, 238 (S.D.N.Y.2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*White v. Ford Motor Co.*, 312 F.3d 990 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*White v. Texas*, 310 U.S. 530 (1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Williams v. Illinois*, 132 S.Ct. 2221 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Zaremba v. Gen. Motors Corp.*, 360 F.3d 355 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 7

## STATUTES

U.S. Const. Amend. X. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 14, 21

U.S. Const. Amend. XI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 13, 17, 21-22

18 U.S.C. §2339B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Rule 401, Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 11, 28

Rule 402, Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 28

Rule 403, Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10, 11, 27-29, 33

Rule 702, Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5-7, 9-11, 15, 25, 27-28

Rule 702(a), Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Rule 703, Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 9-11, 21, 25, 27-28

Rule 803(8), Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Rule 16(a)(1)(G), Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12, 27

## OTHER

Ali, Wajahat, et al., "Fear, Inc., the Roots of the Islamophobia at Work in the United States,"
    Center for American Progress (CAP) (August 26, 2011). . . . . . . . . . . . . . . . . . . . . 55-58

v

Amos, Deborah, "A Smuggler Explains How He Helped Fighters Along 'Jihadi Highway'," *NPR* (Oct. 7, 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Cameron-Moore, Simon, "Analysis: Al Qaeda fishes for Turks seeking jihad," *Reuters* (Oct. 27, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Giglio, Mike & al-Awad, Munzer,"ISIS Operative: This Is How We Send Jihadis To Europe," *BuzzFeed News* (Jan. 29, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Giraldi, Philip, "Terrorism Experts on Parade," *Antiwar.com* (Jul.28, 2011).. . . . . . . . . . .  39-40

Goodman, Maxine D., *A Hedgehog on the Witness Stand- What's the Big Idea?*, 59 Am. U. L. Rev. 635 (Feb. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Huber, Peter W., *Galileo's Revenge: Junk Science in the Courtroom*, 206–09 (1991).. . . . . . . . 16

"Jihadists 'using cruise ships' to reach Middle East war zones," *BBC News* (Nov. 7, 2014). . . . 25

Lang, Jennifer, "Turkey's Counterterrorism Response to the Syrian Crisis," *Terrorism Monitor*, Vol. 11-14 (Jul. 12, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Moore, Jack, "Lack of Co-ordination Leaves EU 'Vulnerable' to Jihadists Posing as Refugees," *Newsweek* (Jan. 30, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Paton Walsh, Nick, "The secret jihadi smuggling route through Turkey," *CNN* (Nov. 5, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Reitman, Janet, "The Children of ISIS," *Rolling Stone Magazine* (Mar. 25, 2015). . . . . . . . . . 24

Shane, Scott, "From Minneapolis to ISIS: An American's Path to Jihad," *New York Times* (Mar. 21, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Sugg, John, "Steven Emerson's Crusade," *Extra!*, Fairness & Accuracy in Reporting (January/February 1999).. . . . . . . . . . . . . . . . . . . . . . . . 55

Taub, Ben, "Journey to Jihad," *New Yorker Magazine* (Jun. 1, 2015). . . . . . . . . . . . . . . . . . . 25

Tasteken, Fehim, "Turkey's Syria borders an open door for smugglers," *Al-Monitor* (Apr. 30, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Weinstein Fed. Evid., §702.03(2)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Wright, Charles Alan, *et al.*, 29 Fed. Prac. & Proc. Evid. § 6266 (2011). . . . . . . . . . . . . . . . . . 50

vi

"Uzbekistan," World Report 2015, *Human Rights Watch* (2015). . . . . . . . . . . . . . . . . . . . . . . 18-19

Yang, Wesley, "The Terrorist Search Engine,"
    *New York Magazine*, December 5, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**Introduction**

This Memorandum of Law is submitted on behalf of defendant Agron Hasbajrami in support of his motion, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 526 U.S. 579 (1993), and Rules 702, 703, 401, 402, and 403, Fed.R.Evid., and the Fifth and Sixth Amendments to the U.S. Constitution, to preclude or limit the projected testimony of Evan Kohlmann, for whom the government has provided notice to the defense as a proposed government expert witness at trial.

As detailed below, Mr. Kohlmann and/or his testimony do not qualify for admission under the panoply of applicable federal rules and/or constitutional provisions – and therefore should be precluded – because he and/or his testimony:

(1)     are not a proper means or form of expert testimony because his proposed testimony, as reflected in his expert report, is designed for litigation purposes rather than the organic product of expert research, experience, and/or scholarship, and consists entirely of unsubstantiated hearsay gleaned exclusively from the internet, and not from the experience, study, research, and field work characteristic of authentic expertise.  In addition, the sources of the hearsay are not fully described, and could very well include information that violates Mr. Hasbajrami's Sixth Amendment right to confrontation as established in *Crawford v. Washington*, 541 U.S. 36 (2004), as well as his right to Due Process as guaranteed by the Fifth Amendment;

(2)     will not assist the trier of fact "understand the evidence" because the information is *not* beyond the understanding of the average juror, and because, even if it were,

1

Mr. Kohlmann lacks the requisite specialized knowledge and training;

(3)     lack a viable methodology within the academic/scientific community in which he claims to operate;  and

(4)     are not reliable because Mr. Kohlmann has a history of misrepresentations, misleading testimony and statements (including with respect to his background and credentials), distortion and alteration of texts that vitiate any claim of reliability, and of ignoring and omitting evidence contrary to his conclusions that are tailored to be favorable to the government's position.

In fact, as detailed below, Mr. Kohlmann's 12-page single-spaced report is simply a compendium of materials downloaded from the internet, and then translated by someone other than Mr. Kohlmann, who does not possess any relevant language skills.  Embedded inextricably within those materials is multi-level, unverified hearsay – in many instances from unidentified sources.  That is neither competent evidence generally, or a proper form of expert testimony.  Rather, it is the converse:  the assimilation of otherwise inadmissible evidence for the purposes of testimony funneled through a purported expert.

As a result, contrary to the requirements for expert witnesses set forth in *Daubert*, neither Mr. Kohlmann nor his testimony rest on a "reliable foundation" or would be "relevant to the task at hand."  526 U.S. at 597.  Nor is that requisite "reliable foundation" satisfied by prior testimony or prior admission by judges.  Rather, it requires, and is designed to based upon, peer review, acceptability in the scientific community, testing, error rates, and a proposed expert's substantive experiences and credentials.  *Id.*, at 593-94.

Examined in that context, Mr. Kohlmann's testimony is neither "relevant to the task" at

hand nor reliable.  In addition, neither *Daubert* nor any other case prescribes a rule that would validate an expert, and decide a *Daubert* motion, based on qualification as an expert – even on multiple occasions – in the past.

Indeed, as discussed below, courts have either declined to qualify Mr. Kohlmann, or significantly circumscribed his testimony [as this Court did in *United States v. Kaziu*, 09 Cr. 660 (JG), as set forth **post**].  Moreover, not all *Daubert* motions directed at Mr. Kohlmann – and particularly those early in his career, when he was building a roster of successive qualifications – included the information presented herein, particularly with respect to to one critical aspect, addressed in the SECRET submission filed today as part of this motion, that has surfaced only within the past year in two cases.

Concurrently, as Mr. Kohlmann's profile as a testifying expert has expanded, so has the criticism – of Mr. Kohlmann's lack of training, lack of methodology, his selective use of information, and his bias – from judges, academics, and experts with practical training and experience in the fields Mr. Kohlmann covers in his testimony.

Accordingly, it is respectfully submitted that regardless of any past record of qualification by courts as an expert, Mr. Kohlmann's qualifications and his testimony – in this case, at this time – merit fresh scrutiny in the Court's independent exercise of its discretion under Rule 702. Subjected to such review, it is respectfully submitted that Mr. Kohlmann and his testimony should be precluded.

## STATEMENT OF THE FACTS

Pursuant to Rule 16(a)(1)(G), Fed.R.Crim.P., and by letters dated February 24, 2015 (Docket #110), and March 16, 2015 (Docket #115), copies of which are attached as Exhibits 1 &

2 to the accompanying Declaration of Joshua L. Dratel, Esq. (hereinafter "Dratel Declaration"),

the government provided notice that it intended to call Mr. Kohlmann as an expert witness at

trial.  Both letters also included a brief summary of Mr. Kohlmann's projected testimony at trial

herein.  Mr. Kohlmann's formal expert report, attached as Exhibit 3 to the Dratel Declaration,

was provided to defense counsel June 12, 2015.  The specific contents of those letters and expert

report, to the extent they are relevant to this motion, are integrated within the legal argument set

forth below.

Generally, though, the government has proffered that Mr. Kohlmann's testimony would

cover the following subjects:

(1)    "the background, make-up and significance of certain terrorists and terrorist

organizations that will be the subject of other witness testimony in this case."

*See* Exhibit 1, at 2;

(2)    "the existence of support networks, including networks of financial and logistical

support, for jihadist terrorist organizations, and the utility of foreign fighters to

such organizations."  *Id*.;

(3)    "the use of online websites and forums by jihadist terrorist organizations to raise

financial and logistical support and recruit foreign fighters to such organizations,

and the content of certain websites at the time of the events in the government's

case."  *Id*.;

(4)    "the routes that foreign fighters use to travel to the Federally Administrated Tribal

Areas ("FATA") of Pakistan."  *Id*.;

(5)    "how terrorists use propaganda to recruit personnel into their mission to promote

4

violent, global jihad, and how knowledge of such propaganda materials facilitates the operational, cultural and social assimilation of foreign fighters into jihadist groups operating abroad." *Id*.;

(6)     "the origin, use, content and dissemination of videos as propaganda tools, including the videos previously disclosed in unclassified discovery, Bates-numbered 428." *Id*.;

(7)     "the dates that certain extremist propaganda materials were first published by foreign terrorist organizations." *Id*.;

(8)     "the common meaning and usage of certain jihadist terminology." *Id*.;

(9)     "places of interest in and around the FATA." *Id*.;  and

(10)    "the content of certain websites at the time of the events in the government's case; this is expected to include the webistes contained on the disk Bates-stamped 1121." *See* Exhibit 2, at 1.

## POINT I

**MR. KOHLMANN AND/OR HIS TESTIMONY SHOULD BE PRECLUDED BECAUSE THEY DO NOT SATISFY THE STANDARDS OF THE APPLICABLE RULES OF EVIDENCE, AND <u>VIOLATE THE FIFTH AND SIXTH AMENDMENTS</u>**

As outlined above and detailed below, for a number of reasons Mr. Kohlmann and his testimony fail to qualify for admission under Rule 702, Fed.R.Evid.  Nor is any prior qualification of Mr. Kohlmann as a witness dispositive.  As the Court in *United States v. Abu Ali*, 05 Cr. 53 (GBL) (E.D.Va.) commented in precluding Mr. Kohlmann's testimony,

the fact that the government has hired him to testify as an expert

> witness in cases including [*United States v. Battle*, *United States v. Benkhala*, *United States v.*] Randall[] Royer, [*United States v.*] Al-Timimi does not with this judge sit as a basis to qualify him as an expert in al-Qaeda, particularly where he has had no contact with someone from al-Qaeda.

*Id*., at Motions Hearing, October 28, 2005, T. 28-29 (a copy of which is attached as Exhibit 4 to the Dratel Declaration).[1]

**A.**     ***The Pertinent Law Regarding Expert Qualifications***

In determining whether or not a proposed expert should be permitted to testify – and even if so, to what extent such testimony should be limited – the standards set by Rules 702 and 703, Fed.R.Evid., as well as by the Supreme Court in both *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), control.

**1.**     ***The Standards Set Forth In Rule 702, Fed.R.Evid.***

Rule 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods;  and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

The party seeking to introduce expert testimony bears the burden of establishing those factors by a preponderance of the evidence.  *See United States v. Williams*, 506 F.3d 151, 160-61

---

[1]  "T." refers to the cited transcript(s) from various cases and proceedings discussed in this Memo of Law.

(2d Cir. 2007);  *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 357-58 (2d Cir. 2004).  Rule 702 assigns to the district court the role of gatekeeper and charges the Court with ensuring that expert testimony "rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  The Court's gatekeeping function thus requires a two-part inquiry.

First, the court must determine whether the party presenting the testimony has met its burden of establishing whether the proffered expert testimony is reliable.  The aim of that inquiry regarding reliability is to exclude expert testimony based merely on subjective belief or unsupported speculation, and requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid.  *See Daubert*, 509 U.S. at 589, 590.  Reliability constitutes the central hallmark of the *Daubert* standard.

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact in understanding the evidence – essentially, whether the expert's testimony is relevant.  *See Daubert*, 509 U.S. at 591; Fed.R.Evid. 702.  The Federal Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed.R.Evid. 401.

The gatekeeping function is therefore critically important because it "ensure[s] the reliability and relevancy of expert testimony."  *Kumho*, 526 U.S. at 152;  *see also Daubert*, 509 U.S. at 590, 594-95.  As Justice Scalia elaborated in his concurrence in *Kumho*, "it is not discretion to perform the [gatekeeping] function inadequately.  Rather, it is discretion to choose among *reasonable* means of excluding expertise that is *fausse* and science that is junky." *Kumho*, 526 U.S. at 159 (Scalia, J., concurring) (emphasis in original).

As the Ninth Circuit explained in its decision in *Daubert* after remand from the Supreme Court, "[u]nder *Daubert*, . . . we must determine nothing less than whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to good science." *Daubert*, 43 F.3d 1311, 1315 (9th Cir. 1995), *on remand*.

In that context, while a court's inquiry regarding reliability is, according to *Daubert*, a "flexible one[,]" 509 U.S. at 594; *see also Williams,* 506 F.3d at 160, in *Daubert* the Court enumerated certain non-exhaustive factors that can  contribute to reliability, or lack thereof:

(1)     whether the method has been tested to determine its validity.  526 U.S. at 593;

(2)     whether there are standards of performance and whether the error rate is known. *Id*., at 594;

(3)     whether the method has been subjected to peer review and publication. *Id*., at 593-94;  and

(4)     whether the method has garnered general acceptance. *Id*., at 594.

*See also Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004).

Yet those specific factors "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire,* 526 U.S. at 141.  Here, while consideration of social science experts may not involve the same level of precision and standardization as exists in evaluating the physical sciences, there nevertheless, as discussed below, are standards that assist in assessing the reliability of such experts, including some of those listed in *Daubert*.  *See Kumho Tire*, 526 U.S. at 147-49;  *White v. Ford Motor Co.*, 312 F.3d 990, 1007 (9th Cir. 2002) (trial court required to "apply his gatekeeping role . . . to all forms of expert testimony, not just scientific testimony").

Indeed, within the framework established by Rule 702 and *Daubert*, given the paramount position of evidentiary reliability as an essential precondition to admissibility of expert testimony that must be demonstrated by the party offering the expert reliability, and the paucity of measurable objective standards for social science experts, it is arguably more important that the reliability of social science experts be considered with extreme caution.

### 2.    The Standards Set Forth In Rule 703, Fed.R.Evid.

Rule 703, Fed.R.Evid., provides more detail regarding the kinds of facts or data upon which an expert may rely in formulating an opinion.  As amended in 2000, Rule 703 requires that such underlying facts or data be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  Fed.R.Evid. 703.

In addition, if the underlying facts or data are otherwise inadmissible, the expert may not disclose them to the jury "unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed.R.Evid. 703.  *See United States v. al-Moayad*, 545 F.3d 139, 161 (2d Cir. 2008);  *United States v. Long*, 917 F.2d 691 (2d Cir. 1990) (in allowing an FBI agent's detailed descriptions of organized crime families, trial court erred because the evidence was only marginally relevant and not directly related to the case, and thus its prejudicial effect substantially outweighed its probative value).

That portion of Rule 703 "provides a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose, when that information is offered by the proponent of the expert."  Fed.R.Evid. 703, Advisory Committee Note;  *see, e.g. Turner v. Burlington Northern Santa Fe Railroad Co.*, 338

9

F.3d 1058, 1062 (9th Cir. 2003).

Although the bases of expert testimony may be as varied as the possible fields of expertise, there are clear limits on the kinds of facts or data upon which an expert may rely in formulating an opinion.  For instance, an expert opinion that is nothing more than a recitation of otherwise inadmissable hearsay is simply not valid.  *See Plourde v. Gladstone*, 190 F.Supp.2d 708, 720-21 (D. Vt. 2002) (expert opinion inadmissible when it "amounts to nothing more than inadmissible 'hearsay in disguise' under Rule 703"; citing cases), *aff'd mem.*, 69 Fed.Appx. 485 (2d Cir. 2003);  *Law v. NCAA*, 185 F.R.D. 324, 341 (D.Kan. 1999) (same).

In addition, expert testimony must, in order to be admissible, assist the trier of fact to "understand the evidence" through the use of specialized knowledge.  *Andrews v. Metro-North Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989);  Rule 702(a), Fed.R.Evid;  *see also* WEINSTEIN FED. EVID., §702.03[2][a] (expert testimony is generally not permitted on issues that would not assist the trier of fact to understand the evidence or determine a fact in issue).

In that context, an expert may not be "created" for the purposes of testifying in litigation. Thus, intensive study or research of a particular subject matter merely for the purpose of repeating that research to a jury is not "expertise" of the type recognized or permissible under Rules 702 or 703.  *See, e.g., United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2002).

### 3.    *The Limiting Principles Applied Through Rule 403, Fed.R.Evid.*

Moreover, expert testimony, like all testimony, is also subject to the requirements of Rule 403, Fed.R.Evid, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence."  The Advisory Committee's notes to Rule 403 define

"unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly

though not necessarily, an emotional one."

Here, application of the principles governing expert testimony compel the conclusion that

Mr. Kohlmann's credentials (or, more accurately, his lack thereof) and  history, and his expert

report and projected testimony, do not qualify under Rules 702 & 703, or *Daubert* (or Rules 401,

402, and/or 403), and therefore his testimony should be precluded.

**B.**      ***Under the Standards Prescribed By Rules 702, 703, 403, Fed.R.Evid., and* Daubert,***
***Mr. Kohlmann Does Not Qualify As An Expert, and His Testimony Is Inadmissible***

As enumerated **ante**, at 1-2, there are several reasons why Mr. Kohlmann's testimony

should be precluded.  Either independently or in combination, those reasons, detailed below,

provide ample basis for precluding Mr. Kohlmann's testimony.  While Mr. Kohlmann has been

permitted to testify dozens of times in U.S. federal court, that is not dispositive because (a)  the

particular subject matter and nature of his report in this case do not satisfy Rules 702 or 703;  (b)

*de novo* evaluation of Mr. Kohlmann is appropriate give the accumulation of information and

investigation of his background and claims that were either not available in the early stages of his

career, or were not raised in *Daubert* motions (to the extent they were even made to preclude,

rather than simply, limit, his testimony);  (c)  additional information provided in the defense's

June 22, 2015, SECRET submission;  and (d)  even if Mr. Kohlmann's projected testimony

clears the hurdles established by Rules 702 and 703, important portions are substantially more

prejudicial than probative, and should be precluded pursuant to Rule 403, Fed.R.Evid.

11

1. ***Mr. Kohlmann's Report and/or Proposed Testimony***
***Are Not Proper Forms or Means of Expert Testimony***

As detailed below, Mr. Kohlmann's projected testimony – to the extent it mirrors the content of his expert report (attached to the Dratel Declaration as Exhibit 3) – strays far beyond the permissible boundaries of expert testimony, and also would inject irrelevant and substantially prejudicial testimony at trial.  In fact, in other cases, even courts that have permitted Mr. Kohlmann to testify have been careful to circumscribe his testimony to constrain it within the limits of proper expert testimony.

Mr. Kohlmann's report is not an expert report contemplated by Rule 16(a)(1)(G), Fed.R.Crim.P., but rather the equivalent of a superficial term paper commissioned by the govenrment, and which any person with rudimentary research skills and an internet connection (and a translator) could compose in two weeks' time, and thereby be proclaimed an "expert" on a particular subject.  It does not require any expertise, but merely a computer, and does not demonstrate "specialized knowledge," but merely downloading and typing capability.

Nor does Mr. Kohlmann's report offer any substantive expert analysis that would assist the trier of fact here.  It does not offer conclusions based upon reliable methodology but instead summarizes certain selected materials found on the Internet.  Notably, of the 51 footnotes in Mr. Kohlmann's report there is not a single citation to an academically peer-reviewed article, journal or book.  All but one of the citations to sources – the U.S. State Department's announcement of the designation of the Islamic Jihad Group as a Specially Designated Global Terrorist – is an unsubstantiated, unverified internet posting or video allegedly by terrorist organizations.  *See* Report, at 7 n. 23.

12

Also, many appear to require translation, an essential element not discussed at all in Mr. Kohlmann's report.  That is hardly a reflection of the sort of social science methodology involving the review of numerous sources, personal interviews, and careful vetting that would demonstrate genuine expert analysis.

In that context, in 2007 Mr. Justice Mackay in a UK prosecution, rejected Mr. Kohlmann as an expert witness for the Crown because his 19-page report on Libyan militant groups was "completely researched on the internet."  *See Regina v. Al-Bashir Mohammed Al-Faqih*, Woolwich Crown Court, attached to the Dratel Declaration as Exhibit 5, also available at <http://www.powerbase.info/images/1/15/Kohlman_cross_robertson_qc.pdf>.

Also, as Judge Lee observed in *Abu Ali* with respect to Mr. Kohlmann:

> [a]ll he has done is to read about it.  My jury could do an Internet search on Google and read about al-Qaeda.  I'm sure that Mr. Kohlmann could probably summarize it for them in a away that would be very helpful, but I'm not of the opinion that Mr. Kohlmann is an expert because he's not qualified by training, because he has none other than what he is self taught.  He has not qualified because of the methods that he's gathered his information, reading the Internet and reading books in and of itself may be a way to learn engineering, but at some point, the engineer has to actually handle a device.

*Daubert* Hearing, *United States v. Abu Ali*, T. 28:8-20 (Exhibit 4 to the Dratel Declaration).

Also, Mr. Kohlmann's testimony, again to the extent it is reflected in his expert report, appears to be based nearly entirely, if not entirely, on hearsay, some of which may very well include the product of custodial interrogation or other similar testimonial statements, the use of which at trial would violate Mr. Hasbajrami's Sixth Amendment rights as established by the Supreme Court's landmark decision in *Crawford v. Washington*, 541 U.S. 36, 61 (2004), and,

13

potentially (depending on the manner in which such statements were obtained, *see* **post**, at 17-19) his Fifth Amendment right to Due Process as well.

As a result, Mr. Kohlmann improperly seeks to testify regarding materials examined for the stated purposes of his expert testimony (enumerated **ante**, at 4-5), rather than from his general experience in the field, or his own independent research – an approach he has tried and failed before as a proposed expert witness in this District.

For example, in *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp.2d 414 (E.D.N.Y. 2013), th Court precluded certain aspects of Mr. Kohlmann's proposed expert testimony because his report in that regard "is nothing more than a recitation of secondary evidence" and "he makes no attempt to bring his expertise to bear and comes to no conclusion as to the import or accuracy of his summaries other than concluding that Hamas has claimed responsibility for the attacks." *Id.*, at 446.

As the Court in *Strauss* pointed out, "[t]his tactic of simply 'repeating hearsay evidence without applying any expertise whatsoever' has been rejected by the Second Circuit, and therefore must be rejected here." *Id.*, *quoting United States v. Mejia,* 545 F.3d 179, 197 (2d Cir. 2008).[2]

Also, the Court in *Abu Ali* recognized the problem with relying wholesale on information

--------

[2] In *Strauss*, the District Court did permit limited testimony from Mr. Kohlmann because the Court concluded he "is qualified as a terrorism expert and that his methodology is sufficiently reliable. Among other things, he is the author of a textbook on terrorism that is used in graduate level courses at Harvard University's Kennedy School of Government and Princeton University, and oversees one of the largest digital collections of terrorist multimedia and propaganda in the world." 925 F. Supp.2d at 446 (citations omitted). However, it is unlikely the Court in *Strauss* was apprised of the information set forth **post**, at 42-50, 50-53, regarding Mr. Kohlmann's book and his methodology.

obtained from the internet:

> [t]he Court does not think that the Internet, particularly the postings that he has described here, in and of themselves have any – there's no way to test the reliability of them.  There's no way to know who posts them.  There's no way to knows who maintains them.  There is no way to know whether the information there is accurate or not.

*Abu-Ali*, T. 27:17-23 (Exhibit 4 to the Dratel Declaration).

Indeed, in examining the factors which the Supreme Court in *Daubert* stated a court must look to determine whether expert testimony is sufficiently reliable under Rule 702, Fed.R.Evid., the Ninth Circuit, upon remand in *Daubert*, pointed out that

> [o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. . . .

43 F.3d at 1317.

Indeed, the Advisory Committee Notes to Rule 702 advise Courts to consider whether an expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."  Fed.R.Evid. 702, Adv. Comm. Note.

That "independence from litigation" is critical, because, as the Ninth Circuit explained in deciding *Daubert* after remand from the Supreme Court, "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office," and testimony based on prior, independent research "provides important, objective proof that the research comports with the dictates of good science."  *See Daubert v. Merrell Dow Pharmaceuticals, Inc*. 43 F.3d 1311,

1317 (9th Cir. 1995), *on remand*.

Here, Mr. Kohlmann's report and projected testimony have not grown naturally and directly out of research but rather have been developed expressly for purposes of testifying in this case.  Consequently, as the Ninth Circuit continued, "[t]hat an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science.  *See* Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom*, 206–09 (1991) (describing how the prevalent practice of expert-shopping leads to bad science)."  *Id*.

Elaborating, the Ninth Circuit explained,

> [f]or one thing, experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration;  when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests.

*Id*.

Similarly, as the Ninth Circuit recognized, "independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support."  *Id*.  As a result, "[t]hat the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were derived by the scientific method.  *Id*. (internal quotations omitted).

Moreover, the Ninth Circuit found that "[i]f the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective,

16

verifiable evidence that the testimony is based on scientifically valid principles. *Id*., at 1317-1318 (internal quotations omitted).

Thus, since Mr. Kohlmann's conclusions are based on the research and conclusions of others, rather than his own independent research (beyond collecting materials from the internet), the burden is on the government to provide "other objective, verifiable evidence that the testimony is based on scientifically valid principles" and constitutes sufficiently reliable and proper expert testimony.

> **2.      *Testimony by Mr. Kohlmann Based on Hearsay In the Form of Testimonial Statements That Would Violate Mr. Hasbajrami's Sixth Amendment Rights Under* Crawford v. Washington *Must Also Be Excluded By The Court***

Mr. Kohlmann's testimony must also be narrowed to prevent him from introducing custodial or testimonial statements at trial.  Such testimony, if permitted, would constitute inadmissible hearsay and would violate Mr. Hasbajrami's constitutional rights under the Confrontation Clause as established in the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. at 61, because Mr. Hasbajrami would not have the opportunity to confront or to cross-examine the declarants on their statements.  *See id.,* at 68 ("whatever else the term covers, ['testimonial'] applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial;  and to police interrogations.  These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed").  *See also United States v. Buonsignore*, 131 Fed. Appx. 252, 257 (11th Cir. 2005) (expert opinions based on testimonial hearsay are inadmissible against a criminal defendant unless the government shows that the hearsay declarant is unavailable and the defendant has had the opportunity to cross-examine him).

17

Mr. Kohlmann's expert report is peppered throughout with statements that would constitute inadmissible hearsay;  indeed, nearly all, if not all, of the report consists of conclusory statements masquerading as a narrative, but based entirely on unverified and inherently suspect multi-level hearsay.

Mr. Kohlmann's report is replete with assertions without any source, and even the contentions that notes sources are the rankest hearsay, entirely substantiated and without any indicia of reliability – indeed, most are in the form of propaganda and rhetoric issued in communiques by "media wings" designed for political and/or public relations purposes (as well as to promote personal and organizational rivalries) rather than accuracy.  Also, Mr. Kohlmann's report fails to identify the origin of some sources, which may emanate from statements made under interrogation.

In that context, it is not clear whether the sources of any of the statements were subjected to physical and/or psychological abuse, including torture, in regions in which mistreatment of detainees is commonplace.[3]  That dispositively proscribes consideration of information derived

---

[3]  For example, with respect to Uzbekistan, earlier this year Human Rights Watch issued the following statement:

> [i]n November 2013, the United Nations Committee against Torture stated that torture is 'systematic,' 'unpunished,' and 'encouraged' by law enforcement officers in Uzbekistan's police stations, prisons, and detention facilities run by the SNB. Methods include beating with batons and plastic bottles, hanging by wrists and ankles, rape, and sexual humiliation . . .
> Although authorities introduced habeas corpus in 2008, there has been no perceptible reduction in the use of torture in pretrial custody or enhanced due process for detainees. Authorities routinely deny detainees and prisoners access to counsel, and the state-controlled bar association has disbarred lawyers that take on

from such a source because it is itself unreliable, and would deny Mr. Hasbajrami Due Process. While the connection between coercion and unreliability is most often analyzed when the government uses a defendant's coerced statement against him, the link between coerced statements and unreliability generally is undeniable. *See Brown v. Mississippi*, 297 U.S. 278 (1936); *Chambers v. Florida*, 309 U.S. 227 (1940); *White v. Texas*, 310 U.S. 530 (1940). *See also United States v. Ghailani*, 743 F. Supp.2d 261 (S.D.N.Y. 2010).

Moreover, it is clear from the report that its information includes multiple levels of hearsay. For example, at 8, a statement Mr. Kohlmann attributes to Taifutal Mansura announced, "Today morning we receive the news that . . . our brother Salahuddin Turki and our German brother Abdulgaffar Almani have been martyred." *See also*, at 10 ("[a]ccording to allied jihadists in the tribal areas . . .").

Much is also based on rumor. For example, at page 3, the report claims that "Tohir Yuldashev *reportedly* later traveled to Chechnya himself in order to confer with local mujahideen commanders in the Caucasus and promote his image as a pan-Islamic leader." (Emphasis added). Yet no source is provicded for that claim, which appears to be supposition in the first place. Likewise, at 8, the report claims that "[t]he group [Taifutal Mansura] was *reportedly* led by a commander identified as 'Selahaddin Azeri.'" (Emphasis added).

The report also relies heavily on self-serving propaganda from various organizations. For example, at 3, the report attributes statements to "[t]he [Islamic Movement of Uzbekistan

---

politically sensitive cases.

"Uzbekistan," World Report 2015, Human Rights Watch (2015), available at <http://www.hrw.org/world-report/2015/country-chapters/uzbekistan>.

(hereinafter "IMU")]'s media wing described their diplomatic negotiations with the Taliban." *See also id*., at 8 ("[a]ccording to a note from Taifutal Mansura's official media wing").

In *United States v. Amawi*, 06 Cr. 719 (JGC) (N.D. Ohio, Western Div. March 27, 2008) (Docket #701), Judge James G. Carr expressed concerns regarding Mr. Kohlmann's proposed testimony about propaganda, and concluded that "testimony about the nature of these materials was not necessary for the understanding of what they are" because "propaganda . . . can have many purposes, most, if not all of which are self-evident" and "[t]o the extent that these materials seek to entice, excite, or incite their viewers, jurors can, on seeing the materials, well understand those various objectives."   *See Amawi* Order, at 6-7 (a copy of which is attached to the Dratel Declaration as Exhibit 6).

In making a determination as to whether to admit expert testimony based upon otherwise inadmissible evidence, a District Court need not make an explicit finding that the underlying sources upon which the expert relies are trustworthy.  *See United States v. Locasio*, 6 F.3d 924, 938 (2d Cir. 1993).  Nonetheless, expert testimony is not completely exempt from the hearsay rule.  *See Dukagjini*, 326 F.3d at 58.

Thus, "an expert witness may rely on hearsay evidence while reliably applying expertise to that hearsay evidence, but may not rely on hearsay for any other aspect of his testimony."  *Id*. Most importantly, an expert may not "simply transmit that hearsay to the jury."  *Id*. at 54. Otherwise, the expert would be simply "repeating hearsay evidence without applying any expertise whatsoever" and the government would, as a result, be allowed "to circumvent the rules prohibiting hearsay." *Mejia*, 545 F.3d at 197, *quoting Dukagjini*, 326 F.3d at 58-59.

Also, both *Locasio* and *Dukagjini* were decided before *Crawford*.  In light of the Supreme

20

Court's plurality opinion in *Williams v. Illinois*, 132 S.Ct. 2221 (2012), which follows *Crawford*, it appears that Rule 703 is itself limited by the Sixth Amendment's right to confrontation. As a result, notwithstanding Rule 703, an expert's "basis testimony" is inadmissible if it is admitted for its truth. *See Williams*, 132 S.Ct. at 2256, 2258 (Thomas, J., concurring in the judgment); *see also id*., at 2268 (Kagan, J., dissenting, noting that "five Justices agree, in two opinions reciting the same reasons, that … [the expert's] statement about [the basis of his testimony] went to its truth, and the State could not rely on her status as an expert to circumvent the Confrontation Clause requirements").

Here, Mr. Kohlmann's report and projected testimony do not constitute expertise;  rather, they represent merely a surrogate witness parroting hearsay statements in a manner immune from confrontation and cross-examination.  The introduction of any of this evidence would improperly enhance the government's case simply by repetition of rank hearsay rather than authentic expertise, and would unduly prejudice Mr. Hasbajrami, in addition to violating his rights under the Sixth Amendment's Confrontation Clause and the Due Process clause of the Fifth Amendment.

### 3.    *Mr. Kohlmann's Projected Testimony Does Not Possess the "Specialized Knowledge Required of Expert Testimony*

Also, Mr. Kohlmann's testimony does not rise to the level of "specialized knowledge" warranting expert testimony.  As the Second Circuit has repeatedly instructed, expert witnesses should not be permitted to testify to matters that are not beyond the ken of a juror.  *See United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991) (reversible error for government to utilize expert testimony on matters in which the jury was capable of understanding on its own); *United States*

*v. Cruz*, 981 F.2d 659 (2d Cir. 1992) (reversible error for government to use expert testimony to bolster the credibility of its fact witnesses);  *see also United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) (discussing various examples of how an expert's testimony can exceed the limits of Rule 702).  *Cf. United States v. Gutierrez*, 995 F.2d 169 (9th Cir. 1993) (trial court should not routinely admit expert opinion testimony without carefully weighing testimony's probative value against possible prejudicial effect, especially when expert testimony of law enforcement officer is involved);  *United States v. Scavo*, 593 F.2d 837 (8th Cir. 1979) (expert testimony must meet criterion of helpfulness expressed in Rule 702, and is subject to exclusion if its probative value is substantially outweighed by risks of unfair prejudice, confusion or waste of time).

Also, the role of an expert is to add specialized knowledge to the case, not summarize the evidence for the jury.  In *United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003), the Second Circuit cautioned prosecutors not to allow an expert law enforcement witness to "stray from his proper expert function" and serve as a "summary prosecution witness" thereby increasing the possibility that the jury would endow his testimony with "unmerited credibility".  Id. at 53-55.

Likewise, in *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007), in which the government called an investigator employed by the U.S. Attorney's Office who testified that the defendant was an organized crime family member, an assertion that may have been based upon out-of-court statements by cooperating witnesses and confidential informants, the Second Circuit expressed concern that such testimony might have exceeded the scope of the witness's expertise and raised a serious question as to whether the defendant's Sixth Amendment right to confrontation had been violated by the expert's opinion.  *See also United States v. Paracha*, 2006 WL 12768, *22-23 (S.D.N.Y. 2006), *citing Dukagjini*, 326 F.3d at 55 ("[w]hen an expert's

22

conclusions are drawn largely from his knowledge of materials in the government's case file, 'rather than upon his extensive general experience' in the field, those conclusions are beyond the proper limits for expert testimony").

Similarly, in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), a case charging the defendants with being members of the MS-13 gang, the government called a police officer, Hector Alicea, as an expert witness with respect to MS-13's "enterprise structure and the derivation, background and migration of the MS-13 organization, its history and conflicts" as well as its "hierarchy, cliques, methods and activities, modes of communication and slang". *Id.*, at 186.

Officer Alicea's testimony in *Mejia* covered a wide variety of subjects, and when asked for the source of his information regarding the history, structure and practices of MS-13, he answered that he had reviewed documents, interviewed incarcerated gang members, conferred with other law enforcement officials, and researched the internet. *Id.*, at 187-88.

In reversing the conviction in *Mejia*, the Second Circuit did not find error in qualifying Officer Alicea as an expert since his experience was as extensive as the agent who had been qualified to offer expert testimony in *Locasio*. *Id.*, at 194. However, the Court did find error with respect to Officer Alicea's testimony regarding subjects that were well within the grasp of the average juror.

For example, his testimony regarding the number of firearms that had been seized from MS-13 members, his statement that MS-13 members had been arrested for dealing narcotics, and his testimony regarding murders committed by MS-13 members, certainly did not require any expertise to assist the jurors in their understanding of such matters. *Id.*, at 194-95. Nor was there

23

any need for expertise to describe the manner in which MS-13 members traveled, assembled or communicated with each other, or how they funded their purchases of narcotics and firearms. *Id.*, at 195.  *See also United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991) (reversible error for government to utilize expert testimony on matters in which the jury was capable of understanding on its own).

In *United States v. Kaziu*, 09 Cr. 660 (JG) (E.D.N.Y.), this Court made the same observation with respect to projected testimony by Mr. Kohlmann, asking in response to the government's declared intention to elicit from Mr. Kohlmann testimony regarding materials a Westerner would review in order to prepare for travel to a *jihadist* environment overseas, "What is it about that that requires expertise though?  I would think the jury would know this stuff would facilitate the assimilation of the defendant into a jihadist group."  *Id.*, at T. 716, June 30, 2011 (a copy of the relevant transcript pages are attached to the Dratel Declaration as Exhibit 7).

Here, a particular segment of Mr. Kohlmann's report is well within a juror's common knowledge at this point in time.  In his report at 7-8, in describing the means of transit for recruits to conflict zones, *i.e.*, – that "[p]rospective recruits were typically advised to gather in Turkey" – Mr. Kohlmann merely repeats what any observer would know from the legion of reports in the mainstream media since the advent of the violence in Syria.[4]  That observation does not require

---

[4]  A sampling gleaned from a simple Google search includes the following articles:

http://www.npr.org/sections/parallels/2014/10/07/354288389/a-smuggler-explains-how-he-helped-fighters-along-jihadi-highway ("[t]he Jihadi Highway from Turkey to Syria long has been an open secret, well-documented by the international media, Syrian activists and the Turkish press")

http://www.rollingstone.com/culture/features/teenage-jihad-inside-the-world-of-american-kids-seduced-by-isis-20150325

expertise, but only a map.

Also, the usefulness of Mr. Kohlmann's testimony is questionable in light of the timing of certain events he chronicles in his report.  As it notes, at 11, the organization Taifatul Mansura – which is featured substantially in the report – "was greatly weakened and, by mid-2010, began falling apart."  Yet mid-2010 *precedes* by at least six months the earliest date (February 23, 2011) mentioned in the Superseding Indictment.

In addition to the limitations of Rule 702, Rule 703 (as set forth **ante**, at 6-10) delineates the bases of opinion testimony by experts.  In that context, Mr. Kohlmann, in his report at 7, and again in the context of travel to conflict zones, uses e-mails provided by the government in corroborating his otherwise unsourced assertions.  In addition to impermissible bootstrapping,

---

http://www.buzzfeed.com/mikegiglio/isis-operative-this-is-how-we-send-jihadis-to-europe#.iqM8nN1Vk

http://europe.newsweek.com/lack-coordination-between-eu-members-leaves-bloc-vulnerable-jihadist-303305

http://www.cnn.com/2013/11/04/world/europe/isis-gaining-strength-on-syria-turkey-border/

http://www.newyorker.com/magazine/2015/06/01/journey-to-jihad

http://www.bbc.com/news/world-middle-east-29944580

http://www.reuters.com/article/2010/10/27/us-turkey-security-idUSTRE69Q3EN20101027

http://www.nytimes.com/2015/03/22/world/middleeast/from-minneapolis-to-isis-an-americans-path-to-jihad.html

http://www.al-monitor.com/pulse/originals/2014/04/turkey-syria-borders-smuggling-guns-conflict-kurds-pkk-isis.html#

http://www.jamestown.org/programs/tm/single/?tx_ttnews[tt_news]=41114#.VYhPWEYkR2A

that attempted connection to Mr. Hasbajrami also contravenes another limiting principle this Court applied to Mr. Kohlmann in *Kaziu*.

In response to the government's notice that it intended to have Mr. Kohlmann render an opinion that a video recovered from the defendant's computer ""bears resemblance to martyrdom videos that suggests to him it was likely modeled on one[,]" this Court stated, ""[t]hat's really not the sort of testimony I'd permit anyway."  Exhibit 7, T. 681-82.

Expanding on that limitation in a subsequent colloquy, with respect to projected testimony from Mr. Kohlmann regarding common *jihadist* reading (or viewing) materials, the Court instructed the government to "structure [Mr. Kohlmann's] testimony as best you can to have him testify about those main texts, whatever they are, in a manner that is distant from the defendant as best as possible."  Exhibit 7, T. 721.

As this Court cautioned the government, that testimony would need to be

> separated as much as possible from the discrete facts of this case and by that I mean this is just so that the order of presentation – I don't want to create the impression before the jury – because juries get confused by experts – I don't want to create the impression that is risked when an expert takes the laptop that's taken from the defendant and flips through it before the jury and says, oh, here is a main text for Al Shabaab or here is the main ones that someone assimilating himself into Al Qaeda really needs to know.  The way that gets presented matters, in my judgment.

*Id*.  *See also id*., T. 714 (Court pointing out it is "acutely sensitive to anything that looks like it might be perceived by a lay jury as expert testimony that the defendant is guilty").[5]

---

[5]  Also, regarding Mr. Kohlmann's projected testimony regarding a "global *jihadist* movement," this Court stated it would not permit testimony with respect to "the extent to which this defendant might have been part of that.  I'll be ultrasensitive to any testimony that gets close to that subject."  Exhibit 7, T. 713.

26

The same is true with respect to Mr. Kohlmann's report's references to computer screenshots provided to him – which Mr. Kohlmann merely translates and describes.  Again, as the cases discussed **ante** establish, that is not expertise;  it is not proper to recite evidence in the guise of contrived "expertise."

### 4. *Even If Admissible Under Rules 702 and 703, Portions of Mr. Kohlmann's Projected Testimony Should Be Precluded Pursuant to Rule 403, Fed.R.Evid.*

Moreover, even if the Court were to conclude that the testimony described **ante** is relevant to the charges in this case, Mr. Kohlmann's testimony regarding certain subject matters must nonetheless be excluded at trial under Rule 403, Fed.R.Evid., which permits the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

In addition to the subjects set forth in the government's Rule 16(a)(1)(G), Fed.R.Crim.P. notice(s), *see* **ante**, at 4-5, Mr. Kohlmann's report refers to (1)  various terrorist attacks and threats against the U.S. and its nationals (and in concert with *al Qaeda*), many of which occurred or were planned to occur in countries and regions not involved in this case, and which took place outside the time frame of the conduct alleged in the Superseding Indictment;[6]  (2)  notorious

---

[6]  For example, the report, at 6-9, makes reference to:

- IJU's "ongoing efforts to launch operations targeting the U.S. and its allies in concert with Al-Qaida and the [*Tehrik-i-Taliban Pakistan*]."

- a statement from "Al-Kahf Media" – without any explanation of that outlet's connection to Mr. Hasbajrami or this case – reporting on a Taliban "operation" in which 20 U.S. soldiers were killed;  and

- an "*unidentified* 'Taliban commander' who 'threatened that the USA and Europe will receive an answer to the murders they committed in Afghanistan and Waziristan as soon as possible[.]" (Emphasis added).

individuals in the al Qaeda network, such as Ayman al-Zawahiri, the current leader of the

organization, but who lacks any connection to the charges in this case;  (3)  the U.S.'s

designation of the Islamic Jihad Union (hereinafter "IJU") as a Specially Designated Global

Terrorist;[7]  and (4)  U.S. military operations, including 36 drone strikes, in the area around the

Pakistani city of Miramshah.  *See* Report, at 6-9.

Testimony about  *al Qaeda* leaders, past and potential violent acts against the U.S., and

U.S. drone strikes in Pakistan would not  illuminate the charges in this case, but rather shroud

These subject matters are irrelevant to the charges in this case, pursuant to *Daubert* (and

Rules 702 and 703) and Rules 401 and 402, Fed.R.Evid., and are therefore unfairly prejudicial to

Mr. Hasbajramim under Rule 403, Fed.R.Evid., because they have the substantial capacity to

induce the jury to equate him with known terrorists in the *al Qaeda* leadership, and to associate

him with terrorist attacks and threats for which he is not on trial, with which he has never been

alleged to have had any involvement, and which are not necessarily even within the time frame

alleged in the Superseding Indictment.

Testimony about  *al Qaeda* leaders, past and potential violent acts against the U.S., and

U.S. drone strikes in Pakistan would not  illuminate the charges in this case, but rather shroud

them under the cloak of *al Qaeda* and its looming shadow – including 9/11 – neither of which are

properly invoked in this case.  That would encourage the jury to equate Mr. Hasbajrami with *al

Qaeda* and its various nefarious actions and members, and would serve only to prejudice the jury

against Mr. Hasbajrami, and to confuse it regarding the issues in this case.  *See, e.g., United

States v. al-Moayad,* 545 F.3d 139, 161 (2d Cir. 2008) (district court erred in admitting expert

---

[7]  Evidence of such designation is not only irrelevant, as this case does not involve a
charge of material support to a designated entity (as would a charge pursuant to 18 U.S.C.
§2339B), but also inadmissable under Rule 803(8), which prevents the government from
admitting "factual findings resulting from an investigation made pursuant to authority granted by
law . . . [,]" which defines the process of designation.

28

testimony regarding a Tel Aviv bus bombing that "[t]he defendants were not charged with planning or carrying out" because the "bus bombing was almost entirely unrelated to the elements of the charges" and "involve[d] conduct more inflammatory than the charged crime[s]").

The Advisory Committee's notes to Rule 403 define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly though not necessarily, an emotional one."  By conjuring up the names of *al Qaeda*'s leaders, and describing threats and violence against the U.S. and its citizens (including in concert with *al Qaeda*), and thus playing to the jurors fears (and emotions, including anger and vengeance), Mr. Kohlmann's testimony threatens to defeat any prospect of a fair trial for Mr. Hasbajrami.

Judge Carr shared these same concerns in *Amawi*, concluding that "permitting the proposed testimony would suggest that, contrary to the evidence, these defendants somehow had connection with those groups, persons or activities" and that "[e]ven if that weren't so, allowing such elaboration would unavoidably create a penumbra of prejudice that could unfairly and improperly affect the outcome."  *Amawi* Order, at 9 (Exhibit 6 to the Dratel Declaration).

As a result, in *Amawi*, Judge Carr held that "as with other aspects of Mr. Kohlmann's anticipated testimony, the modest, even minimal probative value of testimony about groups, persons, and events with which the jurors may not be familiar – and with which the defendants have no connections whatsoever – is outweighed by the potential for unfair prejudice."  *Id*.

Accordingly, given the limited probative value of the matters in Mr. Kohlmann's report described above when compared to the danger of unfair prejudice which they present, it is respectfully submitted that Rule 403 compels narrowing the parameters of Mr. Kohlmann's

proposed testimony to exclude the irrelevant and inflammatory evidence at Mr. Hasbajrami's trial.

Thus, even if Mr. Kohlmann is permitted to testify at all, circumscribing his testimony is necessary.  Courts have in the past narrowed Mr. Kohlmann's testimony on the grounds of relevance in many of the cases in which he has otherwise been qualified as an expert witness. *See e.g.*, *United States v. Uzair Paracha*, not reported in F.Supp.2d, 2006 WL 12768, at *18 (S.D.N.Y. January 3, 2006) (SHS) (refusing to permit Mr. Kohlmann's proposed testimony "regarding the two al Qaeda operatives alleged to be co-conspirators of [the defendant][,] . . . the background of and alleged activities of another alleged co-conspirator[,] . . . and "*al Qaeda*'s purported use of counter-interrogation techniques"); *United States v. Kaziu*, 06 Cr. 660 (E.D.N.Y.) (JG) (discussed **ante**, at 24, 26) (Exhibit 7 to the Dratel Declaration); *United States v. Amawi* (Exhibit 6 to the Dratel Declaration); *United States v. Kabir*, 12 Cr. 92 (VAP) (C.D. Cal.) (July 14, 2014) (discussed **post**, at 33-34).[8]

In *Amawi*, a case charging the defendants with conspiring to kill and maim members of the U.S. military in Iraq and with material support for terrorism, as well as with unlawfully distributing a video showing how to make a suicide bomb vest, Judge Carr limited Mr. Kohlmann's testimony regarding "general information regarding international terrorism" because such evidence was "not relevant to the issues in th[at] case" and because "the limited probative value of his testimony [wa]s outweighed very substantially by its very considerable potential for unfair prejudice to the defendants." *See Amawi* Order, at 4 (Exhibit 6 to the Dratel Declaration).

---

[8]  A copy of Judge Virginia A. Phillips's July 14, 2014, Minute Order in *Kabir* is attached to the Dratel Declaration as Exhibit 8.

Judge Carr explained that while the government wanted to have "Mr. Kohlmann tell the jurors about . . . groups, persons, and events to the extent that they may not already be sufficiently notorious to be known to the jurors . . . to fill in the gaps in the jurors' knowledge about who's who and what's what in international terrorism" he was "far from satisfied that filling in the blanks in the jurors' awareness of who some of the referenced groups, individuals, or events are is either relevant or material." *Id.*, at 8.

In fact, Judge Carr

> expect[ed] that, to a considerable extent, the jurors w[ould] in any event be able to infer, and accurately so, that the referenced organizations, individuals and occurrences have something to do with international terrorism.  What, exactly, that something may be does not appear to be sufficiently pertinent to permit Mr. Kohlmann to elucidate what those groups and persons are and what they or others may have done.

*Id*.

For all these reasons, it is respectfully submitted that Mr. Kohlmann's projected testimony should be precluded, or at the very least limited, in the manner explained **ante**, to only those items that are relevant to the jury's understanding of the issues in this case.

**5.**     ***Mr. Kohlmann's Report and Projected Testimony Are Not Reliable Because He Lacks Any Discernible and/or Acceptable Methodology***

Mr. Kohlmann does not explain his "methodology" in his report. He does not have training in social science methodology, including in statistics, probability, and sampling.  In his expert report in *Ahmad*, Marc Sageman, M.D., Ph.D. (and an acknowledged terrorism expert with abundant experience in U.S. law enforcement and intelligence agencies) explains some of the problems inherent in Mr. Kohlmann's lack of methodology:

31

Mr. Kohlmann does not explain his methodology in his report. Instead, he quotes from judges who qualified him in previous cases. Unfortunately, judges are not trained in scientific methodology, and many defense attorneys do not know enough to challenge a self-promoting witness like Mr. Kohlmann. Methodology is not about access to lots of information. If that were so, all Internet users would be experts. It is about how to use and interpret this data. Methodology in the social sciences has evolved over the past century, and its use defines good scholarship. It involves statistics, probability, sampling strategies, looking for evidence to falsify hypotheses and comparative methods between two samples. It requires training and practice. Mr. Kohlmann has had none. In a previous section, I quoted from my colleagues on Mr. Kohlmann's general lack of credentials and methodology of. From his report, he carefully selects anecdotal evidence from the vast amount of information he has accumulated over the years and ignores any contradictory evidence, as I shall later show. He is not careful to check whether later sources have surfaced to change his "narrative." I heard him say previously that he used a comparative method, but in his reports or his testimony, he rarely compares the facts he selects to others or carefully weighs the evidence. Indeed, he was never trained in the use of the comparative method (his undergraduate class was not a methodology class) and I have never seen him use it in his work. Instead, he selects what is most supportive for the side that retains him. Indeed, he told me so at one time when I challenged him about his testimony in the Khurshid case in Copenhagen because he had neglected to mention important facts under oath. He justified his one-sidedness by saying that it was an adversarial process and it was up to the defense attorneys to cross examine him. I pointed out to him that this was not the case in Europe, except in Britain. In the rest of Europe, the witness was supposed to be impartial and not a hired gun as is often the case in the U.S.

Dr. Sageman's Expert Report in *Ahmad*, attached as Exhibit 9 to the Dratel Declaration, at

BADEF000174-75.

Thus, rather than weigh the facts and point out alternative theories, Mr. Kohlmann

purposefully employs a one-sided approach, believing it is the duty of lawyers and judges to

question his methods, rather than his duty to address conflicting evidence. The problem with

that approach, of course, is that lawyers and judges do not always know enough to critique an expert's methods. Indeed, that is usually the very reason why expert testimony is being sought in the first place.

Mr. Kohlmann's lack of acceptable methodology was also the basis for the limiting of his testimony in *United States v. Kabir*, 12 Cr. 92 (VAP) (C.D. Cal.) (July 14, 2014), in which Judge Phillips concluded that "[t]he Court is not persuaded that Kohlmann's methodology of constructing and maintaining the 'homegrown terrorist' profile is reliable, and that the application of the profile to this case is relevant, helpful, and not confusing or prejudicial." *Id.*, at 4 (Exhibit 8 to the Dratel Declaration).

Articulating her reservations – and Mr. Kohlmann's utter lack of facility with fundamental social science terminology – in more detail, Judge Phillips added that

> [a]fter the *Daubert* hearing, the Court remains concerned that, while Kohlmann has amassed an impressive collection of materials relating to international terrorism, he is unfamiliar with basic terms and theories of social science research (such as "variable," "attribute," "operational definition," and "grounded theory"), he has not submitted the profile and its application for rigorous peer review (despite his claim that it presents a reliable theory of identifying "homegrown terrorists"), and he does not employ recognized social scientific tools (such as random sampling and blind tests) to control for bias or error.

*Id*.

As a result, Judge Phillips ruled that the government had "not sufficiently shown Kohlmann's methodology of constructing and refining the 'homegrown terrorist' profile to be reliable." *Id*. In addition, Judge Phillips concluded that "under FRE 403, the Court finds any probative value of the profile and its application to this case will be substantially outweighed by

the unfair prejudice, confusion, and misleading of the jury that likely will result from the presentation of Kohlmann's testimony on this subject." *Id.*, at 4-5.[9]

### 6. *Mr. Kohlmann Lacks the Specialized Knowledge, Skill, Experience, Training and/or Education to Qualify As An Expert Witness In This Case*

In addition to the obstacles set forth above (before a witness can qualify as an expert), the Court must ensure that the witness will be proffering opinions on issues or subject matter that are within his or her area of expertise. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80-82 (2d Cir. 1997). *See also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp.2d 558, 642 (S.D.N.Y. 2007) ("[t]estimony on subject matters unrelated to the witness'[ ] area of expertise is prohibited by Rule 702"); *United States v. Romano*, 859 F. Supp.2d 445, 456-57 (E.D.N.Y. 2012).

Here, Mr. Kohlmann has not demonstrated that expertise. He has never been to Afghanistan or Pakistan. He does not speak Pashto, Dari/ Farsi, Arabic or Urdu. He has not interviewed any member of the Taliban or anyone with first-hand knowledge of Afghanistan under the Taliban.

In *United States v. Abu Ali*, 05 Cr. 53 (GBL) (E.D. Va.), Judge Lee excluded Mr. Kohlmann's testimony, in part, due to his lack of qualifications. T. 27:8-11; 29: 1 (Exhibit 4 to the Dratel Declaration) (finding that Mr. Kohlmann was not qualified to testify as an expert on *al Qaeda* because, among other shortcomings, he did not speak Arabic or Urdu, could not read

---

[9] Judge Phillips did permit Mr. Kohlmann to testify regarding "(1) the history and context of the Al-Qa'ida, the Taliban in Afghanistan, and Islamic extremism (or the "global jihadi movement"), (2) the use of various social and internet media by Islamic terrorist organizations, and (3) the terms, concepts, and phrases used in this context." *Id.*, at 5.

websites in those languages, and had never been to Pakistan or Saudi Arabia).[10]

Mr. Kohlmann's claimed expertise is based upon his undergraduate minor, a college internship at a controversial, discredited "think tank," a self-published book, a database of documents that he has downloaded from the internet and the fact that he has testified in at least 27 cases in the U.S. (and not once for the defense).

Mr. Kohlmann's *Curriculum Vitae*, dated March 15, 2015, a copy of which is attached to the Dratel Declaration as Exhibit 10, reveals that his purported expertise is not the product of substantive training, experience, field work, recognized scholarship, academic position, or language skills. Rather, Mr. Kohlmann's asserted "expertise" arises from his routine downloading of materials from the internet and his prior testimony.

For example, Mr. Kohlmann's resume does not provide any evidence that, with respect to the principal subjects of his report – the Islamic Movement of Uzbekistan (hereinafter "IMU"), the Taifatul Mansura, and the Islamic Jihad Union (hereinafter "IJU") – he has ever:

- written on the subject (much less for a peer-reviewed publication);

- taught on the subject;

- taken any training or academic courses on the subject;

- visited the subject region at all, much less for a sufficient time period; or

- learned, spoken, or read the various languages and/or dialects that are spoken and read in the region.

As a result, Mr. Kohlmann lacks "a reliable basis in the knowledge and experience" of a

---

[10] While that ruling in *Abu Ali* occurred a decade ago, Mr. Kohlmann has not since traveled to those countries or regions, or learned any language.

relevant discipline.  *See Pan Am. World Airways v. Port Auth. of NY.*, 995 F.2d 5, 9-10 (2d Cir.

1993).  *See also Daubert*, 509 U.S. at 592;  *Nimely v. City of New York*, 414 F.3d 381, 399 n.13

(2d Cir. 2005) ("it is worth emphasizing that, because a witness qualifies as an expert with

respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified

to express expert opinions as to other fields").

Mr. Kohlmann's credentials – which, as discussed **post**, he has not always described

accurately – are also insufficient.  Mr. Kohlmann has an undergraduate degree in

international politics, and a minor "certificate" in Islamic Studies.  *See* Exhibit 10 to the Dratel

Declaration.  His sole post-graduate degree is a law degree.[11]  He does not possess any

postgraduate degree in any cognative social science subject or any substantive subject at all,

including any relating to global terrorism, Islam, Pakistan, and/or Afghanistan.  Nor has he ever

taught a course, graduate or undergraduate, in those subjects.

In addition to not being able to speak any of the languages in the subject region, his first

visit to a Muslim country was in 2006/2007, and including that trip, he has spent a total of 25

days in the Muslim world.[12]  He lacks training in research methodology and has never conducted

any systematic field research.  *See also United States v. Kabir*, 12 Cr. 92 (VAP) (C.D. Cal.) (July

_____

[11]  Mr. Kohlmann's capacity for strategic embellishment of his genuine credentials to
divert attention from those he does not is evident from his self-description in his report, at 1, in
which he describes his *juris doctor* as a "professional law degree," thereby creating a category of
law degree that does not exist.

[12]  *See* Discovery Material in *United States v. Babar Ahmad*, 06 Cr. 194 (JCH), at Bates
No. BA 006131-32.  Mr. Kohlmann has previously testified that he has never been to
Afghanistan, Pakistan, Iraq, Iran, Syria, Lebanon, Palestine, Egypt, Yemen, Morocco, and
Algeria.  *Id.*  (This material will be provided under separate cover to the Court as soon as
practicable).

14, 2014) (discussed **ante**, at 33-34);  *United States v. Mohamud*, 10 Cr. 475 (GMK) (D. Ore.), *Daubert* Hearing (November 28, 2012) (Dkt. #333), T. 109.

It is unclear whether any of Mr. Kohlmann's publications have been subjected to rigorous academic peer review.  In fact, a majority of his "major papers" have not been published in scholarly publications.  According to his C.V., Kohlmann lists 42 titles under "major papers."  Of those, two were written for college or graduate courses (and another two were written while he was an undergraduate).

Fourteen were for Nine Eleven Finding Answers (hereinafter "NEFA"), where Mr. Kohlmann worked from 2005 through 2010.  Those 14 also include television interviews transformed into "Occasional Report(s)" for NEFA.  There is no evidence any of these  papers were peer-reviewed or subject to any academic rigor.  Another two were television interviews altogether.  Those 42 "major papers" also include conference presentations and testimony before Congress – again, not involving peer review or any academic or scientific standard.

Among the "major papers" Mr. Kohlmann includes in his C.V. is one published in *Foreign Affairs*.  *Foreign Affairs* is a magazine that covers a broad range of topics relating to American foreign policy and global affairs.  However, on its website under the "Submissions" information, it clearly states that *Foreign Affairs* does not fact check the articles and "rel[ies] on authors to ensure the veracity of their statements.  Although we try to avoid using footnotes, contributors should be able to provide appropriate citations for any facts or quotations their pieces contain."  Therefore, *Foreign Affairs* articles cannot be assumed to be reliable and/or scholarly.

Another magazine similar to *Foreign Affairs* that has published Mr. Kohlmann is *Foreign*

*Policy*.  He lists three such articles in his current C.V., but they cannot be considered scholarly.  Indeed, *Foreign Policy*'s website describes the magazine as "serious *but not scholarly*, lively but not glib."  (Emphasis added).

Another paper Mr. Kohlmann has included in his C.V. is described therein as a "working paper" for the Danish Institute of International Studies (hereinafter "DIIS"), dated January 2006.  However, that cannnot qualify as a published paper or article, as a representative of DIIS explained in a recent e-mail:  "[a] working paper is a publication of preliminary research results, and it is often rewritten into a report or academic article and then perhaps published if accepted by a journal.  . . .  Evan Kohlmann is not affiliated with DIIS."  *See* May 27, 2015, e-mail from DIIS (attached as Exhibit 11 to the Dratel Declaration).

Mr. Kohlmann's C.V. also lists an article in the Harvard Law Review Forum (*Curbing the Web's Wild West*," Harvard Law Review Forum, March 2013).  The Forum is separate from Harvard Law Review itself, and is far from being as prestigious as the law review.  Aside from that distinction, a representative of Harvard Law Review Forum has stated in an e-mail that the Forum did not publish the article listed in Mr. Kohlmann's C.V. (although it did publish an article he co-authored, "Planning Responses and Defining Attacks in Cyberspace").  *See* May 27, 2015, E-mail from Harvard Law Review Forum (attached as Exhibit 12 to the Dratel Declaration).

Nor does Mr. Kohlmann possess any background in law enforcement or intelligence work.  In *Abu Ali*, the Court professed its

> difficulty with the idea that someone who has never done any real
> law enforcement or intelligence work where he has infiltrated
> terrorist cells or worked with terrorists or had contact with them is

38

> going to come in here and tell the jury that based on what he's read
> on the Internet and his own writings that he thinks that this [cell]
> belong[s] to al-Qaeda.

Exhibit 4 to the Dratel Declaration, at 13 (lines 1-8).

While Mr. Kohlmann claims to have traveled "overseas" to interview "known terrorist

recruiters and organizers[,]" *see* Exhibit 3, at 1, it appears that the number of such interviews is

fewer than five, and the subjects were public figures he met during a short vacation to the United

Kingdom in June and July 2002.[13]

Intelligence professionals and academics alike have also criticized Mr. Kohlmann.  For

instance, Philip Giraldi, a former CIA counter-terrorism specialist and military intelligence

officer, and current Executive Director for The Council for the National Interest, writes that

given Mr. Kohlmann's lack of language skills and field experience, he "does not have the tools

that would normally be required even in the academic world to be considered well informed."

Dr. Giraldi further criticizes Mr. Kohlmann, referring to him as a "phony" without any

---

[13]  The individuals were Abu Hamza Al-Masri, Omar Bakri Mohammed, Dr. Mohammed
Al-Massari, Dr. Saad Al-Faqih, and Anjem Choudhry. *See* Exhibit 13 (attached to the Dratel
Declaration).  Mr. Kohlmann has described them as "prominent Al Qaeda members" (HA
09950), "one of the world's foremost spokesmen in the West for Osama bin Laden" (HA 08965),
"a recruiter and financier for al Qaeda" (HA 09132), "representatives of terrorist organizations"
(HA 09791), and "people that were connected with al Qaeda" (HA 09803).  *See* Exhibit 14
attached to the Dratel Declaration (collection of transcript excerpts).

In fact, none of the five individuals are members, spokesmen, recruiters, financiers,
representatives, or connected with *al Qaeda*.  Abu Hamza Al-Masri (whose real name is Mostafa
Kamel Mostafa) was an outspoken cleric in London who in May 2014 was convicted in the
Southern District of New York for providing material support for terrorism, among other
charges.  Neither the U.S. nor UK government ever alleged he was a member of *al Qaeda*.  Drs.
Al-Massari and Al-Faqih are Saudi dissidents who live freely in the UK since they were granted
political asylum there in 1994.  Neither of them is a member of *al Qaeda* or any other terrorist
organization.

"practical experience" in intelligence:

> [w]ithin the intelligence community and at the Pentagon,
> Kohlmann, like many of his expert colleagues, is widely
> considered a phony who has somehow ingratiated himself with
> those who want an affable young media resource who will say just
> the right things when it comes to terrorism, keeping the public
> suitably alarmed while exuding a facile expertise.  Does all of that
> taken together make him [Mr. Kohlmann] something less than an
> expert?  Well, it depends on how you define that word, but most
> intelligence professionals would agree that without practical
> experience, he has no idea at all of counter terrorist operations,
> possesses no particular insights, and is not worth listening to.

Philip Giraldi, "Terrorism Experts on Parade," Antiwar.com, available at

<http://original.antiwar.com/giraldi/2011/07/27/terrorism-experts-on-parade/>.

David Miller, professor of sociology at Strathclyde University, adds that Mr. Kohlmann

"appears to have risen almost without trace," given that he has "no expertise beyond an

undergraduate [and] law degree and an internship at a dubious think-tank[.]"[14]  Similarly, Dr.

Sageman, in his expert report submitted for the defense in *Ahmad*, criticized Mr. Kohlmann's

credentials:

> [a]s can be gathered from the above, Mr. Kohlmann and his work
> have very poor standing in both the academic and intelligence
> communities.  He is a tireless selfpromoter, who has published
> very few peer reviewed articles or books.  He is certainly no
> scholar and has no training in any of the social sciences, except for
> some general advice from a teacher when he took an undergraduate
> class in the social sciences as.  I toyed with the idea of
> collaborating with him on an article on the role of the Internet in
> the global neo-Jihadi threat in the fall 2008 – winter 2009 and sent
> him an email outlining my ideas.  We even made a common
> presentation at the United Nations in New York.  However, after

---

[14]  Available at <http://spinwatch.org/index.php/issues/more/item/4138-just-how-expert-are-the-expert-witnesses>.

> noticing the poverty of his contribution and the lack of integrity in
> his work, I quickly dropped the project.  Nevertheless, he is very
> articulate and popular both with juries and the laity as a regular
> commentator on a television channel, and also with prosecutors
> because of his pliable testimony tailored to their theory of a case.

Expert Report of Marc Sageman, M.D., Ph.D., in *Ahmad*, Exhibit 9 to the Dratel Declaration, at

BADEF000169-70.

In a law review article entitled *A Hedgehog on the Witness Stand- What's the Big Idea?*,

59 AM. U. L. REV. 635 (Feb. 2010), Professor Maxine D. Goodman chose Mr. Kohlmann as the

paradigm for an expert witness who exhibits what she describes as hedgehog bias:  "unfaltering

devotion" to one big idea that causes an expert to "instinctively dismiss all contrary, opposing

points[.]" *Id.*, at 670.  Mr. Kohlmann's "single-minded cognitive approach," Prof. Goodman

writes, "may certainly detract from his ability or willingness to recognize contrary evidence or to

accept alternate explanations for an individual's behavior."  *Id.*

Dr. Sageman notes that, "[t]he fact that some academics publicly (as opposed to

privately) criticize Mr. Kohlmann is surprising because most of the time terrorism researchers

simply adopt a polite silence when confronted with a colleague with little scholarly integrity."

Exhibit 9 to the Dratel Declaration, at BADEF000168.

Moreover, as investigative journalist Wesley Yang has noted:

> by agreeing to testify in the trials of nearly every defendant placed
> before him, Kohlmann has earned the reputation among many
> scholars as a "hand for hire," and London School of Economics
> professor Fawaz Gerges puts it, working in the "guilty verdict
> industry."

Wesley Yang, "The Terrorist Search Engine," *New York Magazine*, December 5, 2010, available

at <http://nymag.com/news/features/69920/>.

41

### 7.      Mr. Kohlmann Has a Habit of Selective Reporting, and Distorting and Even Altering Text and Translations

Mr. Kohlmann has also demonstrated a disturbing capacity for selective reporting of information he gathers, and distorting and even altering text and translations in the course of preparing reports and testifying in federal court.  In his expert report in *Ahmad*, Dr. Sageman commented on Mr. Kohlmann's selective reporting that is always geared toward assisting the government's case rather than providing an objective or accurate depiction of events and circumstances.

Regarding the views of Dr. Abdullah Azzam, an essential figure in the context of the Afghan *jihad* against the Soviet Union (and who was killed in a still-unsolved car bomb in Peshawar, Pakistan in 1989), and with respect to Dr. Azzam's attitude toward terrorism, Dr. Sageman, in his expert report in the *Ahmad* case, recalled that

> [m]y personal interactions with Azzam when he was still alive also suggest that he was personally opposed to terrorist tactics.  This is also the opinion of Abdullah Anas, his son-in-law, whom Mr. Kohlmann also knows.  But Mr. Kohlmann fills his report [in *Ahmad*] with quotes that only support the theory of the case of the prosecution that retained him and completely ignores either contradictory evidence or glosses over confusion and nuances, which unfortunately are the norm in terrorism research.  This is not indicative of reliable scientific methodology.  The mystery of the quote without a context needs to be addressed, and not given as representative of Azzam's thought.

BADEF-000180 (Exhibit 9 to the Dratel Declaration).[15]

Dr. Sageman further criticizes Mr. Kohlmann regarding the latter's insistence in his

---

[15]   Nearly every recognized terrorism expert, including, for example, Dr. Sageman, Dr. Fawaz Gerges, Thomas Hegghammer, and Dr. Farrall, believes that Dr. Azzam was opposed to terrorism and that he split from bin Laden long before the formation of al Qaeda.  Ultimately, in *Ahmad*, the government withdrew Mr. Kohlmann as an expert prior to the sentencing hearing.

report in the *Ahmad* case that Dr. Azzam was a "founder" of al Qaeda:

> [i]n late 1984, bin Laden, Azzam and Boudejema Bounoua, an Algerian who called himself Abdullah Anas, created the Makhtab al Khadamat, the Services Bureau.  Abdullah Anas went on to marry Mr. Azzam's daughter and was active in the bureau.  Both Mr. Kohlmann and I know Anas, and we have discussed our respective relationships with Anas.  I visited him several times when I went to London, where he lives.  Anas stayed faithful to Azzam when bin Laden later split away from him.  Anas was very familiar with Azzam's work.  Throughout his report, Mr. Kohlmann mischaracterizes Azzam's work.  This is important in [the *Ahmad*] case because Mr. Ahmad's Azzam Publications took Azzam's name, which indicates some approval for his work at the time.  By intentionally mischaracterizing Azzam's work, Mr. Kohlmann attempts to smear the defendant [Mr. Ahmad].  Mr. Kohlmann should know better through his interviews with Anas.

*Id.*, at BADEF-000177 (citations omitted).[16]

Yet Mr. Kohlmann's misrepresentations go well beyond omitting information that conflicts with his mandate to testify favorably for the government in criminal cases.  In fact, it extends to editing documents to suit that purpose.  For example, in his report in *Ahmad*, Mr. Kohlmann quoted the testimony of Jamal al-Fadl, the principal government witness in the 2001 trial of four defendants charged with complicity in the 1998 *al Qaeda* bombings of the U.S. Embassies in Kenya and Tanzania [*United States v. bin Laden*, 98 Cr. 1023 (LBS)], as follows:

> [w]e went to the hotel for two days and somebody come he give us

---

[16]  In previous testimony, Mr. Kohlmann testified that Azzam Publications was Al-Qaeda's press agency.  *See* Excerpts from Summary of Mr. Kohlmann's Expert Testimony in *International Prosecutors v. Abduladhim Maktouf* (Supreme Court of Bosnia-Herzegovina, 2005) and Expert Report In Re: Operation Niche, attached to the Dratel Declaration as Exhibit 15.  Mr. Kohlmann thereby disregarded the fact that during the period for which discovery was provided in *Ahmad* (February 1997 to November 2001) the word "Al-Qaeda" never appeared in all the 4,111 items of content ever posted on the Azzam Publications or (related) Qoqaz.net websites.  *See also See* Motion *In Limine*, *United States v. Ahmad*, 06 Cr. 194 (JCH) (D. Conn.) (hereinafter "*Ahmad* Motion *In Limine*"), (Dkt. #186-1), at 27-28.

> a little lecture about what going inside the war and about jihad and
> about [Al-Qaida]. . . He tell us about [Al-Qaida] if you go inside
> what you have to do and what going on inside Afghanistan. And
> you have to go inside the guesthouse first to put all your stuff. And
> when you go to the guesthouse you go to take your passport your
> documents your money and [they] save it for you. . . when you go
> inside. . . We went after that we went to the guesthouse and we
> give them – each one he gives them his stuff and they put it in
> envelope and they give you nickname. . . Nickname mean when
> you go for training or you go inside Afghanistan you not going to
> use your true name you going.

*See* Discovery in *United States v. Babar Ahmad*, 06 Cr. 194 (JCH), at Bates No. BA-005747.[17]

Yet examination of the transcript of al-Fadl's testimony reveals that

Mr. Kohlmann had substituted the term "[Al-Qaida]" in each instance in which Mr. al-Fadl had

originally said the words "the rule."  Thus, that same passage of Mr. al-Fadl's testimony (which

was in English) reads in the trial transcript as follows:

A.    We went to the hotel for two days and someone come, he give us a little lecture

about what going inside the war and about jihad and about *the rule*.

Q.    He told you about jihad and what else?

A.    He tell us about *the rule*, if you go inside what you have to do, and what going

on inside Afghanistan.  And you have to go inside the guesthouse first to put all

your stuff.  And when you go to the guesthouse, you go to take your passport, your

documents, your money and save it for you as you're going to tell you more about

*the rule* when you go inside.

*United States v. Usama bin Laden, et al.*, 98 Cr.1023 (LBS) (February 6, 2001), T. 169

---

[17]   As set forth **ante** at n.11, Mr. Kohlmann's report and other discovery material from the
*Ahmad* case, including the *curriculum vitae* Mr. Kohlmann submitted in that case, will be
provided under separate cover as soon as practicable.

(emphasis added).

Dr. Sageman criticized Mr. Kohlmann's substitution of terms in his expert report:

> [Mr. Kohlmann] simply made up a reference to al Qaeda that did not exist in the original.  He substituted al Qaeda for "the rule" (of conduct in Pakistan and Afghanistan).  This does not seem to be an accident because Mr. Kohlmann substituted al Qaeda for the rule twice and when a third reference to "the rule" was present a little later, he simply deleted it again from the text.  Of course this substitution of a very emotionally loaded term "Al-Qaida" for a rather neutral word like "the rule" is extremely prejudicial for a reader.  This seems very deceptive:  falsifying data or making up facts is definitely not part of any scientific methodology.

BADEF-00192-93 (Exhibit 9 to the Dratel Declaration).

Likewise, in testimony in a prior case, Mr. Kohlmann fabricated the meaning of an Arabic word.  In *United States v. Amawi*, 06 Cr. 719 (JGC) (N.D. Ohio), the defendant had a computer file entitled "Jahesteshm" containing a video entitled "Russian Hell."  Mr. Kohlmann, who does not speak or read Arabic, testified that "Jahesteshm" means "Russian Hell" in Arabic:

Q.   Okay.  Now, specifically, I'd like to direct your attention to two files.  The first one I'll, marking right there.  Can you just name that file for the jury?

A.   Yes, in English the title is Russian Hell. In Arabic it is known as Jahesteshm, J-A-H-E-S-T-E-S-H-M, Al-Rusjah. A-L, dash, R-U-S-J-A-H.  Jahesteshm Al-Rusjah means "Russian Hell" in Arabic.  It's, again, a video recording …

Q.   And for Russian Hell Part One, the – what would be – I don't know if you said this or not, but there were – was there a file name called Jahesteshm 1 that's associated with Russian Hell Part One?

A.   Yeah, frequently, when it comes to individuals who are Arabic speakers, when

45

they're dealing with files, with this particular file, instead of being named Russian

Hell, they'll name it Jahesteshm Al-Rusjah or something with Jahesteshm because

that's – Jahesteshm, just means "hell."

*United States v. Amawi et al.*, 06 Cr. 719 (JGC) (N.D. Ohio) (May 21, 2008) (Dkt. #888) T. 149-

50.

However, there is no such word in Arabic as "Jahesteshm."  The word for "Hell" in

Arabic is "Jaheem," and "Russian Hell" is "Jaheem Ar-Roos."  Indeed, Mr. Kohlmann was

aware of that translation, because in his August 2007 report in *United States v. Abu Jihaad*, 07

Cr. 57 (MRK) (D. Conn.), issued nine months before the above exchange at the *Amawi* trial, Mr.

Kohlmann wrote the phrase, "'Jaheem Ar-Roos' (a.k.a. 'Russian Hell Part I,' 'Russian Hell

in Chechnya,' 'Russian Hell in the Year 2000')," thus demonstrating that he knows that

"Jaheem" means "hell" in Arabic.  *See* Mr. Kohlmann's Expert Report in *United States v.*

*Hassan Abu Jihaad*, 07 Cr. 57 (MRK) (D. Conn.), attached to the Dratel Declaration as Exhibit

16, at HA3270.

Similarly, two months later, in October 2007 – again, months before his testimony at the

*Amawi* trial – Mr. Kohlmann wrote in his expert report in the UK's Operation Praline case,

"'Jaheem Ar-Roos' (a.k.a. 'Russian Hell Part I,' 'Russian Hell in Chechnya,' 'Russian Hell in the

Year 2000')."  In his expert report in *Ahmad*, Mr. Kohlmann repeated the same translation.  *See*

Mr. Kohlmann's Report in *Ahmad*, at BA-005771 (to be provided shortly under separate cover).

Only in his testimony in *Amawi*, when it suited his purpose, did Mr. Kohlmann invent a separate

– and incorrect – translation.

In addition, in his report in *Ahmad*, at 27, Mr. Kohlmann quoted eight lines from *The Life*

46

*and Times of Khattab*, the video biography of Chechen insurgent commander Ibn al-Khattab.  In
that video, Mr. Khattab described why his troops entered Dagestan in 1999 to confront the
Russian military.  Astonishingly, Mr. Kohlmann selectively excised all the words spoken by Mr.
Khattab that provided context to his actions, specifically Mr. Khattab's references to hundreds of
Chechen civilians who had been killed by Russian bombing.

The paragraphs below depict in *italics* the passages from Mr. Khattab's oration from the
video that Mr. Kohlmann deleted from his report in *Ahmad*:

> [a]re we supposed to wait for the Russians to come and annihilate
> us and destroy everything?!  *Then the tragedies start and you see
> the victims, the raped women and weeping people.  Oh my brother,*
> we got tired of these charades.
>
> *The wise man understands from a sign the Russians want to enter.
> Problems (subversion) inside Chechnya, explosions, assassination
> attempts.  There were attempts on me and Shamil (Basayev) and
> problems among the Chechens.  All these are caused by the
> Russians.  That was after the Russians had invaded the area of
> Naauor, they crossed the borders and they attacked.*
>
> *Even the year after the war ended, Russian aircraft would fly over
> Grozny and military (reconnaissance) aircraft would fly over the
> camps taking photos.  Is this a finished war?  When an aircraft
> violates the skies of another country, isn't that reason enough for
> war to start between the countries?*
>
> In Dagestan, some villages announced the implementation of the
> Islamic law and they expelled the police.  *Wherever there was
> Police there was robbery, drinking and bribery.  But when the
> brothers obtained authority, expelled the Police and applied
> Islamic law, there was order and people started to come out, and
> bought cars.  They lived a prosperous life.*
>
> And here, if the government seeks the help of the Russians, the
> public will seek the help of the Mujahideen.  And we enter before
> the Russians and be defensive, let the Russians attack and we will
> defend.  That was the idea.

*We had no intention to enter except to give the support but within certain steps and certain arrangements.  If the government or the police in Dagestan want to solve the matter openly that is fine, but* to let the Russian forces enter gives us the right to enter as well.

*The Russian forces entered and the people in Dagestan asked for help.  They said "help us! We have people who are killed and injured."  After that, Islamically, one is not allowed to refuse but must enter and give assistance.*

*We went in and fought the Russians although we did not wish to enter.  After the Russians suffered there and stopped their operations we took the decision to withdraw after conferring amongst ourselves and in one night "As-Salaam alaikum" we went back.*

*Three days immediately after that the Russians besieged Karamakhi and three other villages.  There were 1,000 children and more than 500 women.  By Allah, these people did not participate in an operation.  By Allah, they did nothing.  They did not interfere with politics, they did not interfere with the government.  The Russians besieged them from three sides, bombed them and shelled them with their aircraft.  That is what the Russians do.  And some people began to ask me why (I entered)?  No one questioned the Russians why they entered and did what they did.  Only if the Muslims do anything, people say "why did they do that?  They are mistaken."  This is bizarre!*

Some people said it was our fault, but we could not hold back our support for them.  *We tried all the peaceful methods and there was no solution.  There was no interference from any fighter except after the Russian troops invaded.  The Russian forces entered Botlikh and built a base in the military airport there.  Then they entered the area of Somata and started the attack on the villages which had declared the application of the Islamic law.  And those villages which were composed of large numbers of young Muslims . . ."*

*See The Life and Times of Khattab* video biography (DOJ001242704.mpg) at time-stamp 46:00

to 50:20.

Obviously, the Courts in *Paracha* and later in *Strauss* were unaware of Mr. Kohlmann's

skill with the delete key and [bracketing] when they qualified Mr. Kohlmann despite their

reservations with respect to his lack of a traditionally recognized methodology – and arguably

they would have reached a different conclusion had they known.  *See Paracha*, 2006 WL 12768,

at *20 ("[a]lthough Kohlmann's methodology is not readily subject to testing and permits of no

ready calculation of a concrete error rate, it is more reliable than a simple cherry-picking of

information from websites and other sources.");  *Strauss*, 925 F. Supp.2d at 446 (*Strauss*)

Here, Mr. Kohlmann's report includes a similar sleight of hand.  At page 3, Mr.

Kohlmann's report claims that "[t]he relationship between the Taliban itself and Uzbek,

Chechen, Azeri, and Uighur mujahideen is a symbiotic one that began almost immediately as a

result of mutual interests and mutual adversaries."  *See* Exhibit 3 to the Dratel Declaration.

Interestingly, the Wikipedia entry for the Pakistani Taliban, *Tehrik-i-Taliban Pakistan*

(hereinafter "TTP"), includes the following passage:

> [i]n a May 2010 interview, U.S. Gen. David Petraeus described the
> TTP's relationship with other militant groups as difficult to
> decipher:  "There is clearly *a symbiotic relationship between all of*
> *these different organizations:  al-Qaeda, the Pakistani Taliban, the*
> *Afghan Taliban, TNSM [Tehreek-e-Nafaz-e-Shariat-e-*
> *Mohammadi]*.  And it's very difficult to parse and to try to
> distinguish between them.  They support each other, they
> coordinate with each other, sometimes they compete with each
> other, [and] sometimes they even fight each other.  But at the end
> of the day, there is quite a relationship between them."[]

Available at <https://en.wikipedia.org/wiki/Tehrik-i-Taliban_Pakistan> (emphasis added)

(brackets in original) (footnote omitted).

While Gen. Petraeus and Mr. Kohlmann use the same nuanced term ("symbiotic") to

describe relationships among organizations operating in the Afghanistan-Pakistan region, Mr.

Kohlmann's report omits Gen. Petraeus's qualifying language:  that those relationships are "very difficult to parse out[,]" that the organizations "sometimes compete with each other," and sometimes "even fight with each other."  Thus, Mr. Kohlmann transforms what Gen. Petraeus – whose experience in the region is manifest – regarded as complex and opaque into a simple and categorical declaration – again, to suit the purposes of his engagement as a handsomely paid expert.

Accordingly, Mr. Kohlmann's testimony is not based upon sufficient facts or data.  An expert must consider "enough information to make the proffered opinion reliable," and "adequately account[] for obvious alternative explanations."  *See* Charles Alan Wright, *et al.*, 29 FED. PRAC. & PROC. EVID. § 6266 (2011);  *see also* Fed. R. Evid. 702 Advisory Committee Note;  *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp.2d 213, 238 (S.D.N.Y.2004).  Mr. Kohlmann has demonstrated a pattern of doing neither.

### 8.    *Mr. Kohlmann Has Exaggerated and Even Misstated Certain Aspects of His Professional Career*

Mr. Kohlmann's description of his book, *Al-Qaida's Jihad in Europe:  the Afghan-Bosnian Network*, is also illustrative of his penchant for self-promotional prevarication.  In 2004, Mr. Kohlmann attempted to publish his book but it was rejected by several publishers, include academic presses at Yale and the University of Pennsylvania.  *See* Excerpt from Mr. Kohlmann's December 4, 2007, Trial Testimony in *United States v. Mohamed Mubayyid, et al.*, 05 Cr. 40026 (FDS) (D. Mass.), attached to the Dratel Declaration as Exhibit 17.

For example, in 2003, acting on Mr. Kohlmann's request to publish his book, the University of Pennsylvania Press submitted it for blind peer review to Dr. Sageman, who rejected

50

it on the grounds that it did not meet academic standards.  Dr. Sageman wrote

> I believe a more sensationalistic and less academic press is the best
> venue for this monograph and its (uncompelling) claims.  I don't
> think that Penn is the best place to publish this because its audience
> is clearly a lay person, ready to use it as ammunition to demonize
> al Qaida.  It's not serious academic work, but a rather sloppy
> journalistic one despite the attempt to anchor many of the
> statements on the two or three pieces of evidence he looked at.

Dr. Sageman Report, Exhibit 9 to the Dratel Declaration, at BADEF000172 (citing Dr. Marc

Sageman, email to Peter Agree, University of Pennsylvania Press, June 10, 2003).

Mr. Kohlmann next approached the UK-based Berg Publishers, who agreed to publish it

on the condition that Mr. Kohlmann split the legal costs of publishing with them.  *See* Excerpt

from Mr. Kohlmann's November 28, 2007, Trial Testimony in *United States v. Mohamed*

*Mubayyid, et al.*, 05 Cr. 40026 (FDS) (D. Mass.), attached to the Dratel Declaration as Exhibit

18, at HA09955.  Berg Publishers was the imprint of a company named Oxford International

Publishers Ltd.  *See* Excerpt from Mr. Kohlmann's book, *Al-Qaida's Jihad in Europe:  The*

*Afghan-Bosnian Network*, attached to the Dratel Declaration as Exhibit 19, at HA10113.  Berg

Publishers was not an academic press.  *See* Excerpt from Kohlmann's December 4, 2007,

Testimony in *Mubayyid* (Exhibit 17 to the Dratel Declaration).  Rather, Berg Publishers

published books on "visual and material culture, including fashion and textiles, cultural media

studies, film, art and design, food, sport, and anthropology" and similarly non-academic topics.

*Id*.

Thus, Mr. Kohlmann's book was not subject to peer review by an academic publisher.

*See* Excerpt from Kohlmann's November 28, 2007, Testimony in *Mubayyid*, Exhibit 18 to the

Dratel Declaration, at HA09955.  Nevertheless, Mr. Kohlmann has testified that his book was

peer-reviewed and then published by Oxford University Press when, in fact, Oxford University

Press and Oxford International Publishers Ltd. are completely unrelated.  *See* Excerpt from Mr.

Kohlmann's November 2, 2005, Trial Testimony in *United States v. Uzair Paracha*, 03 Cr. 1197

(SHS) (S.D.N.Y.), attached to the Dratel Declaration as Exhibit 20;  *see also* Exhibit 5 (*Regina v.*

*Al-Bashir Mohammed Al-Faqih*, Woolwich Crown Court, January 23, 2007, T. 21).

        For instance, during the *Daubert* hearing in *United States v. Paracha*, 03 Cr. 1197 (SHS),

Mr. Kohlmann testified that the publisher of  his book was Oxford University Press:

>        A:      [w]ell, it's Oxford University Press.  So it's a university
>
>                publisher, which means it is an academic book.  It is
>
>                designed primarily for use in classrooms, by academics, by
>
>                other experts.  It is not a general reading book.  It is pretty
>
>                thick and it is pretty detailed.  There's over 400 footnotes.
>
>        THE COURT:          Who is Berg Publishing?
>
>        THE WITNESS:        Berg is an imprint of Oxford University Press.

Kohlmann's November 2, 2005, Trial Testimony in *Paracha* (Exhibit 20 to the Dratel

Declaration).

        Of course, that testimony was untrue, and Mr. Kohlmann must have been aware of the

distinction between Oxford Press and Oxford University Press, as the latter is not a vanity press

that requires authors to foot half the cost of publication.  Even if the error was a mistake, that

reflects a carelessness with important facts that wholly undermines Mr. Kohlmann's credibility.

        Still, though, as recently as last year, Mr. Kohlmann cited to his book publisher as "Berg/

Oxford International Press, London, 2004," which is inaccurate.  *See* Mr. Kohlmann's C.V. in

*Ahmad* case, at BA-005736 (to be provided to the Court under separate cover).  According to the title page of Mr. Kohlmann's book, the name of the publisher is "Berg Publishers" and its parent company is "Oxford International Publishers Ltd.," neither of which is based in London. *See* Exhibit 19 to the Dratel Declaration, at HA10113.  Having been caught in this charade by a *Daubert* motion filed in the *Ahmad* case a year ago, Mr. Kohlmann has revised his C.V. so that it currently lists the publisher as "Berg Publishers."  *See* Exhibit 10 to the Dratel Declaration, at 4.

Regarding methodology, like Mr. Kohlmann's report in this case, as set forth **ante**, at 31-34, the book is woefully deficient.  The vast majority is comprised of summaries of tertiary – as opposed to primary or secondary – source material.  Mr. Kohlmann's book contains 872 footnotes, only seven of which cite to primary source material.[18]  Of the remaining footnotes, 42 cite to secondary source material such as court filings, and a staggering 823 cite to tertiary source material such as media articles downloaded from the internet.

Despite this documentary record, Mr. Kohlmann inexplicably has claimed that he neither relies on, nor bases his conclusions and opinions on tertiary sources such as media articles, because they are inherently unreliable.  *See* Exhibit 18 to the Dratel Declaration, at HA09957-58. Nevertheless, 823 out of 872 footnotes in his book, *i.e.*, 94%, cite solely to tertiary source material.  *See also Ahmad* Motion *In Limine*, at 15-18 (discussing the lack of accuracy of the book's contents).

Mr. Kohlmann employment experience consists of work at "several mostly virtual entities, including NEFA (now defunct) and most recently Flashpoint Global Partners.  The

---

[18]  The seven references to primary source material are all based upon a single two-hour interview in 2002 with a cleric in London who was expelled after spending a few weeks with the Mujahideen Brigade in Bosnia.

website of Flashpoint Global Partners describes a staff of three people, the most senior of whom

is Mr. Kohlmann himself, and none has any academic credentials." *See* Dr. Sageman Report,

Exhibit 9 to the Dratel Declaration, at BADEF-000167.  Since graduating from Georgetown, Mr.

Kohlmann has never been employed full-time for anyone other than himself.  *See* Mr.

Kohlmann's C.V. submitted in the *Ahmad* case, at BA-005731 (to be provided under separate

cover). His most consistent source of income appears to be as a government expert/consultant, as

opposed to an independent researcher.[19]

### 9.    *Mr. Kohlmann's Formative Professional Experience With a Now-Ostracized Broadcast Journalist's Firm*

Moreover, Mr. Kohlmann's initial professional experience was with a controversial and

discredited firm.  According to his to his curriculum vitae, Mr. Kohlmann worked as a "Senior

Terrorism Consultant" at The Investigative Project for Terrorism ("IPT") in Washington, D.C.

from 1998 to 2004 while he was an undergraduate student at Georgetown and a law student at the

University of Pennsylvania.

According to his testimony at a 2007 proceeding in the U.K., despite being only in his

---

[19]  In contrast, experts, such as Dr. Marc Sageman, Feliz Kuehn, Alex Strick van Linschoten, and Dr. Leah Farrall, who have been critical of Mr. Kohlmann and his analysis, and served as defense experts last year in the *Ahmad* case in the District of Connecticut, have years of experience in intelligence and law enforcement respectively.  For example, regarding Afghanistan under the Taliban, Mr. Kuehn and Mr. van Linschoten lived in Afghanistan, primarily in the Taliban heartland of Kandahar, full time from 2006-12.  During that period they interviewed hundreds of people, including founders of the Taliban movement.   Both are fluent in all the main languages of Afghanistan and Pakistan, *i.e.*, Pashto, Dari/ Farsi, Urdu, and Arabic. Dr. Farrall spent two-and-a-half years in Egypt conducting field research on al Qaeda, and she has co-authored a book with Mustafa Hamid, an Egyptian Islamist close to al  Qaeda who lived for decades in Afghanistan.  Dr. Sageman was a CIA officer based full-time with the Afghan Task Force in Afghanistan and Pakistan during the 1980's Afghan Jihad against the Soviet Union.  He has worked for Coalition forces in Afghanistan as recently as 2012. *See Ahmad* Motion *In Limine*"), (Dkt. #186-1), at 18 n. 15.

teens, Mr. Kohlmann was named deputy head of IPT:

> Q.    Let us be clear, Mr Kohlmann, you are an 18, 19-year old undergraduate who is
>
> helping with the research for a thinktank, correct?
>
> A.    No, I was basically the deputy head of the organisation.  I was speaking on
>
> television, on nationally televised shows about terrorism on behalf of the
>
> investigative project.  At that point I was testifying – . . .

*Regina v. Al-Bashir Mohammed Al-Faqih*, Woolwich Crown Court, January 23, 2007, T. 20,

attached to the Dratel Declaration at Exhibit 5.

IPT was founded in the 1990's by Steven Emerson, a former freelance journalist and

television correspondent.  Mr. Kohlmann praised IPT and Mr. Emerson in the Acknowledgments

to Mr. Kohlmann's book, *Al-Qaida's Jihad in Europe:  The Afghan-Bosnian Network*:

> I would like to personally thank a number of individuals for their
> invaluable assistance in researching and writing this work.  First
> and foremost, a special thanks goes out to the extraordinarily
> dedicated past and present staff members of the Investigative
> Project, the Washington DC-based counter terrorism think-tank
> founded by *American Jihad* author Steven Emerson in 1995. . . .

Exhibit 19 to the Dratel Declaration, at HA10118.

Yet a 2011 report by the Center for American Progress (CAP) titled *Fear, Inc., the Roots*

*of the Islamophobia at Work in the United States*, included Mr. Emerson on a short list of five

individuals described as "misinformation experts" who promote a "deeply mistaken portrayal of

Islam . . . as an inherently violent ideology[.]"[20]   The work of Emerson and his colleagues, whom

CAP describes as an "Islamophobia network," is characterized by a belief that mainstream Islam

---

[20]   Available at
<http://americanprogress.org/issues/religion/report/2011/08/26/10165/fear-inc/>.

55

is essentially violent and anti-Western and a willingness to misconstrue and even fabricate

evidence to support their larger thesis.

For example, the CAP report referred to the following episodes:

- in the March 1995 issue of The Jewish Monthly, Emerson wrote:

  the level of vitriol against Jews and Christianity within

  contemporary Islam, unfortunately, is something that we are not

  totally cognizant of, or that we don't want to accept.  We don't

  want to accept it because to do so would be to acknowledge that

  one of the world's great religions, which has more than 1.4 billion adherents,

  somehow sanctions genocide, planned genocide, as part of its religious doctrine.[21]

- within hours of the 1995 Oklahoma City bombing (caused by far right Christian

  extremists, not Muslims), Mr. Emerson appeared on the CBS Evening News

  speculating that Muslims were behind the attacks (long before the FBI had

  developed any leads):

  - "[t]his (the bombing) was done with the intent to inflict as many

    casualties as possible.  That is a Middle Eastern trait." (CBS News, April

    19, 1995).[22]

  - "Oklahoma City, I can tell you, is probably considered one of the largest

_____

[21]  John Sugg, "Steven Emerson's Crusade," *Extra!*, the publication of FAIR (Fairness & Accuracy in Reporting), January/February 1999, available at <http://fair.org/extra-online-articles/steven-emersons-crusade/>.

[22]  Available at <http://www.newson6.com/story/12335915/cair-extremism-resurgent-15-years-after-oklahoma-city-bombing>.

centers of Islamic radical activity outside the Middle East." (CBS News, April 19, 1995).[23]

- on July 17, 1996, TWA Flight 800 crashed into the Atlantic Ocean shortly after departing from JFK Airport.  Again, Mr. Emerson was on the airwaves claiming that a bomb, possibly planted by Islamic militants, had brought down the 747.  For instance:

  - Reuters quoted Mr. Emerson saying he was "confident that a bomb brought down the plane."  Mr. Emerson added that the crash could have been a plot by "the permanent floating (Islamic) militant international." (Reuters, July 31, 1996).  "I have no doubt whatsoever, at this point, that it was a bomb that brought down TWA Flight 800 – not a missile, but a bomb . . ."  not a missile, but a bomb . . ." (CNBC, RIVERA LIVE, August 23, 1996).[24]  Subsequently, after an exhaustive investigation, the FBI concluded that no

    evidence of criminal involvement existed with respect to the downing of TWA 800.

- on October 31, 1999, while Mr. Kohlmann was the "deputy head" of the IPT, Egypt Air 990 crashed in the Atlantic Ocean near Nantucket.  Again, Mr. Emerson

---

[23]  Available at <http://www.cair.com/action-alerts/111-pbs-ignores-muslim-concerns.html>.  Not surprisingly, once the authorities arrested Timothy McVeigh CBS no longer used Mr. Emerson's services.

[24]  Available at <https://groups.google.com/forum/#!topic/soc.culture.somalia/gS9Zk2GFh7E>.

publicly suggested the crash was a terrorist attack because the Islamic Declaration

of Faith (*shahadah*) was recorded from the cockpit radio before the crash:

EMERSON:   Well, look, there are lots of reports out of Egypt today about what

the pilot said, or what the relief pilot may have said:  the *Shahada*,

a prayer that someone says.  It's a major tenet of Islam and

sometimes it's said before you commit an act of terrorism . . .

(CTV [Canada Television], November 17, 1999).[25]

It was later established that Egypt Air 990 crashed due to either pilot suicide

unconnected to terrorism, or mechanical failure.

- earlier this year, on Fox News, Mr. Emerson claimed that "[i]n Britain, it's not

just no-go zones, there are actual cities like Birmingham that are totally Muslim

where non-Muslims just simply don't go in."[26]  Those remarks prompted UK

Prime Minister David Cameron to reply, "When I heard this, frankly, I choked on

my porridge and I thought it must be April Fools' day . . .  This guy's clearly a

complete idiot."  *Id.*[27]

In addition, the CAP Report describes a "history of fabricating evidence" by Emerson in

support of his "portraits of Islam as inherently radical," citing specifically a 1997 FBI dossier he

claimed established links between Muslim American organizations and radical Islamist groups.

---

[25]  Available at <https://groups.google.com/forum/#!topic/nyc.general/wJ1iptp3J74>.

[26]  Available at <http://www.theguardian.com/media/2015/jan/12/fox-news-expert-ridiculed-over-birmingham-is-totally-muslim-city-claims>.

[27]  Fox News subsequently apologized for failing to correct Mr. Emerson's misstatements. *See* <http://www.mirror.co.uk/news/uk-news/fox-news-steve-emerson-host-4999556>.

Associated Press reporters later concluded the document was "created by Emerson," a discovery that left them "very, very, very, very leery of using" his work.

### Conclusion

It is respectfully submitted that, in light of the above, a court should be just as leery with respect to qualifying Mr. Kohlmann as an expert.  Mr. Kohlmann is a self-styled expert whose "expertise" has been widely criticized by those within his own field.  His work has not been subjected to the rigors of academic peer review.  He has achieved, though, the status of expert witness in dozens of cases, enabling him to testify repeatedly as a government expert witness. Being an expert at being an expert, however, is precisely what Justice Scalia seemed to have in mind in emphasizing the obligation of district courts to exercise discretion to exclude "expertise that is *fausse* and science that is junky."  *Kumho Tire Co.*, 526 U.S. at 159 (Scalia, J., *concurring*).

Accordingly, it is respectfully submitted that Mr. Hasbajrami's motion to preclude Mr. Kohlmann's testimony, or in the alternative narrow it considerably, be granted.


Dated:   New York, New York
         23 June 2015

Respectfully Submitted,

  /S/ Joshua L. Dratel
JOSHUA L. DRATEL
JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707

MICHAEL BACHRACH
276 Fifth Avenue

59

Suite 501
New York, NY 10001

STEVE ZISSOU
Steve Zissou & Associates
42-40 Bell Blvd., Suite 302
Bayside, NY 11361

*Attorneys for Defendant Agron Hasbajrami*

– Of Counsel –

Joshua L. Dratel
Lindsay A. Lewis
Whitney Schlimbach
Michael Bachrach
Steve Zissou