AO 243 (Rev. 09/17)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ OCT 2 3 2024 ★
BROOKLYN OFFICE

**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| United States District Court | District | |
|---|---|---|
| Name *(under which you were convicted)*: <br> AGRON HASBAJRAMI | | Docket or Case No.: <br> 11-cr-623 |
| Place of Confinement: <br> THOMSON FEDERAL CORRECTIONAL INSTITUTION | Prisoner No.: <br> 65794-053 | |
| UNITED STATES OF AMERICA | Movant *(include name under which convicted)* | |
| V. | AGRON HASBAJRAMI | |

## MOTION

1. (a) Name and location of court which entered the judgment of conviction you are challenging:

   Eastern District of New York

   (b) Criminal docket or case number (if you know): ___11-cr-623___

2. (a) Date of the judgment of conviction (if you know): August 13, 2015

   (b) Date of sentencing: ___August 13, 2015___

3. Length of sentence: 16 years (192 months)

4. Nature of crime (all counts):

   18 U.S.C. 2339A   and   18 U.S.C. §§ 371

5. (a) What was your plea? (Check one)

   (1) Not guilty ☐        (2) Guilty ☒        (3) Nolo contendere (no contest) ☐

6. (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

   18 U.S.C. §§ 2339A; and 18 U.S.C. §§ 371   [Plead Guilty to this.

   Dismissed (S-1) (JG)

6. If you went to trial, what kind of trial did you have? (Check one)    Jury ☐    Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?    Yes ☐    No ☐

AO 243 (Rev. 09/17)

8. Did you appeal from the judgment of conviction?    Yes ☒    No ☐

9. If you did appeal, answer the following:
   (a) Name of court:    U.S. Appeallant Court for the Second Circuit
   (b) Docket or case number (if you know):    15-2684-cr-(L), 17-2669-cr-(CON).
   (c) Result:    Remanded.
   (d) Date of result (if you know):    December 19, 2019
   (e) Citation to the case (if you know):    945 F.3d 641; 2019 U.S. App. LEXIS 37583
   (f) Grounds raised:

   (g) Did you file a petition for certiorari in the United States Supreme Court?    Yes ☐    No ☒
      If "Yes," answer the following:
      (1) Docket or case number (if you know): _____
      (2) Result: _____

      (3) Date of result (if you know): _____
      (4) Citation to the case (if you know): _____
      (5) Grounds raised:

                                    N/A

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?
    Yes ☐    No ☒

11. If your answer to Question 10 was "Yes," give the following information:
    (a) (1) Name of court: _____
        (2) Docket or case number (if you know): _____
        (3) Date of filing (if you know): _____

                                    N/A

AO 243 (Rev. 09/17)

(4) Nature of the proceeding: _____

(5) Grounds raised:

N/A

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?

    Yes ☐    No ☒

(7) Result: _____

(8) Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court: _____

(2) Docket of case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised:

N/A

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?

    Yes ☐    No ☐

(7) Result:         N/A

(8) Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition:    Yes ☐    No ☐

(2) Second petition:    Yes ☐    No ☐

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

N/A

AO 243 (Rev. 09/17)

12.   For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:**                          INEFFECTIVE ASSISTANCE OF COUNSEL

                                         FAILURE TO INFORM

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Petitioner counsel failed to inform the Petitioner that
Tehriki Taliban Pakistan (TTP) was not a designated Terrorist
organization at the time of the investigation started.

(b)  **Direct Appeal of Ground One:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☒

(2)   If you did not raise this issue in your direct appeal, explain why:

Petitioner counsel failed to raised the issue.

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☒

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

N/A

(3)   Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

AO 243 (Rev. 09/17)

    (4)  Did you appeal from the denial of your motion, petition, or application?

         Yes ☐     No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

         Yes ☐     No ☐

N/A

    (6)  If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available):

    _____

    (7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

N/A

**GROUND TWO:**                  PROSECUTORIAL MISCONDUCT

    (a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

        The Government **withheld evidence** [information] that was **favorable** to the petitioner's defense.

    (b)  **Direct Appeal of Ground Two:**

        (1)  If you appealed from the judgment of conviction, did you raise this issue?

             Yes ☐     No ☒

AO 243 (Rev. 09/17)

(2)  If you did not raise this issue in your direct appeal, explain why:

`Petitioner's counsel failed to raise the issue.`

(c)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☐

(2)  If you answer to Question (c)(1) is "Yes," state:          N/A

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

N/A

_____

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐    No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐    No ☐          N/A

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

N/A

_____

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

N/A

AO 243 (Rev. 09/17)

**GROUND THREE:** INEFFECTIVE ASSISTANCE OF COUNSEL

ADVISE TO PLEAD GUILTY

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

1.) Individual #1. He was not in fact a Terrorist (PSR).

2.) There is no conspiracy.

3.) They had proof problems, they had evidentiary problems and they had legal problems.

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☒

(2) If you did not raise this issue in your direct appeal, explain why:

Petitioner counsel failed to raised the issue on appeal.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☒

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

N/A

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

N/A

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐    No ☐        N/A

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐    No ☐

AO 243 (Rev. 09/17)

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

N/A

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

N/A

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

N/A

**GROUND FOUR:**                    COURT VIOLATED RULE 11(e)(1)

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

　　　1.) Court order
　　　2.) Hearing transcript: Participating in plea negotiations
　　　3.) "Thats why I suggested that you extend the same bargain" (Sentencing Transcript 08/13/2015)

(b)  **Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☒

(2)   If you did not raise this issue in your direct appeal, explain why:

Petitioner counsel fail to raise issue on appeal.

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☐

N/A

(2)   If you answer to Question (c)(1) is "Yes," state:

AO 243 (Rev. 09/17)

Type of motion or petition: _____ N/A _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

N/A

(3) Did you receive a hearing on your motion, petition, or application?

Yes [ ]    No [ ]

(4) Did you appeal from the denial of your motion, petition, or application?

Yes [ ]    No [ ]

N/A

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes [ ]    No [ ]

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

N/A

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

N/A

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

Ground #1, #2, #3 and #4. Petitioner's counsel was ineffective and in violation of the Sixth Amendment of the constitution.

AO 243 (Rev. 09/17)

14. Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the you are challenging?    Yes ☐    No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

N/A

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At the preliminary hearing:

(b) At the arraignment and plea: Micheal k. Bachrach, 276 5th Ave., Ste. 501, NY, NY 10001
Joshua L. Dratel, 2 Wall Street, 3rd Fl., NY, NY  10005.

(c) At the trial:

(d) At sentencing: Joshua L. Dratel, 2 Wall Street, 3rd Fl., NY, NY  10005.
Steven Zissou & Associates, 4240 Bell Blvd. Ste. 302, Bayside, NY.  11361

(e) On appeal:         SAME ATTORNEYS AS LISTED IN (b) ABOVE.

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:

SAME ATTORNEYS AS LISTED IN (b) ABOVE.

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?    Yes ☐    No ☒

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?    Yes ☐    No ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

N/A

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?    Yes ☐    No ☐

AO 243 (Rev. 09/17)

18.  TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain
     why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

THE ONE-YEAR STATUTE OF LIMITATIONS AS CONTAINED IN

28 U.S.C.§ 2255 DOES NOT BAR PETITIONER'S MOTION

BECAUSE THE CASE WAS REMANDED BACK TO THE DISTRICT COURT

IN DECEMBER 2019 AND WAS JUST DECIDED ON

MAY 1ST, 2024.

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255,
paragraph 6, provides in part that:
    A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run
from the latest of –
    (1)  the date on which the judgment of conviction became final;
    (2)  the date on which the impediment to making a motion created by governmental action in violation of
    the Constitution or laws of the United States is removed, if the movant was prevented from making such a
    motion by such governmental action;
    (3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has
    been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral
    review; or
    (4)  the date on which the facts supporting the claim or claims presented could have been discovered
    through the exercise of due diligence.

AO 243 (Rev. 09/17)

Therefore, movant asks that the Court grant the following relief:

for the court to vacate the sentence and conviction.

or any other relief to which movant may be entitled.

N/A
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on     October 15 , 2024.
(month, date, year)

Executed (signed) on     OCTOBER 15 , 2024.         (date)

Signature of Movant
Agron Hasbajrami, #65794-053

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

MEMORANDUM OF LAW
IN SUPPORT OF


# AGRON  HASBAJRAMI


2255 MOTION


## INTRODUCTION

The facts giving rise to this petition, set forth in greater detail below, are quite extraordinary. On April 20, 2023, Petitioner became aware of the existence of 82,568 pages of records subject to the FOIPA by FBI. Also, in April of 2024, the Petitioner was "INDIRECTLY" informed by his attorney (Dratel) that Tehriki Taliban Pakistan (TTP) was not designated a Foreign Terrorist Organization (FTO) until September of 2010. Moreover, in September of 2024, the Petitioner, a layman in law, became aware of Rule 11(e)(1), which was violated by court.


In light of these facts, Petitioner moves to vacate, set aside his sentence and conviction pursuant to 28 U.S.C. 2255 on the grounds of Ineffective Assistance of Counsel, Prosecutorial Misconduct and Violation of Rule 11(e)(1) by the court.

Accodingly, Petitioner respectfully requests from this court that his 2255 motion be GRANTED.

## STATEMENTS OF FACTS

1.) Petitioner, Agron Hasbajrami, was arrested on September 6, 2011 and charged with one count of Provision of Material Support to Terrorist, in violation of 18 U.S.C. §§2339A(a),2. See Sealed Indictment, dated, September 8, 2011.

2.) On January 26, 2012, after he fired his attorneys, Hasbajrami was charged with three counts of Provision and One Count of Attempt to Provide Material Support to Terrorists, all in violation of 18 U.S.C. §§2339A(a),2. See Superseding Indictment(S-1).

3.) On April 12, 2012, Hasbajrami pleaded guilty to Count Two-Attempt to Provide Material Support to Terrorist, and Count One, Three and Four of indictment were dismissed.

4.) On January 8, 2013, Hasbajrami was sentenced to 15 years in prison by Judge Gleeson.

5.) In July of 2013, Hasbajrami filed a 2255 Motion.

6.) On February 24, 2014, the Government provided Hasbajrami with notice for the very first time that it had relied upon warrantless Section 702 surveillance.

7.) On October 2, 2014, District Court vacated the sentence in part of DOJ policy which deprived Hasbajrami of his ability to make an intelligent decision about whether to plead guilty.

8.) On February 20, 2015, Judge Gleeson denied the motion to supress the fruits of FAA surveillance.

1

9.) On June 26, 2015, one day before Jury selection, Hasbajrami entered a conditional guilty plea to a two-count superseding Indictment (SS-2) charging him with one count of Provision and Attempted Provision of Material Support to Terrorist in violation of 18 U.S.C. §§2339A(a) and 2, and one count of Conspiracy to Provide Material Support to Terrorists in violation of 18 U.S.C. §§371.

10.) On July 20, 2015, Hasbajrami filed a Motion to Withdraw Plea of Guilt.

11.) On August 6, 2015, District Court denied the Motion to Withdraw Plea of Guilt.

12.) On August 13, 2015, Hasbajrami was re-sentenced to 16 years.

13.) Subsequently, Hasbajrami filed the appeal.

14.) On December 18, 2019, Second Circuit remanded the case.

15.) On May 1, 2024, this court denied Supplemental Motion to Supress.

16.) Now, Hasbajrami, in light of new information he recently became aware of, he moves to vacate, set aside his sentence and conviction pursuant to 28 U.S.C. §§2255 and respectfully asks this court that his 2255 Motion be GRANTED.


## LEGAL STANDARD

Second Circuit has held on several occasions that "[A] collateral attack on a final judgment in a federal criminal case is generally available under §§2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"

2

Hill v. United States, 368 U.S. 424, 428, 7 L.Ed.2d 417, 82 S. Ct. 468 (1962); see Napoli v. United States, 32 F.3d 51, 35 (2d Cir. 1994); Hardy v. United States, 878 F.2d 94, 97 (2d Cir. 1989); United States v. Bukun, 73 F.3d 8, 12 (2d Cir. 1995); United States v. Hoskins, 905 F.3d 97, 102 (2d Cir. 2018). The reasons for a narrowly limiting the relief permitted under §§2255--a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place-are "well known and basic to our adversary system of justice." United States v. Addonizio, 442 U.S. 178, 184 n.11, 60 L.Ed.2d 805, 94 S. Ct. 2235 (1979).

## A. Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel "may appropriately be raised for the first time on Section 2255 Motion, whether or not the petitioner could have raised the claim on direct appeal." Harrington v. United States, 689 F.3d 124, 129 (2d Cir. 2012) (quoting Massaro v. United States, 538 U.S. 500, 504-509, 123 S. Ct. 1690, 155 L.Ed.2d 714 (2003)). Ineffective Assistance of Counsel violates a criminal defendant's constitutional [2024 U.S. Dist. Lexis 5] rights, creating the possibility for relief under 28 U.S.C. §§2255. see Morales v. United States, 635 F.3d 39, 43 (2d Cir. 2011).

## B. Prosecutorial Misconduct

An exception to present a claim exists "if the defendant establishes (1) cause for the procedural default and ensuring prejudice or (2) actual innocence." United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011); see Bousley v. United States, 523 U.S. 614, 622, 118 S. Ct. 1604, 140 L.Ed.2d 828 (1998).

Several courts and commentators maintain that a prosecutor may not withhold exculpatory evidence from a defendant during plea negotiations on the ground that such information is vital

to enable the defendant to intelligently decide whether to plead guilty. Failure to disclose such evidence has resulted in vacating otherwise valid guilty pleas. Ferrara v. U.S., 456 F.3d 278, 293 (1st Cir. 2006) ("government's nondisclosure so outrageous that it constituted impermissible misconduct sufficient to ground the petitioner's claim that his guilty plea was involuntary"); Bousley v. United States, 523 U.S. 614 (1998) (" in extraordinary circumstances where the defendant has been induced to plead guilty by egregious...or other serious misconduct a court may find that the defendant was deprived of his ability to plead guilty voluntarily").

## C. Violation of Rule 11(e)(1)

Courts that have construed Rule 11 have uniformly held that it means what it says: the court shall not participate in any plea agreement negotiations. Accordingly, when a district court express-es its preference for or against certain plea-bargaining terms in an unfinalized or hypothetical plea agreement, the court impermissibly participates in plea negotiations in violation of Rule 11. In sum, Rule 11 contains a clear prohibition on judic-ial involvement in plea discussions. See Diaz, 138 F.3d at 1363. (finding a Rule 11 violation "because the sentencing judge took an active part in discussing [the defendant's] probable sentence before the time of his conviction and because she commented on the weight and nature of the evidence against him").

Section 2255 provides that a district court should grant a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoners is entitled to no relief." 28 U.S.C. §§2255(b).

4

<u>ARGUMENT</u>

1) Ineffective Assistance of Counsel : Failure to Inform

At the end of April 2024, upon Hasbajrami's request, he received a copy of the sentencing memo, that his attorney Dratel filed on.<u>U.S. v Babar Ahmad</u> 3:04cr301 (JCH) (U.S.D.C.) (Exhibit1).

Astonishingly, after 13 years of his incarceration, in that memo he discovered that Tehriki Taliban Pakistan (TTP) was <u>NOT</u> designated as a Foreign Terrorist Organization (FTO) until Sept. of 2010

Notably, it's known in the discovery pg 42 + 122 that individual #1 was affiliated with TTP, and the investigation started in June of 2010. (Sealed Indictment). The government's case against Hasbajrami has been, that it arose from an incidental wiretap, meaning that the Individual #1 was the main "Target" of section 702 of FISA.

The fact is that individual #1 was <u>NOT</u> and can <u>NOT</u> be the "Target" on or prior June of 2010, when his group was NOT designated as a FTO yet. Also, it is a fact that individual #1 was <u>NOT</u> the "Target" in beginning of 2010 (detention order doc #3, pg 3, 9/9/11) because he was "<u>incarcerated</u>" in Turkey from April 2009 until January 2010. (discovery pg 463-464). (Exhibit 2).

Unequivocally, this exculpatory information debunks government's long standing claim, and it asserts that Hasbajrami was the main "Target" of section 702 of FISA. Government's argument holds no water. Simply put, the government has no case. Most likely, this is exactly what his ex-lead attorney Zissou meant in sentencing hearing on January 8, 2013:

> "For all your honor knows, they had proof problems,
> they had evidentiary problems, they had legal problems.
> The possibilities are endless, and I don't think it's

a place where your honor should go." (sentencing transcript 1-8-13 pg 23)

What more "proof, evidentary, legal problems" can be than this one?!¨This is none other than a repeated "Failure to Inform" of ineffective counsel(s). The first time, occurred when they failed to inform him that:

> "There is information to suggest that individual #1 was not in fact a terrorist, and that he solicited funds from the defendant for purposes unrelated to terrorism." (2/6/13 (PSR)).

prior to me entering a plea agreement in 2012.

Designation of TTP as a FTO it can easily be found in Department of State's website or in the motion my attorney, Dratel, filed. Accordingly, his attorney(s) were well aware of it and failed to inform him "Twice" before the "Two (2)" plea agreements that he entered. Moreover, this disclosure of information would have changed the landscape of this case and eventually of his life. For this reason they never litigated that Hasbajrami was the main "Target" of section 702 of FISA, neither in District Court nor Appellate court.

Had Hasbajrami known this information he would have never ever entered any plea agreement. ("but for counsel's errors [the defendant] would have not pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59); (there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 US 668 at 694, 104 S. Ct. 2052, 80 L.Ed.2d 674; US v. Resnick, 745 F.2d 1179 at 1187-88); (counsel's advise concerning a plea offer may be ineffective if it is "so incorrect and so insufficient that it undermined the defendant's ability to make an intelligent decision." Day, 964 F.2d at 43).

6

Subsequently, failure to inform him of this information renders them ineffective and violates his Sixth Amendment's right. (Made errors so serious as to fail to function as counsel guaranteed by the Sixth Amendment. Strickland, 466 US at 687-89); US v. Bui, 769 F.3d 831 (3rd Cir. 2014) ("records clearly indicated that defendant's counsel provided him with incorrect advice and defendant was prejudiced."); Dela Rosa v. Myrick, 2021 U.S. App. Lexis 24803 (9th Cir. Aug. 19, 2021) (counsel was ineffective in "fail[ing] to accurate advise Dela Rosa); Bousley v. U.S. 523 US 614 (1998) ("in extraordinary circumstances where the defendant has been induced to plead guilty by egregious misrepresentations...court may find that the defendant was deprived of his ability to plead guilty voluntarily").

Ineffective assistance of counsel "may render a guilty plea involuntary and hence invalid." Ventura v. Meachum, 957 F.2d 1048, 1058 (2d Cir. 1992). The same is true here.

2) Prosecutorial Misconduct

On February 7, 2023, Hasbajrami was informed that the FBI located 9,200 pages of records subject to the FOIPA, pursuant to my request. Subsequently, on April 20, 2023, he was then informed that the FBI had located 82,568 pages of records subject to the FOIPA. This information has been disclosed to him after 12 years of his incarceration. (Exhibit 3).

At the time he pleaded guilty, the government had disclosed in the ballpark of 1,300 pages of discovery. The difference between the FBI and AUSA's records is enormous. The FBI is willing to disclose more records than AUSA. Common sense begs the question: What is AUSA hiding?!

Remarkably, the government has a record of misconduct in this case as noted by Judge Gleeson when he vacated the guilty plea. U.S. v. Hasbajrami, 2014 WL 4954596 (EDNY, Oct. 2, 2014). (...The government's misleading pre-plea notice in this case

7

prevented Hasbajrami from knowing about availability of this legal
argument...I conclude that he was not sufficiently informed about
the facts.)

First, certainly, one of the evidences in FBI's records is/
includes the designation of TTP as a FTO in September of 2010 -
an exculpatory evidence - as noted in Exhibit 1. Second, most
significantly, the government has never disclosed any discovery
on their first 7 month (June 2010 - February 2011) of a total 14
month FBI investigation. Arguendo, the government maintains that
this case arose from incidental wiretap, and yet, on the other
hand, they don't disclose any discovery from the beginning of the
investigation so Hasbajrami can litigate his counter argument
as he was the main "Target".

Unequivocally, this is prosecutorial misconduct. Absolutely,
non-disclosure of these records constitutes a prosecutorial
misconduct. Ferrara v. U.S., 456 F.3d 281-86 (1st Cir. 2006)
(members of prosecution knowingly withheld and then manipulated
evidence that the defendant had not ordered a murder he plead
guilty to committing.)

Without a doubt, had Hasbajrami been aware of these enormous
records he would have NOT pleaded guilty. Mathew v. Johnson, 201
F.3d 353, 364 (5th Cir. 2000) (noting that there maybe situations
in which the prosecution's failure to disclose evidence makes it
"impossible for [a defendant] to enter a knowing and intelligent
plea"); US v. Avellino, 136 F.3d 249 (2d Cir. 1998) ("government's
obligation to make [Brady] disclosures is pertinent not only to
an accused's preparation for trial but also to his determination
to plead guilty"); Sanchez v. US, 50 F.3d 1448 (9th Cir. 1995)
("a waiver cannot be deemed intelligent and voluntary if entered
without knowledge of material information withheld by the pros-
ecution"); Ferrara v. US, 456 F.3d 278, 293 (1st Cir. 2006)
("government's nondisclosure so outrageous that it constituted
impermissible misconduct sufficient to ground petitioner's claim
that his guilty plea was involuntary"). see also People v. Pilotti,

8

127 A.D. 2d 23, 511 N.Y.S. 2d 248 (1sy Dep't 1987); Ex parte
Lexis, 587 S.W. 2d 697 (Tex. Crim. App. 1979); Lee v. State, 573
S.W.2d 131 (Mo. Ct. App. 1978); Ashley v. State of Tex., 319 F.2d
80 (5th Cir. 1963). see also Matter of Bear, 578 S.W.2d 928 (Mo.
1979) (private prosecutors reprimanded by Missouri court for erasing
tape recording); US v. Hasbajrami 2014 WL 4954596 (EDNY, Oct. 2,
2014) (Hasbajrami seem to have been misled about a fact he consi-
dered important in deciding how to plead); Bousley v. US, 523 US
614 (1998) ("in extraordinary circumstances where the defendant
has been induced to plead guilty by egregious...or other serious
misconduct a court may find that the defendant was deprived of
his ability to plead guilty voluntarily")

The only justifiable remedy for this misconduct would be the
vacation of guilty plea and sentence. US v. Piscano, 459 F.2d
259 (2d Cir. 1972), judgment vacated, 417 US 903, 94 S. Ct. 2597,
41 L.Ed.2d 208 (1974)

Respectfully, vacatur of sentence and guilty plea is
warranted here.

3) Ineffective Assistance of Counsel: Advise to Plead Guilty

On February 20, 2015 Judge Gleeson issued the following order:

>"Order as to Agron Hasbajrami. The defendant's motion
>to suppress the fruits of FAA surveillance...is denied.
>...A status conference will be held on Friday, February
>27, 2015 at 3:30 PM. At that conference, the court will
>inquire of the government whether it intends to offer
>once again the charge bargain that was previously
>accepted by the defendant, and whether it has considered
>the prospect of allowing the defendant to enter such
>a plea pursuant to Rule 11(a)(2), reserving his right
>to seek appeallate review of my denial of the motion
>to supress evidence. Order by Judge Gleeson on 2/20/2015."

The last part of the order regarding the inquiry of a plea contradicts the judge's statements in sentencing hearing:

> "...if it was to my own devices, if I was the prosecutor, I wouldn't have given you this deal, based on what I know, but I'm sure there is more. I think a greater sentence is more appropriate (pg 34)...But in my judgment, as painful as it is to impose a 15-year sentence on you, the young man that you are with a lot of promise, in my judgment, that sentence is certainly no greater than necessary, maybe not suff± icient to reflect the seriousness of your crime, but accepting the plea agreement. I can't go higher (pg 35) (sentencing transcript, 1/8/13)."

The following unraveled in the next court hearing:

> "The Court: Okay. I put this on because I have denied the motion to suppress and in the docket entry doing so gave you some food for thought. I thought I'd touch base with you on your thoughts about how we're going to proceed...Now we've gotten a resolution and I wonder what you think, that's why I asked you. Maybe you can share that with me.

> Mr. Zissou: ...so it makes sense, obviously...it's obvious that our view is we would embrace your honor's suggestion. We think it's a fair one, to be sure, and I'd certainly recommended it to him... but just as a counsel, we think that it was a reasonable and prudent one that the court suggest. We think it's fair, and our recommen- dation is for him to accept it. And we would encourage the government to make it available.

> Mr. DuCharme: ...I think you know, to the extent that we're going to make another plea offer. I think

10

> we can make that relatively soon, we have
> a decision maybe in the next couple of weeks.
> To see whether or not it makes sense to proceed
> to trial or not...I'm reluctant...the case
> could be resolved by plea. (pg 2, 3, 4)
> (hearing transcript 3/2/15)."

Since AUSA Mr. DuCharme was reluctant that the case would be resolved by plea and in order to avoid being excoriated and embarrased by Judge Gleeson again, AUSA Mr. DuCharme asked the counsel to ACT as if the defendant was asking the government to extend a higher-plea than 15 years. On May 27, 2015, counsel, Mr. Bachrach, as he covertly has agreed with AUSA DuCharme begged the government, in front of the court, to offer 20 year plea agreement (hearing transcript  5/27/15).

As mentioned above, it was the intention of the Judge, Counsel, and AUSA's into forcing me to enter a plea, and nowhere does it appear that Hasbajrami was interested in a plea. A ploy was being concocted by 3 parties. Since his attorney were so keen in pursuing the court's interest and not his, their consultations always revolved around entering a plea agreement.

Remarkably, Mr. Bachrach, stated in one of the attorney-client meetings that, "There is no defense in your case", and neither did he discuss any possible defense strategies. Heard v. Addison, 728 F.3d 1170 (10 Cir. 2013) (counsel "provided ineffective assistance in failing to advise [Heard] of viable defenses to the charges against him, and...but for counsel's deficient performance, Heard would not have pled guilty to these offenses"). The "[i]nformed evaluation of potential defenses to criminal charges" is a cornerstone of effective assistance of counsel. Mitchell, 762 F.2d at 889 (quoting Gaines v. Hopper, 557 F.2d 1147, 1149-50 (5th Cir. 1978); Moore v. Bryant, 348 F.3d 238 (7th Cir. 2003) ("...the attorney has failed to engage in the type of good-faith analysis of the relevant facts and applicable legal prinsiples" that effective assistance requires).

11

Technically, if "they had proof problems, they had eviden-
tiary problems, they had legal problems" (sentencing transcript
1/8/13 pg 23) which were never discussed with him; then, there
must be a defense. Two Lead attorneys told him; Ex-Lead attorney
Zissou: "I can win this case. There is nothing here." and current-
ly Lead attorney Dratel: "If you go to trial, 75% you will win
this case." Yet, Mr. Bachrach can't find even one(1) defense.
Conversely, the one who doesn't have a defense is the government
because with all these "Problems" there is no case.

The most basic requirement of effective assistance under
the Sixth Amendment is correct, timely advice about elements
the prosecution must prove to obtain a conviction, how the pro-
secution will try to match the facts to the elements and what
consequences are likely to follow at trial and at sentencing.
Advice of that nature is the whole point of having legally,
trained and professionally licensed counsel. My attorney failed
this requirement, rendering himself ineffective. Ivy v. Caspari,
173 F.3d 1136 (8th Cir. 1999) (counsel failed to give adequate
explanation of elements of offense).

Not to forget that it was his counsel, Dratel, on his "First"
attorney-client visit to advise Hasbajrami to plead guilty. A
brilliant advice for an effective counsel without even looking
at the evidences. Thus, rendering himself ineffective. US v.
Shepheard, 880 F.3d 734 (5th Cir. 2018) (counsel was ineffective
in advising accused to plead guilty.)

Distinctively, the plea Hasbajrami entered is worse than
the first plea because he was compelled to admit to charges
he's NOT GUILTY of such as: "Material Support" and "Conspiracy"
where it is clear that, "individual #1 was not in fact a Terror-
ist" (PSR) and he can't conspire with himself. ("There must be
at least 2 people to have a conspiracy and if you had gone to
trial and the government was unable to prove that there was at
least one other person who you conspire with, the jury would
have to find you not guilty of the counts of the indictment that

12

charges a conspiracy) (Exhibit 4). (Court:...you can't commit a conspiracy by yourself. Guilty Plea Transcript pg 31, 6/26/15). Nor can it be a conspiracy with the government's "CS" who set him up in the last days of the investigation.

On top of that, "they had proof...evidentiary...legal problems" (sentencing transcript 1/8/13, pg 23). Yet his attorney would, "Recommend it (plea) to him..." and "Encourage the government to make it available" (hearing transcript 3/2/15 pg 3, 4), when there is no case to begin with.

In sum, these are the undeniable facts:

1) Individual #1 was not in fact a terrorist (PSR)

2) There is no conspiracy (Exhibit 4)

3) They had proof...evidentiary...legal problems sentencing transcript 1/8/13 pg 23)

Despite all these facts his attorney(s) made him plead guilty and didn't proceed to trial. Furthermore, his attorneys refused to file a Motion to Dismiss the indictment, upon his request during pretrial motions.

In sum and substance, his attorney(s) "Only" interest laid in fulfilling Judge Gleeson's 02/20/15 order and helping the government get away with Section 702 of FISA. At least, in the first plea, Hasbajrami pleaded guilty to "Attempt" but on the second plea he was made to admit to more serious charges, "Material Support" and "Conspiracy, 18 USC 371" which he was never charged with in neither Sealed Indictment nor in SS-1. The worst possible outcome if he had gone to trial, he'd "May be" found guilty in "Attempt", but at least, the records would have been accessible for Secound Circuit and would have been NO need for remand.

13

In short, Hasbajrami didn't gain any benefit from this plea, government did. <u>United States v. Bui</u>, 795 F.3d 363 (3rd Cir. 2015) ("there is a reasonable probability that, but for counsel error, he would not have pled guilty" because Bui " gained no benefit from his plea agreement"); <u>US v. Jaeger</u>, 2010 US. Dist. 60274 (The record shows that Jaeger received advice "so incorrect and so insufficient that it undermined his ability to make an intelligent decision"); <u>US v. Shepherd</u>, 800 F.3d 734 (5th Cir. 2018) (counsel was ineffective in advising accused to plead guilty); <u>US v. Bui</u>, 769 F.3d 831 (3d Cir. 2014) ("records clearly indicated that defendant's counsel provided him with incorrect advice...and defendant was prejudiced.")

Finally, nothing can be further from the truth than his attorney's (Dratel) own statement regarding the plea:

> "I'm not sure that he has absorbed that totally or is convinced of that and he's not unjustifiably distrusting of the situation...And I think to a certain extent, and maybe <u>this is counsel's fault</u>..." (sentencing transcript, 08/13/15, pg 7).

As his attorney admitted, the counsels were ineffective in advising him to plead guilty. Thus, vacatur of sentence and guilty plea is warranted.

4) Court Violated Rule 11(e)(1)

On February 20, 2015, Judge Gleeson issued the following order:

> "...A status conference will be held on Friday, February 27, 2015 at 3:30 PM. At that conference the court will inquire of the government whether it intends to offer once again the charge bargain that was previously accepted by the defendant, and whether it has considered the prospect of allowing the defendant

14

to enter such a plea pursuant to Rule 11(a)(2), reserving his right to seek appellate review of my denial of the motion to suppress evidence. Order by Judge Gleeson on 2/20/2015."

The following unraveled in the next court hearing:

"The court: Okay. I put this on because I have denied the motion to suppress and in the docket entry doing so gave you some food for thought. I thought I'd touch base with you on your thoughts about how we're going to proceed...Now we've gotten a resolution and I wonder what you think, that's why I asked you. Maybe you can share that with me." (hearing transcript 3/2/15 pg 2)

On sentencing hearing court stated the following:

"...I have no doubt that I'm empowered to impose the greater sentence that I suggested was appropriate the last time around. I just don't think it is fair, that's why I suggested that you extend the same bargain after I denied the motion to suppress. Fair is fair. He got the deal." (sentencing transcript 08/13/15, pg 16-17)

Federal Rule of Ciminal Procedure 11(e)(1), which allows the government and the defendant to negotiate a plea bargain, ends with the following explicit sentence: "The court shall not participate in any such discussions."

1974 Amendment of Rule 11 which became effective December 1, 1975 states:

Subdivision(e)(1) prohibits the court from participating in plea discussions. This is the position of ABA standards Relating to Please of Guilty §3.3(a) (Approved Draft, 1968)

15

Such Involvement makes it difficult for a judge to objectively assess the voluntariness of the plea. See ABA standards Relating to Please of Guilty §3.3(a) Commentary at 72-74 (Approved Draft, 1968)

"The commentaries regarding this injunction, and consideration of it's intendment, leave no room for any discussion or communication regarding the sentence to be imposed prior to the entry of a plea of guilty or conviction, or sub-mission to him of a plea agreement." Werker, 535 F.2d at 201. See ABA Standards Relating to Pleas of Guilty §3.3(a), Commentary at 72-74 (1968)

"Under Rule 11, the judge's role is limited to acceptance or rejection of the plea agreement after a thorough review of the relevant factors; the judge shall not participate in the plea bargaining process." Harris, 635 F.2d 526, 528 (6th Cir. 1980)

Rule 11 absolutely prohibits judicial involvement of any form in plea negotiations, an interpretation that is widely held among circuit courts. Barrett, 982 F.2d at 195; see e.g. United States v. Baker, 489 F.3d 366, 373, 376 U.S. App. D.C. 358 (D.C. Cir. 2007); United States v. Cano-Varela, 497 F.3d 1122, 1132 (10th Cir. 2007); United States v. Bradley, 455 F.3d 453, 460 (4th Cir. 2006); United States v. Miles, 10 F.3d 1135, 1139 (5th Cir. 1993); United States v. Fleming, 239 F.3d 761, 765 (6th Cir. 2001); In re Benvin, 791 F.3d at 1103 ("the court's sugg-estion that the parties add a particular term to the plea agree-ment constitutes impermissible involvement"); United States v. Harrell, 751 F.3d 1235, 1239 (11th Cir. 2014) (finding a Rule 11 violation because a court's pre-plea agreement suggestions are improper "indications of what the judge will accept"); United States v. Pena, 720 F.3d 561, 570-73 (5th Cir. 2013) (finding that a court's comments on a hypothetical plea agree-ment violated Rule 11); ("the judge must refrain from all forms of plea discussions.") Adams, 634 F.2d at 835. Rule 11(e)(1)

16

bars a judge from participating in plea bargaining for three main reasons.

First, Rule 11 protects the <u>integrity</u> of the judicial process. "The Rule is based on the sound principle that the interests of justice are best served if the judge remains aloof from all discussions preliminary to the determination of guilt or innocence so that his impartiality and objectivity shall not be open to any questions or suspicion when it becomes his duty to impose sentence." <u>Werker</u>, 535 F.2d at 203. When judges participate in plea discussions, a defendant may "view the judge as an adversary during the bargaining process, rather than as the embodiment of his guarantee of a fair trial and sentence." Kathleen Gallagher, Judicial Participation In Plea Bargaining: A search for New Standards, 9 Harv. C.R.-C.L.L. Rev. 29, 44 (1974); see also <u>White</u>, supra note 3, at 452-53 ("The judge may jeopardize his role as an impartial arbiter of justice if he participates in plea negotiating.") The loss of judicial integrity is particularly serious when, the judge explicitly or implicitly advocates a particular bargain. see <u>Werker</u>, 535 F.2d at 203 ("As a result of his participation, the judge is no longer a judicial officer or neutral arbiter. Rather, he becomes or seems to become an advocate for the resolution he has suggested to the defendant.") However, legitimate concerns exist even when the judge does not urge a particular course of action upon the defendant: " the unequal positions of the judge and the accused... raise a question of fundamental fairness" regardless of the degree or type of judicial involvement. <u>United States ex.rel Elksnis v. Gilligan</u>, 256 F.Supp. 244, 254 (S.D.N.Y. 1996); see also <u>White</u> at 453 ("Active judicial participation in plea bargaining may favorably color the defendant's view of system. To the defendant, the judge becomes an adversary or at least a compromiser rather than an embodiment of his guarantee to a fair trial and impartial sentence.") The judge's role must be that of a neutral arbiter of the criminal prosecution: his involvement in the adversary process of plea negotiation is beyond and detracts from the judicial duty, which occurred here.

Second, Rule 11 bars judicial participation in plea dis-
cussions in order to preserve the judge's impartiality after
the negotiations are completed. Judicial involvement detracts
from a judge's objectivity in three ways.

I.    "[S]uch involvement makes it difficult for a judge
      to objectively assess the voluntariness of the plea"
      eventually entered by the defendant. Notes of Advisory
      Committee on Rules at 351; see also Adams, 634 F.2d
      839 ("We cannot truly expect this role to be filled
      by a trial judge who has participated in discussions
      leading to a plea bargain for such a judge may...feel
      a personal stake in the acceptance of the plea or have
      a preconceived notion of its validity."); Note, Guilty
      Plea Bargaining: Compromises By Prosecutors to Secure
      Guilty Pleas, 112 U. Pa. L. Rev. 865, 891-92 (1964);
      Comment, Official Inducements to Plead Guilty: Sugg-
      ested Morals for a Market Place, 32 U. Chi. L. Rev.
      167, 180-83 (1964).

II.   Judicial participation in plea discussions that ult-
      imately fail inherently risks the loss of a judge's
      impartiality during trial, not only because he becomes
      aware of the defendant's possible interest in pleading
      guilty, but also because he may view unfavorably the
      defendant's rejection of the proposed agreement. see
      Adams, 634 F.2d at 840 ("The judge who suggests or
      encourages a particular plea bargain may feel a personal
      stake in the agreement and may therefore resent the
      defendant who rejects his advice...). Werker, 535 F.2d
      at 202. Here the judge resented Hasbajrami for filing
      a Motion to Withdraw the Plea and punished him by
      sentencing him to an extra year for that. ("The
      defendant is likely to make incriminating concessions
      during the course of plea negotiations.") Werker, 535
      F.2d at 202. Here, Hasbajrami was made to plea to
      conspiracy charge 371 and Providing Material Support

that he is not guilty of. Also, the allocution incriminated him in supporting a "Group" while in fact he was only dealing with the one person, Individual #1. ("Nor can we fail to consider the subtle pressures that may be exercised by a judge against a defendant who rejects an opportunity...[to] relieve the judge of a lengthy trial.")

III. Involvement in plea negotiations diminishes the judge's objectivity in post-trial matters such as sentencing and motions for a judgment acquittal. see White, at 453; see also Gallagher, at 44. ("If a judge urges a defendant to plead guilty in exchange for a sentencing concession and the defendant rejects the arrangement, the judge may desire to reaffirm his initial belief in the defendant's probable guilt after the defendant has been convicted at trial.")

Third, such participation is prohibited because a judge's participation is plea negotiations is "inherently coercive." United States v. Ushery, 785 F.3d 210, 219 (6th Cir. 2015). see Harris, 635 F.2d at 529 ("if the court puts its imprimatur on a plea offer, the defendant might be coerced into taking it...") This is exactly what happened here. Hasbajrami was even made to sign the plea in bullpen not in front of court, to hide the coercion and to look good in front of the court. Cameras will verify it.

Also, judicial involvement in plea negotiations inevitably carries with it the high and unacceptable risk of coercing a defendant to accept the proposed agreement and plead guilty. see Werker, 535 F.2d at 202 ("Judicial intervention may coerce the defendant into an involuntary plea that he would not otherwise enter."). Among other things, "it might lead the defendant to believe that he would not receive a fair trial, were there a trial before the same judge." Notes of Advisory Committee on Rules, 1974 Amendment, 18 U.S.C.A. Federal Rules of Criminal

19

Procedure 1 to 11 (West 1986) at 351; see also Werker, 535 F.2d
at 202 ("The defendant may fear that rejection of the plea will
mean imposition of a more severe sentence after trial or decrease
his chances of obtaining a fair trial before a judge whom he
has challenged.") A coerced plea would not only violate a defend-
ant's fundamental constitutional rights, see Waley v. Johnston,
316 U.S. 101, 104, 86 L. Ed. 1302, 62 S. Ct. 964 (1942), but
also necessarily risks the incarceration of even innocent criminal
defendants. See Noted of Advisory Committee on Rule at 351
("The risk of not going along with the disposition apparently
desired by the judge might induce the defendant to plead guilty,
even if innocent.") (emphasis added) The same is true here. That
unacceptably high risk of coercion exists even if the judge does
not explicitly endorse a particular plea agreement: "regardless
of the judge's objectivity it is the defendant's perception of
the judge that will determine whether the defendant will feel
coerced to enter a plea." Werker, 535 F.2d at 202.

The defendant may fear that rejection of the plea will mean
imposition of a more severe sentence after trial or decrease
his chances of obtaining a fair trial before a judge whom he
has challenged. These fears are admirable expressed by Judge
Weinfeld:

> "The unequal positions of the judge and the accused,
> one with the power to commit to prison and the other
> deeply concerned to avoid prison, at once raise a
> question of fundamental fairness. When a judge becomes
> a participant in plea bargaining he brings to bear
> the full force and majesty of his office. His awesome
> power to impose a substantially longer or even maximum
> sentence in excess of that proposed is present whether
> referred to or not. A defendant needs no reminder that
> if he rejects the proposal, stands upon his right to
> trial and is convicted, he forces a significantly longer
> sentence. One facing a prison term, whether of longer
> or shorted duration, is easily influenced to accept

20

what appears the more preferable choice. (Footnote
omitted) <u>United States ex rel. Elksnis v. Gilligan</u>,
256 F.Supp. 244, 254. see <u>Frank v. Blackburn</u>, slip
op. at 1318; <u>Blackmon v. Wainwright</u>; <u>United States
v. Werker</u>, supra at 201-203; Notes of Advisory Committee
on Rules, fed.R.Crim. p.11, 18 U.S.C.A. at the 25 (1975)
...When a plea bargain is presented by the court, neither
the defendant nor the government has an incentive to
argue that the plea is involuntarily, unknowing or
unjustified by the facts: both have already agreed
to the bargain and are in court to seek its acceptance.
It is up to the judge, therefore, to take an active
role insuring that Rule 11's core concerns are adequate-
ly dealt with. We cannot truly expect this role to be
filled by a trial judge who has participated in dis-
cussions leading to a plea bargain, for such a judge
may (as discussed below) feel a personal stake in the
acceptance of the plea or have a preconceived notion
of it's validity. Moreover, the judge may, in the course
of plea discussions, commit himself or herself to a
particular bargain before he or she has all of the
relevant information; many important facts (including
disclosed in the pre-sentence investigation) are not
known before the plea agreement is officially presented
to the court." <u>United States v. Werker</u> supra at 204.

By intervening to facilitate a plea, a judge communicates
to the defendant that he desires a plea. He thereby raises the
possibility, if only in the defendant's mind, that a refusal
to accept the judge's preferred disposition would be punished.
It is not only a trial court's sentencing power which gives
coercive potential to it's participation in the plea bargaining
process, but also the court's control over the conduct of a
trial. "The defendant must view the judge as the individual who
conducts the trial and whose rulings will effect what the jury
is to consider in determining guilt or innocence. The defendant
may therefore be reluctant to reject a proposition offered

21

by one who wields such immediate power." <u>Werker</u>, 535 F.2d at 202.

The prohibition exists because of "concern that a defendant might be induced to plead guilty rather than risk displeasing the judge who would preside at trial." and "would facilitate objective assessments of the voluntariness of a defendant's plea." 133 D. Ct. at 2146.

Courts that have construed Rule 11 have uniformly held that it means what it says: the court shall not participate in any plea agreement negotiations. Accordingly, when a district court expresses its preference for or against certain plea-bargaining terms in an unfinalized or hypothetical plea agreement, the court impermissibly participates in plea negotiations in violation of Rule 11. In sum, Rule 11 contains a clear prohibition on judicial involvement in plea discussions. see <u>Diaz</u>, 138 F.3d at 1363 (finding a Rule 11 violation "because the sentencing judge took an active part in discussing [the defendant's] probable sentence before the time of his conviction and because she commented on the weight and nature of the evidence against him").

<u>United States v. Garfield</u>, 987 F.2d 1424 (9th Cir. 1993) (district court improperly participated in plea negotiations in violation of Fed. R. Crim. P. 11(e)); <u>Fleming</u>, 239 F.3d 761 at 765 (An attempt to rewrite the plea agreement from the bench would fall squarely into the category of prohibited participation); <u>Rodriguez</u>, 197 F.3d 156, 158 (5th Cir. 1999) (explaining that "Rule 11(e)(1) is a clear prohibition against all forms of judicial participation or interference with the plea negotiation process); 2022 U.S. App. Lexis 16 in re United States (the district court's involvement violated Rule 11's prohibition on judicial participation)

On the face of the record it is obvious that District Court not only initiated, but became involved in the parties plea discussions, and also took the lead in orchestrating even the conditions of the ................

plea agreement that Hasbajrami ultimately entered. Court's state-
ment, "...that's why I suggested that you extend the same
bargain..." (sentencing transcript 8/13/15 pg 16-17) does not
need further comments. Interestingly, ex-Judge Gleeson now an
attorney, still does not believe in violation of Rule 11 by
representing Hon. David M. Lawson in 32 F.4th 584: In re United
States April 26, 2022.

Violation of Rule 11(e)(1) entitles withdrawal of the plea.
Barrett, 982 F.2d 193 (By trying to facilitate a plea bargain,
the judge indicated that he desired an agreement; this is pressure
enough. Barrett must be allowed to withdraw his guilty plea);
Bruse, 976 F.2d 552 (A district court's failure to comply with
the provisions of Rule 11(e)(1) is plain error that entitles
a defendant to withdraw his guilty plea.) see United States v.
Sanchez-Lupez, 879 F.2d 541, 551 (9th Cir. 1989) (reviewing claim
of judicial misconduct for plain error); see Casallas, 59 F.3d
at 1178 (holding that defendant must be permitted to withdraw
his guilty plea if the district court participated in the plea
discussions); United States v. Harrell, 751 F.3d 1235, 24 Fla.
L. Weekly Fed. C. 1337, 94 Fed. R. Evid. Service (CBC) 649, 2014
U.S. App. Lexis 89555 (11th Cir. 2014) (District courts violation
of this rule had coercive effect because district court was not
pleased with decision of co-defendant to go to trial...so there
is a reasonable concern that defendant would have felt pressure
to plead guilty, especially after district court essentially
came up with terms of plea agreement that government ultimately
offered him; given extensiveness of district court's involvement,
any objective assessment of voluntariness of guilty plea was
significantly weakened); In McCarthy v. United States the Supreme
Court decided that a defendant whose guilty plea had been taken
in a court procedure which did not fully comply with Rule 11
was entitled to withdraw his plea).

Withdrawal of the plea should be granted here, too.

<u>CONCLUSION</u>

Accordingly, Petitioner Agron Hasbajrami, asks this court to grant vacatur of sentence and of guilty plea.

Date 10-15-2024

Respectfully submitted,

Agron Hasbajrami
#65794-053
FCI Thomson
P.O. Box 1002
Thomson, IL 61285

CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the Motion was sent by U.S. Postal Service to the Respondant:

AUSA Saritha Komatireddy
Eastern District of New York
271 Cadman Plaza
Brooklyn, NY 11201

Date 10-15-2024                    /s/ _____
                                   Agron Hasbajrami

25

EXHIBIT 1

LAW OFFICES OF
## DRATEL & LEWIS

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: jdratel@dratellewis.com

JOSHUA L. DRATEL
LINDSAY A. LEWIS

—

AMY E. GREER

ACHARA AMY SCHRODER
*Paralegal*

April 18, 2024

## ATTORNEY-CLIENT CORRESPONDENCE
## OPEN ONLY IN PRESENCE OF INMATE

Mr. Agron Hasbajrami
Register No. 65794-053
FCI THOMSON
FEDERAL CORRECTIONAL INSTITUTION
PO BOX 1002
THOMSON, IL  61285

> Re:    *United States v. Hasbajrami*,
>               11 Cr. 623 (JG)

Dear Mr. Hasbajrami:

Enclosed please find the sentencing documents you requested regarding Babar Ahmed. If you have any questions, of course please ask.  As you may notice (and may already know), I was co-counsel in the case with the Connecticut Federal Defenders Office.  Exhibit 14 was based in large part on my research and collection.

Very truly yours,

Joshua L. Dratel, Esq.

JLD/
Encls.

- 66 -

agents that the Tamil Tigers wired a deposit of $250,000 as a down payment for the purchase of the weapons. Indeed, the next day $250,000 was wired from Malaysia to an undercover bank account in Maryland. On September 28, an additional $452,000 was wired from Malaysia to the undercover account in Maryland as a further down payment on $900,000 worth of weapons ordered by the Tamil Tigers.

The above-named defendants subsequently pled guilty, receiving sentences from 12 to 57 months in jail. Haji Subandi and Balraj Naidu were found guilty after trial and received respective sentences of 37 and 57 months.

4.   *United States v. Ul Haq et al.*, 1:11-cr-56 (JDB) (D.D.C.): Zahid Yousaf (36 months); Qasim Ali (40 months); Irfan Ul Haq (50 months).

On September 12, 2011, defendants Irfan Ul Haq, Qasim Ali, and Zahid Yousaf entered guilty pleas to a one-count information charging them with conspiracy to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339(B). As part of a government sting operation, U.S. officials tasked three confidential informants with asking defendants to smuggle an individual purportedly belonging to the Pakistani Taliban into the United States from Ecuador. Govt's Memo in Aid of Sentencing at 1. In exchange for cash, the defendants agreed to make a fraudulent passport for said person and counsel him as to the proper route for entering the U.S. *Id.* at 2-5. One of the informants stated that he was a member of Tehrik-e Taliban, which the State Department designated a terrorist organization in September 2010. Ul Haq, in turn, stated that it was not his concern what the "Pakistani Person" intended to do in the U.S., *i.e* whether he intended to "sweep floors" or "blow up." *Id.*

Ul Haq consented to a two-level increase in his offense level for his role as "organized, leader, or manager." *Id.* at 7. For its part, the government credited all of the defendants for their timely acceptance of responsibility and did not seek a terrorism enhancement. The government recommended a sentence from the low to middle end of Ul Haq's 57-71 month guideline range, and the middle end of the 46-57 month range for Yousaf and Ali.

| Name, Outcome and District | Description | Convictions | Sentencing Date | Sentence (Months) | Alleged affiliation or plot name |
|---|---|---|---|---|---|
| Dzhokhar Tsarnaev In DMA | | | | | Boston Marathon Bombing |
| Yildirim Beyozit Tumer Pleaded guilty In EDPA | During a Coast Guard inspection of his merchant ship, Tumer said, "There's a bomb on board and it will go off in Philadelphia." The Turkish ship captain then said he was only joking. He was deported. | Making false statements | 08/25/2004 | TS | |
| Earnest James Ujaama Pleaded guilty In WDWA | Ujaama conspired to set up an Al Qaeda training camp in Bly, Oregon. He attended Dar-us-Salaam, a radical mosque connected to Sheikh Abu Hamza, a radical British cleric. Ujaama was sentenced to two years in prison. | Funding terrorists | 02/13/2004 | 24 | Al Qaeda |
| Earnest James Ujaama Pleaded guilty In SDNY | | Material support for terrorists | | | |
| Irfan Ul Haq Pleaded guilty In DDC | Ul Haq, Ali and Yousaf admitted that between Jan. 3, 2011, and March 10, 2011, they conspired to provide material support to the TTP in the form of false documentation and identification, knowing that the TTP engages in terrorist activity and terrorism. According to court documents, Ul Haq, Ali and Yousaf conducted a human smuggling operation in Quito, Ecuador, that attempted to smuggle an individual they believed to be a member of the TTP from Pakistan into the United States. The TTP was designated as a foreign terrorist organization by the State Department on Sept. 1, 2010. | Material support for terrorists | 01/05/2012 | 50 | Tehrik-e Taliban Pakistan (TTP) |
| Jose Tito Libio Ulloa Melo Pleaded guilty In SDFL | Ulloa Melo, a Colombian, helped an informant posing as a member of FARC, the left-wing Colombian guerilla group, travel to the United States. He introduced FBI informants to an airport-security contact, arranged for fraudulent entry stamps, and agreed to run the names on their passports through official databases to see if Interpol had flagged them. He was sentenced to 30 months in prison. | Material support for terrorists | 01/04/2008 | 30 | Revolutionary Armed Forces of Colombia (FARC) Operation Pipeline |




5/29/24, 12:14 PM                    Foreign Terrorist Organizations - United States Department of State

| Date Designated | Name |
| --- | --- |
| March 13, 2012 | Jemaah Anshorut Tauhid (JAT) |
| September 19, 2011 | Indian Mujahedeen (IM) |
| May 23, 2011 | Army of Islam (AOI) |
| November 4, 2010 | Jaysh al-Adl (formerly Jundallah)<br>— Jaysh al-Adl Amendment (July 2, 2019) |
| September 1, 2010 | Tehrik-e Taliban Pakistan (TTP) |
| August 6, 2010 | Harakat ul-Jihad-i-Islami (HUJI) |
| January 19, 2010 | al-Qa'ida in the Arabian Peninsula (AQAP)<br>— Ansar al-Shari'a Amendment (October 5, 2012) |
| July 2, 2009 | Kata'ib Hizballah (KH) |
| May 18, 2009 | Revolutionary Struggle (RS) |
| March 18, 2008 | al-Shabaab<br>— al-Hijra Amendment (August 1, 2018) |
| March 5, 2008 | Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B) |
| June 17, 2005 | Islamic Jihad Union (IJU) |
| December 17, 2004 | ISIS (formerly al-Qa'ida in Iraq)<br>— Islamic State of Iraq Amendment (January 26, 2012)<br>— al-Hayat Media Center and Amaq News Agency Amendments (March 22, 2019) |
| July 13, 2004 | Continuity Irish Republican Army (CIRA) |
| March 22, 2004 | Ansar al-Islam (AAI) |
| January 30, 2003 | Lashkar i Jhangvi (LJ) |
| October 23, 2002 | Jemaah Islamiya (JI) |
| August 9, 2002 | Communist Party of the Philippines/New People's Army (CPP/NPA) |
| March 27, 2002 | al-Qa'ida in the Islamic Maghreb (formerly Salafist Group for Call and Combat)<br>— AQIM Amendment (February 20, 2008) |
| March 27, 2002 | Asbat al-Ansar (AAA) |
| March 27, 2002 | Al-Aqsa Martyrs Brigade (AAMB) |

EXHIBIT 2

UNCLASSIFIED

Case # ⬛⬛⬛⬛⬛⬛⬛⬛

to you than God, than His Messenger, and than carrying out jihad in His cause, then just keep waiting until His command comes. God does not guide the congregation of wicked ones."

Since we are a tribe, because of his anger my brother kicked me out of the house, and I was scared. I stayed in some [*sic*] cities for approximately 7-8 months.

Then I requested permission from the brother of a woman whom I had met on the internet, [for me] to marry his sister [*sic*] on God's command. He said, "You need to come here to the city of Van so that we may get to know you better." I then counseled with my mujahid siblings who lived in a city [*sic*], and took along a mujahid [older] brother of mine who substituted for my father and we went to the city of Van. We requested the girl from her brother and her father, on God's command. The siblings and brothers of the girl were content with her marrying me but the mother objected it due to the Al-Qaeda issue and some other problems in her mind. We were also having some doctrinal issue with her [older] brother; he was not accepting the hadith and was taking the verses as they were, not even looking at the interpretation[s]. So I said "I am not about to change my religion for a girl" and this marriage issue was closed. Where is this [*sic*], this is in violation of the boundaries set by God. You may go and ask one thousand individuals to marry, but marry only one of them, or if one has the means, he may marry four individuals. God has warranted this and made it halal, but nowadays our society, whose members pose as Muslims, considers even the second marriage to be adultery. That's what's called violating the boundaries set by God, not what I was doing. After that, since the marriage didn't happen, I went around many cities in the name of visiting Muslims. In one of the cities I was visiting, I met an intelligence [*sic*] by the name "Omer (Nazmi Kivrak)" who introduced himself as Muslim and was an English student at the Adapazari University. He knew how to utilize the internet very well, [whereas] I was only able to look at forums. He made me a member to a site called Facebook. We [*sic*] met an individual named "Afgan kanascisi" on that site. On the second day after meeting [her on the site], I told her that I wanted to marry [her] and she accepted. I said "let me come and request [to marry] you from your father" and she said "my father would not give a girl to Muslims, once a Muslim came and requested [to marry] me" and she explained that her father scolded [the Muslim person] by saying "even if your God came down from the skies I would not give my daughter to clerics." I said "alright, tell me what to do," and she asked "would you kidnap me?" So I took a mujahid sibling along, and we kidnapped her. Our mujahid brother performed our wedding. May God be pleased with him. So it all happened within 15 days, from the time we met until the time we got married. Praise be [to Him] that my Lord granted me an auspicious spouse. We are now carrying out jihad in Afghanistan with my spouse and, God willing, she gave me a cute son, named Muhammed Bera.

My spouse is truly an auspicious spouse. I am pleased with her and may my Lord be pleased with her too. With my mother's help, we made peace with those [back] at home. We moved into the home with my spouse. Later, in April 2009. my brother and I, and one other person, 3 of us were arrested. Nobody is linked to the other. My brother and I have always had Satan [come] in between us, he instigates against me all the time. Accounting for this is surely up to God. As a curse from God to

5

UNCLASSIFIED

UNCLASSIFIED

Case #

him, he was captured along with me. That friend [*sic*] and my other sibling got along well, though he [*sic*] used to provoke him [*sic*] against me all the time as well. God brought us face-to-face in the F-Type prison. That friend used to say "Ebu Yasir, I didn't know who you were." After staying in prison for 9 months, while I was still in prison [*sic*] there were 2 children that I had with the woman I had divorced first, one being a girl and the other a boy, the girl's name being Zeynep, 7 years old, [I heard that] they had registered her in a school affiliated with the system of the Evil. I wrestled with my family and my brother in order to get my daughter out of [that] school. They beat me up because of that. I couldn't accept that and my spouse and I migrated to another city. Later, with God's discretion, we made contact with Selahaddin Azeri. At the time I had produced a counterfeit passport for Selahaddin Azeri so that he could get to Azerbaijan. After 4 months immediately following my getting out of prison, my spouse, my son and I went on the Afghan jihad [*sic*]. They did not give me my daughter. I came to Selahaddin's congregation where he had become the Emir. I became the Media Emir, to take care of the media work of their congregation, since I was knowledgeable in media tasks. We launched a help campaign in behalf of the congregation. We created two email addresses: alkahfmedia@yahoo.com
alkahfmedia@gmail.com

At first, I was trying to look after it. I couldn't get on the internet all the time because the internet [*sic*] was an issue on the front line. While I was in Turkey, I met someone who introduced himself as Seyfullah Ergun, who was studying, studying psychology, in Azerbaijan. He was also taking additional classes in surgery. That's the way I knew him. Supposedly his daughter's name being Esila, I named him Ebu Esila, so that his true identity would not be revealed. I told Selahaddin about this Ebu Esila, and about his abilities too. Emir said "if you trust him, there is no problem." Since Esila said that he had links to Belgium, Netherlands, Germany and France, I made him the European Representative, but Emir never trusted him.

He also had the passwords to these help emails. When an individual emailed us, both Esila and I were following up with it. Later on, so that there would be no problem, I thought it be best if Esila followed up [by himself]. I was checking the emails every once in a while, but not a penny came through the ones I was working on. We [*sic*] met a woman named Ayse on the internet. The name of my current spouse who is full of obedience and fear of God is also Ayse. I wanted to obtain my wife's consent and have a second wife. Also, I named her Hatice. I asked around for help for her to come here, not in behalf of the congregation, but just for this woman to make it here [*sic*]. They sent small amounts of money, in the name of Durana Topcu. All in all, the money sent was 900 dollars. Some individuals got in Hatice's mind and told her that the women here were treated like a slave. She gave up on coming here. She sent the 900 dollars back here for the families of mujahids. I gave 60 dollars of that money to Selahaddin, 150 dollars to Commander Ebu Nuh for repairs in his home, 60 dollars to brother Ebu Enes for his food expense and he [Ebu Enes] was given nearly 500 dollars to build a house because he didn't have a house. The other few dollars that were remaining were spent in the service of the siblings here. I had left Selahaddin's congregation and we had announced that on the

6

U.S. Department of Justice

EXHIBIT 3

Federal Bureau of Investigation

*Washington, D.C. 20535*

February 7, 2023

AGRON HASBAJRAMI
**65794-053
FEDERAL CORRECTIONAL INSTITUTION RAY BROOK
POST OFFICE BOX 900
RAY BROOK, NY 12977

         FOIPA Request No.: 1548847-000
         Subject: HASBAJRAMI, AGRON

Dear Agron Hasbajrami:

    This is in reference to your Freedom of Information/Privacy Acts (FOIPA) request.   Please see the selected paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

    The Federal Bureau of Investigation (FBI) has located approximately 9,200 pages of records subject to the FOIPA that are potentially responsive to your request.   By DOJ regulation, the FBI notifies requesters when anticipated fees exceed $25.00.

    Releases sent to a correctional institution will be made in paper.   If all potentially responsive pages are released, you will owe $455.00 based on a duplication fee of five cents per page. See 28 CFR §16.10 and 16.49.   Please be advised that you are entitled to the first 100 pages free of charge.

    Compact Discs (CDs) will not be sent to a correctional institution.   You will only qualify for CD release(s) if an alternate address is provided.   If an alternate address is provided, you will receive the cost equivalent ($5.00) of 100 free pages as a credit towards the first CD release.   If all potentially responsive pages are released on CD, the following costs will apply:

     ☐  CD release(s) will be provided to you at no cost.

     ☑  It is estimated that you will owe $280.00 in duplication fees (19 CDs at $15.00 each, less $5.00 credit for the first CD).   Each CD contains approximately 500 reviewed pages per release.   The 500 page estimate is based on our business practice of processing complex cases in interim monthly releases.

     ☐  The FBI located audio and video files that are potentially responsive to the subject of your request.   If all of the potentially-responsive media is released, it is estimated that you will owe $_____ (__ CDs at $15.00 each, less $5.00 credit for the first CD). The estimated number of CDs is based off of our business practice of processing media associated with complex cases in interim monthly releases, and is not synonymous with the number of potentially responsive digital media files.

    It is estimated that you will owe approximately $___ in international shipping fees.

    **The estimated total cost for processing your request is approximately $280.00 for CD releases or $455.00 for paper/media releases.**

    If you receive the release in paper, estimated fees will exceed $250; therefore, an advanced payment of 50% of total estimated costs (*insert 50% of total paper cost*) will be required prior to moving the case forward.   You may reduce the estimated cost by narrowing the scope of your request.   To do so, please notify us by letter with an alternate contact to negotiate on your behalf.

    Please remember this is only an estimate, and some of the information may be withheld in full pursuant to FOIA/Privacy Act exemption(s).   Also, some information may not be responsive to your subject.   Thus, the actual charges could be less.



U.S. Department of Justice

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

April 20, 2023

JOHNATHAN OBOYLE ESQUIRE
1286 WEST NEW PORT CENTER DRIVE
DEERFIELD BEACH, FL 33442

FOIPA Request No.: 1548847-000
Subject: HASBAJRAMI, AGRON

Dear Johnathan O'Boyle:

This is in reference to your Freedom of Information/Privacy Acts (FOIPA) request.    Please see the selected paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

The Federal Bureau of Investigation (FBI) has located approximately 82,568 pages of records subject to the FOIPA that are potentially responsive to the subject of your request. By DOJ regulation, the FBI notifies requesters when anticipated fees exceed $25.00. Please be advised that you are entitled to the first 100 pages free of charge. If the release is made on a Compact Disc (CD) or through the FBI's eFOIPA system, you will receive the cost equivalent ($5.00) as a credit.

Based upon the FBI's standard release practices and/or release format preferences indicated within your request letter, material responsive to your request will be provided to you through:

☐   The eFOIPA system

☑   CD release(s)

☐   Paper release(s)

If all potentially responsive pages are released on CD or through the eFOIPA system, it is estimated that you will owe $2,485.00 in duplication fees (166 releases at $15.00 each, less $5.00 credit for the first release). Each release contains approximately 500 reviewed pages. The 500 page estimate is based on our business practice of processing complex cases in interim monthly releases. Should you request that the release be made in paper, it is estimated that you will owe $4,123.40 based on a duplication fee of five cents per page. See 28 CFR §16.10 and 16.49.

Please reference the information below that may be specific to your request. Only checked boxes contain information relevant to your request.

☐   The FBI's eFOIPA system cannot transmit digital media files, and they will need to be released on CD. The FBI located audio and video files that are potentially responsive to the subject of your request. If all of the potentially responsive media is released, it is estimated that you will owe $_____ (__ CDs at $15.00 each, less $5.00 credit for the first CD). The estimated number of CDs is based off of our business practice of processing media associated with complex cases in interim monthly releases, and is not synonymous with the number of potentially responsive digital media files.

☐   It is estimated that you will owe $_____ in international shipping fees.

**The estimated total cost for processing your request is $2,485.00 for CD/eFOIPA release(s) or $4,123.40 for paper/media release(s).**

**We received your payment of $455.00 dated February 2023. Additionally, we received correspondence dated February 21, 2023, requesting your release be made on CD requiring a refund of $175.00. Due to the above updated fee amount, please advise how you would like to proceed with your previous payment.**

EXHIBIT 4

TRULINCS  65794053 - HASBAJRAMI, AGRON - Unit: FAI-C-R

-------------------------------------------------------------------------------------------------------------------

FROM: Zissou, Steve
TO: 65794053
SUBJECT: RE: attorney client
DATE: 05/09/2013 03:21:28 PM

You are correct, Agron.  There must be at least 2 people to have a conspiracy and if you had gone to trial and the government was unable to prove that there was at least one other person who you conspired with, the jury would have to find you not guilty of the counts of the indictment that charged a conspiracy.

However, the SECOND count of the indictment did not charge a conspiracy.  It charged you with "ATTEMPTING" TO PROVIDE MATERIAL SUPPORT. It reads as follows:

"On or about and between April 1, 2011 and September 6, 2 01 1 , both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AGRON HASBAJ RAMI, together with others, did knowingly and intentionally
attempt to provide material support and resources . . . . ."

And clearly, you attepmted to provide material support, no?  You confessed and there was all of the emails in additon to being arrested at the airport going to the Fatah region..

Understand now?

Regarding an appeal, you gave up the right to appeal if you were sentenced to 15 years or less.  There is nothing to appeal from.

AGRON HASBAJRAMI on 4/19/2013 6:37:40 AM wrote
STEVE

WHAT YOU MEAN BY "MIGHT BE" A COC-CONSPIRATOR.
IF HE IS NOT A CONSPIRATOR THEN THERE IS NO CONSPIRACY AND WHEN THERE IS NO CONSPIRACY THERE IS NO CASE.
HOW DO I GOT A CASE NOW.
WHATEVER THAY CLAIM CRIME CAME OUT TO BE FALCE BECAUSE THE GUY WAS O CONARTIST NOT TERROSIT. HOW THIS IS A CRIME NOW?

WHY DID YOU TOLD ME IN THE FIRST MEETINGS THAT YOU CAN WIN THIS CASE. WHAT WAS THE REASONS? CAN YOU EXPLAIN THIS PLEASE

IF I WANT TO HIRE YOU AND TO GO TO APPEAL HOW MUCH MONEY WOULD YOU LIKE AND HOW MUCH ARE OUR CHANCES?

A.H.
-----Zissou, Steve on 4/17/2013 4:51 PM wrote:

>

He is not a "co-defendant."  Unless he is actually charged in that same indictment with you.  He is NOT a co-defendant.  He MIGHT be a co-conspirator.  If you remember, a conspiracy is an illegal agreement between 2 or more people.  In order to prove your guilt at trial, the government would have to prove that there were at least 2 people involved in the crime. But they do not have to bring both of those people into the courtroom or to actually even name who the person is.

AGRON HASBAJRAMI on 3/27/2013 11:20:54 AM wrote
Dear Mr. Steve

I got some questions in my mind so i thought you might help me with the answer.
Abu Yasser is my co-defedant, isn't he?  If yes, how it comes he never been charge in USA?
If no, then how it comes i am part of conspiracy when i am by myself?

Could you please give a brief explanation about that?

FEDERAL
AGRON
PO BOX 1002
THOMSON, IL 61285



QUAD CITIES
WED 16 OCT 20

AUSP Thomson

OCT

Received in CSD

<u>LEGAL MAIL</u>

THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT COURT JUDGE
EASTERN DISTRICT OF NEW YORK
225 CADMAN PLAZA EAST
BROOKLYN, NEW YORK 11201

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 23 2024 ★

BROOKLYN OFFICE

U.S.M.S